IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Eiser Infrastructure Limited and Energia Solar
Luxembourg S.A.R.L.,

                    *Petitioners*,

            v.                                          **Civil Action No. _____**

Kingdom of Spain,

                    *Respondent*.

**Petition to Enforce Arbitral Award**

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L., *Petitioners*, v. Kingdom of Spain, *Respondent*. | Civil Action No. _____ |

## **Declaration of Matthew S. Rozen in Support of Petition to Enforce Arbitral Award**

Pursuant to 28 U.S.C. § 1746, I, Matthew S. Rozen, declare as follows:

1.      I am an attorney and am admitted to practice law in the District of Columbia and Virginia.  I represent Petitioners Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. ("Eiser") in this matter.

2.      I am over the age of eighteen and make this declaration from personal knowledge based on information reviewed and/or referenced herein.

3.      This declaration is submitted in support of the Petition to Enforce Arbitral Award filed today by Eiser.

4.      Attached hereto as Exhibit A is a certified copy of the arbitral award rendered on May 4, 2017 in ICSID Case No. ARB/13/36 in the arbitration proceeding between Eiser and Respondent, the Kingdom of Spain.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2018
Washington, DC

_____
Matthew S. Rozen

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Eiser Infrastructure Limited and Energia Solar
Luxembourg S.A.R.L.,

        *Petitioners*,

    v.

Kingdom of Spain,

        *Respondent*.

**Civil Action No. _____**

**Declaration of Matthew S. Rozen in Support of Petition to Enforce Arbitral Award**

# EXHIBIT A



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE (202) 458 1534  |  FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

**EISER INFRASTRUCTURE LIMITED AND
ENERGIA SOLAR LUXEMBOURG S.À R.I.**

**v.**

**KINGDOM OF SPAIN**

**(ICSID Case No. ARB/13/36)**

I hereby certify that the attached document is a true copy of the English version of the Arbitral Tribunal's Award dated 4 May 2017, which was rendered in the English and Spanish languages.

Certified copies of the Award were first dispatched to the Parties on 4 May 2017. Therefore, pursuant to Article 49(1) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, the Award is deemed to have been rendered on 4 May 2017.

Martina Polasek
Acting Secretary-General

Washington, D.C., 24 May 2018

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**EISER INFRASTRUCTURE LIMITED AND ENERGIA SOLAR LUXEMBOURG S.À R.I.**
Claimants

and •

**KINGDOM OF SPAIN**
Respondent

**ICSID Case No. ARB/13/36**

---

# AWARD

---

*Members of the Tribunal*
Professor John R. Crook, President
Dr. Stanimir A. Alexandrov, Arbitrator
Professor Campbell McLachlan QC, Arbitrator

*Secretary of the Tribunal*
Ms. Luisa Fernanda Torres

*Date of dispatch to the Parties:* 4 May 2017

**REPRESENTATION OF THE PARTIES**

Representing Claimants:

Ms. Judith Gill QC
Mr. Jeffrey Sullivan
Ms. Marie Stoyanov
Ms. Virginia Allan
Mr. Ignacio Madalena
Ms. Lauren Lindsay
Ms. Naomi Briercliffe
Mr. Tomasz Hara
Ms. Lucy Judge
Ms. Stephanie Hawes

Allen & Overy LLP
One Bishops Square
London E1 6AD
United Kingdom

Representing Respondent:

Mr. Diego Santacruz
Mr. Javier Torres
Mr. Antolín Fernández
Ms. Mónica Moraleda
Ms. Elena Oñoro
Ms. Amaia Rivas
Mr. José Luis Gómara
Mr. Álvaro Navas
Ms. Ana María Rodríguez

Abogacía General del Estado
Ministry of Justice of the Government of Spain
Calle Ayala 5
28001, Madrid
Spain

# TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................................ 1

II.   PROCEDURAL HISTORY............................................................................................ 1

    A.   Registration and Constitution of the Tribunal................................................... 1

    B.   The First Session ............................................................................................... 2

    C.   The Parties' Written Submissions and Procedural Applications........................ 3

    D.   The Non-Disputing Party Applications ........................................................... 11

    E.   The Oral Procedure ........................................................................................ 14

    F.   The Post-Hearing Procedure .......................................................................... 17

III.  FACTUAL BACKGROUND ...................................................................................... 19

    A.   Overview ......................................................................................................... 19

    B.   The Energy Charter Treaty.............................................................................. 20

    C.   Spain's Policies Favoring Renewable Energy and Royal Decree 661/2007..... 21

    D.   The Claimants and Their Decision to Invest.................................................... 29

    E.   The Disputed Measures ................................................................................... 41

IV.  SUMMARY OF THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ................ 45

V.   JURISDICTION ........................................................................................................ 48

    A.   First Objection: The Intra-EU Objection........................................................ 48

        (1)  The Parties' Positions ............................................................................. 48

             a.   Respondent's Position ................................................................. 48

             b.   Claimants' Position ..................................................................... 52

        (2)  The Tribunal's Analysis........................................................................... 54

    B.   Second Objection:  Failure to Prove that the Investors Have Made an Investment "In the Objective Sense" in Conformity with the ECT and the ICSID Convention .......... 65

        (1)  The Parties' Positions ............................................................................. 65

             a.   Respondent's Position ................................................................. 65

             b.   Claimants' Position ..................................................................... 68

        (2)  The Tribunal's Analysis........................................................................... 70

    C.   Third Objection:  No Shareholder Claims........................................................ 72

        (1)  The Parties' Positions ............................................................................. 73

             a.   Respondent's Position ................................................................. 73

             b.   Claimants' Position ..................................................................... 75

        (2)  The Tribunal's Analysis........................................................................... 76

D.  Fourth Objection:  No Jurisdiction over Taxation Measures ........................... 77
    (1)  The Parties' Positions ................................................................................ 77
         a.  Respondent's Position ................................................................... 77
         b.  Claimants' Position ...................................................................... 80
    (2)  The Tribunal's Analysis ............................................................................ 82
E.  Fifth Objection:  Failure to Refer to the Competent Tax Authorities ............... 84
    (1)  The Parties' Positions ................................................................................ 84
    (2)  The Tribunal's Analysis ............................................................................ 86
F.  Sixth Objection: Cooling Off Period ....................................................................... 91
    (1)  Background ................................................................................................... 92
    (2)  The Parties' Positions ................................................................................ 94
         a.  Respondent's Position ................................................................... 94
         b.  Claimants' Position ...................................................................... 95
    (3)  The Tribunal's Analysis ............................................................................ 96

VI.  LIABILITY ............................................................................................................... 98
A.  Applicable Law ........................................................................................................ 98
B.  Respondent's New Defense ..................................................................................... 99
    (1)  The Parties' Positions ................................................................................ 99
         a.  Respondent's Position ................................................................... 99
         b.  Claimants' Position ...................................................................... 101
    (2)  The Tribunal's Analysis ............................................................................ 102
C.  The Claims ................................................................................................................ 105
    (1)  Overview ....................................................................................................... 105
    (2)  The Issue of Judicial Economy .................................................................. 108
    (3)  The Guarantee of Fair and Equitable Treatment .................................... 109
         a.  The Parties' Positions .................................................................... 109
         b.  The Tribunal's Analysis ................................................................ 111

VII.  DAMAGES ............................................................................................................... 134
A.  The Applicable Standard ........................................................................................ 134
B.  What Reparation Is Due? ........................................................................................ 135
    (1)  The Parties' Positions ................................................................................ 136
         a.  Claimants' Position ...................................................................... 136
         b.  Respondent's Position ................................................................... 139

    C.  The Tribunal's Analysis ........................................................................... 141

        (1)  The Plants' Operational Life ........................................................ 141

        (2)  The Tax "Gross-Up" Claim ......................................................... 145

        (3)  The Claim for Historic Damages ................................................. 147

        (4)  The Claim for Lost Future Cash Flows ....................................... 147

        (5)  Interest ........................................................................................ 153

VIII. COSTS ................................................................................................... 154

IX.   AWARD ................................................................................................. 155

## TABLE OF SELECTED ABBREVIATIONS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| C-[#] | Claimants' Exhibit |
| CL-[#] | Claimants' Legal Authority |
| Cl. Mem. | Claimants' Memorial on the Merits, dated 30 October 2014 |
| Cl. Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, dated 18 September 2015 |
| Cl. Rej. | Claimants' Rejoinder on Jurisdiction, dated 23 December 2015 |
| Cl. Sub. New Def. | Claimants' Additional Submission on the New Defense, dated 22 January 2016 |
| Cl. St. Costs | Claimants' Statement of Costs (as revised 16 September 2016) |
| First Meissner Statement | First Witness Statement of Hans Meissner, dated 30 October 2014 |
| Second Meissner Statement | Second Witness Statement of Hans Meissner, dated 16 September 2015 |
| First Hector Statement | First Witness Statement of Jaime Hector, dated 30 October 2014 |
| Second Hector Statement | Second Witness Statement of Jaime Hector, dated 15 September 2015 |
| Bolaña Statement | Witness Statement of Mauricio Bolaña, dated 11 September 2015 |
| First Brattle Regulatory Report | Expert Report of the Brattle Group – Changes to the Regulation of Concentrated Solar Power Installations in Spain, dated 29 October 2014 |
| Second Brattle Regulatory Report | Second Expert Report of the Brattle Group – Rebuttal Report: Changes to the Regulation of Concentrated Solar Power Installations in Spain, dated 17 September 2015 |
| First Brattle Quantum Report | Expert Report of the Brattle Group – Financial Damages to EISER, dated 30 October 2014 |
| Second Brattle Quantum Report | Second Expert Report of the Brattle Group – Rebuttal Report: Financial Damages to EISER, dated 17 September 2015 |

| First Mancini Report | First Expert Report of Thomas R. Mancini – Evaluation of the Expected Lifetime of the EISER Solar Parabolic Trough Plants, dated 15 September 2015 |
|---|---|
| Second Mancini Report | Second Expert Report of Thomas R. Mancini – Regarding the Installed Capacity of the Generators at the Solar Thermal Plants ASTE-1A, ASTE-1B and ASTEXOL-2, dated 22 January 2016 |
| ECT | Energy Charter Treaty |
| Hearing | Hearing on Jurisdiction and Merits, held 15-20 February 2016 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| RL-[#] | Respondent's Legal Authority |
| Resp. C-Mem. | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, dated 13 April 2015 |
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on Jurisdiction, dated 27 November 2015 |
| Resp. St. Costs | Respondent's Statement of Costs (as revised 16 September 2016) |
| First Montoya Statement | First Witness Statement of Carlos Montoya, dated 13 April 2015 |
| Second Montoya Statement | Second Witness Statement of Carlos Montoya, dated 24 November 2015 |
| Olivas Statement | Witness Statement of Alfonso Olivas, dated 26 November 2015 |
| First BDO Regulatory Report | BDO Expert Report – Economic and Financial Analysis of Incentives to the Solar Thermal Energy Sector, dated 10 April 2015 |
| Second BDO Regulatory Report | Second BDO Expert Report – Rejoinder Report to Brattle's "Rebuttal Report: Changes to the Regulation of Concentrated Solar Power Installations in Spain", dated 26 November 2015 |
| First BDO Financial Report | BDO Expert Report – Economic and Financial Analysis of EISER and the Solar Thermal Plants, dated 10 April 2015 |

| Second BDO Financial Report | Second BDO Expert Report – Rejoinder Report to Brattle's "Rebuttal Report: Financial Damages to EISER", dated 26 November 2015 |
|---|---|
| Servert Report | Expert Report of Jorge Servert – Astexol II (Badajoz), Aste 1A and Aste 1B (Alcázar de San Juan) CSP Plants – Lifetime Analysis, dated 26 November 2015 |
| RfA | Request for Arbitration, dated 9 December 2013 |
| Rev. Tr. Day [#] (ENG/SPA), [page:line] ([Speaker(s)]) | Transcript of the Hearing (as revised by the Parties on 1 April 2016) |
| Tribunal | Arbitral Tribunal constituted on 8 July 2014 |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Energy Charter Treaty which entered into force on 16 April 1998 for Luxembourg, the United Kingdom and the Kingdom of Spain (the "ECT"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "ICSID Convention").

2.    The Claimants are Eiser Infrastructure Limited ("EIL" or the "First Claimant"), a private limited company incorporated under the laws of the United Kingdom, and Energia Solar Luxembourg S.à r.l. ("ESL" or the "Second Claimant"), a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg (together, "Claimants").

3.    The Respondent is the Kingdom of Spain ("Spain" or "Respondent").

4.    Claimants and Respondent are collectively referred to as the "Parties."  The Parties' representatives and their addresses are listed above on page (i).

5.    This dispute relates to measures implemented by Respondent modifying the regulatory and economic regime of renewable energy projects.

## II.   PROCEDURAL HISTORY

### A.    Registration and Constitution of the Tribunal

6.    On 13 December 2013, ICSID received a request for arbitration dated 9 December 2013 from Claimants against Spain (the "Request for Arbitration").

7.    On 23 December 2013, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.  In the Notice of Registration, the Secretary-General invited the

1

Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.      In accordance with Article 37(2)(a) of the ICSID Convention, the Parties agreed to constitute the Tribunal as follows: three arbitrators, one to be appointed by each Party, and the third, presiding arbitrator to be appointed by agreement of the Parties.  Pursuant to the Parties' agreed method of constitution, failing an agreement of the Parties on the presiding arbitrator, s/he would be appointed by the Chairman of the ICSID Administrative Council without limitation to the ICSID Panel of Arbitrators.

9.      The Tribunal is composed of Professor John R. Crook, a national of the United States, President, appointed by the Chairman of the ICSID Administrative Council in accordance with the Parties' agreement on the method of constitution; Dr. Stanimir Alexandrov, a national of Bulgaria, appointed by Claimants; and Professor Campbell McLachlan QC, a national of New Zealand, appointed by Respondent.

10.     On 8 July 2014, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Luisa Fernanda Torres, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

**B.      The First Session**

11.     In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 5 September 2014 in Washington, DC.

12.     Following the first session, on 29 September 2014, on behalf of the Tribunal, the President of the Tribunal issued Procedural Order No. 1 embodying the Parties' agreements on procedural matters and the Tribunal's decisions on the disputed issues.  Procedural Order No. 1 established, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that

2

the place of proceeding would be Washington, DC.   Procedural Order No. 1 also set out the Procedural Calendar for this arbitration.

### C.   The Parties' Written Submissions and Procedural Applications

13.   On 30 October 2014, Claimants filed their Memorial on the Merits ("Claimants' Memorial") accompanied by exhibits C-001 to C-175; legal authorities CL-001 to CL-101; two (2) witness statements, by Mr. Hans Meissner and Mr. Jaime Hector, respectively; and two (2) expert reports by the Brattle Group, with exhibits BRR-001 to BRR-055 and BQR-001 to BQR-071.

14.   On 22 December 2014, Respondent filed a request to address the objections to jurisdiction as a preliminary question ("Respondent's Request for Bifurcation") accompanied by exhibits R-002 to R-007; and legal authorities RL-001 to RL-008.

15.   On 14 January 2015, Respondent submitted an amended version of its Request for Bifurcation accompanied by exhibits R-002 to R-007; and legal authorities RL-001 to RL-009.

16.   On 16 January 2015, Claimants opposed the admissibility of Respondent's 14 January 2015 submission.  In the alternative, Claimants requested an extension to file their observations on bifurcation.

17.   On 16 January 2015, the Tribunal admitted Respondent's 14 January 2015 submission, and granted Claimants an extension to file their observations on bifurcation.

18.   On 23 January 2015, Claimants filed their Observations on Respondent's Request for Bifurcation ("Claimants' Observations on Bifurcation") accompanied by exhibits C-176 to C-180 and legal authorities CL-102 to CL-136.

19.   Referring to Claimants' Observations on Bifurcation, on 3 February 2015, the Tribunal invited Respondent to provide the Tribunal with a copy of the non-public decision on jurisdiction in the case captioned *PV Investors v. Kingdom of Spain*, noting Claimants' representation that the claimants in that proceeding had given their consent to publication.

Respondent declined the invitation on 6 February 2015, *inter alia* on grounds of confidentiality.

20. On 9 February 2015, the Tribunal dismissed Respondent's Request for Bifurcation. The reasons for the Tribunal's decision were communicated to the Parties on 6 April 2015. Amongst those reasons, the Tribunal noted a particular consideration relating to efficiency in the context of the ICSID system. It stated:

> [...] This case is one of several similar cases involving the Respondent's measures affecting the solar sector. (ICSID's website lists other apparently similar cases.) The Respondent's fifth objection [the Intra-EU Objection], if valid, might well apply in any of these cases. However, Respondent's position is that the decision on bifurcation must be made 'taking into consideration the concurring circumstances of each particular case.' [...]
>
> This position has a real consequence for procedural economy in the ICSID system, a consideration that the Tribunal believes should be considered in weighing the issue of bifurcation. Respondent's position appears to be that each arbitral tribunal charged with an ECT solar energy case should decide independently (presumably in a separate bifurcated jurisdiction hearing) whether that tribunal has jurisdiction over an EU investor's claims against an EU country. This position seems at odds with the notion that early consideration of this issue in this case would contribute to procedural economy. There would be a powerful case for bifurcation if Respondent accepted that, at least on this issue, an early preliminary ruling, within the ICSID system, arrived at after full argument and with the participation of the European Commission, could serve as a test case, the outcome of which could be made known in other pending ICSID cases.
>
> However, Respondent argues (as it is surely entitled to do) that the issue must be separately and independently judged on the circumstances of each particular case. Thus an early jurisdictional ruling by this Tribunal would, in Respondent's view, have no effect (save as 'arbitral doctrine') beyond the four corners of the present case. Given Respondent's insistence that the Tribunal should decide the matter in the light of the particular circumstances of this case (and not as a discrete point of law of general importance), the question should be joined to the merits, where it may be appreciated

against the background of all of the facts and matters particular to this case.[1]

21. On 13 April 2015, Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction ("Respondent's Counter-Memorial"), accompanied by exhibits R-008 to R-154; legal authorities RL-010 to RL-059; two (2) witness statements, by Mr. Santiago Caravantes and Mr. Carlos Montoya, respectively; and two (2) expert reports by BDO, with exhibits BFR-001 to BFR-021 and BIR-001 to BIR-068.

22. On 20 April 2015, following a joint request by the Parties, the Tribunal amended the Procedural Calendar.

23. On 25 May 2015, Respondent filed an application concerning a disagreement over the language for the Parties' exchanges during the document production phase. On 26 May 2015, Claimants submitted their observations on this application.

24. On 26 May 2015, the Tribunal issued Procedural Order No. 2 concerning the language for exchanges during the document production phase.

25. On 8 June 2015, following exchanges between the Parties, and in accordance with Procedural Order No. 1, the Parties jointly submitted their Document Production Applications (Redfern Schedules) for decision by the Tribunal. Claimants' application was accompanied by exhibit C-181.

26. On 15 June 2015, Respondent filed an application seeking (i) authorization to add to the record additional translations of documents filed with Respondent's Counter-Memorial; and (ii) an order from the Tribunal requiring Claimants to provide fuller translations of certain documents filed with Claimants' Memorial. On 19 June 2015, Claimants submitted observations on this application.

27. On 23 June 2015, observing that the Parties appeared to have reached an agreement on the matter, the Tribunal authorized the Parties to submit the additional translations.

---

[1] Reasons for Decision on the Respondent's Request for Bifurcation, 6 April 2015, ¶¶ 22-24 (internal citations omitted).

28.    On 29 June 2015, the Tribunal issued Procedural Order No. 3, on document production.

29.    On 14 July 2015, Respondent filed an application asking the Tribunal to exclude from production certain documents ordered by the Tribunal in Procedural Order No. 3.  On 22 July 2015, Claimants filed observations on this application.

30.    On 23 July 2015, Claimants filed an application asking the Tribunal to order Respondent to provide the annexes to two exhibits (R-029 and R-031) to Respondent's Counter-Memorial.  On 4 August 2015, Respondent filed observations on this application.

31.    On 10 August 2015, the Tribunal issued Procedural Order No. 4 denying both Respondent's application of 14 July 2015 and Claimants' application of 23 July 2015.

32.    On 2 September 2015, Claimants filed an application arguing that Respondent had failed to comply with the Tribunal's order on document production with regard to Claimants' Document Request No. 16.  Claimants asked the Tribunal to order Respondent to comply with the Tribunal's prior orders.  On 7 September 2015, Respondent filed observations on this application.

33.    On 8 and 9 September 2015, the Parties submitted an agreed upon request for modification of the Procedural Calendar.

34.    On 9 September 2015, the Tribunal issued Procedural Order No. 5 (i) approving the agreed amendment to the Procedural Calendar; and (ii) ruling on Claimants' application of 2 September 2015.  Referring to Claimants' Document Request No. 16, the Tribunal ruled, *inter alia*, that "[i]f the Respondent [...] produce[d] responsive documents [...] not in time to be taken into account by the Claimants in their Reply on the Merits and Counter-Memorial on Jurisdiction, the Tribunal [would] consider a request by the Claimants for leave to file a short additional pleading addressing those documents."

35.    On 18 September 2015, Claimants filed their Reply on the Merits and Counter-Memorial on Jurisdiction ("Claimants' Reply") accompanied by exhibits C-182 to C-281; legal authorities CL-137 to CL-236; three (3) witness statements, by Mr. Hans Meissner, Mr. Jaime Hector, and Mr. Mauricio Bolaña, respectively; an expert report by Dr. Thomas R.

Mancini, with exhibits TRM-1 to TRM-48, and two (2) expert reports by the Brattle Group, with exhibits BRR-056 to BRR-114, and BQR-072 to BQR-97.

36. Also on 18 September 2015, Respondent submitted a communication formally withdrawing from the record the witness statement of Mr. Santiago Caravantes, previously filed with Respondent's Counter-Memorial. On 12 October 2015, Claimants opposed the withdrawal.

37. On 29 September 2015, Respondent filed an application arguing that Claimants had (i) failed to produce documents they had voluntarily agreed to produce; and (ii) failed to comply, or only partially complied, with some of the orders on document production in Procedural Order No. 3. On 14 October 2015, Claimants filed observations on this application.

38. On 5 October 2015, following a joint request by the Parties, the Tribunal amended the Procedural Calendar.

39. On 14 October 2015, pursuant to Procedural Order No. 5, Claimants sought (i) authorization to submit to the record certain documents produced by Respondent after the filing of Claimants' Reply, in connection with Document Production Request No. 16; and (ii) an order from the Tribunal instructing Respondent to confirm whether it had additional documents responsive to this request in its custody, possession or control.

40. On 26 October 2015, the Tribunal issued Procedural Order No. 6 (i) authorizing Respondent's 18 September 2015 withdrawal of Mr. Caravantes' witness statement; (ii) dismissing Respondent's application of 29 September 2015; and (iii) authorizing Claimants' 14 October 2015 request to submit additional documents to the record, but declining to issue the additional order requested by Claimants.

41. Pursuant to Procedural Order No. 6, on 30 October 2015, Claimants submitted exhibits C-282 to C-288 to the record.

42. On 27 November 2015, Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction ("Respondent's Rejoinder") accompanied by exhibits R-155 to R-234; legal

authorities RL-060 to RL-081; two (2) witness statements, by Mr. Carlos Montoya and Mr. Alfonso Olivas, respectively; an expert report by Dr. Jorge Servert; and two (2) expert reports by BDO, with exhibits BFR-022 to BFR-062, and BIR-069 to BIR-107.

43.   On 23 December 2015, Claimants filed their Rejoinder on Jurisdiction ("Claimants' Rejoinder") accompanied by exhibits C-289 to C-290; and legal authorities CL-237 to CL-240.[2]

44.   On 23 December 2015, Claimants filed an application asking the Tribunal (i) to rule as inadmissible a defense that, according to Claimants, was raised for the first time in Respondent's Rejoinder; or (ii) in the alternative, to authorize Claimants to file a submission in response to this new defense with additional evidence. Claimants' application was accompanied by three exhibits.

45.   On 28 December 2015, the Tribunal invited Respondent's observations on Claimants' application of 23 December 2015, noting that in the interim, the exhibits filed with the application would not be considered.

46.   On 30 December 2015, Respondent opposed Claimants' application of 23 December 2015 and argued that the submission of the exhibits attached to it was in breach of Procedural Order No. 1.

47.   On 11 January 2016, the Tribunal issued Procedural Order No. 9 (i) authorizing Claimants to file a further submission on the new defense (no longer than 25 pages), together with a "reasonable amount of supporting rebuttal evidence"; and (ii) refusing to admit the three exhibits attached to Claimants' application of 23 December 2015, for lack of compliance with the procedural rules on submission of documents after the last written submissions. However, Claimants were authorized to resubmit those documents, if appropriate, as rebuttal evidence in support of the Claimants' submission on the new defense.[3]

---

[2] Initially, the accompanying materials were mistakenly labeled C-282 to C-283 and CL-236 to CL-239, overlapping with nomenclature previously assigned to other documents. The numbering was later corrected. *See* Claimants' emails of 30 December 2015 and 7 January 2016.

[3] In its letter of 23 December 2015, Claimants incorrectly labeled these three documents as exhibits C-284 to C-286 overlapping with nomenclature previously assigned to other documents. When these documents were re-submitted

8

48.    On 12 January 2016, Respondent filed an application asking for authorization to (i) submit additional documents to the record agreed between the Parties, namely: the translation of Dr. Jorge Servert's expert report, exhibits JSR-01 to JSR-017, and a supplemental translation of exhibit C-156; and (ii) submit one additional document to the record (a ruling by the Spanish Constitutional Court dated 17 December 2015) (exhibit R-236).   Claimants consented to Respondent's request (ii) during the pre-Hearing conference call on 13 January 2016, without agreeing to the assertions about the relevance of the document at issue.    Noting Claimants' agreement on both items, on 13 January 2016, the Tribunal granted Respondent's application.    Accordingly, on 14 January 2016, Respondent submitted exhibits JSR-01 to JSR-017, an additional translation of exhibit C-156 and exhibit R-236; and on 18 January 2016, Respondent filed the translation of Dr. Servert's report.

49.    On 14 January 2016, Respondent filed another application, now seeking authorization to submit six additional documents to the record.    On 19 January 2016, Claimants filed observations opposing this application.  Thereafter, by letters of 29 January 2016 and 2 February 2016, Respondent withdrew the request with respect to the majority of the documents, limiting its application to one.  On 2 February 2016, the Tribunal granted Respondent's application to add that single document to the record.  Accordingly, on 3 February 2016, Respondent submitted exhibit R-237 to the record.

50.    On 22 January 2016, Claimants filed an Additional Submission on the New Defense, accompanied by exhibits C-291 to C-298; legal authorities CL-241 to CL-242; and an expert report by Dr. Thomas Mancini with exhibits TRM-49 to TRM-52.

51.    On 25 January 2016, Claimants filed an application concerning a disagreement relating to the identification of the individual(s) who would testify at the Hearing to answer questions on the BDO expert reports.  On 27 January 2016, Respondent submitted observations on this application.

---

on 22 January 2016 as part of Claimants' Additional Submission on the New Defense, they were designated as C-295, C-296 and C-298.

9

52.     On 3 February 2016, the Tribunal issued Procedural Order No. 11 on the issue of expert testimony at the Hearing.

53.     On 28 January 2016, the Respondent filed an application seeking leave from the Tribunal to submit new documents to the record, namely: an additional legal authority (*Charanne B.V. & Construction Investments S.A.R.L. v. Kingdom of Spain*, Case SCC V 062/2012, Award and Dissenting Opinion, 21 January 2016); and five additional rulings of the Spanish Supreme Court of 22 January 2016.  On 3 February 2016, Claimants consented to the submission of these materials to the record, while recording their disagreement with Respondent's characterizations on the relevance of these documents, and asking for an opportunity to file written submissions on the *Charanne* award and dissenting opinion after the Hearing.

54.     On 8 February 2016, Respondent filed an application seeking leave from the Tribunal to add a number of documents to the record, namely, documents cited in Mr. Carlos Montoya Second Witness Statement (the "Montoya Exhibits").     On that same day, Claimants consented to the admission of these documents, on the condition that they were provided to Claimants forthwith, with their relevant translations.

55.     On 8 February 2016, the Tribunal (i) granted Respondent's application of 28 January 2016, noting that the Parties were free to address the *Charanne* award and dissent during their oral presentations at the Hearing; and (ii) granted Respondent's application of 8 February 2016 subject to confirmation from Claimants that they had been provided with all the Montoya Exhibits.[4]  Respondent submitted the new documents to the record on 11 and 13 February 2016, designating them as exhibits R-238 to R-256 and RL-084.

56.     In its ruling of 8 February 2016, the Tribunal also gave the following direction to the Parties:

> The Tribunal notes the numerous recent requests by the Parties for Tribunal rulings on late admission of documents and other procedural matters. In the interests of fairness and efficiency, the Tribunal will not be disposed to consider further requests for such

---

[4] Claimants' confirmation was provided on 10 February 2016.

rulings by either Party prior to the hearing, absent a compelling and documented justification.

57.     On 9 February 2016, Claimants filed an application seeking authorization to add 29 additional documents to the record. This application was denied by the Tribunal on 11 February 2016.

58.     On 11 February 2016, Claimants filed a request seeking authorization to add a number of translations of documents already on the record. On 12 February 2016, Respondent consented to Claimants' request, and submitted its own request to add further translations to the record. In light of the Parties' agreement, both applications were granted by the Tribunal on 12 February 2016. The Parties filed the additional translations on 13 February 2016.

## D.     The Non-Disputing Party Applications

59.     On 14 November 2014, the European Commission (the "Commission") filed an Application for Leave to Intervene as a Non-Disputing Party dated 12 November 2014 ("the EC First Application").

60.     On 17 November 2014, the Tribunal invited the Parties to provide comments.

61.     On 3 December 2014, each Party filed its observations on the EC First Application. Respondent's observations were accompanied by exhibit R-001.

62.     On 17 December 2014, the Tribunal dismissed the EC First Application, on the ground that it was premature. The Tribunal observed that the Commission sought to invite the Tribunal to decline jurisdiction, at a time in which the Respondent had not yet indicated whether it intended to object to the Tribunal's jurisdiction. The Tribunal noted, however, that the Commission could renew the application "after the Respondent ha[d] indicated its position regarding the Tribunal's jurisdiction[;]" mentioning the dates by which that should occur (*i.e.*, with the Respondent's Request for Bifurcation due on 22 December 2014, or if no bifurcation was sought, with the Counter-Memorial on the Merits and Memorial on Jurisdiction due on 26 February 2015). The Tribunal also reminded the Commission that, should the Commission decide to renew the application, the Tribunal would consider the

requirements of Rule 37(2) of the Arbitration Rules, including that any submission did not disrupt the proceeding or unduly burden or unfairly prejudiced either Party.

63.  On 9 December 2015, the European Commission filed a second Application for Leave to Intervene as a Non-Disputing Party ("the EC Second Application").  That same day, the Tribunal invited the Parties to provide comments.

64.  On 16 December 2015, each Party filed its observations on the EC Second Application. Respondent's observations were accompanied by legal authority RL-082.

65.  On 21 December 2015, the Tribunal issued Procedural Order No. 7 ruling on the EC Second Application.  The Tribunal authorized the European Commission to file a written non-disputing party submission no later than 31 December 2015, under certain parameters and subject to a condition.  Observing that "[t]he present circumstances pose a significant risk of disruption and prejudice in light, inter alia, of the European Commission's filing of its Second Application little more than two months before the scheduled final hearing on jurisdiction and merits," the Tribunal ruled that "[a]s a condition for filing a non-disputing party submission and prior to any consideration of that submission by the Tribunal, the Commission shall provide a written undertaking, satisfactory to the Tribunal, to pay the additional costs of legal representation reasonably incurred by the parties in responding to that submission."

66.  On 31 December 2015, the European Commission submitted a Request to Alter Procedural Order No. 7, asking the Tribunal to remove the condition concerning the cost undertaking. This request also observed that "[g]iven that the deadline for the submission of the Commission's written observations falls on the same date as the deadline for the submission of the costs undertaking, the Commission has today delivered its written submission to the ICSID Secretariat, without directly sending copies to members of the Arbitral Tribunal, so as to avoid a *fait accompli*."   The Parties received a copy of this request on 5 January 2016.

67.  Also on 31 December 2015, the European Commission submitted to the ICSID Secretariat (without copying the Members of the Tribunal), a separate document entitled "*amicus*

*curiae* submission."   The Tribunal instructed the ICSID Secretariat not to transmit this "*amicus curiae* submission" to the Members of the Tribunal or the Parties, pending further instructions from the Tribunal.   The Parties and the Commission were informed of the Tribunal's instructions on 5 January 2016.

68.   On 8 January 2016, the Tribunal issued Procedural Order No. 8 declining the European Commission's Request to Alter Procedural Order No. 7, and inviting the Commission to submit the cost undertaking referred to in Procedural Order No. 7 by 15 January 2016.   The Tribunal added that, should the European Commission fail to do so, the Tribunal would not receive the European Commission's "*amicus curiae* submission" dated 31 December 2015.   The Tribunal reasoned, *inter alia*:

> Given the posture of the case and the timing of the Commission's Second Application, the Tribunal sought in Procedural Order No. 7 to find a means to lessen the likelihood of disruption, undue burden, or unfair prejudice to either Party. Rescheduling the February hearing was not an acceptable option. The means identified by the Tribunal was the requirement that the Commission bear the reasonable financial burdens imposed upon the Parties as the result of the Commission's December submission.   The Tribunal sees no change in the circumstances that led to this decision, indeed, they have become more compelling as the hearing comes nearer. Accordingly, the Tribunal does not agree to the Commission's Request.

> […]

> […] While it would be regrettable for the Tribunal not to receive the Commission's views, it would also be regrettable for those views to be received in circumstances involving significant risk of disruption, undue burden, or unfair prejudice to the Parties in this case.

69.   On 15 January 2016, the European Commission submitted a communication informing the Tribunal that it would not provide the undertaking on costs requested by the Tribunal.

70.   In consequence, pursuant to the Tribunal's order in Procedural Order No. 8, the European Commission's "*amicus curiae* submission" of 31 December 2015 was not received by the Tribunal or the Parties, and did not enter into the record of this proceeding.

E.    **The Oral Procedure**

71.    On 13 January 2016, the President of the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

72.    On 20 January 2016, the Tribunal issued Procedural Order No. 10 embodying the Parties' agreements on procedural matters pertaining to the organization of the Hearing and the Tribunal's decisions on the disputed issues.

73.    The Hearing on Jurisdiction and the Merits was held in Paris, France from 15 to 20 February 2016 (the "Hearing").[5]    The following persons were present throughout the Hearing:

*Tribunal*:
| | |
|---|---|
| Professor John R. Crook | President |
| Dr. Stanimir A. Alexandrov | Arbitrator |
| Professor Campbell McLachlan QC | Arbitrator |

*ICSID Secretariat*:
| | |
|---|---|
| Ms. Luisa Fernanda Torres | Secretary of the Tribunal |

*For the Claimants*:
| | |
|---|---|
| Ms. Judith Gill QC | Allen & Overy LLP |
| Mr. Jeffrey Sullivan | Allen & Overy LLP |
| Ms. Marie Stoyanov | Allen & Overy LLP |
| Mr. Ignacio Madalena | Allen & Overy LLP |
| Ms. Naomi Briercliffe | Allen & Overy LLP |
| Mr. Tomasz Hara | Allen & Overy LLP |
| Ms. Lucy Judge | Allen & Overy LLP |
| Ms. Stephanie Hawes | Allen & Overy LLP |
| Ms. Kristin Bong | Allen & Overy LLP |
| Mr. Jaime Hector* | EISER Infrastructure Partners LLP |
| Mr. Hans Meissner* | EISER Infrastructure Partners LLP |
| Mr. Lorenzo Cannizzo | EISER Infrastructure Partners LLP |
| Mr. Mauricio Bolaña* | Antin Infrastructure Partners S.A.S |
| Mr. Carlos Lapuerta | The Brattle Group |
| Mr. Jose Antonio Garcia | The Brattle Group |
| Mr. Richard Caldwell | The Brattle Group |
| Mr. Jack Stirzaker | The Brattle Group |
| Dr. Thomas R. Mancini | TRMancini Solar Consulting, LLC |

---

[5] The venue for the Hearing was established on 19 May 2015, following consultation with and agreement of the Parties.

*For the Respondent*:

| | |
|---|---|
| Mr. Diego Santacruz | Abogacía del Estado, Ministerio de Justicia |
| Mr. Javier Torres | Abogacía del Estado, Ministerio de Justicia |
| Ms. Mónica Moraleda | Abogacía del Estado, Ministerio de Justicia |
| Ms. Elena Oñoro | Abogacía del Estado, Ministerio de Justicia |
| Mr. Antolín Fernández | Abogacía del Estado, Ministerio de Justicia |
| Ms. Esther de Benito Navarro | Abogacía del Estado, Ministerio de Justicia |
| Ms. Amaia Rivas | Abogacía del Estado, Ministerio de Justicia |
| Mr. Carlos Montoya* | Instituto para la Diversificación y Ahorro de la Energía |
| Mr. Alfonso Olivas* | Instituto para la Diversificación y Ahorro de la Energía |
| Mr. Javier Espel | BDO |
| Mr. David Mitchell | BDO |
| Mr. Eduardo Pérez | BDO |
| Mr. Gervase MacGregor | BDO |
| Mr. Gerdy Roose | BDO |
| Mr. Manuel Alejandro Vargas | BDO |
| Ms. Cristina Centellas | BDO |
| Dr. Jorge Servert | |

*Court Reporters*:

| | |
|---|---|
| Mr. Leandro Lezzi | DR-ESTENO |
| Mr. Dionisio Rinaldi | DR-ESTENO |
| Ms. Rachel Bradbury | Opus 2 |
| Ms. Rebecca Ridgway | Opus 2 |

*Interpreters*:
Mr. Jesús Getan Bornn
Mr. Mark Viscovi
Ms. Amalia Thaler de Klem

*not present prior to their
testimony

74.   The following persons were examined during the Hearing:

*On behalf of Claimants*:

Fact Witnesses
Mr. Jaime Hector
Mr. Hans Meissner
Mr. Mauricio Bolaña

Expert Witnesses
Dr. Thomas R. Mancini
Mr. Carlos Lapuerta

15

Mr. Richard Caldwell

*On behalf of Respondent*:

Fact Witnesses
Mr. Carlos Montoya
Mr. Alfonso Olivas

Expert Witnesses
Dr. Jorge Servert
Mr. Javier Espel
Mr. David Mitchell
Mr. Eduardo Pérez

75.     On the first day of the Hearing, 15 February 2016, Claimants resubmitted an application to
add new documents to the record, previously denied by the Tribunal on 11 February 2016,
now narrowing the request to nine documents. Both Parties were heard extensively on this
matter during the first and second days of the Hearing.[6] Having required and received from
Claimants an indication of the portions of the documents they intended to use and their
specific purpose, on the third day of the Hearing (17 February 2016), the Tribunal
authorized Claimants to submit the nine additional documents.[7] Accordingly, on 17
February 2016, Claimants submitted exhibits BQR-98 to BQR-104, and BRR-115 to BRR-
116.

76.     During the Hearing, each Party also submitted various demonstrative exhibits, as follows:

 • Claimants: C-299 to C-304, BQR-105, BRR-117 and TRM-53.

 • Respondent: R-257 to R-261; and power point presentations by BDO and Dr.
Servert (unnumbered).

77.     Following a request by the Tribunal during the Hearing, on 2 March 2016, Claimants
submitted supplementary translations of exhibits BRR-36, BRR-37, BQR-88 and BQR-89.

---

[6] *See, e.g.*, Rev. Tr. Day 1 (ENG), 4:25-8:15 (Ms. Gill), 89:4-92:8 (Mr. Torres), 92:20-100:10 (Ms. Gill, Mr. Torres);
Rev. Tr. Day 2 (ENG), 1:15-4:22 (President, Ms. Gill, Mr. Torres), 137:20-138:23 (Mr. Torres, Ms. Stoyanov,
President), 140:1-146:21 (Mr. Santacruz, Ms. Stoyanov, President, Mr. Alexandrov); 228:13-229:13 (Ms. Stoyanov,
President, Mr. Alexandrov). All citations to the Hearing Transcript in this Award refer to the Revised Hearing
Transcripts submitted jointly by the Parties on 1 April 2016.

[7] Rev. Tr. Day 3 (ENG), 1:7-2:1 (President).

78.     On 1 April 2016, the Parties submitted agreed corrections to the Hearing transcripts.

**F.     The Post-Hearing Procedure**

79.     During the last day of the Hearing, it was agreed that there would be no post-Hearing briefs.[8]

80.     On 5 April 2016, the Parties filed their statements of costs.

81.     On 26 May 2016, Respondent submitted an application seeking authorization from the Tribunal to add seven additional documents to the record.   On 3 June 2016, Claimants objected to the request.  The Tribunal dismissed Respondent's application on 9 June 2016.

82.     On 29 June 2016, Claimants submitted an application seeking authorization to add one additional legal authority to the record (*RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (the "RREEF Decision")).  On 8 July 2016, Respondent objected to the request.

83.     On 26 August 2016, the Tribunal ruled on Claimants' application of 29 June 2016.  Noting that a redacted version of the RREEF Decision had become publicly available, the Tribunal observed that it considered that such public version could be referred to by the Tribunal. The Tribunal added that "[s]hould either Party wish to provide the Tribunal with any views or comments on the Decision, the Parties may submit a written request" to the Tribunal to do so.

84.     On 30 August 2016, Respondent filed comments on the RREEF Decision.  On that same day, Claimants argued that Respondent's submission was not authorized, and requested an opportunity to respond to it.  On 31 August 2016, Respondent opposed to Claimants' request.

85.     On 7 September 2016, the Tribunal authorized Claimants to "submit any views or comments on the substance of the RREEF Decision [...]."  The Tribunal did so, noting that

---

[8] *See, e.g.*, Rev. Tr. Day 6 (ENG), 113:7-114:14 (President, Ms. Gill, Mr. Torres), 117:23-118:3 (President).

on 26 August 2016 it had directed the Parties to first seek authorization from the Tribunal if they wished to submit comments on the RREEF Decision, which Respondent had failed to do.

86.     On 14 September 2016, Claimants filed comments on the RREEF Decision responding to matters raised in Respondent's 30 August 2016 submission.

87.     On 16 September 2016, the Parties filed revised statements on costs.

88.     On 18 November 2016, Respondent filed an application seeking authorization to add a non-public additional legal authority to the record (*Isolux Netherlands, BV v. Kingdom of Spain*, SCC Case V2013/153, Award and Dissenting Opinion, 17 July 2016 (the "*Isolux* Award")). Claimants filed observations on 22 November 2016, Respondent replied on 23 November 2016, and Claimants replied again on 25 November 2016.   Claimants argued, *inter alia*, that Respondent application should be dismissed unless and until Respondent provided evidence of consent by the claimant in the *Isolux* arbitration.

89.     On 8 December 2016, the Tribunal ruled that it would not allow the submission of the *Isolux* Award to the record unless Respondent showed that the submission would not breach confidentiality instructions of the *Isolux* tribunal.

90.     On 15 December 2016, Respondent sent an *ex-parte* communication with supporting documents to the Tribunal, in response to the Tribunal's ruling of 8 December 2016. Respondent requested that its communication not be transmitted to Claimants on grounds of confidentiality of the information referred therein.   On 22 December 2016, the Tribunal wrote to the Parties regarding Respondent's 15 December 2016 *ex-parte* communication, observing that it was inappropriate and would not be considered by the Tribunal unless it was appropriately filed with a copy to Claimants.

91.     On 23 December 2016, Respondent filed a submission (this time, copying Claimants) providing observations in response to the Tribunal's ruling of 8 December 2016.   On 6 January 2017, Claimants replied.

92.    On 23 February 2017, the Tribunal dismissed Respondent's application to add the *Isolux* Award to the record, observing that the condition established in the Tribunal's ruling of 8 December 2016 had not been met by Respondent.

93.    On 13 April 2017, the Tribunal declared the proceeding closed.

## III.    FACTUAL BACKGROUND

### A.    Overview

94.    Spain has become a world leader in promoting the use of solar power, including facilities that concentrate the sun's heat to create steam to drive turbines.  "Now, Spain has 59% of the installed capacity of CSP [Concentrated Solar Power] [...] production worldwide, with 50 plants and 2304 MW."[9]

95.    This case grows out of a failed investment in the Concentrated Solar Power ("CSP") sector in Spain.   CSP plants can be built on different design principles.  Those at issue here involved large stationary arrays of horizontal reflective trough-shaped collectors.  These arrays focus the sun's rays onto horizontal tubes running through them carrying special heat-absorbent oil.   The oil is heated to high temperatures as it passes through the collectors.  It is then pumped in a continuous cycle to a heat exchanger.  There, the heat energy stored in the oil is used to generate steam that turns steam turbines that turn generators.  The process is broadly comparable to that utilized in a conventional coal or gas fired electric generation station, except that the heat used to create steam comes from concentrated solar power, not burning of gas or coal.

96.    CSP offers significant environmental benefits.  It employs a renewable resource, solar power, rather than consumable resources like coal or gas.  And, conventional solar plants introduce little or no pollution into the atmosphere.   However, CSP plants are large facilities that are expensive to build, requiring large initial capital investments.

---

[9] Rev. Tr. Day 5 (ENG), 39:20-22 (Mr. Espel).

97.     Because of their high capital costs, CSP had not been economically competitive with
        traditional forms of power generation utilizing fossil fuels.  Accordingly, Spain, like many
        other countries, determined that to promote the development of CSP, a regime of State
        subsidies was required.  The evolution of Spain's policies in this regard is at the heart of
        the case.

98.     Investment in CSP plants is "front-end loaded," with the largest outlays incurred in
        planning, designing and then constructing the plants prior to their entry into service.  The
        large initial investments in such plants must eventually be recouped from revenues from
        electrical power sold over a solar plant's service life, plus any subsidies received.  The
        evidence showed that because of the large initial capital outlays, and the substantial period
        required to recover investment after CSP plants enter production, plants are often financed
        utilizing a high proportion of non-recourse loans from third-party lenders.  Such financing
        is available because of the steady long-term cash flows expected from the production and
        sale of electricity.[10]

## B.   The Energy Charter Treaty

99.     The Energy Charter Treaty ("ECT") is a multilateral treaty adopted in 1994 that has over
        fifty parties, including the European Union, Luxembourg, Spain and the United Kingdom.
        As described in the Energy Charter Secretariat's Guide:

> According to Article 2 of the ECT, the purpose of the Treaty is to
> establish a legal framework in order to promote long-term co-
> operation in the energy field, based on complementarities and
> mutual benefits, in accordance with the objectives and principles of
> the Energy Charter.  It is a milestone in international energy co-
> operation.    By creating a stable, comprehensive and non-
> discriminatory legal foundation for cross-border energy relations,
> the ECT reduces political risks associated with economic activities
> in transition economies.  It creates an economic alliance between
> countries with different cultural, economic and legal backgrounds,
> but all united in their commitment to achieve the following common
> goals:

---

[10] *See infra* ¶¶ 411-412.

- To provide open energy markets, and to secure and diversify energy supply;

- To stimulate cross-border investment and trade in the energy sector;

- To assist countries in economic transition in the development of their energy strategies and of an appropriate institutional and legal framework for energy, and in the improvement and modernisation of their energy industries.[11]

100. The ECT's emphasis on developing secure long-term energy cooperation is coupled with provisions addressing the environmental aspects of energy development. Article 19(1) of the ECT thus requires:

> In pursuit of sustainable development and taking into account its obligations under those international agreements concerning the environment to which it is party, each Contracting Party shall strive to minimize in an economically efficient manner harmful Environmental Impacts occurring either within or outside its Area from all operations within the Energy Cycle in its Area, taking proper account of safety. In doing so each Contracting Party shall act in a Cost-Effective manner. In its policies and actions each Contracting Party shall strive to take precautionary measures to prevent or minimize environmental degradation. The Contracting Parties agree that the polluter in the Areas of Contracting Parties, should, in principle, bear the cost of pollution, including transboundary pollution, with due regard to the public interest and without distorting Investment in the Energy Cycle or international trade [...].[12]

## C.   Spain's Policies Favoring Renewable Energy and Royal Decree 661/2007

101. Building from multilateral agreements including the 1992 Framework Convention on Climate Change,[13] the Energy Charter Treaty, and the 1997 Kyoto Protocol,[14] in 2001, the

---

[11] **R-007**, Energy Charter Secretariat, *The Energy Charter Treaty: A Readers Guide*, at 9.

[12] **C-001**, Energy Charter Treaty, Art. 19(1).

[13] **C-014**, United Nations Framework Convention on Climate Change, 1771 U.N.T.S. 107, Senate Treaty Document No. 102-38, United Nations Document A/AC.237/18 (Part II)/Add.1, 31 International Legal Materials 849 (1992), 9 May 1992 (entered into force on 9 May 1992) [hereinafter, "UNFCC"].

[14] **C-015**, Kyoto Protocol to the United Nations Framework Convention on Climate Change, United Nations Document FCCC/CP/1997/7/Add.1, 10 December 1997, 37 International Legal Materials 22 (1998), 11 December 1997 (entered into force on 16 February 2005) [hereinafter, "Kyoto Protocol"].

European Union adopted a policy of reducing greenhouse gasses through development of renewable energy.[15] The European Union's Directive 2001/77EC set out binding targets for developing renewable energy by member countries within the Union.[16] This directive also recognized that subsidies would be required to attain these targets. Mr. Espel, an expert from Respondent's economic consultants BDO, highlighted the role of renewables in Spain's response to the European Union's ("EU") requirements in his testimony: "[t]here is no doubt that energy renewables are playing a relevant role in the Spanish electrical sector with a view to hit the 20% target for 2020 set forth in the European directives [...]."[17]

102.    In compliance with the EU's directive and in pursuit of its own national interests, Respondent adopted extensive measures aimed at promoting CSP and other sources of renewable energy. These built from the adoption by Respondent's Parliament of Electricity Law 54/1997,[18] which provided the legal framework for regulation of the electrical sector during much of the period at issue. The 1997 Electricity Law guarantees to investors in the energy sector a reasonable return, but leaves the meaning of this guarantee to be fleshed out by other legal instruments.[19]

103.    Article 15 of the Electricity Law provides:

---

[15] **C-032**, Communication from the Commission – Energy for the Future: Renewable Sources of Energy, White Paper for a Community Strategy and Action Plan, COM (97) 599 Final.

[16] **C-016**, Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market, Official Journal of the European Union Series L 283, 27 October 2001, at 33-40 (entry into force on 27 October 2001) [hereinafter, "2001 Renewables Directive"] .

[17] Rev. Tr. Day 5 (ENG), 30:26-32:2 (Mr. Espel).

[18] **C-034**, Law 54/1997, on the Electric Power Sector, 27 November 1997 (published on 28 November 1997) [hereinafter, "Law 54/1997" or "1997 Electricity Law"]; **C-043/R-185**, Law 54/1997, on the Electric Power Sector, 27 November 1997 (version as of 1 January 2008).

[19] **C-043/R-185**, Law 54/1997, Art. 30(4) ("To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money in capital markets.") *See also*, **C-034**, Law 54/1997, Art. 30(4) (translating as "reasonable remunerative tariffs").  Respondent contests the English translation of this provision at **C-034**. *See* Resp. Rej., ¶¶ 420-421.

1. The activities involved in the supply of electric power shall be remunerated economically in the manner provided by this Act, as charged to the rates and prices paid.

2. To determine the rates and prices that consumers must pay, the remuneration of activities shall be stipulated in regulations with objective, transparent and non-discriminatory criteria that act as an incentive to improve the effectiveness of management, the economic and technical efficiency of said activities and the quality of the electricity supply.[20]

104.    The Electricity Law distinguishes between an "Ordinary Regime" of energy production and a "Special Regime" favouring generation from renewable sources of energy, *inter alia*, by authorizing payment of tariffs above market prices.   It includes a chapter in title IV, "dedicated to the special regime for the production of electric power consisting of a set of specific rules which apply to electricity generated through renewable energy sources [...]."[21]   Under Article 27:

1. Electricity generation activities shall be regarded as generation under the special regime in the following cases whenever they are carried out from installations whose installed capacity is no greater than 50 MW:

[...]

(b) Whenever non-consumable renewable energies, biomass or biofuels of any type are used as primary energy, provided their holder does not engage in generation activities under the ordinary regime.

[...]

2. Generation under the special system shall be governed by specific provisions and, in cases not provided for in these special provisions,

---

[20] **C-043/R-185**, Law 54/1997, Art. 15 (as of 1 January 2008). *See also*, **C-034**, Law 54/1997, Art. 15 (as of 28 November 1997) ("1. The activities for electricity supply shall be remunerated in the manner provided in this law from tariffs, tolls and prices paid. 2. For the determination of tariffs or tolls and prices that consumers must pay, the remuneration of activities with certain objective, transparent and non-discriminatory criteria that encourage improvement of management, technical and economic efficiency of such activities and the quality of electricity supply, will be set out in regulations.")

[21] **C-031**, Royal Decree 413/2014, regulating the activity of electric power production from renewable energy sources, cogeneration and waste, 6 June 2014 (published on 10 June 2014) [hereinafter, "RD 413/2014"], Preface.

>by the general regulations on electricity generation where
>applicable. [...][22]

105.    In August 2005, the Spanish government approved its 2005-2010 Renewable Energy Plan,
        setting out the Government's policy for attaining the renewable energy targets set by the
        European Union.[23]  The plan observed that "[r]enewable energy contributes decisively to
        guaranteeing the long-term supply of energy, through independent and inexhaustible
        energy sources."[24]

106.    Like many other countries, the Spanish legal system involves a hierarchy of legal
        instruments.  The Spanish Constitution is supreme.  Subordinate to the Constitution are
        laws enacted by Parliament, like the 1997 Electricity Law.  Royal Decree Laws are decrees
        promulgated by the government to meet emergency conditions which have immediate
        effect but require parliamentary approval.  Royal Decrees are instruments promulgated by
        the Ministerial Order in the exercise of regulatory powers created by laws or decree laws
        approved by Parliament.  Royal Decrees are implemented by Ministerial Orders and
        Resolutions.[25]

107.    In 1998,[26] 2002[27] and 2004, Spain adopted a series of decrees to regulate and facilitate
        production from renewable sources and to provide incentives to producers.  The last of

---

[22] **C-043/R-185,** Law 54/1997, Art. 27 (as of 1 January 2008). *See also,* **C-034,** Law 54/1997, Art. 27 (as of 28 November 1997) ("1. Electrical energy production shall be approved for operation under the special regime in the following cases, and when said activity is carried out in power plants with an installed power capacity that does not exceed 50MW: [...] (b) When used as a primary energy source, any of the non-consumable renewable energy, biomass or any kind of biofuel, providing the owner does not operate electricity production activities under the ordinary regime. [...] 2. Energy production under the special regime shall be governed by its specific guidelines and, in matters not covered by them, general applicable electrical production rules shall apply. [...].")

[23] **C-053,** Ministry of Industry, Tourism and Commerce & IDAE, *Renewable Energy Plan in Spain 2005-2010*, August 2005 [hereinafter, "2005-2010 Renewable Energy Plan"]; **C-041,** Ministry of Industry, Tourism and Commerce & IDAE, *Summary of the Spanish Renewable Energy Plan 2005-2010*, August 2005 [hereinafter, "Summary 2005-2010 Renewable Energy Plan"].

[24] **C-053,** 2005-2010 Renewable Energy Plan, at § 2.1.1.

[25] Resp. C-Mem., ¶ 68; Rev. Tr. Day 2 (ENG), 46:3-47:4 (Mr. Santacruz); Rev. Tr. Day 1 (ENG), 178:14-179:5 (Ms. Gill), 220:19-221:22 (Mr. Sullivan).

[26] **C-038,** Royal Decree 2818/1998, on electricity production installations supplied by renewable energy, waste incineration or combined heat and electric resources or sources, 23 December 1998 (published on 30 December 1998) [hereinafter, "RD 2818/1998"].

[27] **R-038,** Royal Decree 1432/2002, on the methodology for the approval or modification of the average reference electricity tariff, 27 December 2002 (published on 31 December 2002) [hereinafter, "RD 1432/2002"].

these, RD 436/2004,[28] regulated "the methodology for the updating and systematization of the legal and economic regime of the activity of electric power production under the special regime."[29]

108.   RD 436/2004 did not succeed in attracting the desired level of investment in electricity production from renewables.  Claimants attributed this to the decree's failure to provide long-term certainty regarding the tariffs to be received and the level of tariffs on offer.[30] The introductory language of the successor decree, Royal Decree 661/2007 ("RD 661/2007") is consistent with this view, affirming that "certain variables […] were not considered in the [RD 436/2004] compensation system" and that economic circumstances "make it necessary to modify the compensation system."[31]

109.   In February 2007, Respondent's National Energy Commission ("CNE") issued a report on a proposed successor decree that became RD 661/2007.[32]  The CNE report identified the elements required to promote production under the Special Regime and highlighted the importance of the proposed decree's assurances of stability to investors and their financiers:

> **(b) Minimise regulatory uncertainty.** The National Energy Commission understands that transparency and predictability in the future of economic incentives reduce regulatory uncertainty, which in turn, incentivises investment in new capacity and minimises the cost of project financing, thereby reducing the final cost for consumers.  Regulation must offer sufficient guarantee, in order to ensure that economic incentives are stable and predictable throughout the entire life of the installation, setting, where appropriate, both transparent mechanisms to be updated annually, linked to the evolution of strong indices (such as the average or baseline fee, the CPI, ten-year bonds, etc.) and periodic revisions,

---

[28] **C-052**, Royal Decree 436/2004, establishing the methodology for the updating and systematization of the legal and economic regime for electric power production in the special regime, 12 March 2004 (published on 27 March 2004) [hereinafter, "RD 436/2004"].

[29] **C-031**, RD 413/2014, Preface.

[30] Rev. Tr. Day 1 (ENG), 103:9-104:9 (Ms. Gill).

[31] **C-017**, Royal Decree 661/2007, regulating the activity of electricity production under the special regime, 25 May 2007 (published on 26 May 2007) [hereinafter, "RD 661/2007"].  *See also*, **R-188**, RD 661/2007.

[32] **C-185**, CNE Report 3/2007, *On the Proposed Royal Decree Regulating the Activity of Electric Energy Production under the Special Regime and Certain Facilities using Similar Technologies in the Ordinary Regime*, 14 February 2007 [hereinafter, "CNE Report 3/2007"].  *See also*, **R-030**, CNE Report 3/2007.

> which would take place every four years, for example, and would
> only affect new installations, in terms of investment costs, whereby
> the reduction of operating costs might also affect existing
> installations.[33]

110. The Regulatory Dossier prepared for the proposed decree also indicated that future changes
in tariffs, etc., would not be applied to existing facilities:

> The regulated tariffs, premiums, supplements and limits derived
> from any of these revisions will be applicable *only* to those facilities
> that have been registered definitively [...] after 1 January of the year
> following the year in which the revision is made.[34]

111. In May 2007, Respondent adopted RD 661/2007.[35]   A 25 May 2007 press release by
Respondent's Ministry of Industry, Energy and Tourism sets out the purposes and core
elements of the new Royal Decree.  The release, captioned "[t]he Government prioritises
profitability and stability in new Royal Decree-Law on renewables and combined heat and
power – Part of the government's commitment for clean domestic energy sources,"
summarizes aspects of a complex regime and expresses Respondent's intentions and
expectations regarding it.  A substantial excerpt follows:

> The aim of this Royal Decree is to increase remuneration for
> facilities using newer technologies, such as biomass and solar-
> thermal, in order to comply with targets outlined under the
> Renewable Energies Plan 2005-2010 and those agreed upon
> between Spain and the European Union. As these renewable energy
> technologies are developed, renewable energy shall cover 12% of
> Spain's energy needs by 2010 [...] With regard to technologies in
> need of a boost in view of their limited development, such as biogas
> or solar-thermoelectric, profitability shall rise to 8% for facilities
> that choose to supply distributors and between 7% and 11% return
> for those participating in the wholesale market. Tariffs shall be
> reviewed every 4 years, taking into account compliance with the
> established targets. Such a revision shall allow for adjustments to be
> made to the tariff in virtue of new costs and the level of compliance
> with the targets. Future tariff revisions shall not be applied to
> existing facilities. This guarantees legal certainty for the electricity
> producer and stability for the sector, thereby favouring

---

[33] **C-185**, CNE Report 3/2007, § 5.3(b).  *See also*, **R-030**, CNE Report 3/2007, § 5.3(b) (alternate translation).

[34] **C-188**, Regulatory Dossier of RD 661/2007, *Memoria*, at 9 (Eng. Tr.) (emphasis added).

[35] **C-017**, RD 661/2007; **R-188**, RD 661/2007.

26

development. The new legislation shall not be applied retroactively. [...]

The new Royal Decree [...] is aimed at establishing a stable subsidy system that guarantees attractive profitability for electricity production under the special scheme, and shall regulate over coming years the legal and economic scheme under which electricity producing facilities using combined heat and power technology, renewable energy resources and waste shall operate.

The new text, substituting Royal Decree 436/2004, is in harmony with Spain's energy policy commitment to encourage the use of clean and efficient domestic energy resources. The Government's investment in favour of these energy technologies is behind the effort enshrined in the new legislation to create stability and give investors time to plan mid to long-term, and to guarantee sufficient and reasonable profitability, together with stability, thereby attracting more investors to this sector.

Similarly, the Royal Decree shall contribute towards reaching targets under the Renewable Energies Plan 2005-2010 and those agreed upon between Spain and the European Union. As these renewable energy technologies are developed, renewable energy shall cover 12% of Spain's energy needs by 2010, thereby avoiding [27] million tons of $CO_2$ emissions during that year. Similarly, compliance with combined heat and power targets set for 2010 means that up to 6.3 million tons of $CO_2$ emissions shall be averted every year.

Overview of the new Royal Decree

The new legislation provides the right to a special remuneration sum in exchange for energy produced by facilities operating under the special scheme, i.e. those with an installed power capacity of less than 50 MW [...]

This legislative reform shall not be applied retroactively. [...]

[...]

Future tariff revisions shall not be applied to existing facilities. This guarantees legal certainty for the electricity producer and stability for the sector, favouring development. [36]

---

[36] **C-270**, Ministry of Industry, Energy and Tourism, Press Release, *The Government Prioritises Profitability and Stability in the New Royal Decree on Renewable Energy and Combined Heat and Power*, 25 May 2007.

112. The RD 661/2007 regime has multiple elements. *Inter alia*, it:

- guaranteed "priority of dispatch" assuring that all production could be introduced into the grid subject to the established tariff;[37]

- allowed producers to annually elect between two different tariffs, a fixed tariff per unit of production (the "Fixed Tariff Option") and a premium for each unit on top of the market price (the "Premium Option");[38]

- provided for tariffs solely based on production[39] for the entire operational life of the facility,[40] and without setting limits on total lifetime payments;

- established caps and floors for payments under the Premium Option;[41]

- allowed use of gas for up to 15 % of total generation.[42]

113. With respect to the press release's statement that "[f]uture tariff revisions shall not be applied to existing facilities," Article 44.3 of RD 661/2007 provides:

> During the year 2010 [...] there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.
>
> The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed. [43]

---

[37] **C-017**, RD 661/2007, Art. 17(e) and Annex XI. *See also*, **R-188**, RD 661/2007.

[38] *Id.*, Arts. 24.4, 25 and 27.

[39] *Id.*, Arts. 24 and 36.

[40] *Id.*, Arts. 36 and 44.

[41] *Id.*, Arts. 27 and 36.

[42] *Id.*, Art. 2(1)(b)(sub-Group b.1.2)

[43] *Id.*, Art. 44.3. Respondent contests the English translation of Article 44.3 at **C-017**. *See* Resp. Rej., ¶ 422 (indicating it should read "for which the deed of commissioning should have been granted" (emphasis added)).

**D.    The Claimants and Their Decision to Invest**

114.    The Claimants herein are collectively referred to here as "Eiser."  As described in
Claimants' Request for Arbitration:

> 13.  The First Claimant, EIL [Eiser Infrastructure Limited], is the
> general partner of five limited partnerships (EISER Infrastructure
> Capital Equity Partners 1-A, EISER Infrastructure Capital Equity
> Partners 1-B, EISER Infrastructure Capital Equity Partners 1-C,
> EISER Infrastructure Capital Equity Partners 1-D and EISER
> Infrastructure Co-Investment Partners LLP). EIL directly and
> wholly owns the Second Claimant.

> 14. The Second Claimant, ESL [Energia Solar Luxembourg S.à r.l.],
> is a private limited company (*société à responsabilité limitée*)
> incorporated under the laws of Luxembourg, having its registered
> address at [...] Luxembourg [...].  ESL owns shareholding and debt
> interests in two Spanish companies that own and operate three CSP
> plants in Spain with a total installed capacity of 149.7 MW.[44]

115.    The activities of Claimants and their associated companies are described on Eiser
Infrastructure's website:

> EISER is a London headquartered multinational asset manager
> specialising in deploying and managing equity and debt instruments
> in the real assets class. [...]

> Founded in 2005 as part of a standalone initiative developed by
> ABN AMRO Bank, a leader in project financing, EISER today is an
> independent, wholly Partner-owned asset manager.

> EISER has a particular focus in the following infrastructure sectors:
> energy, principally distribution and renewables power-generation;
> environmental services, mainly in the water and waste management
> sector; commercial transportation assets, such as city airports; and
> social infrastructure, particularly new-build development projects.

> EISER currently manages real assets with a total enterprise value of
> over EUR 4 billion, for its fund and managed co-investment
> products. Throughout the challenging markets that have defined the
> post-2007 financial era, EISER has raised over EUR 2 billion in

---

[44] RfA, ¶¶ 13-14.

financing and overseen over EUR 1.5 billion of project capital expenditure.[45]

116.   The limited partners involved in Eiser's business model are retirement funds and other investors seeking long-term stable returns. Accordingly, Eiser seeks to invest in assets in public sector or regulated sectors characterized by stability of long-term returns, including multiple investments in regulated energy producers in numerous countries. Eiser's business model involves finding and developing such low risk investments involving public infrastructure with stable cash flows, often in regulated areas.[46]

117.   Following adoption of RD 661/2007, Eiser was introduced by a third party to the possibility of investing in the ASTE solar energy project in Spain, then at the initial stages of development. The evidence shows that Eiser quickly began a preliminary investigation, and concluded that investment in CSP in Spain offered attractive business potential consistent with their business model and their past experience in developing large capital projects in energy and other regulated sectors.[47]   The initial assessment of the economic potential of solar investments in Spain prepared by Claimants' deal team emphasized the favorable characteristics of RD 661/2007, contrasting it with the previous regulatory regime which the team described as "not bankable." By contrast, RD 661/2007 was viewed as consolidating the regulatory regime, "making it more stable and predictable."[48] Claimants submit that this initial paper shows that they were well aware of the RD 661/2007 regime, and that it was central to their assessment of a possible investment in CSP in Spain.[49]

118.   In June 2007, Claimants' investment committee approved initiation of a due diligence review of a possible investment in the ASTE project.[50] Gomez Acebo & Pombo, a leading Madrid law firm, was retained in July 2007 to conduct legal due diligence. The principal

---

[45] **R-009**, About Us, Eiser Infrastructure Partners LLP Website.

[46] **R-009** (excerpt from Eiser website); **R-186**, iiQ4 Intelligent Infrastructure Q4 (Eiser 4Q 2012 promotional document discussing investments in school and airport assets in the United Kingdom); First Meissner Statement, ¶¶ 14-15.

[47] First Meissner Statement, ¶¶ 32-34; First Hector Statement, ¶ 29.

[48] **C-062**, ABN AMRO Infrastructure Capital Management Limited, *ASTE Screening Paper*, 7 June 2007.

[49] Rev. Tr. Day 1 (ENG), 146:7-149:23 (Ms. Gill).

[50] Cl. Mem., ¶ 162; Second Meissner Statement, ¶¶ 9 *et seq*.

risk identified by counsel was the risk of construction not being completed within the 36-month window required under RD 661/2007 to qualify for the Special Regime.[51] Believing that the due diligence process revealed no unacceptable risks, Eiser's Investment Committee approved investment in the ASTE project in August 2007.[52] The project was designed in a manner that would allow subsequent addition of storage, resulting in higher initial design and construction costs.[53]

119.    Eiser's contemporaneous documents show that those responsible for Claimants' initial decision to invest in Spain were keenly aware of the features of the RD 661/2007 regime, and that their assessment of the feasibility of the investment, and that of the banks that loaned money to finance it, were all based on that regime.[54] Both the ASTE project and its financing were structured in expectation of the stable cash flows provided by RD 661/2007.[55] The evidence shows that Claimants recognized that there could be changes in regulatory regimes;[56] indeed, the initial briefing paper prepared for Eiser's Investment Committee in June 2007 identified as a possible risk "regulatory risk: change of position of government." However, that same paper indicated Claimants' reasons for expecting continuity of government policy, listing as a risk mitigation factor that "Spain is a world leader in solar technology. The Spanish Government is promising the development of solar energy, the solar industry and promising the solar companies development help both in Spain and abroad."[57]

120.    CSP solar plants are large and complex undertakings; the process of planning, financing, gaining regulatory approval, and building those at issue here took several years.    Eiser acquired its initial shareholding interest in the ASTE projects in October 2007, entering

---

[51] First Meissner Statement, ¶ 51; Second Meissner Statement, ¶¶ 20-21.

[52] First Meissner Statement, ¶ 43; Second Meissner Statement, ¶ 13; First Hector Statement, ¶ 43.

[53] First Hector Statement, ¶ 33.

[54] **C-062,** ABN AMRO Infrastructure Capital Management Limited, *ASTE Screening Paper*, 7 June 2007; **C-067,** Gómez-Acebo & Pombo, *Report on the Spanish Legal Framework Applicable to Electrical Generation Under Special Regime*, 27 July 2007; First Meissner Statement, ¶¶ 37-40; First Hector Statement, ¶¶ 28, 44.

[55] **C-070**, ABN AMRO Global Infrastructure Fund, *Interim Investment Summary (Continued), General Partner's Review, Aires Solar Termoeléctrica S.L. ("ASTE" or "the Project Company")*, 30 June 2008; First Meissner Statement, ¶ 44; First Hector Statement, ¶¶ 17, 44; Cl. Reply, ¶ 110.

[56] Rev. Tr. Day 3 (ENG), 13:14-22 (Mr. Meissner).

[57] **C-062,** ABN AMRO Infrastructure Capital Management Limited, *ASTE Screening Paper*, 7 June 2007.

into a shareholders' agreement to acquire 85% of ASTE, and the shares were formally acquired on 23 October 2007.[58] As of the beginning of February 2008, the evidence shows that Eiser had incurred financial exposure of approximately €14.2 million, with large contributions of roughly the same amount impending.[59]

121.    Several years of planning and work ensued before the plants began operation in March and May 2012[60] and were definitively registered in the fall of that year.[61] The undisputed evidence shows that Claimants invested more than €126 million in the course of this process.[62] As noted below, while the plants were under development during this period, the operating companies in which Claimants held interests had multiple interactions with Respondent's regulatory and licensing authorities, during which those authorities confirmed the plants' coverage by the RD 661/2007 regime.

122.    In the summer of 2008, during the global financial crisis, ASTE's project lenders required a Tariff Window Guarantee against the risk of delayed completion of the ASTE projects, which would disqualify them from the RD 661/2007 Special Regime. Eiser could not provide the guarantee because its investment criteria barred commitment of substantial funds against a contingent liability.[63] This led to discussions with Spanish Engineering, Procurement and Construction ("EPC") contractors potentially prepared to take an equity

---

[58] First Meissner Statement, ¶ 31.

[59] **R-207.02**, ABN AMRO Infrastructure Capital Management Limited, *Investment Committee Update, Project Helianthus*, 1 February 2008, at 2.

[60] "The ASTE Plants started operations on 21 March 2012 and the ASTEXOL Plant on 25 May 2012." Cl. Reply, ¶ 310.

[61] First Meissner Statement, ¶ 58; First Hector Statement, ¶ 65; **C-094**, Resolution by which the final commissioning of the ASTE-1A facility is authorized, 24 May 2012; **C-095**, Resolution by which the final commissioning of the ASTE-1B facility is authorized, 22 May 2012; **C-096**, Ruling of the Directorate-General of Energy and Agro-Industrial Incentives, of the Regional Department of Agriculture, Rural Development, Environment and Energy, on commissioning the ASTEXOL-2 facility for generating electricity under the Special Regime, 25 May 2012; **C-158**, Resolutions by the Directorate General of Industry, Energy and Mines, through which the Thermoelectric Solar Power Plants "ASTE 1A" and "ASTE 1B", owned by Aries Solar Termoeléctrica, S.L., are definitively registered in the regional registry of electricity production facilities under the special regime, 24 October 2012; **C-161**, Resolution of the Directorate-General of Agro Industrial Incentives and Energy, of the Regional Department of Agriculture, Rural Development, the Environment and Energy, on the definitive registration of ASTEXOL-2 in the autonomous community registry of generation facilities under the Special Regime, 19 November 2012.

[62] First Hector Statement ¶ 4; Second BDO Financial Report ¶ 113.

[63] First Meissner Statement, ¶ 46, First Hector Statement, ¶ 47. In closing argument, counsel for Spain contended that Eiser "had no financing," and "found themselves in a highly precarious situation." Rev. Tr. Day 6 (ENG), 68:25, 69:7-8 (Mr. Fernandez). These statements do not appear consistent with the evidence.

stake in the ASTE project and provide the required guarantee.[64]   These culminated in an agreement with Elecnor, a large and established Spanish engineering and construction firm that was then developing ASTEXOL, a large solar plant in Badojoz, Spain owned by a company called Dioxipe.[65]   The parties agreed that Elecnor would participate in the ASTE project in return for Eiser taking a stake in Dioxipe.[66]   On 6 May 2009, Eiser and Elecnor entered into a Memorandum of Understanding providing for Eiser to acquire a minority stake in both the ASTE and ASTEXOL projects.   Elecnor provided the required guarantee to cover the risk of delayed completion.[67]

123.   As of 15 August 2008, Eiser's exposure in its solar investments in Spain amounted to €45 million.[68]   Over the ensuing months, the projects in which Claimants invested crossed various regulatory thresholds.   Article 16 of RD 661/2007 required Claimants to acquire state licenses before concluding contracts to access the electrical grid.   On 30 October 2008, the ASTE projects received the required state licenses,[69] and on 31 March 2009, ASTE concluded a Technical Agreement with grid operator Red Eléctrica to access the electrical grid.

124.   In the meantime, Respondent became increasingly concerned by a large and growing cumulative "tariff deficit", the financial gap between the costs of subsidies paid to renewable energy producers and revenues derived from energy sales to consumers.   In an effort to address this problem, on 30 April 2009 Respondent promulgated Royal Decree Law 6/2009 ("RDL 6/2009"),[70] which introduced a pre-registration process ("RAIPRE") intended to limit the number of projects potentially eligible for the RD 661/2007 regime. Projects entered into the registry had three years to be completed and definitively registered.   A document prepared by Eiser at this time viewed this evolution of the RD

---

[64] Cl. Reply, ¶ 144; Second Hector Statement, ¶ 30.

[65] Cl. Reply, ¶ 145; Second Hector Statement, ¶¶ 31-32.

[66] Rev. Tr. Day 1 (ENG), 157:8-11 (Ms. Gill).

[67] Cl. Mem., ¶ 180; Second Meissner Statement, ¶ 22; Second Hector Statement, ¶ 31.

[68] **R-207.09**, *Investment Committee Minutes, Project Helianthus*, 15 August 2008, at 2.

[69] *See* **R-0147**, § VI at 3.

[70] **C-073**, Royal Decree Law 6/2009, which adopted certain measures within the Energy Industry and approved the special rate, 30 April 2009 (published on 7 May 2009) [hereinafter, "RDL 6/2009"]; Rev. Tr. Day 1 (ENG), 157:25-158:16 (Ms. Gill).

661/2007 regime as "good news" because Claimants were confident of their ability to meet the three-year registration deadline.[71]

125.    The process of meeting regulatory and administrative requirements continued during 2009. A 26 November 2009 document prepared for Eiser's Investment Committee indicated that ASTE 1A and 1B had been successfully pre-registered for the RD 661/2007 regime under RDL 6/2009.[72] This was perhaps a few days premature; the actual registrations of ASTE 1A and 1B and ASTEXOL were recorded in separate resolutions dated 11 December 2009. Allowing for slight discrepancies perhaps attributable to differences in interpretation, the three registration documents indicate in similar terms that all three plants had been granted the RD 661/2007 regime.

- The registration document for ASTEXOL, captioned "Ruling of the Directorate General of Energy and Mining Policy in which [the ASTEXOL plant owned by DIOXIPE], who have been granted the economic regime regulated in Royal Decree 661/2007, of 25 May, is registered in the payment pre-allocation registry." The document states: "[...] the economic regime of the installations which are registered in the payment pre-allocation Registry [...] shall be as established in Royal Decree 661/2007 [...]."[73]

- The registration document for ASTE-1A speaks of ASTE 1-A "to which the economic regimen regulated in Royal Decree 661/2007, dated 25 May, is granted." The text of the Resolution repeats the language of ASTEXOL registration regarding application of the RD 661/2007 regime.[74]

- The registration document for ASTE-1B again speaks of ASTE 1-B "to which the economic regime regulated in Royal Decree 661/2007, dated 25 May, is granted."[75]

---

[71] First Meissner Statement ¶ 47; First Hector Statement ¶ 50; Second Hector Statement ¶ 34. RDL 6/2009 was discussed (probably "good news") in **R-207.17**, ABN AMRO Infrastructure Capital Management Limited, *Investment Committee Update, Project Helianthus*, 19 May 2009, at 2.

[72] **R-207.23**, *Investment Committee Minutes, Project Helianthus*, 26 November 2009, at 1.

[73] **R-0202**, Resolution of the Directorate-General of Energy and Mining Policy, which registers in the pre-allocation register the Power station CENTRAL SOLAR TERMOELÉCTRICA "ASTEXOL -2", whose owner is DIOXIPE SOLAR, S.L, who is awarded the economic regime regulated by Royal Decree 661/2007, of 25 May, 11 December 2009, at 5-6. *See also*, **C-154** and **R-060**.

[74] **C-075**, Resolution of the Directorate General for Energy Policy and Mines, through which the THERMOELECTRIC SOLAR ENERGY POWER PLANT ASTE-1A owned by ARIES SOLAR TERMOELÉCTRICA, S.L. is registered in the Pre-Allocation Registry for Compensation and to which the economic regime regulated in Royal Decree 661/2007, dated 25 May, is granted, 11 December 2009.

[75] **C-076**, Resolution of the Directorate General for Energy Policy and Mines, through which the THERMOELECTRIC SOLAR ENERGY POWER PLANT ASTE-1B owned by ARIES SOLAR

34

> The text again repeats the language of the ASTEXOL registration regarding application of the RD 661/2007 regime.

126.   The Parties disagreed whether these documents constituted binding commitments by Respondent.  In any case, they establish that as of November 2009, more than two years after Claimants acquired their interests in the ASTE projects, the responsible Spanish authorities viewed all three plants as subject to the RD 661/2007 regime.

127.   During this same period in 2009, the evidence indicates that Respondent's authorities were considering the possibility of other measures to limit availability of the RD 661/2007 regime to additional facilities.  A 25 November 2009 update prepared for Eiser's Investment Committee reported on a successful lobbying effort by renewables generators to defeat a proposal to eliminate RD 661/2007 coverage of new plants coming on line during the 12-month period after 85% of the target capacity had been met. [76]

128.   The engineering, procurement and construction contracts with Elecnor, were signed on 27 April 2010 for ASTE and 3 March 2010 for ASTEXOL. [77]

129.   In April 2010, almost three years after Eiser was introduced to the possibility of a CSP investment in Spain, construction work began on the ASTE plants. [78] The next two months were marked by discussions between the government and renewables producers regarding possible further revisions to the RD 661/2007 regime.  A June 2010 Eiser Asset Review document refers to Spain's budget and tariff deficits, and notes proposals to alter the regulatory framework, primarily aimed at the solar voltaic sector, but also impacting other technologies. The Asset Review document assessed that the worst possible outcome would still allow financing of the projects, but would "affect greatly" the financing base case used by the banks. As of that time, Claimants had invested €124 million in the ASTE projects. [79]

---

TERMOELÉCTRICA, S.L. is registered in the Pre-Allocation Registry for Compensation and to which the economic regime regulated in Royal Decree 661/2007, dated 25 May, is granted, 11 December 2009.

[76] **R-0207.22**, EISER Infrastructure Limited, *Investment Committee Update, Project Helianthus*, 25 November 2009, at 2.  *See also*, **C-211** and Rev. Tr. Day 1 (ENG), 162:6-163:21 (Ms. Gill).

[77] First BDO Financial Report, ¶¶ 29-30.

[78] First Hector Statement, ¶ 54.

[79] **R-207.25**, EISER Infrastructure Limited, *Asset Review, Project Astexol & Helianthus*, June 2010, at 2-4; **R-207.26**, *Investment Committee Minutes and Update, ASTE*, 22 June 2010, at 1.  *See also*, **C-217**.

130.    The threatened changes did not materialize in a manner that significantly affected Claimants.  On 2 July 2010, the Ministry of Industry, Tourism and Trade issued a press release setting forth revisions to the subsidy regime that had been agreed in negotiations with solar thermal and wind power producers' trade associations. [80]   The press release described limited reductions of the subsidy regime, but guaranteed continued availability of rates under the RD 661/2007 regime for existing registered facilities, describing the agreement between the Ministry and wind and solar thermal producers as "guaranteeing the current subsidies and rates of RD 661/2007 for the facilities in operation (and for those included in the pre-registration) starting in 2013."   Claimants saw these developments as positive.[81]

131.    Substantial work on the ASTE projects got underway in July 2010 following the Ministry Press release. [82]  In November 2010, a draft decree implementing the elements of the July press release was published.  This confirmed that any future changes to the RD 661/2007 regime would not affect registered installations.[83]  Aside from loss of the premium rate for one year, these changes had little impact on Eiser.[84]  On 8 December 2010, RDL 1614/2010[85] was promulgated, implementing the July 2010 agreement between operators and the government.  Article 4 confirmed that the tariff reviews envisaged in RD 661/2007 would not apply to registered CSP plants.   With clarification of the regulatory situation, banks were prepared to proceed with the financing for ASTE.[86]

---

[80] **C-088**, Ministry of Industry, Tourism and Commerce, Press Release, *The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Remuneration Frameworks*, 2 July 2010.

[81] Cl. Mem., ¶ 191; First Meissner Statement, ¶ 53; First Hector Statement, ¶ 53; Bolaña Statement, ¶ 18; Second Hector Statement, ¶ 43; Second Meissner Statement, ¶ 26; **R-207.27**, *ASTE–Status Update*, 9 July 2010, at 1 ("[o]verall, the outcome of the regulatory review is positive [...]"). *See also*, **C-218**.

[82] First Meissner Statement, ¶ 53.

[83] First Hector Statement, ¶¶ 55, 77.

[84] First Meissner Statement, ¶¶ 55-56.

[85] **R-062**, Royal Decree 1614/2010, regulating and modifying certain aspects related to electric energy production using thermoelectric solar and wind power technologies, 7 December 2010 (published 8 December 2010) [hereinafter, "RD 1614/2010"].

[86] First Hector Statement, ¶ 57; Second Meissner Statement, ¶ 27; Second Hector Statement, ¶ 46.

132.    As of 16 December 2010, Claimants' half-year review reflected that their total "equity investment" in the projects would total €124.3 million.[87]   At 2010 year end, Eiser valued its investment in ASTE and ASTEXOL at €133.4 million. [88]

133.    On 30 November 2010, letters were written on behalf of each of the three plants, waiving their right to discharge into the grid prior to 1 August 2012, thus implementing one of the changes agreed between the Ministry and renewables producers in July.   Each letter also requested that the plant "be notified about the remunerative conditions of the installation during its operational life."[89]

134.    In three separate Resolutions dated 2 February 2011 and 1 March 2011,[90] the Directorate accepted the plants' waiver of their rights to supply power prior to 1 August 2012.   The documents continued to "inform that, currently," the remuneration of the three plants is as specified by the tariffs, premiums, limits and complements set out in RD 661/2007.[91]   As translated by Respondent, these informed the recipient that:

> [C]urrently, by dint of the stipulations of section 1 [...] the remuneration applicable to the installation is made up of the tariffs, premiums, upper and lower limits and complements set out in Royal Decree 661 [...].[92]

135.    The Parties disputed the legal significance of the Resolutions' reference to the plants' remuneration under the RD 661/2007 regime.   Claimants contend that it constituted a binding commitment by Respondent. [93]   Respondent insisted that it had no binding legal

---

[87] **R-207.29**, Asset Management Quarterly Review ASTE-XOL, December 2010, at 1.

[88] **C-289**, Audited Financial Statements of Eiser Global Infrastructure Fund, Year Ended 31 December 2011, at 6.

[89] **R-063/C-090**, Letter of Waiver ASTE 1A, 30 November 2010; **R-064/C-091**, Letter of Waiver ASTE 1B, 30 November 2010; and **R-065/C-092**, Letter of Waiver ASTEXOL 2, 1 December 2010.   Respondent contests Claimants' translations. Resp. Rej., ¶¶ 423-424.

[90] **R-066**, Ruling of the Directorate General of Energy Policy and Mines, Accepting the Waiver Filed on behalf of the Holder of ASTE-1A, 2 February 2011; **R-067**, Ruling of the Directorate General of Energy Policy and Mines, Accepting the Waiver Filed on behalf of the Holder of ASTE-1B, 2 February 2011; and **R-068**, Ruling of the Directorate General of Energy Policy and Mines, Accepting the Waiver Filed on behalf of the Holder of ASTEXOL 2, 1 March 2011.

[91] **R-066**; **R-067**; **R-068**; First Meissner Statement, ¶ 57; First Hector Statement, ¶¶ 58, 78; Second Hector Statement, ¶ 48.

[92] **R-066**; **R-067**; **R-068**. *See also*, Rev. Tr. Day 1 (ENG), 171:6-9 (Ms. Gill).

[93] Rev. Tr. Day 1 (ENG), 171:11-172:6 (Ms. Gill).

effect and was merely a statement of factual information provided in response to an inquiry. Whatever their legal status, the three statements show that as of February 2011, more than three-and-a-half years after Claimants began to consider a possible investment in Spain, and seven months after construction of the plants had commenced, the competent Spanish authorities continued to view the RD 661/2007 regime as applicable to their investment.

136.    On 15 April 2011, the investors, the operating companies, and the banks closed on the financing required to complete the projects. Claimants' shareholder loans and interest in the amount of €124.3 million were repaid and reinvested in ASTE and ASTEXOL. [94] As ultimately configured, the debt equity ratios for the plants were 70% debt – 30% equity for ASTEXOL, and 63.5% debt – 36.5% equity for the two ASTE plants. [95] (Substantial shareholder loans were treated as equity. [96]) Eiser's Quarterly Review for April 2011 then shows a total equity investment in the projects of €124.3 million. [97] As of 31 December 2011, utilizing a DCF valuation, Eiser valued its investment in ASTE and ASTEXOL at €148.3 million. [98]

137.    In November 2011, Spain held elections, resulting in a significant defeat for the existing government and formation of a new government in December 2011. [99] In his inaugural address, the President pointed to the accumulated tariff deficit, then amounting to more than €22 billion, and called for structural reforms in the energy system. "We must therefore introduce policies based on putting a brake on and reducing the average costs of the system [...]." [100]

---

[94] First Hector Statement, ¶ 61; Second Hector Statement, ¶ 51.

[95] **C-140**, Notarized Deed of EUR 238,745,000 Credit Agreement between, amongst others, Dioxipe Solar S.L. as Borrower and Banco Bilbao Vizcaya Argentaria, Co. as Agent Bank; **C-141**, Notarized Deed of EUR 443,790,000 Credit Agreement between, amongst others, Aries Solar Termoelécrica, S.L. as Borrower and Banco Bilbao Vizcaya Argentaria, Co. as Agent Bank.

[96] Rev. Tr. Day 6 (ENG), 39:18-19 (Mr. Sullivan).

[97] **R-207.31**, *Asset Management Quarterly Review - ASTE-XOL*, April 2011, at 1.

[98] **C-289**, Audited Financial Statements of Eiser Global Infrastructure Fund, Year Ended 31 December 2011, at 6.

[99] **R-084**, Ministry of the Presidency, Secretariat of State for Communication, *Six Months of Government: To Reform for Growing*, 9 July 2012.

[100] **R-073**, President Mariano Rajoy Inagural Address, 19 December 2011.

138.    The new government quickly took measures aimed at reducing the tariff deficit, beginning in January 2012 with the adoption of RDL 1/2012, suspending new registrations for the Special Regime.[101]   The government also gave the National Energy Commission ("CNE") thirty days to produce a report with recommendations to curb the tariff deficit.[102]   The Commission initiated a substantial public consultation, and in March 2012 produced a report with several recommendations relevant to CSP plants, involving modifications of the existing Special Regime, not its complete replacement by a new type of regulation.[103]

139.    In 2012, as the plants neared completion and entry into service, they crossed additional licensing and regulatory thresholds, during which Spanish authorities again affirmed their participation in the Special Regime under RD 661/2007.  On 14 March, the commissioning of the facilities connecting ASTE 1-A and 1-B to the grid was authorized.[104]   On 16 May, a Resolution of the Castilla-La Mancha General Directorate of Industry, Energy and Mines recorded registration of ASTE 1-B in the b.1.2 group of the Special Regime, citing as background information, *inter alia*, RD 661/2007.[105]   On 22 and 24 May respectively, the final commissioning of ASTE 1-B[106] and ASTE 1A[107] were authorized.

140.    On 25 May 2012, ASTEXOL-2 received confirmation of preliminary registration by the Regional Department of Agriculture, Rural Development, the Environment and Energy. The registration resolution states, *inter alia*:

> The applicable economic regime for the billing of the power and energy delivered to the grid shall be established by Royal Decree

---

[101] **R-076**, Ministry of Industry, Energy and Tourism, Press Release, *The Government will Temporarily Discontinue the Premiums for New Special Regime Power Plants*, 27 January 2012.

[102] **R-077**, Letter from the Secretary of State for Energy, Ministry of Industry, Energy and Tourism, to the President of the National Energy Commission, 27 January 2012 ("The above, with the swearing in of the new government, calls for a radical analysis [...]").

[103] **R-079**, CNE, *Report on the Spanish Energy Sector: Introduction and Executive Summary*, 7 March 2012; **R-080**, CNE, *Report on the Spanish Energy Sector: Part I – Measures Guaranteeing the Economic Financial Sustainability of the Electricity System*, 7 March 2012.

[104] **R-201**, End of Works Certification, ASTE 1A and ASTE 1B, 14 March 2012, at 1-4.

[105] **R-201**, Resolution of the General Directorate of Industry Energy and Mines Recognizing the Condition of Electrical Energy Production Installation in Special Regime to ASTE 1B, 16 May 2012, at 5-6.

[106] **C-095**, Resolution on Peripheral Building Services in Ciudad Real by which the Final Commissioning of the ASTE-1B Facility is Authorized, 22 May 2012. *See also*, **R-201**, at 7-8.

[107] **C-094**, Resolution on Peripheral Building Services in Ciudad Real by which the Final Commissioning of the ASTE-1A Facility is Authorized, 24 May 2012.

> 661/2007, of 25 May, regulating the production of electrical energy under the special regime.[108]

141.   On 25 May 2012, a regional authority issued a ruling marking commissioning of ASTEXOL-2 "under a special regime (thermoelectric solar energy)" under RD 661/2007.[109]   On 8 June 2012, the Ministry of Industry, Energy and Tourism issued certifications that all three plants were registered in the Administrative Register ("RAIPRE") for plants in the Special Regime, identifying all three as having been classified in the Special Regime in Group b.1.2 under RD 661/2007.[110]

142.   On 24 October 2012, ASTE 1A and ASTE 1B were finally registered by the Castilla-La Mancha Regional Directorate of Industry, Energy and Mines.  The registration documents state:

> The economical regime resulting from this final registry corresponds to group b.1.2 of article 24.1 a) of Royal Decree 661/2007, of the 25th of May, to sell electricity according to a regulated tariff and shall be applicable to such installation with effect from the 1st of June 2012, without prejudice of what is established in article 4 of Royal Decree-Law 6/2009 of the 30th of April.[111]

143.   19 November 2012 marked the Definitive Registration of ASTEXOL 2.  The Resolution states:

> The applicable economic regime for the billing of the power and energy delivered to the grid shall be established by Royal Decree

---

[108] **R-202**, Ruling of the Directorate General of Agro-Industrial and Energy Incentives, of The Regional Department of Agriculture, Rural Development, the Environment and Energy, on the Prior Registration in the Regional Registry of Production Installations under Special Regime, Case Reference RE/1572/08, 25 May 2012, at 7-8.

[109] **C-096**, Ruling of the Directorate-General of Energy and Agro-Industrial Incentives, of the Regional Department of Agriculture, Rural Development, Environment and Energy, on Commissioning the ASTEXOL-2 Facility for Generating Electricity under the Special Regime, 25 May 2012.

[110] **C-007**, Provisional RAIPRE Certificates for ASTE-1A, ASTE-1B and ASTEXOL-2 CSP Plants, 8 June 2012.

[111] **R-201**, Resolution of the General Directorate of Industry, Energy and Mines Recognizing the Final Registry of ASTE 1B Thermosolar Plant, whose Holder is Aries Solar Termoeléctrica, S.L. in the Regional Registration Subject to Such Regime, 24 October 2012, at 9-10; **C-158**, Resolution of the General Directorate of Industry, Energy and Mines Recognizing the Final Registry of ASTE 1A Thermosolar Plant, whose Holder is Aries Solar Termoeléctrica, S.L. in the Regional Registration Subject to Such Regime, 24 October 2012.

661/2007, of 25 May, regulating the production of electrical energy under the special regime.[112]

### E.    The Disputed Measures

144.    The following month, December 2012, without prior notice to CSP producers, Parliament adopted Law 15/2012, *inter alia* imposing a 7% tax on the total value of all energy fed into the National Grid by electricity producers ("TVPEE") and eliminating premiums for electricity generated with gas.[113]  A February 2013 Eiser Quarterly Review discussed the impact of the 7% tax on energy production, eliminating subsidies for electricity generated using gas, and other revisions to the regulatory regime.  It concluded that the changes eliminated nearly 30% of ASTEXOL's net revenue and brought the debt service coverage ratio to approximately one.[114]

145.    Royal Decree Law 2/2013 of 1 February 2013 ("RDL 2/2013") then eliminated the Premium Option altogether, leaving CSP producers the option of either the market price or the fixed rate tariff.  RDL 2/2013 also cancelled the mechanism for updating the feed-in tariffs in accordance with the Consumer Price Index, substituting a different index lower than the CPI. [115]

146.    A much more drastic change came on 12 July 2013, with the enactment of Royal Decree Law 9/2013 ("RDL 9/2013").[116]   This legislation amended Article 34 of the 1997 Electricity Law (which created the Special Regime for renewables producers) and repealed RD 661/2007. It eliminated the entire regime of fixed tariffs and premiums, and substituted a system providing for "specific remuneration" based on "standard" (but not actual) costs

---

[112] **R-202**, Ruling of the Directorate General of Agro-Industrial and Energy Incentives, of The Regional Department of Agriculture, Rural Development, the Environment and Energy, on the Definitive Registration in the Regional Registry of Production Installations under Special Regime, Case Reference RE/1572/08, 19 November 2012, at 9-10.

[113] **C-025**, Law 15/2012, concerning tax measures to ensure energy sustainability, 27 December 2012 (published on 28 December 2012) [hereinafter, "Law 15/2012"]; First Hector Statement, ¶ 85; Rev. Tr. Day 1 (ENG), 172:25-173:16 (Ms. Gill).

[114] **C-174**, EISER Infrastructure Limited, Asset Management Quarterly Review, February 2013.

[115] **C-026**, Royal Decree Law 2/2013, concerning urgent measures within the electricity system and the financial sector, 1 February 2013 (published on 2 February 2013) [hereinafter, "RDL 2/2013"]; Rev. Tr. Day 1 (ENG), 175:12-25 (Ms. Gill).

[116] **C-029**, Royal Decree Law 9/2013, by which urgent measures are adopted to guarantee the financial stability of the electricity system, 12 July 2013 (published on 13 July 2013) [hereinafter, "RDL 9/2013"].

per unit of installed power, plus standard amounts for operating costs. However, many key details of the new replacement regime were left uncertain.[117]   Then, in December 2013, Respondent adopted Law 24/2013, which superseded the 1997 Electricity Law and completely eliminated the distinction between the Ordinary and Special Regimes. [118]

147.   In June 2014, Respondent adopted Royal Decree 413/2014 ("RD 413/2014"),[119] which provided for a regulatory regime intended to attain a prescribed reasonable return calculated on the basis of a hypothetical "efficient" plant.  Crucial details of the new regime, however, were left to the government regulators who developed Ministerial Order IET/1045/2014 of 16 June 2014.  This Ministerial Order sets the remuneration parameters for "standard" facilities,[120] including the estimated "standard costs" applied under the new regulatory regime.[121]   Ministerial Order IET/1045/2014 marked the definitive end of the RD 661/2007 regime.[122]

148.   The new regulatory regime culminating in Ministerial Order IET/1045/2014 applies to existing plants constructed and financed under the principles of the prior regime.  *Inter alia*, under the new regime:

- The tariff regime in RD 661/2007 is abandoned, substituting a new regime of reduced remuneration based on hypothetical "standard" investment and operating costs and characteristics of hypothetical "efficient" plants, with remuneration limited to an operating life of 25 years.

- Remuneration is calculated based on regulators' projections of the revenues required to attain a prescribed lifetime pre-tax return of 7.398% based on the hypothetical costs of a hypothetical standard installation.  The prescribed rate of return is potentially subject to change every six years.

---

[117] First Meissner Statement, ¶ 61; First Hector Statement, ¶ 90.

[118] **C-030**, Law 24/2013 of the Electricity Sector, 26 December 2013 (published on 27 December 2013) [hereinafter, "Law 24/2013"]; Rev. Tr. Day 1 (ENG), 177:7-20 (Ms. Gill).

[119] **C-031**, Royal Decree 413/2014, regulating the activity of electric power production from renewable energy sources, cogeneration and waste, 6 June 2014 (published on 10 June 2014) [hereinafter, "RD 413/2014"].

[120] **C-100/R-094**, Order IET/1045/2014, 16 June 2014 (published 20 June 2014) [hereinafter, "Order IET/1045/2014."]

[121] *Id.*

[122] *See* First Brattle Regulatory Report, ¶ 103 *et seq.*  Claimants recognize the fundamental nature of the change to the new regime in June 2014, using this date as the turning point in calculating their damages claim.  Rev. Tr. Day 2 (ENG), 9:23- 10:5 (Ms. Stoyanov).

- Remuneration is based on capacity, not production, eliminating the incentive potentially available under RD 661/2007 to build more expensive but more productive plants. Remuneration is capped at the hypothetical production of a "standard plant."

- Payments already received by a facility under the prior regime can be credited against the lifetime remuneration due under the new one, thus allowing clawback of "excess" amounts received under the prior regime.

149. Thus, the new system is calculated to provide a lower pre-tax rate of return that Respondent judges to be reasonable. This is calculated on the basis of hypothetical assets and costs, without regard to specific existing plants' actual costs or efficiencies.[123]  Instead, existing plants' remuneration is based on their generating capacity and regulators' estimates of the hypothetical capital and operating costs, per unit of generating capacity, of a hypothetical standard installation of the type concerned. [124]  The regulatory regime also prescribes a twenty-five year regulatory life for CSP plants. Once set, neither this regulatory life nor the prescribed "initial value of the investment" can be changed.

150. The new measures were intended to, and did, accomplish the objective of significantly reducing the level of subsidies paid to CSP and other renewables generators. At the Hearing, Mr. Espel of BDO informed the Tribunal that Spain's annual tariff deficit had been eliminated, and that a small surplus was projected for 2015.[125]

151. However, Claimants' plants did not conform to the retroactively applied standard for hypothetical "efficient" plants. The historical capital costs of Claimants' plants were about 40% higher than the level deemed efficient under the new regime.[126]  Claimants' financial experts, Brattle, attribute the higher capital costs to several factors, including that two of the plants owned (rather than leased) the underlying land, and additional costs incurred in anticipation of adding future storage.[127]  The plants' operating and maintenance costs also

---

[123] Rev. Tr. Day 3 (ENG), 72:5-8 (Mr. Montoya) ("[W]ell, all plants were analyzed. For instance, from the advantage [sic] point of energy produced, the capacity, their technical characteristics, but obviously [...] not the financial aspects of each of them [...].")

[124] Cl. Reply, ¶ 251 *et seq*.

[125] Rev. Tr. Day 5 (ENG), 41:23-42:4 (Mr. Espel).

[126] Second Brattle Quantum Report, ¶ 130 and Table 9.

[127] *Id.*, ¶¶ 131-135.

exceeded those deemed efficient.[128]   The plants' revenues accordingly dropped sharply from those projected by the investors and their lenders under the prior regime.  ASTE 1-A's revenues fell by 66% compared to those projected under the prior regime.[129]

152.   The operating companies' financial reports for 2014 (the latest year available to the Tribunal) show revenues under the new regime substantially below the level required to cover the plants' actual financing and operating costs, let alone to provide any return on the investment.  In 2014, Aires Solar showed net operating income of about €19.92 million, well short of the almost €27.76 million required to service its debts just with third parties.[130] Dioxipe showed net operating income of €7.79 million, against current debt obligations to third parties of about €13.94 million.[131]

153.   This sharp fall of revenues from the levels anticipated under the RD 661/2007 regime forced the operating companies into debt rescheduling negotiations with their external lenders.   Following these negotiations, for the next several years, all revenues exceeding ASTE's operating costs go to the external lenders, leaving nothing to repay the investors' loans (which are being capitalized) or as return of capital. [132]

154.   In response to the Tribunal's question at the Hearing, Mr. Meissner, a founding partner of Eiser, drew a distinction between the changes in Spain's regulatory regime and other regulatory situations where regulators might "tinker a little bit with the returns."   In contrast, he deposed that "here we had a complete value destruction.  We lost all value in this particular project."[133]   In response to a further question, Mr. Meissner testified that, at the end of 2014, "the investment was valued at 4 million [Euros], compared to an

---

[128] *Id.*, ¶ 136 and Table 10.

[129] First Brattle Regulatory Report, ¶ 154.  In Respondent's closing argument, counsel contended that it "is not true at all" that the plants' revenues went down.  Rev. Tr. Day 6 (ENG), 56:25-57:2 (Mr. Fernandez).  This argument is difficult to reconcile with the operating companies' financial statements in the record.

[130] In closing argument, counsel for Spain submitted, without citation to evidence, that Eiser was drawing cash from the operating companies in order to secure repayment of its own loans.  Rev. Tr. Day 6 (ENG), 70:12-14 (Mr. Fernandez).  This is inconsistent with the evidence in the case.  Second Meissner Statement, ¶ 30, Rev. Tr. Day 5 (ENG), 203:16-19 (Mr. Caldwell) (testifies that shareholder loans are not being repaid).

[131] **BQR-088**, 2014 Annual Accounts for ASTE, at 4; **BQR-089**, 2014 Annual Accounts for Dioxipe, at 4.

[132] Rev. Tr. Day 5 (ENG), 203:9-19 (Mr. Caldwell).

[133] Rev. Tr. Day 3 (ENG), 13:17-22 (Mr. Meissner).

investment which we made, invested in the plants of about 125 million; so a very significant loss."[134]

## IV.    SUMMARY OF THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

155.    Claimants' request for relief is formulated in the Memorial as follows:

> 537. The Claimants request the following relief:
>
> (a) a declaration that the Respondent has violated Articles 10 and 13 of the ECT;
>
> (b) an order that the Respondent make full reparation to the Claimants for the injury to its investments arising out of Spain's violation of the ECT and international law, such full reparation being in the form of:
>
>> (i) full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered prior to the reinstatement of the prior regime; or
>>
>> (ii) pay the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT; and
>>
>> (iii) in any event:
>>
>>> A. pay the Claimants pre-award interest at a rate of 2.07% compounded monthly; and
>>>
>>> B. pay post-award interest, compounded monthly at a rate to be determined by the Tribunal on the amounts awarded until full payment thereof; and
>
> (c) pay the Claimants the costs of this arbitration on a full indemnity basis, including all expenses that the Claimants have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel and experts; and
>
> (d) any other relief the Tribunal may deem appropriate in the circumstances.

---

[134] Rev. Tr. Day 3 (ENG), 17:9-12 (Mr. Meissner).

> 538. The Claimants reserve their rights to amend or supplement this Memorial and to request such additional, alternative or different relief as may be appropriate.[135]

156.   In their Additional Submission on the New Defense, Claimants further request:

> 73. [...] [T]he Claimants respectfully request that Spain's new defence be rejected and the Respondent be *estopped* from arguing that the CSP Plants do not qualify under the Special Regime because the installations exceed the 50 MW limitation provided under Article 27.1 of the 1997 Electricity Law. Similarly, Spain should be estopped from arguing that because the installations could not qualify under the Special Regime, the Claimants do not have any expectations as to the continued application of the tariffs under Article 36 of RD 661/2007. Spain's new defence is unsustainable, raised very late in the proceedings, in an attempt to elude liability under the ECT.

> 74. Should the Tribunal be minded to give any further consideration to the Spain's new defence, the Claimants respectfully request the Tribunal to decide that Spain's new defence be rejected on the basis that the Respondent is requesting from the Tribunal a decision on issues that go beyond the Tribunal's role in deciding the present investment dispute.

> 75. Alternatively, the Claimants request the Tribunal to reject Spain's new defence on the basis that, as a matter of Spanish law, the CSP Plants do not exceed the 50 MW installed capacity threshold, which is determined based on nominal capacity of the plants; and that Spain's position on the calculation of installed capacity is technically flawed and should be rejected, as demonstrated in the Second Mancini Report.

> 76. Additionally, given that the defence was not only filed belatedly, but also manifestly lacks any merit, the Claimants request that Spain be ordered to pay all costs in relation to the new defence.[136]

157.   As to jurisdiction, Claimants request in the Rejoinder:

> Insofar as the jurisdictional objections are concerned (and in addition to the relief set out at paragraph 537 of the Claimants' Memorial and paragraph 997 of the Claimants' Reply on the Merits

---

[135] Cl. Mem., ¶¶ 537-538.   This same request for relief was reiterated in the Reply, including a few additional "reservations" pertaining to documents the production of which was pending at the time of the Reply, and discovery of any translation discrepancies. Cl. Reply, ¶ 997.

[136] Cl. Sub. New Def., ¶¶ 73-76.

and Counter-Memorial on Jurisdiction), the Claimants request the Tribunal to:

(a) dismiss all of the Respondent's objections; and

(b) order that the Respondent bear the cost of the jurisdictional objections.[137]

158. Respondent, in turn, asks:

1261. In view of the arguments set forth in this document, the Kingdom of Spain respectfully requests that the Arbitral Tribunal:

a) Declare it has no jurisdiction over the Claimants' claims, or inadmissibility, if applicable, in accordance with that set forth in section III of this brief, referring to Jurisdictional Objections;

b) In the alternative, in the event that the Arbitral Tribunal decides that it has jurisdiction over this dispute, to dismiss all the Claimant's pretensions regarding to merits as the Kingdom of Spain has not breached the ECT in any way, in accordance with the above-mentioned part (A) and (B) of Section IV of this brief, referring to the merits of the case;

c) In the alternative, to dismiss all reparation pretensions from the Claimants as they do not have right to compensation, in accordance with the foregoing in part (C) of Section IV of the present brief; and

d) Order the Claimants to pay all the costs and expenses arising from the present Arbitration, including the administrative costs incurred by ICSID, the fees of the arbitrators and the fees for legal representation of the Kingdom of Spain, their experts and advisers, as well as any other costs or expenses incurred, all of this including a reasonable rate of interest from the date on which these costs were incurred up to the date of payment.

1262. The Kingdom of Spain reserves the right to supplement, modify or complement these allegations and to present any additional arguments required in accordance with the ICSID Convention, the ICSID arbitration rules, the Procedural Orders and the guidelines of the Arbitral Tribunal in order to respond to all the allegations made by the Claimants in relation to the present matter.

1263. In particular, in the exercise of their right of defence, the Kingdom of Spain reserves the right to incorporate into these arbitral

---

[137] Cl. Rej., ¶ 194.

> proceedings the necessary documents to discredit the manifestations
> of the witness for the Claimants, Mr Bolana. This presentation shall
> be requested to the Arbitral Tribunal as soon as the authorisation to
> lift the the confidentiality agreed in the Procedural Order by the
> Court in the case Antin is received.[138]

159. The Parties' respective positions in connection with the matters at issue in the arbitration
are summarized in the sections that follow. The Tribunal emphasizes that it has considered
the full extent of the Parties' arguments in their written and oral submissions. The fact that
a given argument might not be referred to expressly in the brief summary of the Parties'
positions included in this Award should not be considered as an indication that the Tribunal
has not considered the argument.

## V.   JURISDICTION

### A.   First Objection: The Intra-EU Objection

160. Spain maintains that the Tribunal lacks jurisdiction *ratione personae* because the ECT does
not apply to disputes involving investments made within the EU by investors from other
EU countries.

#### (1)   The Parties' Positions

##### a.   Respondent's Position

161. Respondent summarizes the essence of its Intra-EU Objection in its Rejoinder:

> [T]he Kingdom of Spain considers that there is no protected investor
> pursuant to the ECT. Both, [sic] the United Kingdom [...] and the
> Kingdom of Spain were Member States of the European Economic
> Community, currently the European Union (henceforth 'EU'), when
> subscribing the ECT. The EU is a Contracting Party of the ECT and
> hence the Claimants do not derive from '*another Contracting Party*'
> as Article 26 of the ECT requires in order to seek arbitration. The
> arbitration dispute settlement mechanism foreseen in Article 26 of
> the ECT is not applicable to an intra-EU dispute such as the present
> one. In such disputes, European Law and its dispute resolution

---

[138] Resp. Rej., ¶¶ 1261-1263. *See also*, Resp. C-Mem., ¶¶ 1245-1246.

mechanisms take precedence over the ECT, thus determining the
lack of jurisdiction of the Arbitral Tribunal to hear this dispute.[139]

162.   Article 26 of the ECT, providing for arbitration of disputes, covers disputes between "a
Contracting Party" and "an Investor of another Contracting Party."[140]   As both Spain and
the European Union are parties to the ECT, in Respondent's view, this "inevitably implies
the exclusion of said Article in cases in which an investor from an EU Member State has a
dispute [concerning an investment] with an [sic] Member State of the European Union
[...]."[141]

163.   For Respondent, the EU grants to investors with EU citizenship specific protection superior
to that granted by the ECT and by bilateral investment treaties,[142]  a regime that must apply
equally to all EU members without distinction.[143]   Accordingly, the proper mechanism for
addressing any disputes arising in this regard are European national courts, with the
possibility of ultimate recourse to the European Court of Justice, as the EU's judicial
system has "the monopoly on the ultimate interpretation of EU law."[144]

164.   Respondent further contends that as the United Kingdom, Luxembourg, and Spain were all
members of the European Economic Community ("EEC") when the ECT was concluded,
they could not, as a matter of European law, enter into obligations *inter se* related to the
internal electrical market, which was then harmonized by the EEC.[145]

165.   In Respondent's view, the ECT reflects this state of affairs and recognizes that the
European legal regime should exclusively govern investments within the EU by investors
from EU member countries.[146]   "[T]he ECT itself acknowledges the preferential
application of EU law between EU Member States. Furthermore, any discrepancies

---

[139] Resp. Rej., ¶ 4.

[140] **C-001**, Energy Charter Treaty, Art. 26(1).

[141] Resp. Rej., ¶ 63.

[142] *Id*., ¶¶ 65-66, 97, 131.

[143] *Id*., ¶ 77.

[144] *Id*., ¶ 75.

[145] *Id*., ¶ 64.

[146] *Id*., ¶¶ 79, 117.

between the ECT and EU Law must be resolved by granting primacy to the latter."[147] Respondent finds support for this interpretation in the ECT's wording and object and purpose, referring in particular to the ECT provisions related to Regional Economic Integration Organizations ("REIOs"). The ECT provisions cited by Respondent include, *inter alia*:

- Article 1(3), the definition of REIOs, which clearly covers the EEC (and now the EU), the only such entity party to the ECT. Article 1(3) defines REIOs as organizations constituted by States to which they have transferred competence over certain matters, some governed by the ECT, "including the authority to take decisions binding on them in respect of those matters." Respondent views this as recognition in the ECT that the EU may exercise sole competence with respect to certain matters, presumably including the harmonized electrical market.[148]

- Article 25, under which the ECT's most-favored-nation treatment obligations do not extend to preferential treatment accorded to members of an Economic Integration Agreement eliminating or prohibiting discriminatory measures among its members. Respondent again regards this as recognition of the allegedly preferential treatment accorded to intra-EU investors, again presumably including the energy sector.[149]

- Article 36(7), which accords to a REIO a number of votes equivalent to the number of its member States when voting on matters as to which the REIO has competence. According to Respondent, this necessarily implies that a REIO fully stands in the shoes of its member states in areas where it has competence. [150]

166. Respondent also emphasizes ECT Article 26(6), specifying the law that investment tribunals must apply in disputes between investors and ECT parties. It directs that tribunals "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[151]   In Spain's view, the rules of the EU's legal order constitute rules of international law that this Tribunal must apply pursuant to Article 26(6).[152]

---

[147] *Id.*, ¶ 119.

[148] *Id.*, ¶ 81.

[149] *Id.*, ¶¶ 83-84.

[150] *Id.*, ¶ 85.

[151] **C-001**, Energy Charter Treaty, Art. 26(6).

[152] Resp. Rej., ¶ 117; Rev. Tr. Day 1 (ENG), 57:1-9 (Prof. McLachlan, Ms. Moraleda) ("jurisdiction must be defined according to the standards and criteria of international law, including the European law"); Rev. Tr. Day 1 (ENG),

167.    Respondent urges that Article 26(6) shows that the ECT excludes intra-European disputes, because its application in such disputes would create an unacceptable legal situation. Respondent refers in this regard to Article 344 of the Treaty on the Functioning of the European Union ("TFEU"), which precludes Member States from submitting disputes concerning the interpretation or application of EU treaties to any method of settlement other than those provided in those treaties.[153]   In Respondent's view, allowing this arbitration to proceed would require the Tribunal to rule on the rights of a European investor within the EU's internal market,[154] matters as to which the European Court of Justice retains exclusive ultimate authority.[155] Accordingly, Article 26(6) "bans arbitration between an intra-EU investor and an EU Member State."[156]

168.    Respondent finds further support for its interpretation in the ECT's purpose. This is said to be "to establish the basis to extend the extant internal energy market to the former Soviet Socialist Republics. It was in no question a case of repealing or displacing EU Law, which is still preferentially applicable among its Contracting Parties and their citizens [...]."[157]

169.    As further support, Respondent refers to the European Commission's position "on the impossibility for there to be arbitrations between intra-EU members and EU member States under Article 26 of the ECT,"[158] and to the Commission's longstanding position that intra-EU bilateral investment treaties are incompatible with EU law.[159] Spain also invokes the supportive writings of Bruno Poulain and Professor Jan Kleinheisterkamp.[160]

170.    Respondent denies the relevance of other courts' and tribunals' decisions rejecting its position, observing that only two of those cited by Claimants involved the ECT.[161] As to

---

66:12-67:10 (Ms. Moraleda, Dr. Alexandrov) ("So for the purposes of article 42(1), you are asking us to apply EU law as rules of international law? Yes.").

[153] Resp. Rej., ¶ 88.

[154] *Id.*, ¶ 89.

[155] *Id.*, ¶ 90.

[156] *Id.*, § III(A)(3)(3.2).

[157] *Id.*, ¶ 98.

[158] *Id.*, ¶ 103.

[159] *Id.*, ¶ 105.

[160] *Id.*, ¶ 107.

[161] *Id.*, ¶ 110.

these, Spain distinguishes *Electrabel S.A. v. Hungary*, as Hungary was not a member of the EC/EU when it adhered to the ECT, and so had "full sovereignty" to enter into obligations prohibited to members of the Union.[162]

171.   Respondent denies that its interpretation is inconsistent with the ECT's plain meaning. In Respondent's view, it is immaterial that the ECT does not contain an express disconnection clause addressing EU members' internal relationships, as such a clause has no role in an area where there is complete harmonization of Community rules.[163]

172.   For Respondent, Claimants' position ignores the ECT's context, object and purpose, the EEC's role as a dominant actor in negotiating the ECT, and the impossibility that it would have agreed to subordinate its own superior internal system of investment protection to the ECT's.[164]   Respondent also disputes Claimants' arguments that the ECT does not conflict with EU law, and that it provides investors protection superior to that under European law. Respondent contends in this regard that investment arbitration cases invoked by Claimants involved other issues, not Spain's argument regarding the primacy of European law.[165]

173.   Respondent's Rejoinder concludes its discussion of this objection by observing that European authorities might regard any monetary award by the Tribunal in favor of the Claimants as impermissible state aid, implying that payment of such an award by Spain would be contrary to European law.[166]

### b.   Claimants' Position

174.   Claimants dispute Respondent's Intra-EU Objection, contending that it ignores multiple decisions by investment tribunals and national courts that have considered and rejected the objection, three in cases involving the ECT.[167]   Claimants refer to six investment tribunal

---

[162] *Id.,* ¶ 113.

[163] *Id.,* ¶¶ 140, 142.

[164] *Id.,* ¶ 131.

[165] *Id.,* ¶ 134.

[166] *Id.,* ¶¶ 145-146. *See also, id.,* ¶ 68(c).

[167] Cl. Reply, ¶ 368, n. 548.  Cases cited by Claimants in this regard include **CL-112**, *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007 [hereinafter, *Eastern Sugar v. Czech Republic*], ¶¶ 142-180; **CL-116**, *Eureko B.V. v. Slovak Republic*, PCA Case No. 2008-13, UNCITRAL (1976), Decision on Jurisdiction, 26 October 2010 [hereinafter, *Eureko v. Slovak Republic*], ¶ 291; **CL-120**, *Jan Oostergetel and Theodora*

rulings in existence when the claims were filed,[168] other unpublished decisions, including one – *PV Investors v. Spain* – where Spain has not consented to this Tribunal's access to a relevant decision or award,[169] and two other subsequent published awards.[170]  According to Claimants, no tribunals have upheld the Intra-EU Objection, and Spain's attempts to distinguish or dismiss tribunal awards rejecting it are unpersuasive and unavailing.[171]

175.    Claimants likewise reject Respondent's arguments to the effect that bilateral investment treaties are contrary to EU law; that the Intra-EU objection remains valid even if it has not been raised in some cases; that national court cases rejecting the objection may be subject to appeal; that high-level European institutions have "highlighted" the intra-EU issue; that a 2014 regulation of the European Parliament and Council shows that investment tribunals cannot consider intra-EU disputes; and invoking the Commission's order enjoining payment of the compensation awarded in *Micula v. Romania*.[172]

176.    For Claimants, the ordinary meaning of Article 26 of the ECT clearly demonstrates that Respondent has consented to arbitration of their claims.  The claims fall within the clear treaty language, which contains no limitations or qualifications creating an exception for claims by EU investors against EU member countries.[173]  Claimants further dispute that the ECT provisions cited by Respondent show that the ECT excepts intra-EU claims.[174]

---

*Laurentius v. Slovak Republic*, UNCITRAL (1976), Decision on Jurisdiction, 30 April 2010 [hereinafter, *Oostergetel v. Slovak Republic*], ¶ 109; **CL-026**, *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 [hereinafter, *Electrabel v. Hungary*], ¶¶ 5.32-5.38; **CL-165**, *European American Investment Bank AG (EURAM) v. Slovak Republic*, UNCITRAL (1976), Award on Jurisdiction, 22 October 2012, ¶¶ 236-238; and **CL-111**, Decision of the Frankfurt Higher Regional Court, 10 May 2012 (26 SchH 11/10), ¶¶ 79-97.

[168] Cl. Reply, ¶ 368, n. 549. **CL-112**, *Eastern Sugar v. Czech Republic*, ¶ 180; **CL-116**, *Eureko v. Slovak Republic*, ¶ 291; **CL-120**, *Oostergetel v. Slovak Republic*, ¶ 109; **CL-026**, *Electrabel v. Hungary*, ¶ 5.60.

[169] Cl. Reply, ¶ 369. *Supra*, ¶ 19.

[170] *Id.*, ¶ 370.

[171] *Id.*, ¶¶ 372-373.  During the proceedings, the Tribunal was also made aware of a further decision in which an ICSID tribunal rejected Respondent's European Union objection.  *RREEF Infrastructure (G.P.) Ltd. and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (redacted version publicly available) [hereinafter, *RREEF v. Spain*].  Both Parties presented observations to this Tribunal concerning this decision.  *Supra*, ¶¶ 82-86.

[172] Cl. Reply, ¶¶ 374-379.

[173] *Id.*, ¶¶ 382-383.

[174] *Id.*, ¶¶ 384-392.

Claimants argue that the ECT contains no disconnection clause, and deny that one can be read into the ECT.[175]

177.   Finally, Claimants dispute Respondent's contentions that the ECT precludes intra-EU claims because the EEC and its member countries recognized that the ECT was contrary to European law, which provided and continues to provide a superior level of protection.[176] Claimants urge that Respondent has identified no contradictions between the ECT and European law. Instead, the two regimes simply cover different subject matters, with the ECT providing certain protections – for example, a guarantee of fair and equitable treatment and direct recourse to arbitration – not found in European law.[177]

178.   Claimants further observe that, whatever the intentions of one or more parties to a multilateral treaty may have been, they are not binding on other parties. Moreover, there is no ambiguity in the text of Article 26 that would justify resort to supplementary means of interpretation under Article 32 of the Vienna Convention on the Law of Treaties.[178]

### (2)   The Tribunal's Analysis

179.   Respondent contends that Article 26 of the ECT, governing settlement of disputes between "a Contracting Party and an Investor of another Contracting Party", does not give rise to jurisdiction with respect to the Claimants' claims. Accordingly, the Tribunal's starting point must be the relevant provisions of Article 26, interpreted in accordance with the rules of interpretation in Article 31 and 32 of the Vienna Convention on the Law of Treaties ("VCLT"). [179]

180.   In relevant part, ECT Article 26 provides:

> (1) Disputes between a Contracting Party and an Investor of another
> Contracting Party relating to an Investment of the latter in the Area

---

[175] *Id.*, ¶¶ 404-413.

[176] *Id.*, ¶ 393.

[177] *Id.*, ¶¶ 398-400.

[178] *Id.*, ¶¶ 394-397.

[179] **CL-101**, *Vienna Convention on the Law of Treaties*, 1155 U.N.T.S. 331, 8 I.L.M. 679, 23 May 1969, entered into force 27 January 1980 [hereinafter, "VCLT"].

of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months [...] the Investor party to the dispute may choose to submit it for resolution:

[...]

(c) in accordance with the following paragraphs of this Article.

(3) (a) [...] each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. [...].[180]

Subsequent provisions provide for arbitration of disputes under the ICSID Convention, as is the case here.

181.   The Parties agree[181] that the ECT is to be interpreted in accordance with the VCLT's familiar rules of interpretation.

Article 31.   General Rule of Interpretation

1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

(b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

---

[180] **C-001**, Energy Charter Treaty, Art. 26.

[181] Resp. Rej., ¶ 154; Cl. Mem., ¶ 308.

(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) Any relevant rules of international law applicable in the relations between the parties.

[...]

Article 32. Supplementary Means of Interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a) Leaves the meaning ambiguous or obscure; or

(b) Leads to a result which is manifestly absurd or unreasonable.[182]

182.    Thus, the starting point must be the ordinary meaning of the words of Article 26 in their context, which includes the ECT's provisions defining several key terms. ECT Article 1(2) defines "Contracting Party" as "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force."[183] Luxembourg and the United Kingdom satisfy this definition, and are Contracting Parties. Article 1(7)(a)(ii) of the ECT defines "Investor" of a Contracting Party as "a company or other organization organized in accordance with the law applicable in that Contracting Party."[184] Claimants are companies or organizations organized in accordance with the laws of the United Kingdom and of Luxembourg and thus are Investors of a Contracting Party.

183.    ECT Article 10 imposes substantial obligations on each Contracting Party with respect to "Investors of other Contracting Parties" and their Investments. Article 13 adds that "Investments of Investors of a Contracting Party in the Area of any other Contracting Party" shall not be nationalized or expropriated, unless certain requirements are met.

---

[182] **CL-101**, VCLT, Arts. 31-32.

[183] **C-001**, Energy Charter Treaty, Art. 1.

[184] *Id.* While the Spanish text of ECT Articles 1, 21 and 26 does not mirror the use of initial capital letters from the English text (*see, e.g.*, definitions of "Investor", "Area", "Returns", "Taxation Measure", "Competent Tax Authority") for clarity, both the English and the Spanish texts of this Award will use the capitalizations as used in the English text of the ECT, to signify reference to the defined terms of the treaty.

Article 26 then contains the ECT parties' commitment to arbitration of "[d]isputes between a Contracting Party and an Investor of another Contracting Party [...]."[185]

184. The ordinary meaning of each of these provisions is consistent with the Tribunal's jurisdiction to entertain Claimants' claims.

185. Respondent argues, however, that the ECT contains a significant, if implicit, exception. In Respondent's view, the plain language of Article 26 is subject to a significant unstated exception that bars any claims by Investors of EU Member States against an EU Member State that is party to the ECT. Respondent argues that the purpose of the ECT and other provisions of the Treaty – the context – compel this limiting interpretation excluding intra-EU claims.

186. As explained below, the Tribunal concludes that Respondent's arguments do not justify disregarding the ECT's ordinary meaning in order to exclude a potentially significant body of claims. It is a fundamental rule of international law that treaties are to be interpreted in good faith. As a corollary, treaty makers should be understood to carry out their function in good faith, and not to lay traps for the unwary with hidden meanings and sweeping implied exclusions. In this regard, the *RREEF* tribunal, in a case much like the present, concluded that international law would require some form of express warning to make such a broad exclusion evident:

> 84. [...] [W]hen the very essence of a treaty to which the EU is a party is at issue, such as it would be for the ECT if the interpretation proposed by the Respondent were correct, then precisely because the EU is a party to the treaty a formal warning that EU law would prevail over the treaty, such as that contained in a disconnection clause, would have been required under international law.
>
> 85. This follows from the basic public international law principle of *pacta sunt servanda*. If one or more parties to a treaty wish to exclude the application of that treaty in certain respects or circumstances, they must either make a reservation (excluded in the

---

[185] *Id.*, Arts. 10, 13 and 26.

> present case by Article 46 of the ECT) or include an unequivocal
> disconnection clause in the treaty itself. [...][186]

187.    Treaty law and practice provide familiar mechanisms for treaty makers wishing to limit or
        exclude application of particular provisions in particular situations.  These were known and
        used in the ECT's texts, including by the predecessor to the European Union and its
        member countries.  The treaty includes multiple limiting decisions and understandings,
        such as those providing that the treaty concerning Spitsbergen prevails over inconsistent
        provisions of the ECT in case of a conflict[187] and limiting the scope of the treaty to
        "Economic Activities in the Energy Sector."[188]  In like vein, the European Communities
        and the Russian Federation agreed that trade in nuclear materials should be regulated by
        separate bilateral arrangements.[189]  Yet the EEC sought no similar clarifying provisions
        regarding what Respondent now contends is a major exclusion in the ECT's coverage.
        Respondent contends that no such express exclusion was included in the ECT because, for
        reasons analyzed below, it was obviously not required.  The Tribunal is not persuaded.

188.    The ECT's purpose does not support the interpretation urged by Respondent.  Article 2,
        captioned "Purposes of the Treaty," declares that "[t]his Treaty establishes a legal
        framework in order to promote long-term co-operation in the energy field, based on
        complementarities and mutual benefits, in accordance with the objectives and principles of
        the Charter."[190]  This statement of purpose does not suggest exclusion of a large category
        of potential claims by Investors in the circumstances presented here.

189.    Nor do Respondent's arguments from context call into question the ordinary meaning of
        Article 26.  Respondent cites several ECT provisions that in its view show that key ECT
        jurisdictional provisions carry a freight of unstated meaning and prohibit a large group of

---

[186] *RREEF v. Spain*, ¶¶ 84-85.

[187] **C-001**, Decisions with Respect to the Energy Charter Treaty, Annex 2 to the Final Act of the European Energy Charter Conference, ¶ 1, at 135.

[188] **C-001**, Final Act of the European Energy Charter Conference, Understanding with respect to ECT Article 1(5), at 25.

[189] *See, e.g.*, **C-001**, Joint Memorandum of the Delegations of the Russian Federation and the European Communities on Nuclear Trade, Annex II to document CONF 115, 6 January 1995, at 159.

[190] **C-001**, Energy Charter Treaty, Art. 2.

claims. These provisions do not justify limiting the treaty's ordinary meaning in this significant way.

190. The definition of a "Regional Economic Integration Organization" ("REIO") in Article 1(3) does indeed contemplate that a REIO's member can transfer competence over some matters to the Organization. However, this does not establish that EEC member countries had transferred competence over energy investments and their protection to the EEC when they signed the ECT in 1994, as Respondent apparently contends, or that this position was communicated to and accepted by other ECT parties. Indeed, as Respondent acknowledged in response to the Tribunal's questions at the Hearing, the Treaty of Lisbon, transferring to the European Union exclusive competence in the field of investment protection, was not signed until December 2007.[191]

191. Article 36(7), giving a REIO votes equivalent to the number of its member States when voting on matters over which it has competence, also recognizes the possibility of divided competence. Again, however, this does not establish that the particular allocation of competence now urged by Spain existed at the time of the ECT's conclusion, or was somehow incorporated into the Treaty as a significant but unstated exception to its otherwise clear language.

192. Nor does Article 25, exempting provisions that eliminate or prohibit discriminatory treatment among members of an "Economic Integration Agreement" from the ECT's MFN obligations, compel Respondent's interpretation. The ability of parties to such an agreement to create a regime limiting discrimination among themselves in no way dictates that they cannot also agree to other obligations under a different treaty regime.

193. The Tribunal also finds unconvincing Respondent's contention that Claimants cannot invoke arbitration under ECT Article 26 because they, like Spain, are located within the geographical confines of the European Union, which is itself party to the ECT. In Respondent's submission, this means that "Claimants are not from the territory of another

---

[191] Rev. Tr. Day 1 (ENG), 62:23-63:7 (Mr. McLachlan, Ms. Moraleda).

contracting party as the United Kingdom and the Netherlands [sic], like the Kingdom of Spain, are member States of the European Union."[192]

194.    However, the Tribunal recalls, as did the *Charanne* tribunal, that while the EU is a Contracting Party to the ECT, so too are its Member States. "[A]lthough the EU is a party to the ECT, EU Member States also remain contracting parties to the ECT. Both the EU and [its] Member States can have legal standing as respondents in a claim under the ECT." [193] Investors organized in accordance with the law of any Contracting Party satisfy Article 1(7)(a)(ii)'s literal requirement to be an "Investor" of a "Contracting Party." And, a dispute involving such an Investor and another Contracting Party regarding an Investment in that Contracting Party's "Area" satisfies the literal requirements for compulsory dispute settlement under ECT Article 26(1) and (2).

195.    Respondent's analysis, however, imposes an unstated limitation upon any Investor hailing from an EU Member State. For Respondent, such an Investor loses its national character and becomes predominantly an Investor of the EU, because its home country is also an EU Member State and subject to EU law.[194] Accordingly, the Investor and the putative respondent State are found in the same "Area" – the area of the EU – so that the diversity required by Article 26(1) and (2) does not exist.

196.    A difficulty with this analysis is that it is not evident how there can be an "Investor of the EU" satisfying Article 1(7)(a)(ii) definition. There is no trans-national body of European law regulating the organization of business units, a matter that remains subject to member countries' domestic law. Thus, within the framework of the definition, there can be no "EU Investors." Investors exist only as "Investors" of a "Contracting Party." In response to the Tribunal's question at the Hearing, Counsel offered a lengthy argument to the effect that, while the law governing the creation of companies in the EU was national law, national law and EU law were "totally overlapping" and companies "organised according

---

[192] Resp. Rej., § III(A).

[193] **RL-084,** *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain,* SCC V 062/2012, Final Award, 21 January 2016 [hereinafter, *Charanne v. Spain,* Award], ¶ 429 (Resp. translation).

[194] Rev. Tr. Day 1 (ENG), 65:17- 66:11 (Ms. Moraleda).

to the regulations" of a EU Member State were also "companies and citizens of the EU."[195] However, in the Tribunal's view, this argument seems to offer more support for Claimants' position than for Respondent's, as it underscores both the absence of EU law determining companies' nationality for purposes of the ECT, and the central role of EU Member States' national legislation in this regard.

197.    Finally, Respondent invokes ECT Article 26(6), defining the law to be applied in disputes between Investors and ECT Contracting Parties and directing that tribunals "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[196]   Respondent contends that the treaties creating the EEC and the EU and allocating competences among European institutions and their member countries, as well as the EU's internal legislation and decisions of the European Court of Justice, constitute "applicable rules and principles of international law" for purposes of Article 26(6).[197]     Respondent further contends that under Article 344 of the Treaty on the Functioning of the European Union and controlling principles of European law articulated by the European Court of Justice, only European courts, in particular, the European Court of Justice, are competent to pass upon the meaning and content of European law. Accordingly, Respondent argues, the relevant principles of international law prescribed by Article 26(6) render this Tribunal unable to address the Claimants' claims, as "EU law prohibits the existence of any dispute solving mechanism other than that laid down by its Treaties and that may interfere with the fundamentals of the Common Market."[198]

198.    Respondent's argument from Article 26(6) thus seeks to introduce a major, if unwritten, exception into the coverage of the ECT on the back of a somewhat intricate argument regarding choice of law.   The Tribunal does not agree that the drafters of the ECT either intended or accomplished this result.

199.    The Tribunal's jurisdiction is derived from the express terms of the ECT, a binding treaty under international law.  The Tribunal is not an institution of the European legal order, and

---

[195] Rev. Tr. Day 1 (ENG), 66:3; 66:8-9 (Ms. Moraleda).

[196] **C-001**, Energy Charter Treaty, Art. 26.

[197] *See, e.g.*, Resp. Rej., ¶¶ 86-87, 117.

[198] *Id.*, ¶ 66.

is not subject to the requirements of that legal order. However, the Tribunal need not address the possible consequences that might arise in case of a conflict between its role under the ECT and the European legal order, because no such conflict has been shown to exist. Here, as in *Charanne*:

> [...] [T]his case does not entail any assessment with regards to the validity of community acts or decisions adopted by European Union organs. Additionally, it does not concern in any way allegations by the European Union that EU law has been violated, nor claims against such organization. In this arbitration there is not an argument according to which the content of the disputed provisions [...] is contrary to EU law.[199]

200. Respondent contended in general terms that at the time of the ECT's conclusion, the European electricity market was harmonized internally, such that it would have been somehow contradictory for EEC States to enter international legal obligations potentially affecting that market. However, no convincing support was offered for this proposition. Indeed, the record in this case is replete with evidence showing the role of autonomous national policy decisions relating to energy policy. To whatever degree there was harmonization of the European electricity market in 2004, it clearly did not eliminate a broad sphere for national action, as the present claim demonstrates. Indeed, Respondent acknowledges the sphere for national action with regard to investment and energy.[200]

201. Respondent also contended that there was no need for EEC (and now EU) Member States to enter into obligations regulating their conduct with respect to energy investments because, by reason of their participation in the European legal order, they participated in a regime offering superior protection based upon fundamental guarantees of non-discrimination.[201] Whether correct or not (and Claimants insist that it is not), this argument fails in the face of Article 16(2) of the ECT, which provides that, should Contracting Parties enter into agreements addressing matters covered by Parts III or V of the ECT:

---

[199] **RL-084**, *Charanne v. Spain*, Award, ¶ 448 (Resp. translation).

[200] *See, e.g.,* Resp. Rej., ¶ 74.

[201] *Id.,* ¶¶ 65, 97-98, 131.

> (2)  nothing in such terms of the other agreement shall be construed
> to derogate from any provision of Part III or V of this Treaty or from
> any right to dispute resolution with respect thereto under this Treaty,
>
> where any such provision is more favourable to the Investor or
> Investment.[202]

202.    To the extent that provisions of European law may in some manner provide protections
more favorable to Investors or Investments than those under the ECT, Article 16(2) makes
clear that they do not detract from or supersede other ECT provisions, in particular the right
to dispute settlement under ECT Part V.  By its terms, Article 16 assures Investors or their
Investments the greatest protection available under either the ECT or the other agreement.
Thus, an agreement covered by Article 16(2) may improve upon particular protections
available to Investors or their Investments, but it cannot lessen rights or protections under
the ECT that are in other respects more favorable.

203.    Respondent also invoked Article 344 of the Treaty on the Functioning of the European
Union, which provides that "Member States undertake not to submit a dispute concerning
the interpretation or application of the Treaties to any method of settlement other than those
provided for therein."   For Respondent, Article 344 "prevents Spain from submitting
questions related to the internal electricity market to arbitration."[203]

204.    However, Article 344 is not implicated here.  This case does not involve any dispute
between EU Member States, or address the allocation of competence between the EU and
its members.  As the *Charanne* tribunal concluded:

> [...] [T]here is no such conflict between those treaties. [...] [T]he
> jurisdiction of the Arbitral Tribunal to decide on a claim filed by an
> investor of an EU Member State against another EU Member State
> based on allegedly wrongful acts performed in the exercise of its
> national sovereignty, is perfectly compatible with the EU being
> involved as a REIO in the ECT. [...] [T]here is no rule of EU law
> preventing EU Member States to submit to arbitration their disputes
> with investors of other Member States.  Neither there is any rule of

---

[202] **C-001**, Energy Charter Treaty, Art. 16.

[203] Resp. Rej., ¶ 88.

> EU law preventing an arbitral tribunal from applying EU law to
> resolve such a dispute.[204]

205.   Respondent's arguments from the ECT's context often reflect the conviction that
       negotiators from EEC countries intended that the new treaty not affect the EEC's internal
       market, as "it was a field on which they had transferred their sovereignty to the then
       European Community [...]."[205]  Reliance upon the negotiators' claimed intention brings to
       the fore the limited role of supplementary means of interpretation under Article 32(a) of
       the VCLT.  Under Article 32(a), supplementary means "including the preparatory work of
       the treaty and the circumstances of its conclusion" may be considered where interpretation
       according to Article 31 "[l]eaves the meaning ambiguous or obscure."  The Tribunal finds
       nothing ambiguous or obscure in the interpretation of Article 26, so recourse to
       supplementary means of interpretation is not required, or even permitted.

206.   Even were the circumstances to warrant recourse to supplementary means of interpretation,
       Respondent has not offered evidence to document its characterization of the EEC
       members' supposed negotiating objective in the ECT negotiations.  Of perhaps greater
       significance, there is no evidence showing that any such objective was shared by all EEC
       members, or was communicated to and accepted by the other parties to the treaty.

207.   The Tribunal thus concludes that the ordinary meaning of the relevant provisions of the
       ECT, construed in accordance with the rules of the VCLT, is clear and supports Claimants'
       ability to assert their claims.  As the *Charanne* tribunal observed in rejecting an argument
       that the ECT must contain an implicit "disconnection clause" excluding intra-EU claims:

> The issue raised by the Respondent is ultimately a matter of
> interpretation of the ECT.  Only through an interpretative *iter* of the
> treaty may the Arbitral Tribunal reach the conclusion that the
> Contracting Parties intended to provide for an implicit disconnection
> clause.  However, any interpretation of the ECT must be made in
> accordance with Article 31 of the Vienna Convention on the Law of
> the Treaties, according to which the main rule is that [a] treaty shall
> be interpreted in good faith in accordance with the ordinary meaning
> to be given to the terms of the treaty in their context and in the light

---

[204] **RL-084,** *Charanne v. Spain*, Award, ¶ 438 (Resp. translation).

[205] Resp. Rej., ¶ 94.

of its object and purpose. However, the Arbitral Tribunal considers that the terms of the treaty are clear and they do not require any additional interpretation that could lead to adding an implicit disconnection clause for intra-EU disputes to the ECT. [206]

**B.    Second Objection: Failure to Prove that the Investors Have Made an Investment "In the Objective Sense" in Conformity with the ECT and the ICSID Convention**

208.    Respondent's second objection is that the Tribunal lacks jurisdiction *ratione materiae,* as Claimants have not shown that they made an investment "in the objective sense," that is, an investment in which Claimants contributed funds, incurred risk, and made a long-term investment.

**(1)    The Parties' Positions**

**a.    Respondent's Position**

209.    Respondent initially contends that because of an alleged failure to produce sufficient evidence, "we still do not know who the investor or investors making claims against the Kingdom of Spain actually are."[207] Further, in Respondent's submission, Claimants have not shown that they have made an investment or are investors. Respondent contends that both Article 1(6) of the ECT and Article 25 of the ICSID Convention require that putative claimants show that they have made an investment in "an objective or ordinary sense,"[208] meaning that Claimants must show that they contributed funds in order to obtain profits or returns, assumed risk, and made a long-term investment.[209] For Respondent, under both the ECT and the ICSID Convention, "an investment must be a real investment in the objective sense [...] what this means is that the investor has to provide funds, has to assume risk, and do that over a specific duration of time. In this case, we see that none of these requirements were satisfied."[210]

---

[206] **RL-084,** *Charanne v. Spain*, Award, ¶ 437 (Resp. translation).

[207] Resp. Rej., ¶ 152.

[208] *Id.,* ¶¶ 149-151.

[209] *Id.,* ¶¶ 170 (ECT) and 191, 195 (ICSID Convention).

[210] Rev. Tr. Day 1 (ENG), 20:24-21:5 (Ms. Moraleda).

210.    While the definition of Investment in Article 1(6) of the ECT does not explicitly mention these three requirements, Respondent urges that they must be implied because the key term defined – Investment – sometimes appears in the definition in quotation marks and at other times without. This is said to show that the term has a broader meaning not confined to Article 1(6)'s list of types of covered investments.[211]  Respondent invokes the ECT's object and purpose, which it sees as emphasizing the goals of long-term cooperation and promoting the flow of investments. This is said to show that Article 1(6)'s definition of investment "requires the existence of an economic contribution with the intention of obtaining profits, the existence of risk associated to said contribution and duration."[212]

211.    Respondent also maintains that the ECT's context supports its "objective" concept of investment, citing eight other ECT provisions said to show in various ways that an investment implies provision of funds, making an economic contribution, or some form of active conduct by the putative investor.[213]

212.    With respect to Article 25 of the ICSID Convention, Respondent initially contended that arbitral decisions show the need for claimants invoking ICSID jurisdiction to prove that they have made an investment having the three specified elements.  In response to Claimants' arguments that rulings like the award in *Biwater Gauff v. Tanzania*[214] and the decision in *Malaysian Historical Salvors v. Malaysia*[215] and writings of authors like Dolzer and Schreuer show that there is no settled view on this question,[216] Respondent reaffirmed its position, but also indicated that the position in ICSID is not controlling because disputes under the ECT can be heard in other fora.[217]

---

[211] Resp. Rej., ¶¶ 162-165.

[212] *Id.*, ¶ 176.

[213] *Id.*, ¶¶ 179-190.

[214] **CL-009**, *Biwater Gauff (Tanzania) Ltd. v. Tanzania,* ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶¶ 312-314.

[215] **CL-175**, *Malaysian Historical Salvors, SDN, BHD v. Government of Malaysia*, ICSID Case No. ARB/05/10, Decision on the Application for Annulment, 16 April 2009.

[216] Resp. Rej., ¶ 193.

[217] *Id.*, ¶ 194 ("[…] a subjective approach is not appropriate in this case, as the ICSID system is not the only one to which the parties may resort to solve their disputes on Article 26 of the ECT […]").

213.   Respondent contends that Claimants have failed to show that they satisfy the three claimed requirements.  As to contribution of funds, Respondent contends that Eiser Infrastructure Limited, the First Claimant, is merely the general partner of a limited partnership, while Energia Solar Luxembourg S.à r.l., the Second Claimant, is a mere conduit.  Neither entity provided its own funds or incurred any risk.  Instead, funds were provided, and risk incurred, by limited partners – many said to be pension funds from various countries – that are not claimants and some of whose identities have not been disclosed.[218]

214.   Respondent cited provisions of the Limited Partnerships Act 1907 (UK) providing that a general partner has unlimited liability for obligations and debts of a limited partnership, while the limited partners' liability is limited to the extent of their contributions.[219]  In Respondent's view, the General Partner does not assume the risk of the investment,[220] but rather the limited partners assume risk to the extent of their investment.[221]  "[T]he people who are actually assuming this investor risk is neither the first claimant nor the second, because the real risk is being borne by the person who puts the money in the fund."[222]

215.   Respondent also urges that Claimants have not made a long-term investment.  The argument in this respect appeared to be that the First and Second Claimants were not proper claimants.  Respondent urges in this regard that it is irrelevant that English partnership law makes the General Partner the only entity with legal personality enabling it to bring litigation on behalf of the partnership, as the ECT does not require that claimants have legal capacity to sue under national legislation.  The sole relevant requirement under the ECT is that an entity be "a company or other organization organized" under the relevant national law.  In Respondent's contention, there are at least five possible claimants, involving various combinations of limited and general partners, a "fund," and a special purpose vehicle.[223]  Respondent goes on to add, however, that "a sum of Limited Partnerships or a

---

[218] *Id.*, ¶ 195 *et seq.*  Respondent did not consistently characterize the origin of the funds invested, also appearing to suggest that those assuming risk might not be the limited partners but investors in the underlying pension funds.  *Id.*, ¶ 199.

[219] **CL-227,** Limited Partnerships Act 1907, § 4(2).

[220] Resp. Rej., ¶ 204.

[221] *Id.*, ¶ 203.

[222] Rev. Tr. Day 1 (ENG), 21:13-16 (Ms. Moraleda).

[223] Resp. Rej., ¶¶ 209-210.

'fund' of funds does not seem to be an entity organised in accordance with the legislation of the country of incorporation of the Claimants."[224]  The thrust of this argument is that Claimants are not the proper claimants.[225]

### b. Claimants' Position

216.  Claimants deny that they have in some way been insufficiently identified or documented, arguing that as a matter of English law, Eiser Infrastructure Limited is the proper entity to bring the claims on behalf of Eiser Global Infrastructure Fund ("EGIF"), which does not have separate personality enabling it to bring litigation.[226]   Further, Claimants argue that they "have disclosed to Spain the identity of each of the five Limited Partnerships and their Limited Partners. Spain has not attempted to articulate (nor could it) why it would need any more information."[227]

217.  Claimants maintain that they have made a qualifying investment protected by the ECT.[228] Their interests fall within ECT Article 1(6)'s list of types of covered assets constituting investments, and moreover conform to the ordinary meaning of the word "investment."[229] For Claimants, if an asset thus satisfies Article 1(6), there is a rebuttable presumption that it also satisfies Article 25 of the ICSID Convention. Respondent makes no showing to displace that presumption.[230]   For Claimants, the question of conformity with ICSID Article 25 might arise only if a claimed investment is of an unusual character "at the margin."  Only then might the contribution of economic resources and assumption of risk (but not duration) be considered.  This is not such a case.[231]

218.  For Claimants, the VCLT's rules of interpretation do not support Spain's additional criteria.[232]  Respondent does not address the ECT decision in *Anatolie Stati v. Kazakhstan,*

---

[224] *Id.*, ¶ 220.

[225] *Id.*, ¶¶ 213-215; Rev. Tr. Day 1 (ENG), 22:23-24:23 (Ms. Moraleda).

[226] Cl. Rej., ¶¶ 114-115.

[227] *Id.*, ¶ 77.

[228] *Id.*, ¶ 81 *et seq.*

[229] *Id.*, ¶¶ 81-82.

[230] *Id.*, ¶ 82(b).

[231] *Id.*, ¶ 82(c).

[232] *Id.*, ¶ 84 *et seq.*

rejecting application of additional tests or criteria to any investment clearly covered by Article 1(6).[233] Further, ECT Article 1(6) does not support the claim that an investment requires some dynamic action, but in any case, Claimants have "made" an investment in the dynamic sense urged by Respondent.[234] The cases invoked by Respondent do not involve the ECT and do not advance its case;[235] indeed, the cited academic commentary supports Claimants' position.[236]

219. For Claimants, Respondent's narrow definition of investment would actually contradict the ECT's object and purpose,[237] and Respondent's invocation of *Caratube Intl. v. Kazakhstan,* a case under the US-Kazakhstan bilateral investment treaty in this regard is inapposite.[238] Further, the ECT provisions relied upon by Respondent do not provide relevant context, and do not support Respondent's interpretation.[239]

220. In any case, Claimants maintain that their interests satisfy the criteria of contribution, risk and duration.[240] While they dispute the existence of any "origin of capital" requirement as a condition of investment,[241] they contend that they have in any case made a significant contribution to the interests.[242] With respect to assumption of risk, Claimants contend that Respondent misapprehends the structure and allocation of risks among the entities involved in its business structure.[243] As to duration, Claimants urge that their interests are by their very nature long-term.[244]

---

[233] *Id.*, ¶ 87.

[234] *Id.*, ¶¶ 88-92.

[235] *Id.*, ¶ 93.

[236] *Id.*, ¶ 94.

[237] *Id.*, ¶ 97.

[238] *Id.*, ¶¶ 98-100.

[239] *Id.*, ¶¶ 101-106.

[240] Cl. Reply, ¶¶ 465-471, Cl. Rej., ¶¶ 75, 106, 108-112.

[241] Cl. Reply, ¶¶ 472-485; Cl. Rej., ¶ 76.

[242] Cl. Reply, ¶¶ 465-467, 486-490; Cl. Rej., ¶ 78.

[243] Cl. Rej., ¶ 111.

[244] Cl. Reply, ¶ 471; Cl. Rej. ¶ 112.

**(2)   The Tribunal's Analysis**

221.   Respondent's second objection to jurisdiction raises three issues:

- Have Claimants shown that they are qualifying investors under the ECT with requisite clarity and precision?

- Do the ECT (and Article 25 of the ICSID Convention) require that protected investments have the characteristics of contribution, risk and duration?

- If so, have the Claimants met those requirements, or have the elements of contribution and risk been incurred by the Limited Partners (who are not claimants in this case), or even by those who invested in the Limited Partners?

222.   As to the first issue, Respondent's concerns regarding identification of the Claimants do not appear to be asserted as an objection to jurisdiction, *i.e.*, that Claimants are not "Investors" within the definition of ECT Article 1(7).   Rather, the argument seems to be that Claimants must identify themselves in a satisfactory manner, and that they have not done so.  The Tribunal does not agree.

223.   The evidence of record shows that the First Claimant – Eiser Infrastructure Limited – is an English company.[245]   The First Claimant is the general partner with a group of limited partnerships that together constitute the "EISER Global Infrastructure Fund (EGIF)."[246]

224.   The First Claimant wholly owns Energia Solar Luxembourg S.à r.l., the Second Claimant, in its capacity as general partner of EGIF.[247]   The undisputed evidence shows that the Second Claimant is a Luxembourg *société à résponsabilité limitée*.[248]   It is also clear from the record that Energia Solar Luxembourg owns 36.95% of the shares of Aires Solar Termoeléctrica S.L. ("ASTE") and 33.83% of the shares of Dioxipe Solar S.L ("DIOXIPE"), the Spanish companies that own the thermo-solar power plants at issue.[249]

---

[245] **C-003**, Eiser Infrastructure Limited Certificate of Incorporation and Certificates of Incorporation on Change of Name.

[246] **C-300**, Cl. Hearing Opening Presentation, at 19; **C-273**, Eiser Structure Chart; Second Meissner Statement, ¶ 7.

[247] *Id.*, Cl. Mem., ¶ 3; Cl. Reply, ¶ 430 citing **C-193**, Energia Solar Luxembourg Share Register, 9 October 2007.

[248] **C-004**, Extract from the Companies Register in respect of the Second Claimant.

[249] First Meissner Statement, ¶ 3; Cl. Reply, ¶ 430 citing **C-244**, ASTE Certification of Shares, 1 April 2013 and **C-245**, Dioxipe Certification of Shares, 1 April 2013.

225.   Beyond its pleas for more documentation, Respondent does not appear to dispute the Claimants' description of their structure or ownership, and the Tribunal has no reason to do so.  Within this structure, it is not disputed that Eiser Infrastructure Limited has legal personality, including the capacity to bring claims and litigation on behalf of the partnership of which it is the general partner.  As the English legislation of record here indicates, such a general partner exercises management control over the limited partnership, and can contract and take actions on its behalf, necessarily including the power to bring claims and litigation like the present.[250]

226.   Article 1(7)(a)(ii) of the ECT defines "Investor" of a Contracting Party to mean "a company or other organization organized in accordance with the law applicable in that Contracting Party."[251]  The First and Second Claimants satisfy this requirement.

227.   The Tribunal then must consider whether the Claimants must satisfy additional requirements not stated in the ECT's definition of Investment or in Article 25 of the ICSID Convention, and show that their purported investment met the requirements of contribution, risk, and duration.

228.   The Tribunal can quickly cut to the chase in this regard.  Even assuming, while without deciding, that the ECT and the ICSID Convention require that an investment possess the characteristics urged by Respondent, the investment at issue here clearly had these characteristics.  The record shows that Claimants made significant investments of funds in the form of share purchases, loans and injections of capital into the Spanish entities that own and operate the CSP plants at issue.[252]  Respondent urged that the funds invested were not the Claimants' own, and were derived from the limited partners in EGIF.  However,

---

[250] Cl. Rej., ¶ 114, citing Cl. Reply, ¶¶ 425-429 (referring to **CL-227**, Limited Partnerships Act 1907, §§ 4(2) and 6(1)).

[251] **C-001**, Energy Charter Treaty, Art. 1(7).

[252] *See, e.g.*, **C-020**, Share Purchase Agreement in Favour of Energia Solar Luxembourg S.à r.l., 18 October 2010; **C-159**, EISER Infrastructure Limited, Asset Management Quarterly Review – ASTE/XOL, October 2010 ("Total Equity Investment € 124.3m").

the origins of capital invested by an Investor in an Investment are not relevant for purposes of jurisdiction.[253]

229.  Further, the Investment here involved a substantial duration.  Claimants began their involvement in this process in early summer of 2007; the plants did not become operational until 2012; and Claimants continue to own minority interests in them (albeit, alleged to have little or no value to them).

230.  Finally, there clearly was risk.  Claimants allege that their substantial investment has lost virtually all of its value on account of unforeseen conduct by Respondent claimed to be contrary to its ECT obligations.[254]

231.  Accordingly, Respondent's second jurisdictional objection is denied.

## C.   Third Objection: No Shareholder Claims

232.  Respondent's third objection is that the Tribunal lacks jurisdiction *ratione materiae* to entertain Claimants' claims for alleged damage directly incurred by the operating companies in which they held minority shareholdings.[255]   Respondent contends that Claimants assert such claims, pointing to language in their written submissions said to reflect this position.

233.  The Tribunal initially observes that the Parties agree on a central issue:  that a shareholder claiming under the ECT may frame and value its claim on the basis of the claimed reduction

---

[253] *See* **CL-182**, *Saipem S.p.A. v. Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, ¶ 106; **CL-196**, *Tokios Tokelės v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction, 29 April 2004, ¶¶ 77, 80; **CL-118**, *Hulley Enterprises Limited (Cyprus) v. Russian Federation*, PCA Case No. AA 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009, ¶ 431. *See also*, **CL-204**, Christoph H. Schreuer, *The ICSID Convention: A Commentary* 137 (2d. ed. Cambridge University Press 2009).

[254] Respondent contended that Claimants did not in fact incur any risk in connection with their investment prior to April 2011, because the relevant shareholder agreements provided the option for them to recover the sums invested at that time. Rev. Tr. Day 6 (ENG), 79:3-80:15 (Mr. Torres). Given the valuation date adopted by the Tribunal, it need not address this contention.

[255] Resp. C-Mem., ¶ 668 *et seq*; Resp. Rej., ¶ 223 *et seq*.

in the value of its shareholding interests.[256]   Given this agreement, it is not apparent the third objection requires the Tribunal to decide any matters actually in dispute.

### (1)   The Parties' Positions

#### a.   Respondent's Position

234.   In Respondent's view, shareholders' claims for alleged damages suffered by companies in which they have invested (described by Respondent as "reflective losses") are barred by public international law and by "advanced national systems of Commercial Law."[257] Respondent's written pleadings present extensive public and private international law arguments to the effect that a shareholder cannot claim for injuries incurred by a company in which the shareholder owns stock.   Respondent also urges that ICSID Convention Article 25 allows ICSID arbitration only of claims arising "directly" out of an investment.[258]

235.   However, Respondent agrees that an investor in Claimants' position – as minority shareholders in Spanish operating companies – can assert a claim for diminution of the value of their shareholding interests resulting from actions claimed to violate the ECT. Spain's Counter-Memorial thus affirms:

> The Kingdom of Spain does not deny that the shareholders have legitimation to have resort to an Arbitral Tribunal for damages suffered directly in their authentic investment.
>
> [...] the legitimation of the shareholders and the Jurisdiction of the Tribunal can only be extended to [...] the dispute relating to the loss of value of the shareholders' shares as a consequence of the measures approved by the State.[259]

236.   Indeed, Respondent's Rejoinder indicates that Spain would withdraw this objection if Claimants limited their claims to losses "suffered due to their alleged indirect participation

---

[256] *See, e.g.*, Resp. C-Mem., ¶¶ 672-673, 695; Resp. Rej., ¶ 253; Cl. Reply, ¶¶ 493(a), 506.

[257] Resp. Rej., ¶ 224.

[258] *See, e.g.*, Resp. C-Mem., ¶¶ 668-669; Resp. Rej., ¶ 225.

[259] Resp. C-Mem., ¶¶ 672-673. *See also, id.*, ¶ 695.

in the shares and credits of the partners of the Spanish companies that own the Plants."[260] Accordingly, Respondent accepts that there can be no jurisdictional objection to a claim for "for the lower value their indirect stake in the companies that own the Plants and their credits with the companies that own the plants may have suffered as a consequence of the measures of the Kingdom of Spain that are challenged in this Arbitration."[261]

237.    However, Respondent points to language in Claimants' written submissions that it understands to show that Claimants assert more extensive claims. Respondent cites, *inter alia*, Claimants' description of their investment in their Memorial:

> [T]he Claimants have made substantial investments in the CSP electricity generation sector in Spain, which include, without limitation, the Claimants' direct and indirect shareholding and debt interests in the Operating Companies that own and operate the CSP Plants, as well as interests in those CSP Plants (Article 1(6)(b)); claims to money (Article 1 (6)(c)); returns (Article 1 (6)(e)); and rights conferred by law (including those conferred by RD 661/2007) (Article 1(6)(f)). The Claimants' investments thus fall within the ECT's definition of 'Investment.'[262]

238.    Respondent disputes this conception of Claimants' investment, instead arguing that:

> The alleged investment of the Claimants would not affect:
>
> –   the installations or the Plants;
>
> –   credits of any kind of the Spanish companies that own the Plants,
>
> –   the alleged rights granted by RD 661/2007 to the Spanish companies that own the Plants;
>
> –   returns of any other nature of the Spanish companies that own the Plants.[263]

---

[260] Resp. Rej., § III(C)(3) (heading), ¶ 241.

[261] *Id.*, ¶ 241.

[262] Resp. C-Mem., ¶ 674, quoting Cl. Mem., ¶ 286.

[263] Resp. Rej., ¶ 238.

239.  At the Hearing, Respondent's counsel reaffirmed Spain's understanding that Claimants' claims are not confined to diminution of shareholder value, again referring to the paragraph cited above.[264]

240.  In addition to being contrary to public and private international law, Respondent contends that allowing claims for alleged damages to the operating companies improperly permits "two bites of the same apple."   Respondent notes in this regard that the new regulatory scheme incorporated in Order IET/1045/2014 has been disputed by another shareholder in the plants before the Spanish Supreme Court.  Respondent implies that Claimants acted in bad faith by bringing these proceedings challenging measures that are also being challenged in Spanish courts by another investor in the same projects.[265]

### b.  Claimants' Position

241.  Claimants dispute Respondent's objection, affirming in their Reply that "the Claimants are bringing their treaty claims for damages caused to the value in their shareholding interest in the Operating Companies."[266]   However, they maintain in this regard that those shareholding interests include "an interest in the assets of that company, including its licences, contractual rights, rights under law, claims to money or economic performance [...]." [267]

242.  Claimants refer to the ECT's definition of "Investment," pointing out that under ECT Article 1(6), Investment "means every kind of asset, owned or controlled directly or indirectly by an Investor [...]."[268]  The term is further defined to include "a company or business enterprise, or shares [...]."  For Claimants, the definition of covered investments under the ECT "includes not only the underlying business unit, but also the share or participation (direct or indirect) in the ownership of the underlying assets."[269]  Thus, under

---

[264] Rev. Tr. Day 1 (ENG), 25:3-26:5 (Ms. Moraleda) citing Cl. Mem., ¶ 286.

[265] Resp. Rej., ¶ 252; Resp. C-Mem., ¶¶ 720, 725-726.

[266] Cl. Rej., ¶ 62 citing Cl. Reply, ¶ 506.

[267] Cl. Rej., ¶ 65.

[268] *Id.*, ¶ 69; **C-001**, Energy Charter Treaty, Art. 1(6).

[269] *Id.*, ¶ 66.

the ECT's definition, Claimants' investments encompass both their rights to ownership of their shares, and their indirect rights in the assets of the Spanish operating companies.[270]

243.   Claimants point in this regard to decisions of investment tribunals such as *Azurix v. Argentina* that draw no distinction between shareholders' direct rights of ownership in their shares and their indirect interests in local companies affected by State action. Claimants maintain that Respondent has failed to address or rebut these. [271]

244.   Claimants deny Spain's allegations of bad faith in connection with domestic court litigation brought by the majority shareholder in the operating companies, insisting that they have no interest or involvement in that litigation, and that in any case, Claimants' international law rights under the ECT are legally distinct from those being asserted by the other shareholder.[272]

### (2)   The Tribunal's Analysis

245.   As noted above, the Parties agree that Claimants can bring claims for reduction of value of their shareholdings on account of conduct alleged to violate the ECT. Claimants contend that this is what they are doing.

246.   The Tribunal understands Claimants' claim in this way as well. The report of the Brattle Group, Claimants' economic experts, makes clear that the claim is for the reduction in the fair market value of the Claimants' investments in the Spanish companies that built and operate the CSP plants:

> 20. [...] EISER holds shares and shareholder loans in dedicated project companies, which themselves have borrowed substantial sums. Reflecting standard practice, we first estimate the value of the relevant project companies as a whole, before deducting the value of the outstanding liabilities of the project companies to derive the value of EISER's investment interests. The final step is to reduce the value of EISER's investment interests by a further 18% to account for their relatively illiquid nature. Investors attribute value to liquidity, since it provides the opportunity to acquire or dispose

---

[270] *Id.*, ¶¶ 67, 69.

[271] *Id.*, ¶¶ 67, 68.

[272] *Id.*, ¶ 70.

> of investments at short notice and for low cost. The 18% discount reflects recent published research in corporate finance concerning the effects of liquidity.
>
> 21. We conclude that in the Actual world the alleged violations reduced the fair market value of EISER's financial interests in CSP assets by a further €193 million as of June 2014, relative to their value under the But For scenario and the continued application of the Original Regulatory Regime. [...].[273]

247.    The Brattle Group's second rebuttal report reaffirmed this position, again concluding that the disputed measures "severely diminished the fair market value of its equity and other shareholder interests in the ASTE and ASTEXOL project companies."[274]

248.    As discussed *infra*, the Tribunal has accepted this line of analysis – valuing the reduction of the value of the companies in which Claimants held interests – in assessing damages.

249.    Respondent's third jurisdictional objection is denied.

## D.    Fourth Objection:  No Jurisdiction over Taxation Measures

250.    Respondent's fourth objection is that the Tribunal does not have jurisdiction to hear Claimants' claims involving alleged violations of Article 10(1) of the ECT involving the adoption of taxation measures, in particular the 7% tax on the value of electric energy production created by Law 15/2012 ("TVPEE").

### (1)    The Parties' Positions

#### a.    Respondent's Position

251.    Claimants contend that the TVPEE is among the measures said to violate Spain's obligations under the ECT.[275]

252.    Respondent contends that it has not consented to arbitration of these claims, and that the Tribunal therefore has no jurisdiction over them.   Spain observes that, under Article 26 of

---

[273] First Brattle Quantum Report, ¶¶ 20-21.

[274] Second Brattle Quantum Report, ¶ 4.

[275] Cl. Mem., ¶¶ 217-219, 342-344, 408; Cl. Reply, ¶ 805.

the ECT, a Contracting Party's consent to arbitration is limited to disputes concerning an alleged breach of its obligations under Part III of the ECT.  However, Article 21(1) of the ECT expressly provides that, subject to certain exceptions not relevant to claims under Article 10(1),[276] the ECT imposes no obligations on Contracting Parties regarding taxation measures:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[277]

253.   ECT Article 21(7)(a) defines the term "Taxation Measure":

> (a) The term 'Taxation Measure' includes:
>
> (i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and
>
> [...].[278]

254.   In Respondent's view, these provisions clearly preclude arbitration of Claimants' claims that the TVPEE violates ECT Article 10(1).   The TVPEE is a Taxation Measure.  ECT Article 21 establishes that Article 10(1) does not create rights or obligations with respect to such measures.  The ECT Contracting Parties' consent to jurisdiction under Article 26(3) encompasses only claimed breaches of obligations under Part III (which includes Article 10(1)).  Accordingly, Spain has not consented to arbitration of Claimants' claims regarding the TVPEE, [279] and the Tribunal has no jurisdiction over them.[280]

---

[276] As discussed below, ECT Article 21(1) does permit claims for Taxation Measures alleged to contravene ECT Article 13 (dealing with expropriation), but subject to a special procedural regime.

[277] **C-001**, Energy Charter Treaty, Art. 21(1).

[278] *Id.*, Art. 21(7).

[279] Spain's Counter-Memorial notes that Claimants' Request for Arbitration refers to another other taxation measure (the hydrocarbons tax) also contained in Law 15/2012 (apart from the TVPEE), not mentioned in Claimants' Memorial, but cited in their experts' Regulatory Report.  Respondent accordingly emphasized the TVPEE, while reserving the right to supplement its arguments if Claimants made claims regarding other tax measures.  Resp. C-Mem., ¶¶ 762-764.  In the Reply, Claimants observed that the hydrocarbons tax is not part of the Disputed Measures. Cl. Reply, ¶ 544, n. 788.

[280] Resp. C-Mem., ¶¶ 754-757, 769-786, 836; Resp. Rej., ¶ 353.

255.    In Respondent's submission, the TVPEE meets the ECT's definition of "Taxation Measure." It is a national law, enacted by Parliament in accordance with the normal Constitutional and legal procedures,[281] and has the characteristics of a tax under Spanish law.[282] Further, it is a *bona fide* tax of general application.[283] In this regard, Respondent urges that arbitral jurisprudence recognizes a presumption that tax measures are *bona fide*, citing *Renta 4 S.V.S.A et al. v. Russian Federation*[284] and *El Paso Energy International Company v. Argentine Republic*.[285] In Respondent's view, this presumption can be overcome only in extraordinary cases, as recognized by the *Yukos* tribunal.[286]

256.    In response to Claimants' arguments that the TVPEE is not a *bona fide* tax, Respondent observes that it applies to all energy production facilities, both conventional and renewable, and that renewables generators are not entitled to preferential treatment giving them tax benefits not accorded to others.[287] Further, the tax does not discriminate against renewables producers because they cannot shift its burden to others, nor is it a disguised tariff cut, as the cost of the tax is remunerated to these producers through their remuneration under the post-2014 regulatory regime.[288]

257.    Finally, Respondent observes that both the Spanish Constitutional Court and the European Commission have confirmed the legality of the TVPEE under Spanish and European law.[289]

---

[281] Resp. C-Mem., ¶¶ 787-791.

[282] *Id.*, ¶¶ 792-793.

[283] *Id.*, ¶ 796.

[284] Resp. C-Mem., ¶¶ 798-802; **RL-029**, *Renta 4 S.V.S.A et al. v. Russian Federation*, SCC Case No. 24/2007, Award, 20 July 2012, ¶ 181.

[285] **CL-024**, *El Paso Energy International Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 [hereinafter, *El Paso v. Argentina*], ¶ 290.

[286] **RL-028**, *Yukos Universal Limited (Isle of Mann) v. Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014 [hereinafter, *Yukos v. Russia*], ¶ 1407.

[287] Resp. C-Mem., ¶¶ 805-814.

[288] *Id.*, ¶¶ 823, 827.

[289] *Id.*, ¶¶ 828-833.

### b. Claimants' Position

258.    Claimants "accept that the 7% Levy is a charge imposed by the Government and therefore falls within the literal definition of the word 'tax.'"[290]   However, in their view, Respondent's arguments aimed at establishing the TVPEE's character as a tax are of no moment.  Instead, the question is whether it is *bona fide* and therefore entitled to the benefit of the Article 21(1) tax "carve-out."   Claimants urge in this regard that good faith is a fundamental aspect of treaty interpretation and performance, as shown by Article 31(1) of the VCLT and extensive international jurisprudence and scholarly commentary.[291]

259.    Claimants contend that "the 7% Levy was intentionally framed as a tax under Spanish law in order to breach Spain's commitments to the Claimants without incurring liability under the ECT.  This means that the tax is not *bona fide* and, consequently, Spain cannot rely on the taxation carve-out to avoid its obligations under international law."[292]

260.    Claimants dispute Respondent's view that the *Yukos* tribunal recognized a presumption in favor of the validity of tax measures, arguing instead that the *Yukos* decision shows that a tax measure's *bona fides* must be assessed from conduct on the basis of the balance of probabilities.[293]

261.    The heart of Claimants' position is that the tax imposed by Law 15/2012 was intended to be, and operates as, a cut in the revenues to which CSP operators were entitled under the RD 661/2007 regime.  Claimants contend that: (1) the Government's conduct shows that Law 15/2012 was intended to effect a tariff cut, even if denominated a tax; (2) it in fact accomplishes the opposite of its stated official aim; and (3) it is a part of a "Government scheme to dismantle the RD 661/2007 economic regime [...]."[294]

262.    As to the first point, Claimants contend that the Government adopted the tax notwithstanding the CSP industry's concerns that it would have a disproportionate and

---

[290] Cl. Rej., ¶ 118.

[291] Cl. Reply, ¶¶ 544, 548-554, 559-564.

[292] Cl. Rej., ¶ 118.

[293] Cl. Reply, ¶¶ 565-569.

[294] *Id.*, ¶ 571.

unfair impact on CSP operators and would in practice cut their Special Regime incentives.[295]   Claimants cite a statement made by the Minister of Energy after adoption of the tax as acknowledging that the Government could have opted to reduce premiums, but instead chose to adopt the tax on generation.[296]   In Claimants' view, this comment, made when Spain already faced ECT claims stemming from changes to the RD 661/2007 regime, demonstrates that the true motivation behind the TVPEE was simply to reduce payments to CSP producers under the RD 661/2007 tariffs.[297]   For Claimants, "[t]he inference must be that the 7% Levy was framed as a tax with the purpose of avoiding liability for breaching investors' rights under the ECT,"[298] which in Claimants' view confirms that Respondent's measure is not a *bona fide* tax.[299]

263.   As to the second point, Claimants argue that while the new measure's preamble claims that it is intended to protect the environment, it has the opposite effect, showing that the measure is arbitrary.[300]   The new tax significantly and impermissibly discriminates against CSP plants because, unlike conventional plants that can raise prices to pass the tax to consumers, the government determines CSP plants' revenues, so they cannot pass along the burden of the tax.[301]   The Regulatory Dossier prepared in connection with adoption of the tax shows that Spain did not consider these effects, which rational policymakers would have recognized as potentially inimical to the environment.[302]

264.   Finally, Claimants contend that they do not challenge the 7% tax in isolation, but instead as part of a pattern of measures "that deprived the Claimants of the rights to which their CSP plants were entitled under RD 661/2007."[303]   For Claimants, "[t]he 7% Levy was part of a number of measures that constitute the Government's scheme to restrict and ultimately

---

[295] *Id.*, ¶¶ 575-580.

[296] Cl. Reply, ¶ 581 citing **C-103**, Patricia Carmona & Javier Mesones, Interview with the Minister of Industry, Energy and Tourism, La Gaceta, 14 October 2012.

[297] Cl. Reply, ¶¶ 582-583; Cl. Rej., ¶ 121.

[298] Cl. Reply, ¶ 584.

[299] *Id.*, ¶ 586.

[300] *Id.*, ¶ 595.

[301] *Id.*, ¶¶ 587-593, 602.

[302] *Id.*, ¶¶ 596-597.

[303] *Id.*, ¶ 603.

eliminate the rights to which the Claimants' investments were entitled under RD 661/2007. As such, the 7% Levy was not a normal tax as part of the Government's ordinary process of revenue-raising but rather a disguised tariff cut forming part of the Government's policy decision to remove the rights that had been granted to the Claimants' investments."[304]  For this reason, Claimants maintain that the *Plama v. Bulgaria* case relied upon by Respondent is inapposite, as that case involved the application of tax law provisions in existence when claimants made their investment.[305]

265.    Finally, Claimants urge that Respondent's characterizations of the measure as a tax and as compliant with its domestic law do not establish its right to invoke the Article 21 exemption.[306]    In this regard, Claimants dispute Respondent's contention that the remuneration regime now applicable to their facilities neutralizes the effect of the tax by treating it as a compensable cost.[307]

### (2)    The Tribunal's Analysis

266.    As Respondent contends, and as Claimants acknowledge,[308] the TVPEE has characteristics typically associated with a legitimate tax.  It was established by law, imposes obligations on a defined class of persons, generates revenues going to the State, and these revenues are used for public purposes.[309]    The TVPEE thus a falls within the literal definition of "Taxation Measure" under ECT Article 21(7).  As such, it falls within the literal scope of the Article 21(1) limitation:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[310]

---

[304] *Id.*, ¶ 606.

[305] *Id.*, ¶ 608.

[306] *Id.* ¶¶ 612-618.

[307] *Id.* ¶¶ 619-623.

[308] Cl. Rej., ¶ 118.

[309] Rev. Tr. Day 1 (ENG), 34:4-36:5 (Ms. Oñoro).

[310] **C-001**, Energy Charter Treaty, Art. 21(1).

267.   Claimants contend, however, that the Tribunal should disregard these characteristics and the plain meaning of the Treaty.  Claimants argue that that the TVPEE was adopted in bad faith, as Spain presumably knew that it could not legally reduce the subsidies it promised in RD 661/2007 and therefore used taxation powers abusively in order to shield its improper conduct.  Hence, as the taxing power was used in pursuit of an illegitimate end, the Tribunal should disregard the clear text of Article 21(1).[311]

268.   The Tribunal recalls in this connection the conception of "bona fide taxation" utilized by the tribunal in *Yukos Universal v. Russia*, a case much discussed by both Parties.  In a case involving the allegedly abusive enforcement of taxation measures, the tribunal there found that, "the carve-out of [ECT] Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State."[312]

269.   Whether or not (which the Tribunal does not decide) there is an exception to Article 21(1) as held in *Yukos*, Claimants' allegation of bad faith could be maintained only if Spain knew or should have known that the RD 661/2007 tariffs cannot be substantially altered, and so knowingly violated its obligations under the ECT by adopting Law 15/2012.  The evidence is not sufficient to sustain this contention.  Respondent obviously believed at that time that its action was lawful, as its vigorous defense in these proceedings demonstrates.  Claimants emphasize a press report quoting the Minister of Energy following adoption of the TVPEE to the effect that the Government could have opted to reduce premiums, but instead chose to adopt the tax on generation.[313]  This is too slender a reed to sustain Claimants' case, which otherwise essentially rests on inferences regarding Respondent's presumed intention to evade liability under the ECT.

270.   The power to tax is a core sovereign power that should not be questioned lightly.  The ECT Article 21(1) tax "carve-out" and the corresponding provisions in many other bilateral and multilateral investment treaties reflect States' determination that tax matters not become a subject of investor-State arbitration, save perhaps in carefully limited circumstances.  (ECT

---

[311] Cl. Reply, ¶ 571 *et seq*.

[312] **RL-028**, *Yukos v. Russia*, ¶ 1407.

[313] Cl. Reply, ¶¶ 581-585, citing **C-103**, Patricia Carmona & Javier Mesones, Interview with the Minister of Industry, Enery and Tourism, La Gaceta, 14 October 2012.

Article 21(5)(a) thus allows claims for expropriation effected through taxation, but subject to limiting procedures requiring consideration of the claim by national tax authorities.)  The present case does not on the facts reach a situation where the tax enforcement measures are found to have been used as part of a pattern of behavior aimed at destroying Claimants and therefore the Tribunal does not reach a view on the availability of such an exception, were such a case to be made out.

271.    The Tribunal cannot disregard the ECT's clear terms on the strength of the record here, which falls well short of demonstrating any improper or abusive use of the power to tax. The Tribunal therefore finds that it does not have jurisdiction to decide Claimants' claim with respect to the alleged inconsistency of the TVPEE with Spain's obligations under Article 10(1) of the ECT.

272.    As there is no jurisdiction over this claim and given the Tribunal's ruling on the Fifth Objection *infra*, damages alleged to flow from the TVPEE cannot be considered in any possible award of damages.  The Tribunal notes, however, that any such damages would appear to be greatly reduced, if not eliminated, by Respondent's decision to include the 7% TVPEE levy among the costs compensable to CSP operators under the new regime that has replaced RD 661/2007.[314]

### E.    Fifth Objection: Failure to Refer to the Competent Tax Authorities

#### (1)    The Parties' Positions

273.    Spain's fifth objection is that the claim that it unlawfully expropriated Claimants' investments in part by adopting the 7% tax on energy production under Law 15/2012 is inadmissible because Claimants did not comply with ECT Article 21(5)(b).[315]

274.    As discussed above in connection with Respondent's fourth jurisdictional objection, ECT Article 21(1) precludes claims based on ECT Article 10 with respect to taxation measures. However, under Article 21(5)(a), this "carve-out" does not apply to expropriation claims

---

[314] Rev. Tr. Day 1 (ENG), 41:10-23 (Ms. Oñoro); Resp. Rej., ¶¶ 342-345; Rev. Tr. Day 4 (ENG), 153:11-14 (Mr. Lapuerta).

[315] *See, e.g.*, Resp. Rej., ¶¶ 355-375.

based on Article 13, subject to the further requirements of Article 21(5)(b).  These establish a procedure for expropriation claims involving taxation measures.  This requires that expropriation claims involving taxation receive preliminary consideration by national taxation authorities. [316]

275.    Article 21(5) provides:

>    (5) (a) Article 13 shall apply to taxes.

>    (b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

>    (i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

>    (ii) The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. [...]

>    (iii) Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

>    (iv) Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27. [317]

276.    Article  21(7)(c) defines "Competent Tax Authority":

---

[316] *See, e.g.*, **R-257**, Respondent's Hearing Opening Presentation at 57; **RL-027**, Energy Charter Secretariat, *The Energy Charter Treaty: A Readers Guide*, at 39.

[317] **C-001**, Energy Charter Treaty, Art. 21(5).

(7) For the purposes of this Article:

[...]

(c) A 'Competent Tax Authority' means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.[318]

277.   Respondent contends that Claimants did not refer their claim regarding the allegedly expropriatory effect of Law 15/2012 to the Competent Tax Authorities as required by Article 21(5)(b), so that this claim is inadmissible.[319]

278.   Claimants first respond, as discussed above in connection with Respondent's fourth jurisdictional objection, that Law 15/2012 does not involve a *bona fide* tax, so that Article 21(5)(b) does not apply.[320]   However, if the Article applies, Claimants contend that they have complied with it, in that on 11 October 2012, they and other investors raised the issue of the 7% tax with the Ministry of Finance and Public Administrations,[321] the Spanish Competent Tax Authority.[322]   Claimants also cited their 26 April 2013 letter to the President of Spain as satisfying this requirement.[323]   Claimants finally contended that any referral would be futile, and that investment jurisprudence confirms that in such a case, they "need not comply with the requirement, which is procedural in nature."[324]

### (2)   The Tribunal's Analysis

279.   The Tribunal has not accepted Claimants' contention that Law 15/2012 is not a *bona fide* tax. Accordingly, it initially considers whether the two communications cited by Claimants satisfy Article 21(5)(b)'s requirement that Investors refer expropriation claims involving

---

[318] **C-001**, Energy Charter Treaty, Art. 21(7).

[319] *See, e.g.*, Resp. Rej., ¶¶ 355-375.

[320] Cl. Reply, ¶ 625.

[321] **C-242**, Letter from Foreign Investors (including EISER) to the Government of Spain, 11 October 2012.

[322] Cl. Reply, ¶¶ 626-629.

[323] **C-009**, Letter from Allen & Overy to President Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013. *See also*, Cl. Reply, ¶¶ 630-633.

[324] Cl. Reply, ¶ 362.   *See also, id.*, ¶¶ 634-638.

taxation to the Competent Tax Authority in order to trigger a process of consultation between that authority and its foreign counterpart.

280.   This raises two issues: were these communications directed to the appropriate authority(ies), and did they refer the relevant issue in a manner sufficient to inform the recipient(s) of the communications' purpose and of the need to respond in accordance with the procedure set out in Article 21(5)(b)?

281.   As to the first issue, Article 21(7)(c) defines "Competent Tax Authority" as "the competent authority pursuant to a double taxation agreement in force between the Contracting Parties [...]." Thus, the relevant authorities are those under the bilateral double tax agreements between Spain and Luxembourg,[325] and Spain and the United Kingdom.[326] Claimants introduced into the record the double tax treaties between Spain and these two countries; each identifies the Minister of Finance as the competent Spanish authority under the treaty, albeit with different formulations of the Minister's title.

282.   This first issue brings to light an ambiguity in the wording of Article 21. Article 21(5)(b) appears to envision bilateral consultations between the national tax authorities identified in bilateral double tax conventions, that is, those of the State of the investor and those of the State against which the investor claims. According to the English text of the ECT, the investor is required to refer a claim that a tax measure is expropriatory to "the relevant Competent Tax Authority." However, it is not apparent whether the "relevant" authority is that of the investor's State or that of the respondent State.[327] (In a situation where an

---

[325] **CL-232**, Double Taxation Treaty between the Kingdom of Spain and Luxembourg (1986), 3 June 1986, Art. 3(1)(h)(i).

[326] **CL-231**, Double Taxation Treaty between the Kingdom of Spain and the United Kingdom (1976), 21 October 1975, Art. 3(1)(i). This treaty has apparently been superseded by a 2013 double tax convention between Spain and the United Kingdom. *See* **R-167**, Convention between the Kingdom of Spain and the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation, 14 March 2013. Under Article 3(1)(i) of the new treaty, Spain's "competent authority" is "the Minister of Economy and Finance or his authorised representative."

[327] Rev. Tr. Day 2 (ENG), 35:14-36:16 (Mr. Alexandrov, Mr. Sullivan); **R-257**, Respondent's Hearing Opening Presentation at 57; **RL-027**, Energy Charter Secretariat, *The Energy Charter Treaty: A Readers Guide*, at 39.

arbitral tribunal is to seek referral, according to the English text of the ECT, the tribunal "shall make a referral to the relevant Competent Tax Authorities" – presumably both.)[328]

283.   A further question arises where – as here – there are two investors from two different States. Is it sufficient for the one of the two to refer the issue to the Competent Tax Authority of the respondent State?   Or must each investor refer the issue to its national authority?

284.   The Tribunal assumes, without deciding, that Article 21(5)(b)'s requirements can be satisfied by an appropriately phrased communication from one of the Claimants to Respondent's Competent Tax Authority.   Thus, it would suffice for a Claimant to refer the issue to Spain's Minister of Finance, recognizing that the Minister's title is stated differently in different documents in the record.

285.   The second issue then is whether the two communications cited by Claimants satisfy the requirement that they "refer" their claim that the 7% tax is expropriatory to the Minister for consideration and consultations under Article 21(5)(b).

286.   The first communication is a two-page letter dated 11 October 2012 addressed to three Spanish Government Ministers, including the Minister of Finance and Public Administration.[329]   This letter was signed by representatives of eight foreign investors, including by Mr. Hector on behalf of Eiser Infrastructure Partners.   The letter contains a brief statement of the signatories' concerns about the draft law that became Law 15/2012, and a general reference to the possibility of international legal action.   It does not refer to the ECT, let alone to Article 21(5).   It does not contain the word expropriation.   Nothing in it indicates that the senders viewed the future tax (which had yet to be enacted) as

---

[328] There is an apparent discrepancy between the authentic English and Spanish texts of Article 21 of the ECT.   In English, the ECT provides that the investor must refer to the "Competent Tax Authority" and the tribunal to the "Competent Tax Authorities."   In Spanish, with regard to the investor it uses "*autoridades fiscales competentes*" (plural) and with regard to the tribunal's referral it uses "*autoridad fiscal competente*" (singular).   (The Tribunal understands the French text to be consistent with the English.)   While this issue does not affect the outcome of the case, the Tribunal believes, pursuant to Article 33(4) of the VCLT, that interpreting the ECT to require that, in an appropriate situation, it refer a matter to each of the potentially concerned "Competent Tax Authorities" is most in harmony with the ECT's object and purpose.

[329] **C-242**, Letter from Foreign Investors (including EISER) to the Government of Spain, 11 October 2012.

expropriatory, or that they sought to refer "the issue of whether the tax is an expropriation" to the Minister for action under Article 21(5).

287.   Under the VCLT, the key term "refer" must be read in good faith and in accordance with its ordinary meaning.   In this light, it is not possible to view this letter as a reference for purposes of ECT Article 21(5)(b).   This document cannot reasonably be read to put the recipient on notice that the senders view the proposed tax as expropriatory and that the recipient should therefore initiate the process of international consultations envisioned by Article 21(5).

288.   The second communication cited by Claimants is less compelling in this regard.   It is a 26 April 2013 letter written on behalf of Claimants by Allen & Overy to the President of the Government, Mariano Rajoy Brey.[330]   This letter briefly lists numerous changes made to the CSP legal regime, and indicates that these do not comply with Spain's obligations under the ECT.   It requests negotiations under ECT Article 26 with a view to reaching an amicable settlement, and reserves Eiser's right to submit claims to arbitration if settlement is not possible.

289.   Claimants presented no evidence that the President of the Government is a "Competent Authority" under the relevant tax treaties, and it seems unlikely that such a high officer of the State would perform this function.   More to the point, the contents of the letter again are not sufficient to inform a conscientious reader that the Investor alleges a tax measure to be expropriatory and seeks to have the issue referred for international consultations under Article 21(5)(b).

290.   Accordingly, the Tribunal finds that Claimants did not refer their expropriation claims involving the 7% tax on energy production under Law 15/2012 to the "Competent Tax Authority" as required by Article 21(5)(b) of the ECT.

291.   Claimants' final contention is that the Tribunal should disregard any non-compliance with the requirements of Article 21(5), urging in this regard that "investment treaty jurisprudence has confirmed that where a referral would be futile, as it would be in the

---

[330] **C-009**, Letter from Allen & Overy to President Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013.

present circumstances, an investor need not comply with the requirement, which is procedural in nature."[331]

292.  Claimants briefly advance three arguments to show that a referral to the competent tax authorities would be futile and therefore unnecessary.[332]   The first two are similar: that Claimants twice informed Spain of their concerns regarding Law 15/2012, but Spain did not respond to those concerns:

> [...] Spain made no attempt to engage its tax authorities to 'strive to resolve the issues.' Had there been any prospect of the issue being addressed by the tax authorities before commencing the present proceedings, it is reasonable to assume that Spain would have informed the tax authorities to consider the matter. Spain did not do so [...].[333]

293.  Third, Claimants contend that their claim and the measures giving rise to it "are far too broad and complex for the Spanish tax authorities to have resolved within six months,"[334] so that it would be futile to refer the issue for consideration. This argument appears to rest on the premise that the issue to be referred would encompass the whole of Claimants' dispute with Spain, and not the narrower issue of whether the 7% tax is expropriatory.[335]

294.  This final contention – that recourse to the procedure mandated by Article 21(5)(b) would be futile and therefore can be disregarded – largely rests on Claimants' speculation about Spain's response to a properly framed referral under Article 21. The Tribunal cannot assume, as Claimants urge, that the Spanish authorities would ignore such a referral, particularly as the ECT appears to allow Claimants to have recourse as well to their national tax authorities. This argument also reflects an apparent misconception that any response to a referral would be a wholly Spanish affair. Instead, although perhaps not perfectly drafted, Article 21(5) appears to envision a process of interaction between national tax authorities regarding a vexed question of international law – when and whether a tax

---

[331] Cl. Reply, ¶ 362, citing **RL-028**, *Yukos v. Russia*, ¶ 1424.

[332] Cl. Reply, ¶¶ 635-638.

[333] *Id.*, ¶ 635.

[334] *Id.*, ¶ 636.

[335] *Id.*, ¶ 637.

measure may be expropriatory. The existence of this provision indicates that this was a matter of concern to the ECT Contracting Parties, who nevertheless took care to assure that the agreed procedure could not be allowed to frustrate arbitration of a future claim.

295.    The 7% tax on energy production under Law 15/2012 is a tax. Claimants did not refer their claim that it is expropriatory to the Competent Tax Authority as required by Article 21(5)(b) of the ECT, and they have not sustained their contention that complying with this procedure would be futile, so that non-compliance can be disregarded.

296.    The Respondent's fifth objection is therefore sustained. Claimants' claim that the 7% tax is expropriatory is inadmissible to the extent that the Tribunal cannot at this stage of the proceedings decide this claim, because Claimants have not complied with ECT Article 21(5)(b)(i).

297.    Were Claimants' claim that the 7% tax on energy production is expropriatory to figure in the Tribunal's final award, Article 21(5)(b)(i) would oblige the Tribunal to itself refer the tax to the appropriate national authorities for consideration. The result would be further delay in the proceedings, although this need not exceed six months.

298.    As explained, *infra*, however, the Tribunal finds that it is not necessary for it to decide Claimants' expropriation claim, as the case can be appropriately resolved on another basis. Accordingly, it is not necessary for it to take the action indicated by Article 21(5)(b)(i).

## F.    Sixth Objection: Cooling Off Period

299.    Respondent's sixth objection to jurisdiction is that Claimants did not comply with ECT Article 26's requirement to request negotiations to settle their disputes regarding Law 24/2013, RD 413/2014, and Ministerial Order IET/1045/2014, and then to observe a three-month waiting period before initiating arbitration regarding those measures. Respondent contends that the Tribunal therefore lacks jurisdiction over claims involving them.[336]

---

[336] Resp. C-Mem., ¶¶ 858-859.

**(1)   Background**

300.   Article 26 of the ECT provides in relevant part:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
> [...]
>
> > (c) in accordance with the following paragraphs of this Article [setting out the procedure applicable in this arbitration]
>
> (3) (a) Subject only to subparagraphs (b) and (c),[337] each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.[338]

301.   On 26 April 2013, Claimants wrote a letter in English to His Excellency Mariano Rajoy Brey, President of the Government of Spain. The letter, captioned, "Energy Charter Treaty – Request for Negotiations" listed a number of changes made by Spain to the legal regime for CSP plants. It contended that these and other changes were not in compliance with Spain's obligations under the ECT, and "requests negotiations pursuant to Article 26(1) of the ECT, with a view to reaching an amicable settlement of the dispute."[339]

302.   Claimants did not receive a substantive reply to this request for negotiations. Instead, a letter from the Ministry of Industry, Energy and Tourism dated 7 May 2013 informed them that:

---

[337] Subparagraphs (b) and (c) permit a Contracting Party to withhold consent to arbitration when a claimant pursues other methods of dispute settlement and regarding claims under the last sentence of Article 10(1), the ECT's "umbrella clause." Neither subparagraph applies here.

[338] **C-001**, Energy Charter Treaty, Art. 26.

[339] **C-009**, Letter from Allen & Overy LLP to President Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013.

> [I]n accordance with the provisions of article 71.1 of Law 30/1992 of 26 November on the Legal System applicable to Public Administrations and the Common Administrative Procedure, you are required to correct the submission within 10 days in accordance with article 36 of the aforementioned law, by submitting the document written in Spanish.
>
> In the event that this is not rectified by the deadline specified, it will be presumed that you have withdrawn your request and your file will not be processed any further.[340]

303.    While noting that the ECT does not require that requests for negotiations be submitted in the manner required by Respondent, Claimants did as directed on 15 May 2013, renewing their request for negotiations and transmitting a Spanish-language translation of their 26 April 2013 letter.[341]

304.    On 30 July 2013, Claimants wrote a further letter in English and Spanish to His Excellency Mariano Rajoy Brey, noting that since their earlier letter, RDL 9/2013 had been adopted, further changing the CSP regulatory framework. This letter reiterated Claimants' request for a meeting for purposes of reaching an amicable resolution of the dispute.[342]

305.    Claimants aver that they have never received responses to their requests for negotiations.[343]

306.    The Claimants' Request for Arbitration is dated 9 December 2013, more than three months after Claimants' 30 July 2013 letter again requesting negotiations.   The Request notes that it is lodged at a time when further adverse changes in the CSP regulatory regime are likely.[344]  The measures effecting the most significant changes to the regime for CSP plants (Law 24/2013 of 26 December 2013, RD 413/2014 of 6 June 2014, and Ministerial Order IET/1045/2014 of 16 June 2014) were all adopted after the Request for Arbitration. These are the measures at issue in this objection to jurisdiction.

---

[340] **C-010**, Letter from the Ministry of Industry, Energy and Tourism to Allen & Overy LLP, 7 May 2013.

[341] **C-011**, Letter from Allen & Overy LLP to the Ministry of Industry, Energy and Tourism on behalf of the Claimants, 15 May 2013.

[342] **C-012**, Letter from Allen & Overy LLP to President Mariano Rajoy Brey on behalf of the Claimants, 30 July 2013.

[343] Cl. Reply, ¶ 647.

[344] RfA, ¶¶ 95-96.

### (2) The Parties' Positions

#### a. Respondent's Position

307. Respondent contends that under Article 26 of the ECT, its consent to jurisdiction over Claimants' claims involving these three measures is conditional upon compliance with Article 26(2)'s requirements of a request for amicable settlement and a subsequent three-month "cooling off" period. Under Article 26(3)(a), Contracting Parties consent to arbitration "in accordance with the provisions of this Article." In Respondent's view, this includes a request for negotiations and the three-month cooling-off period under Article 26(2). If these requirements are not met, there is no consent to jurisdiction.[345]

308. In support of its view that jurisdiction depends upon compliance with Article 26's request and cooling off period requirements, Respondent cites the *Oxford Handbook of International Investment Law* and the views of two tribunals acting under the U.S. bilateral investment treaties with, respectively, Argentina and Bolivia, *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*,[346] and the UK's treaty with Bolivia, *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*.[347]

309. Respondent observes that each of these three measures was adopted after the Claimants' 30 July 2013 letter informing Spain of the dispute and communicating their wish to seek an amicable settlement, and that Claimants sent no further letters proposing amicable settlement of a further dispute regarding these measures.[348]

310. Accordingly, in Spain's submission, "[in] this case the circumstances under which the Kingdom of Spain has consented and offered to resort to arbitration under the ECT have not been observed. As a consequence, the breach of these requirements means that the

---

[345] Resp. C-Mem., ¶¶ 862-863.

[346] **RL-033**, *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on Jurisdiction, 14 January 2004 [hereinafter, *Enron v. Argentina*], ¶ 88.

[347] **RL-006**, *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*, PCA Case No. 2011-17, Award, 31 January 2014, ¶¶ 388-391.

[348] Resp. C-Mem., ¶¶ 875-880.

Arbitral Tribunal cannot have jurisdiction, according to Law 24/2013, Royal Decree 413/2014, and Ministerial Order IET/1045/2014."[349]

### b. Claimants' Position

311.    Claimants dispute Respondent's objection, contending that the three cited measures – Law 24/2013, RD 413/2014, and Order IET/1045/2014 – are elements of a single on-going dispute related to Spain's actions to progressively alter the RD 661/2007 regime.[350] "[T]he dispute between the Parties relates to Spain's failure to honour its commitments to the Claimants under RD 661/2007. That this forms a single dispute which was clearly notified to Spain cannot seriously be disputed."[351]

312.    In support of their view that the three measures are part of the same on-going dispute, Claimants refer to cases such as *Pope & Talbot v Canada*,[352] *Ethyl Corp. v. Canada*, [353] and *Enron Corp. v. Argentina*.[354]

313.    Claimants also contend that interpreting Article 26 to require a further request for negotiations regarding Spain's measures introduced after the arbitration began would be futile, as shown by Respondent's failure to reply to their earlier requests for negotiations.[355] Claimants find support for this position in arbitral decisions finding that failure to observe cooling off periods in comparable situations does not justify refusal to hear claims, citing *Biwater Gauff v. Tanzania*[356] and *Alps Finance and Trade AG v. Slovak Republic*,[357] as well as in the writings of Professors Dolzer and Schreuer.

---

[349] *Id.*, ¶ 868.

[350] Cl. Reply, ¶¶ 641, 643.

[351] *Id.* ¶ 642.

[352] **CL-181**, *Pope & Talbot Inc. v. Canada*, UNCITRAL, Award, 7 August 2000.

[353] **CL-115**, *Ethyl Corp. v. Canada*, UNCITRAL, Award on Jurisdiction, 24 June 1998.

[354] **RL-033**, *Enron v. Argentina*.

[355] Cl. Reply, ¶¶ 655, 659

[356] **CL-009**, *Biwater Gauff (Tanzania) Ltd v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 343.

[357] **CL-105**, *Alps Finance and Trade AG v. Slovak Republic*, UNCITRAL (1976), Award, 5 March 2011, ¶¶ 201 and 204.

314.   Finally, Claimants maintain that Respondent's objection involves a question of
       admissibility and not of jurisdiction.   They contend in this regard that the majority of
       tribunals have rejected Respondent's claim that compliance with a cooling-off period goes
       to jurisdiction,[358] citing in this regard *Bayindir v Pakistan*[359] and many other investment
       cases, as well as decisions of the International Court of Justice.   Claimants distinguish the
       cases relied upon by Respondent, urging, for example, that the cited provisions in *Enron v.
       Argentina* are *obiter* that the tribunal itself appreciated reflected a minority view.[360]

### (3)   The Tribunal's Analysis

315.   Claimants' letter of 26 April 2013 lists several changes to the legal regime for CSP plants,
       stating that "[t]hese and other measures" substantially alter the legal framework for CSP
       investments.   It recites that "Spain's actions are not in compliance with its obligations under
       the Energy Charter Treaty," and requests negotiations under Article 26(1) "with a view to
       reaching an amicable resolution of *the dispute*."[361]   Claimants' subsequent letter of 15 May
       2013 again refers to "*the dispute*."[362]   Their letter of 30 July 2013 again recalls changes to
       the regime "including but not limited to" specified measures, contends that the changes do
       not comply with the ECT, and renews the request "to discuss possible amicable solutions
       to *this dispute*."[363]

316.   As clearly described in the letters, the dispute did not center on any specific measure, and
       instead concerned the broader issue of Spain's alleged non-compliance with its obligations
       under the ECT. These three letters satisfy Articles 26(1) and (2)'s requirement to seek
       amicable settlement of "the dispute."   They clearly informed Respondent of the existence

---

[358] Cl. Reply, ¶ 664.

[359] **CL-107**, *Bayindir Insaat Turizm Ticaret ve Sanayi AS v. Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005, ¶ 100.

[360] Cl. Reply, ¶ 666.

[361] **C-009**, Letter from Allen & Overy LLP to President Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013 (emphasis added).

[362] **C-011**, Letter from Allen & Overy LLP to the Ministry of Industry, Energy and Tourism on behalf of the Claimants, 15 May 2013 (emphasis added).

[363] **C-012**, Letter from Allen & Overy LLP to President Mariano Rajoy Brey on behalf of the Claimants, 30 July 2013 (emphasis added).

of a dispute and of Claimants' wish to seek its amicable settlement, as required by Article
26.

317. Accordingly, this case involves a single dispute:  Claimants' contention that through an
evolving series of measures changing the economic regime for CSP plants, Respondent
violated its obligations under the ECT.

318. The particular measures involved in Respondent's objection – Law 24/2013, RD 413/2014,
and Order IET/1045/2014 – are not a new dispute or disputes triggering Article 26's
requirement for another request for negotiations.  Articles 26(1) and (2) do not require
additional piecemeal requests for amicable settlement of new issues or elements arising in
the course an ongoing dispute following a request for negotiations.  It would be
unreasonable and inefficient in case like this, involving an evolving situation, to interpret
Article 26 to require the dispute to be carved into multiple slices, with each new
development requiring an additional request for negotiations and a subsequent request for
a separate additional arbitration.  The situation is akin to that in cases such as *Enron v.
Argentina*,[364] where Enron was found to have only a single dispute regarding provincial
taxation, and did not need to give further notice or observe a cooling off period before
adding other provinces to its claim.

319. The unreasonable nature of Respondent's objection is particularly evident here, where
Claimants sent multiple letters expressing their desire for an amicable settlement, each
invoking the Energy Charter Treaty and clearly conveying that the matter in dispute was
Spain's revision of the RD 661/2007 regime.  Respondent's only response was a
notification that the first request would be "presumed" withdrawn if not "corrected" and
submitted in Spanish. Nothing in the record suggests that further requests for negotiations
identifying Spain's subsequent measures would have been more effective in securing an
amicable settlement.

---

[364] **RL-033**, *Enron v. Argentina*, ¶¶ 84-87. ("85.  Even more so than the situation discussed in the *Metalclad*, *Pope &
Talbot Inc.* and *Ethyl* cases, the filing of multiple, subsequent and related actions in this case would lead to a superlative
degree of inefficiency and inequity.")

320.    Accordingly, the Tribunal finds that Claimants' April, May, and July 2013 notifications
        and requests for negotiations, and their observance of the subsequent three-month cooling-
        off period before filing their request for arbitration, satisfy ECT Article 26(2).
        Respondent's sixth jurisdictional objection is denied.

321.    In light of this finding, the Tribunal need not decide whether compliance with the
        requirements of Article 26 is jurisdictional, as Respondent would have it, or poses a
        question of admissibility, as Claimants contend.

## VI.    LIABILITY

### A.    Applicable Law

322.    This arbitration is being conducted in the framework of the ICSID Convention.  Article
        42(1) of the ICSID Convention provides:

> (1) The Tribunal shall decide a dispute in accordance with such rules
> of law as may be agreed by the parties. In the absence of such
> agreement, the Tribunal shall apply the law of the Contracting State
> party to the dispute (including its rules on the conflict of laws) and
> such rules of international law as may be applicable.

323.    As a Contracting Party to the ECT, Respondent has given its unconditional consent to
        arbitration of disputes with an Investor of another Contracting Party as provided in ECT
        Article 26(3)(a).    By exercising the option available to them under ECT Article 26(2)(c)
        and choosing to bring this arbitration, Claimants have likewise agreed to resolution of their
        dispute "in accordance with the following paragraphs of" Article 26.

324.    ECT Article 26(6) provides:

> (6) A tribunal established under paragraph (4) shall decide the issues
> in dispute in accordance with this Treaty and applicable rules and
> principles of international law.[365]

---

[365] **C-001**, Energy Charter Treaty, Art. 26(6).

325.   The Parties have thus agreed on the application of the rules of law specified in Article 26(6) to govern resolution of the issues in dispute. Accordingly, the Tribunal will decide the issues on the basis of the terms of the ECT and the applicable rules and principles of international law.

## B.   Respondent's New Defense

326.   In its 27 November 2015 Rejoinder on the Merits and Reply on Jurisdiction, filed after Claimants' last written submission on the merits under the established briefing schedule, Respondent introduced an entirely new defense.  Claimants sought and were given leave to file an additional submission on this new defense, and did so in January 2016.

327.   Claimants' additional submission sets out relevant background:

> [T]he 1997 Electricity Law distinguished between two separate regimes: (i) the Ordinary Regime, for conventional power-generation facilities, selling electricity in the wholesale electricity market at pool prices; and (ii) the Special Regime, for qualifying [Renewable Energy] installations of an installed capacity of less than or equal to 50 [Megawatts].  RD 661/2007 put in place the remuneration for installations qualifying under the Special Regime.  RD 661/2007 also set out the requirements for the registration of a plant under the Special Regime.  In order to enjoy the economic incentives under RD 661/2007, each installation had to register with the Special Regime's Registry or '*Registro Administrativo de Instalaciones de Producción en Régimen Especial*' (the **RAIPRE**) administered by the Ministry. By registering with the RAIPRE, the installation was deemed to qualify under the RD 661/2007 economic regime.[366]

### (1)   The Parties' Positions

#### a.   Respondent's Position

328.   As clarified in subsequent correspondence, Respondent's contended in their new defense that the CSP plants in which Claimants had invested had an installed capacity exceeding 50 Megawatts ("MW") and therefore did not qualify under the Special Regime.[367]  Hence,

---

[366] Cl. Sub. New Def., ¶ 6.

[367] *See, e.g.*, Resp. Rej., ¶¶ 649, 653, 970-972.

in Respondent's submission, this "denies that an investment even exists" and shows that Claimants could not have had a legitimate expectation that their investment was entitled to the remuneration regime under Article 36 of RD 661/2007.[368]

329.   The principal evidence offered in support of Respondent's new defense consisted of:

- Information provided to Respondent in May 2015 by Red Eléctrica de España ("REE"), the national system operator, regarding the amount of electricity the three CSP plants provided to the electrical grid, showing, *inter alia*, "peak hours of maximum energy measured for each thermosolar plant for each month."[369]

- Information derived from annexes to the three plants' Operation and Maintenance ("O&M") contracts said to indicate the amounts of power produced for internal self-consumption to operate the plants.[370]

- The Statement of Mr. Alfonso Olivas, Director of the Board of Renewable Energies in IDAE, the Institute for Conservation and Diversification of Energy, which Mr. Olivas described as "a public business entity belonging to the Ministry of Industry, Energy and Tourism [...] through the Secretary of State [for] Energy [...]."[371]

Mr. Olivas took the maximum power delivered to the grid by each plant at the single peak hour shown in the REE data[372] and added his estimate of each plant's production for internal consumption as derived from the O&M contracts.   The resulting sums in his opinion showed that the three plants had "real power installed" of 53.930 MW, 54.080 MW, and 57.480 MW, in each case greater than 50 MW.[373]   In cross-examination at the Hearing, Mr. Olivas indicated that in his view for each plant, the "gross capacity of the whole installation"[374] was 55 MW.[375]

330.   At the Hearing, in response to Claimants' arguments that under Article 3.1 of RD 661/2007 "the nominal power shall be that specified on the specifications plate of the generator or alternator" Respondent's counsel questioned Claimants' expert Dr. Mancini as to the

---

[368] *See, e.g.,* Resp. Rej., ¶¶ 658, 973, 979; Resp. Letter (30 December 2015), ¶¶ 6, 16, 20, 22.

[369] Olivas Statement, ¶ 15.

[370] *Id.,* ¶ 23.

[371] *Id.,* ¶ 13.

[372] Rev. Tr. Day 3 (ENG), 125:3-10 (Mr. Olivas).

[373] Olivas Statement, ¶ 30.

[374] Rev. Tr. Day 3 (ENG), 122:14-15 (Mr. Olivas).

[375] Rev. Tr. Day 3 (ENG), 121:4-18 (Mr. Olivas).

possibility of collusion between Claimants and the manufacturers of the equipment at issue, all well-known international heavy equipment manufacturers, to install an incorrect specifications plate.[376]   Respondent offered no evidence in support of this suggestion.   In cross-examination Mr. Olivas also made a veiled allusion to this possibility, but again offered no evidence.[377]

### b. Claimants' Position

331.   Claimants contended that Spain should be estopped from raising its new defense, as the plants at issue had been registered with the RAIPRE, had received official documents confirming their registration and their eligibility for the RD 661/2007 regime, and had received remuneration under the regime.   Further, the three plants had been inspected by the competent regulatory authorities and found to have installed capacity at or below 50 MW.[378]

332.   Claimants next urged that determining whether the plants complied with the Special Regime under Spanish law was a matter for the competent Spanish authorities following the specific procedures for cancelling registrations in the Special Regime established by law.   Spain has not contested that the plants have been registered in the Special Regime, and has taken no domestic legal action to contest that registration.[379]   "In these circumstances, the Tribunal must accept as established the fact that the CSP Plants were effectively registered as Special Regime installations at all relevant times."[380]

333.   Claimants also contended that the new defense failed on the merits, for multiple reasons. First, in Claimants' view, Respondent's position had "no basis under Spanish regulations."[381]   Instead, Article 3.1 of RD 661/2007 specifies that for purposes of eligibility for the Special Regime, "the nominal power shall be that specified on the specifications plate of the generator or alternator" corrected as appropriate by several

---

[376] Rev. Tr. Day 3 (ENG), 166:5-8 (Mr. Torres).

[377] Rev. Tr. Day 3 (ENG), 120:7-18 (Mr. Olivas).

[378] Cl. Sub. New Def., ¶¶ 12-14, 19-34.

[379] *Id.*, ¶¶ 35-43.

[380] *Id..*, ¶ 43.

[381] *Id.*, ¶ 45.

factors.[382]  The specifications plates of the equipment at issue here all showed values close to, but less than, 50 MW.  Claimants cited in this regard reports and regulatory actions by Spanish energy regulators confirming that the nominal power as indicated on the specifications plate, and not the effective power fed to the grid, is determinative.[383]

334.   Second, Claimants emphasized that the inspections of all three plants in 2013 and 2014 by Spain's energy regulator CNE and its successor agency CNMC confirmed that the plants' equipment met the technical requirements for registration in the Special Regime.[384]

335.   Finally, Claimants criticized Mr. Olivas' calculations and conclusions on multiple technical grounds.[385]   Drawing on an expert opinion by Dr. Thomas Mancini, they contended that the nominal (or nameplate) capacity of steam turbines or generators is the average output over varying operating conditions, analogizing to a 12-volt battery, which may produce between 10 and 14 volts but is still considered a 12-volt battery.[386']  Claimants' also disputed Mr. Olivas' calculation of the power required for internal operating purposes on multiple grounds, contending, *inter alia*, that his calculations were based on screenshots of production *estimates*, rather than actual production data.[387]  They also criticized his use of a single peak hour of production over an approximately 12,000-hour range of data in his calculations.[388]

### (2)   The Tribunal's Analysis

336.   The Tribunal recalls that Respondent introduced this defense with their Rejoinder, late in the proceedings after Claimants had filed their last written submission on the merits under the agreed schedule.   However, Claimants were authorized to file an Additional Submission addressing the defense and did indeed submit a substantial response in the

---

[382] *Id.*, ¶¶ 47-49.

[383] *Id.*, ¶¶ 51-52.

[384] *Id.*, ¶¶ 54-61.

[385] *Id.*, ¶¶ 62-72.

[386] *Id.*, ¶¶ 67-69.  In cross-examination, Mr. Olivas said that he did not agree with this line of analysis, but did not explain the basis for his disagreement.  Rev. Tr. Day 3 (ENG), 124:1-6 (Mr. Olivas).

[387] Cl. Sub. New Def., ¶ 68.

[388] *Id.*, ¶ 72.

limited time available before the Hearing, and both Parties presented their positions during the Hearing.[389]

337. Claimants' Additional Submission urged that Respondent's past conduct should estop it from presenting its new defense, after Respondents' officials had recognized Claimants' eligibility to participate in the Special Regime in multiple ways. Claimants also contended that eligibility to participate in the Special Regime is an issue of Spanish law that Respondent must raise through legal proceedings in Spain if it chooses, but is not appropriate for resolution by this Tribunal. The Tribunal, however, does not accept that it is precluded from deciding whether Respondent has met the burden of proving its defense. While Respondent's defense presents a question involving application of Spanish law – whether Claimants are eligible to participate in the Special Regime – the power to decide such a question is a necessary corollary of the Tribunal's role in deciding claims for alleged breaches of ECT Part III.

338. The Tribunal concludes that Respondent's additional defense must be rejected.

339. The relevant regulatory regulations – Article 3.1 of RD 661/2007 and corresponding provisions in subsequent legal provisions stating that the nominal power of generating equipment is as indicated on the specifications plate – explicitly define the means for determining eligibility for the Special Regime. Article 3.1 provides: "[t]he nominal power shall be that specified on the specifications plate of the generator or alternator" at certain standard conditions of temperature, altitude and the like.[390]  In cross-examination, Mr. Olivas pointed to these other factors,[391] but offered no suggestion or evidence that any of them was relevant to the specific specifications plates at issue.

340. It is not disputed that the specifications plates of equipment in the three plants comply with the requirements of RD 661/2007.  Standing alone, this seems to refute Respondent's additional defense.

---

[389] *See, e.g.*, Rev. Tr. Day 1 (ENG), 236:23-237:17 (Ms. Gill); Rev. Tr. Day 2 (ENG), 164:18-175:6 (Mr. Torres); **R-259**, Resp. Hearing Opening Presentation, at 60-62.

[390] **C-017**, RD 661/2007, Art. 3(1).

[391] Rev. Tr. Day 3 (ENG), 117:10-20 (Mr. Olivas).

341.    Mr. Olivas's testimony did not satisfactorily address the significance of Article 3.1 or of comparable provisions in successor legal instruments. His written report made no mention of Article 3.1 of RD 661/2007 or other similar legal provisions relating nominal power to the specifications plates on generators or alternators. On cross-examination, he initially testified that the law does not define nominal capacity,[392] and later acknowledged that it did.[393] He gave inconsistent testimony as to whether his report had mentioned Article 3.1 before acknowledging that it had not.[394]

342.    The Tribunal also finds persuasive that the CNE and its successor, the CNMC, the responsible Spanish regulatory authorities, inspected each of the three plants in 2013 or 2014 and found them to comply with the legal requirements for the Special Regime. Mr. Olivas's witness statement again made no mention of these inspections.[395] When asked about the inspections on cross-examination, Mr. Olivas testified that the reports of inspections were "simply wrong."[396] When asked whether he had actually read the reports of the inspections, Mr. Olivas again gave inconsistent testimony, stating variously that he had,[397] had not,[398] or perhaps had[399] read the reports.

343.    The Tribunal also has reservations regarding aspects of the data relied upon by Mr. Olivas in his calculations. While he criticized some data in the O&M Contracts as "technologically impossible,"[400] he nevertheless used other data from a screenshot of a computer program in annexes to those contracts to determine the plants' production of electricity for their own operation. When asked about this on cross-examination, Mr. Olivas complained that "[i]f

---

[392] Rev. Tr. Day 3 (ENG), 116:19-21 (Mr. Olivas).

[393] Rev. Tr. Day 3 (ENG), 117:21-118:2 (Mr. Olivas).

[394] Rev. Tr. Day 3 (ENG), 118:17-22 (Mr. Olivas).

[395] Rev. Tr. Day 3 (ENG), 129:11-23 (Mr. Olivas).

[396] Rev. Tr. Day 3 (ENG), 137:5-14, 137:21-138:2 (Mr. Olivas).

[397] Rev. Tr. Day 3 (ENG), 130:3-6 (Mr. Olivas).

[398] Rev. Tr. Day 3 (ENG), 131:1-3 (Mr. Olivas).

[399] Rev. Tr. Day 3 (ENG), 131:7-13 (Mr. Olivas).

[400] Olivas Statement, ¶ 21; Rev. Tr. Day 3 (ENG), 128:8-19 (Mr. Olivas).

I'm not allowed into the plant," he had to use whatever data was available. However, he also acknowledged that he had not asked for access to the plants.[401]

344. The Tribunal also found unconvincing some of Mr. Olivas's views regarding other issues. Claimants' expert Dr. Mancini testified that the nominal power of a turbine is not its maximum operating point,[402] and that a turbine "can operate beyond the nominal output and typically that is 10% or maybe even 15% above the nominal ratings provided by the manufacturer."[403] When asked about this on cross-examination, Mr. Olivas disagreed with Dr. Mancini, emphasizing that "I do not agree,"[404] and later reiterating his strongly held view that the specifications plate on equipment established the maximum power the equipment was capable of generating.[405] The Tribunal finds Dr. Mancini's testimony more persuasive in this regard. It notes in this connection that Mr. Olivas's view appears inconsistent with the views of Dr. Servert, another of Respondent's expert witnesses, who testified that there is no "real value" to a plant's operation, with output varying over every second of a plant's operation.[406]

345. The Tribunal considers that Respondent has the burden of proving the facts relied upon to support its defense. Respondent has failed to meet this burden with respect to its additional defense.

## C. The Claims

### (1) Overview

346. The Tribunal has considered the Parties' positions as summarized below, as well as many other detailed arguments made in their written submissions and at the Hearing. Insofar as particular arguments are not discussed explicitly here, the Tribunal nevertheless has considered them.

---

[401] Rev. Tr. Day 3 (ENG), 127:12-23 (Mr. Olivas).

[402] Rev. Tr. Day 3 (ENG), 159:17-18 (Dr. Mancini).

[403] Rev. Tr. Day 3 (ENG), 159:25-160:2 (Dr. Mancini).

[404] Rev. Tr. Day 3 (ENG), 123:15, 124:6 (Mr. Olivas).

[405] Rev. Tr. Day 3 (ENG), 135:10-18 (Mr. Olivas).

[406] Rev. Tr. Day 4 (ENG), 18:6-13 (Dr. Servert).

347.    The key elements of Claimants' position may be briefly summarized as follows:  they invested approximately €126.2 million to develop three concentrated solar power (CSP) plants in Spain.[407]  In doing so, they reasonably relied upon inducements and promises by Respondent, and in particular on the regime established in RD 661/2007, which conferred immutable economic rights protected by the ECT.[408]  In deciding whether to proceed with their investment, Claimants consulted with and relied upon the advice of prominent Spanish counsel and other experts.[409]  Spain's conduct at the time of Claimants initial decision to invest in 2007 and their subsequent decision to restructure and broaden their investment in 2011, including presentations to investors hailing Spain's support for solar power and commitments made by State authorities as the investment progressed, show that their expectations of a stable regulatory regime when they made their investment were reasonable.[410]

348.    Claimants and their co-investors leveraged their investments and loans with substantial non-recourse borrowings by the operating companies, and built high-grade facilities capable of high production, including provisions for future storage to allow increased production.   They did so because the RD 661/2007 regime based incentives on production.[411]  Banks were prepared to provide the non-recourse funding required because, like Claimants, they had confidence in the stability of Respondent's regulatory regime.[412]  But, during 2012-2014, Spain took a series of measures drastically altering the regulatory regime, culminating in elimination of the RD 661/2007 regime and substitution with a totally different and arbitrary regime.[413]  This dramatically reduced the cash flows necessary to sustain the investment, and that Respondent had offered to long-term investors through the RD 661/2007 regime.  These changes left the plants with revenues barely

---

[407] First Hector Statement, ¶ 4.

[408] *See, e.g.,* Cl. Mem., ¶¶ 20-21, 25, 122-124, 127, 159, 341, 349, 355, 399 ; Cl. Reply, ¶¶ 16, 130 *et seq.*, 669.

[409] *See, e.g.,* Cl. Mem., ¶¶ 161-167; 183-190.

[410] *See, e.g.,* Cl. Mem., ¶¶ 362, 397, 406; Cl. Reply, ¶¶ 76-93.

[411] *See, e.g.,* Cl. Mem., ¶ 209.

[412] *See, e.g.,* Cl. Mem., ¶ 400(e); Cl. Reply, ¶¶ 110-115.

[413] *See, e.g.,* Cl. Mem., ¶ 408.

sufficient to cover operations and maintenance and financing costs after rescheduling. Claimants have thus been substantially deprived of their investment of €126.2 million.[414]

349.    Claimants contend that Respondent's actions in entirely eliminating and replacing the RD 661/2007 regime violated Spain's obligations under the ECT by (1) expropriating their investment contrary to Article 13; (2) denying fair and equitable treatment contrary to Article 10(1); (3) subjecting Claimants' investments to unreasonable measures, contrary to Article 10(1); and (4) failing to honor undertakings entered into with Claimants' investments, again contrary to Article 10(1).[415]

350.    Respondent disputes this narrative. In Respondent's view, Claimants have not been denied fair and equitable treatment, and there has been no expropriation or any other violation of the ECT.[416] Claimants retain their minority shareholdings in the Spanish companies that own operating solar plants that receive substantial revenues from energy sales and subsidies.[417] They had no legal right under Spanish law to treatment different than that which they receive.[418] Claimants were entitled to receive only a reasonable return on their investment, which the present regime assures them.[419] Proper due diligence would have shown them this, and that they have no right to a subsidy regime frozen for 40 years, as they claim.[420] They have no property right to receive the RD 661/2007 regime, which overcompensated CSP plants.[421]

351.    In Respondent's contention, like any State, Spain is entitled to change its regulatory regime to meet compelling economic challenges, such as Spain's tariff deficit, in order to serve the public welfare.[422] The current regime is fair and assures the operators of efficient solar

---

[414] *See, e.g.,* Cl. Mem., ¶¶ 355-358; Cl. Reply, ¶¶ 793-794.

[415] *See, e.g.,* Cl. Mem., ¶ 344 *et seq.*

[416] *See, e.g.,* Resp. C-Mem., ¶¶ 2, 6, 11, 896-897.

[417] *See, e.g.,* Resp. C-Mem., ¶¶ 958-959, 965; Resp. Rej., ¶¶ 32, 1051.

[418] *See, e.g.,* Resp. C-Mem., ¶¶ 974-985.

[419] *See, e.g.,* Resp. C-Mem., ¶¶ 974-975, 982, 985.

[420] *See, e.g.,* Resp. C-Mem., ¶¶ 1008-1012, 1016.

[421] *See, e.g.,* Resp. C-Mem., ¶¶ 910-914, 920.

[422] *See, e.g.,* Resp. Rej., ¶¶ 945-947, 1048-1050.

plants a reasonable return.[423]   However, Claimants invested in overpriced and over-leveraged plants.  If the substantial remuneration available under the current regime does not give Claimants a satisfactory return on their investment, this results from their unsound decisions in structuring and financing their investment.

### (2)   The Issue of Judicial Economy

352.   Claimants advance four distinct claims under the ECT: (1) expropriation contrary to Article 13; (2) denial of fair and equitable treatment contrary to Article 10(1); (3) impairment by unreasonable measures, contrary to Article 10(1); and (4) failure to honor undertakings entered into with Claimants' investments, again contrary to Article 10(1).

353.   While the Tribunal has considered each of these claims, it concludes that the claim invoking Respondent's Article 10(1) obligation to accord investors fair and equitable treatment provides the most appropriate legal context for assessing the complex factual situation presented here.  The Tribunal's decision in this regard fully resolves Claimants' claim.  In the circumstances here, decision of the remaining claims would not alter the outcome or affect the damages to which Claimants are entitled.

354.   As other Tribunals have observed, considerations of economy – both jurisprudential and financial – may lead a tribunal to conclude that it need not address issues extraneous to those essential to its decision.  As the tribunal in *SGS Société Générale v. Paraguay* observed in a case also involving claims of multiple breaches of the governing investment treaty:

> In light of the Tribunal's conclusion that Respondent breached Article 11 of the BIT by failing to meet its payment obligations under the Contract, the Tribunal need not address Claimant's remaining claims.  Each of those claims arises from the same facts, and reduces to a claim that Respondent failed to pay the invoices.  Even if the Tribunal were to find in favor of Claimant with respect to these claims, Claimant's damages would be

---

[423] *See, e.g.,* Resp. C-Mem., ¶ 1147 *et seq*.; Resp. Rej., ¶¶ 948, 1142-1143.

> unchanged. Therefore, any additional legal findings on these matters are unnecessary.[424]

355. The *Micula v. Romania* tribunal was of like mind:

> In light of the Tribunal's conclusion that, by prematurely revoking the EGO 24 incentives in the manner that it did, the Respondent breached its obligation to treat the Claimants' investments fairly and equitably, the Tribunal does not need to address the Claimants' remaining claims. Indeed, each of those claims arises from the same facts as the fair and equitable treatment claim, and the Claimants claim the same compensation in each instance [...] Thus, even if the Tribunal were to find in favor of the Claimants with respect to these claims, this would not impact the Tribunal's calculation of damages. As a result, any legal findings on these matters are unnecessary.[425]

356. This Tribunal agrees with the approach and logic adopted in the above-referenced arbitral awards.

### (3)   The Guarantee of Fair and Equitable Treatment

#### a.   The Parties' Positions

##### (i)   Claimants' Position

357. Claimants maintain that fair and equitable treatment under the ECT is an autonomous standard,[426] and that Respondent's conduct manifestly was not fair or equitable. For Claimants, the obligation to extend fair and equitable treatment must be construed in light of the ECT's object and purpose, which is to assure stable and transparent conditions for investment.[427] Stability is particularly necessary in the capital-intensive energy sector.[428] Claimants invested in Spain because of the RD 661/2007 regime, which was designed to

---

[424] **CL-058,** *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay,* ICSID Case No. ARB/07/29, Award, 10 February 2012, ¶ 161.

[425] **CL-031,** *Ioan Micula et al. v. Republic of Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 [hereinafter, *Micula v. Romania*], ¶ 874.

[426] Cl. Mem., ¶ 376.

[427] *Id.,* ¶ 381.

[428] *Id.,* ¶ 394.

attract investment, contains a stabilization clause in Article 44(3) and was crucial to their decisions to invest.[429]

358.     The drastic changes adopted by Respondent defeated Claimants' legitimate expectations of stability of the RD 661/2007 regime and of its promised characteristics and advantages.[430]   These expectations were legitimate for multiple reasons.[431]   Investors' legitimate expectations can be predicated upon a State's legal framework,[432] and changing that framework can lead to liability.[433]  Spain's "road shows" promoting solar investments in Spain, the adoption of RD 1614/2010 implementing a July 2010 Agreement between renewables producers and the government, and other efforts to promote investment in renewables, all confirm that Claimants' expectations were legitimate,[434] as do the 2011 resolutions and other official actions confirming that the plants would receive the favorable regulatory regime established by RD 661/2007.[435]

                    (ii)   Respondent's Position

359.     In Respondent's view, Claimants' expectations were not legitimate and were not protected by the ECT.  Claimants could not reasonably expect the freezing or "unmodifiablity" of the RD 661/2007 regime for forty years, as they claim.[436]  Respondent made no promises or commitments in this regard,[437] and Spanish law provides no stabilization clause freezing regulatory regimes.[438]   Case law and doctrine are now less prepared to recognize commitments on basis of legislative frameworks; [439] the rigidity of arbitration cases such

---

[429] *Id.,* ¶¶ 341, 399.

[430] *Id.,* ¶¶ 397-398; 408-410.

[431] *Id.,* ¶ 400.

[432] *Id.,* ¶ 395 (quoting Dolzer).

[433] *Id.,* ¶ 409.

[434] *Id.,* ¶¶ 400, 402.

[435] *Id.,* ¶¶ 404-406.

[436] Resp. C-Mem., ¶ 977.

[437] *Id..,* ¶ 992.

[438] *Id.,* ¶ 974.

[439] *Id.,* ¶ 994 *et seq.*

as *Tecmed v. Mexico* has been "adjusted and corrected"[440] by more recent jurisprudence that recognizes the need for legislative evolution as circumstances change.

360.    With proper due diligence (which Claimants' lawyers did not conduct),[441] Claimants would have known that RD 661/2007 is an implementing regulation that could be changed.[442] Even their lawyer's defective due diligence report noted that similar prior measures had been changed.[443]  Indeed, Claimants and their co-investors recognized the possibility of changes being made even as their project progressed.[444]  They and their lenders and partners could have no legitimate expectation that the regime could not be modified.[445] The parts of certain 2011 Resolutions invoked by Claimants as evidence of a commitment are purely informative statements of facts that were true at the time, not binding commitments.[446]

361.    Claimants were only entitled to a reasonable return,[447] which the new regime provides.[448] Claimants would receive the legislatively determined reasonable return had they properly designed and financed their plants.  That is the central issue – did Spain's regulatory measures provide for a reasonable return?  According to Respondent, they did.[449]

### b.  The Tribunal's Analysis

362.    Absent explicit undertakings directly extended to investors and guaranteeing that States will not change their laws or regulations, investment treaties do not eliminate States' right to modify their regulatory regimes to meet evolving circumstances and public needs.[450]  As

---

[440] *Id.*, ¶ 995.

[441] *Id.*, ¶¶ 980, 1016.

[442] *Id.*, ¶ 1010.

[443] *Id.*, ¶¶ 1016, 1040-1044.

[444] *Id.*, ¶¶ 978, 1051-1060.

[445] *Id.*, ¶ 1060.

[446] *Id.*, ¶¶ 1070-1094.

[447] *Id.*, ¶¶ 214, 975, 1008-1009.

[448] *Id.*, ¶¶ 427, 1147 *et seq.*

[449] *Id.*, ¶¶ 975, 982-985.

[450] *See, e.g., **RL-042**, Parkerings-Compagniet AS v. Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007 [hereinafter, *Parkerings v. Lithuania*], ¶ 332; **RL-048**, *EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, ¶¶ 217-218.

other tribunals have observed, "[i]n order to adapt to changing economic, political and legal circumstances the State's regulatory powers still remain in place."[451]   "[T]he fair and equitable treatment standard does not give a right to regulatory stability *per se*. The state has a right to regulate, and investors must expect that the legislation will change, absent a stabilization clause or other specific assurance giving rise to a legitimate expectation of stability."[452]   The question presented here is to what extent treaty protections, and in particular, the obligation to accord investors fair and equitable treatment under the ECT, may be engaged and give rise to a right to compensation as a result of the exercise of a State's acknowledged right to regulate.

363.   As explained below, the Tribunal finds that Respondent's obligation under the ECT to afford investors fair and equitable treatment does protect investors from a fundamental change to the regulatory regime in a manner that does not take account of the circumstances of existing investments made in reliance on the prior regime.   The ECT did not bar Spain from making appropriate changes to the regulatory regime of RD 661/2007.   Thus, the Tribunal does not accept Claimants' contention that RD 661/2007 gave them immutable economic rights that could not be altered by changes in the regulatory regime. Nevertheless, the ECT did protect Claimants against the total and unreasonable change that they experienced here.

364.   The record indicates that Claimants are experienced and sophisticated investors.   Their substantial financial resources helped to bring about three large-scale solar plants that continue to provide Spain with the environmental benefits of clean solar power.   As experienced investors, Claimants recognized that regulatory regimes for utilities are sometimes adjusted, but within foreseeable limits.   As a one of Claimants' senior executives observed at the Hearing:

> The regulator's quite smart and he will tinker a little bit with the returns.   Yes, the returns typically will go down most of the time, they don't go up, but they will go down, but of course going down

---

[451] **CL-007**, *BG Group Plc. v. Argentine Republic*, UNCITRAL, Award, 24 December 2007 [hereinafter, *BG v. Argentina*], ¶ 298.

[452] **CL-031**, *Micula v. Romania*, ¶ 666.

> a little bit is not killing the project. Here we had a complete value destruction. We lost all the value in this particular project.[453]

365.    As described below, the evidence shows that Respondent eliminated a favorable regulatory regime previously extended to Claimants and other investors to encourage their investment in CSP. It was then replaced with an unprecedented[454] and wholly different regulatory approach, based on wholly different premises. This new system was profoundly unfair and inequitable as applied to Claimants' existing investment, stripping Claimants of virtually all of the value of their investment.

366.    Claimants' counsel summarized this sequence of events at the Hearing:

> Between 2012 and 2014 [...] after Eiser and many, many other investors had poured hundreds of millions of euros into building the renewable energy infrastructure that Spain had enticed them to invest in, Spain then completely changed the ground rules and abolished RD 661 of 2007 which had set up the regime and introduced a wholly new regime, which was applicable not just to new plants, but also to the previously commissioned and registered plants and that new regulatory regime is based on a completely different economic foundation to that on which Eiser based its investment and which was promised by Spain at the time of investing.[455]

367.    The factual and legal situation presented here thus differs fundamentally from that addressed in *Charanne BV v. Spain*,[456] which rejected investors' claims that other changes to Spain's regulatory regime violated the ECT. The *Charanne* claimants in February and December 2009 acquired stakes in an established enterprise that owned 34 photovoltaic solar plants.[457]    The following year, in November 2010, Respondent adopted RD 1565/2010, which eliminated regulated tariffs for photovoltaic plants from their twenty-sixth year of operation and introduced technical requirements to address voltage dips.[458] Then, in December 2010, Respondent adopted RDL 14/2010, limiting such plants

---

[453] Rev. Tr. Day 3 (ENG), 13:16-22 (Mr. Meissner).

[454] Rev. Tr. Day 4 (ENG), 87:12-14 (Mr. Lapuerta).

[455] Rev. Tr. Day 1 (ENG), 73:11-22 (Ms. Gill).

[456] **RL-084**, *Charanne v. Spain*, Award.

[457] *Id.*, ¶¶ 5, 143.

[458] *Id.*, ¶¶ 148-153, 270 *et seq*.

operating hours and imposing charges for using the transportation and distribution network.[459] The *Charanne* award mentions Spain's subsequent more sweeping regulatory changes at issue in this case, including, *inter alia*, RDL 9/2013, RD 413/2014 and Order IET/1045/2014. However, it notes that "Claimants have not submitted any specific claim regarding RDL 9/2013 and subsequent regulations, and they could not do it at this point, since they have already filed a claim on them before another arbitral tribunal. Pursuing the same claim in these proceedings would give rise to unjust enrichment."[460]

368. The measures complained of in *Charanne* had far less dramatic effects than those at issue here. The *Charanne* claimants claimed that RD 1565/2010 and RDL 14/2010 "ha[d] diminished the economic value of its assets and interests [...]."[461] However, the damage claimed was far less sweeping; the claimants alleged that the disputed measures "reduced the profitability of the plants under RD 1578 by 10% (from 9,41% to 8,48%) and plants under RD 661/2007 by 8,5% (from 7,36% to 6,72%) [...]."[462]

369. Thus, as the *Charanne* tribunal made clear,[463] its decision did not address RDL 9/2013, RD 413/2014, and Ministerial Order IET/1045/2014, the key actions at issue in this case. Instead, the case addressed much less sweeping changes to the photovoltaic regulatory regime, changes that produced far less drastic economic consequences for the *Charanne* claimants.

370. Nevertheless, *Charanne* offers relevant insight regarding the more dramatic change to the regulatory regime under consideration here:

> [A]n investor has the legitimate expectation that, when modifying the regulation under which it made the investment, the State will not

---

[459] *Id.*, ¶¶ 158, 273-274.

[460] *Id.*, ¶ 191. *See also id.*, ¶ 395 ("[...] the claims have been limited to the consequences stemming from the 2010 provisions, whereas the claims with respect to subsequent rules have been submitted by other group companies to a different arbitral tribunal.")

[461] **RL-084**, *Charanne v. Spain*, Award, ¶ 232.

[462] *Id.*, ¶ 284.

[463] *Id.*, ¶¶ 481-482.

> act unreasonably, contrary to the public interest, or in a disproportionate manner. [464]

Whether viewed as basis for reasonable expectations, or as a statement of a State's obligations under ECT, the principle is the same. It added:

> The Arbitral Tribunal considers that the proportionality requirement is fulfilled inasmuch as the modifications are not random or unnecessary, *provided that they do not suddenly and unexpectedly remove the essential features of the regulatory framework in place.*[465]

371.    Respondent faced a legitimate public policy problem with its tariff deficit, and the Tribunal does not question the appropriateness of Spanish authorities adopting reasonable measures to address the situation. However, in doing so, Spain had to act in a way that respected the obligations it assumed under the ECT, including the obligation to accord fair and equitable treatment to investors. As the tribunal in *ADC v. Hungary* observed:

> 423. [...] while a sovereign State possesses the inherent right to regulate its domestic affairs, the exercise of such right is not unlimited and must have its boundaries. [...] [T]he rule of law, which includes treaty obligations, provides such boundaries. Therefore, when a State enters into a bilateral investment treaty like the one in this case, it becomes bound by it and the investment-protection obligations it undertook therein must be honoured rather than be ignored by a later argument of the State's right to regulate.
>
> 424. The related point made by the Respondent that by investing in a host State, the investor assumes the 'risk' associated with the State's regulatory regime is equally unacceptable to the Tribunal. It is one thing to say that an investor shall conduct its business in compliance with the host State's domestic laws and regulations. It is quite another to imply that the investor must also be ready to accept whatever the host State decides to do to it. In the present case, had the Claimants ever envisaged the risk of any possible depriving measures, the Tribunal believes that they took that risk with the legitimate and reasonable expectation that they would receive fair treatment and just compensation and not otherwise.[466]

---

[464] *Id.*, ¶ 514.

[465] *Id.*, ¶ 517 (emphasis added).

[466] **CL-002**, *ADC Affiliate Ltd. et al. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶¶ 423-424.

372.    Throughout the proceedings, Respondent stressed that its actions were consistent with the assurances of a reasonable return enshrined in Spanish law and with the requirements of the Constitution, and were regularly upheld in Spanish courts.[467] As the *Charanne* tribunal observed regarding two of these decisions:

> [T]he Spanish Supreme Court had considered in December 2005 that: '*There is no legal obstacle for the Government, exercising the regulatory powers entrusted thereto as well as its broad powers in a heavily regulated matter such as electricity, to modify a specific remuneration scheme, insofar as it remains in compliance with the framework provided by the EPA.*' Similarly, in October 2006, the Supreme Court decided the following: '*the owners of electricity production facilities under the special regime do not have an 'unmodifiable right' to have the feed-in remuneration scheme remain unchanged. Such regime aims at promoting the use of renewable energies by means of incentives which, as it always happens with incentives, is not sure they will remain unchanged in the future.*'[468]

373.    Shortly before the Hearing, Respondent brought to the Tribunal's attention a 17 December 2015 decision by Spain's Supreme Court upholding the constitutionality of RDL 9/2013, the legislation that repealed RD 661/2007 and established the new legal and economic framework for existing renewables facilities.[469] This, however, is not a sufficient response to Claimants' claims, which also must be tested against the obligations Respondent assumed by becoming a party to the ECT. Indeed, Spain's Supreme Court indicated in its 17 December 2015 decision that under Spanish law, the question of conformity with Spain's Constitution and with the requirements of the ECT are quite separate:

> [...] this Court has repeatedly stated that international treaties do not in themselves constitute a contrast parameter for assessing the possible unconstitutionality of laws, because 'the alleged contradiction of treaties by laws or other subsequent regulations is not a matter that affects their constitutionality and, therefore, should be resolved by the Constitutional Court (STC 49/1988, legal basis 14, *in fine*), but as a pure question of selection of the applicable law to the specific case , its resolution is up to the courts in the cases that

---

[467] *See, e.g.*, Resp. C-Mem., ¶¶ 225-230, 238-240, 244, 1215-1216; Rev. Tr. Day 2 (ENG), 58:7-59:4, 59:22-60:2 (Mr. Santacruz).

[468] **RL-084**, *Charanne v. Spain*, Award, ¶ 506 (footnotes omitted).

[469] **R-236**, Judgement of the Spanish Constitutional Court, 17 December 2015.

are known' (STC 28/1991 of 14 February, FJ 5, and 207/2013, of 5 December, FJ 4). In short, 'it is not for this Court to determine the compatibility or otherwise of a legal rule with an international treaty, nor can they be set up in fundamental regulations and constitutional standards' (STC 142/1993, of 22 April, FJ 3).[470]

(i) Construing the Obligation to Accord Fair and Equitable Treatment

374. Article 10(1) of the ECT provides in relevant part:

Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. [...][471]

375. The Parties agree that the ECT's provisions must be interpreted in accordance with the rules of interpretation in Article 31 of the VCLT[472] (to which Respondent, Luxembourg, and the United Kingdom are all parties). Thus, Article 10(1) must be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."[473] Under Article 31(2), "[t]he context for the purpose of the interpretation of a treaty shall comprise [...] the text, including its preamble and annexes [...]."[474]

376. Thus, the meaning of the ECT's Fair and Equitable Treatment obligation must be assessed in the context of the particular treaty in which it is found, not on some Platonic plane:

The context of the term 'fair and equitable' largely depends on the contents of the treaty in which it is employed. Thus, the term must be interpreted not as three words plucked from the [Bilateral Investment Treaty] text but within the context of the various rights and responsibilities with all the conditions and limitations to which the Contracting Parties agreed.[475]

---

[470] *Id.*, at 19-20.

[471] **C-001**, Energy Charter Treaty, Art. 10(1).

[472] Rev. Tr. Day 1 (ENG), 192:12-17 (Mr. Sullivan); Resp. Rej., ¶ 154.

[473] **CL-101**, VCLT, Art. 31.

[474] *Id.*

[475] **CL-143**, *AWG Group v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 30 July 2010, ¶ 214.

377.    ECT Article 2, captioned "Purpose of the Treaty," defines the ECT's purpose as follows:

> This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.[476]

378.    The ECT's stated purpose thus emphasizes the treaty's role in providing a legal framework promoting long-term cooperation, suggesting that the treaty is conceived as enhancing the stability required for such cooperation.   Further, this is to be in accordance with the "objectives and principles of the [European Energy] Charter."   The 1991 European Energy Charter, a political document that was the precursor to the ECT, again points to the goal of a stable investment regime.

> In order to promote the international flow of investments, the signatories will at national level provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade.

> They affirm that it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which ensure a high level of legal security and enable the use of investment risk guarantee schemes.[477]

379.    These Energy Charter provisions illuminate the nature of the legal regime referred to in ECT Article 2, by emphasizing national legal frameworks that are stable, transparent, and compliant with international legal standards.   They show that, in interpreting ECT's obligation to accord fair and equitable treatment, interpreters must be mindful of the agreed objectives of legal stability and transparency.

380.    An important element of Article 10(1) – again, part of the context for purposes of interpreting the fair and equitable treatment obligation – reinforces this emphasis on stability of the legal regime affecting investments.   The first sentence of Article 10(1) directs that "[e]ach Contracting Party shall, in accordance with the provisions of this

---

[476] **C-001**, Energy Charter Treaty, Art. 2.

[477] **C-001**, "Concluding Document of the Hague Conference on the European Energy Charter," Title II(4), in Energy Charter Secretariat, *The Energy Charter Treaty and Related Documents*, at 218.

118

Treaty, encourage and create *stable*, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area."[478]

381. Reflecting a similar analysis of the ECT, the tribunal in *Plama v. Bulgaria* observed that "stable and equitable conditions are clearly part of the fair and equitable treatment standard under the ECT."[479] Applying the fair and equitable treatment standard under a bilateral investment treaty, the tribunal in *Occidental v. Ecuador* stressed that "[t]he stability of the legal and business framework is [...] an essential element of fair and equitable treatment."[480] That tribunal found a violation of the fair and equitable treatment obligation where "the framework under which the investment was made and operates has been changed in an important manner" by actions attributable to respondent.[481]

382. Taking account of the context and of the ECT's object and purpose, the Tribunal concludes that Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments. This does not mean that regulatory regimes cannot evolve. Surely they can. "[T]he legitimate expectations of any investor [...] [have] to include the real possibility of reasonable changes and amendments in the legal framework, made by the competent authorities within the limits of the powers conferred on them by the law."[482] However, the Article 10(1) obligation to accord fair and equitable treatment means that regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive investors who invested in reliance on those regimes of their investment's value.

383. Tribunals assessing the fair and equitable treatment obligation under various treaties have found corresponding obligations to maintain stability in the fundamental characteristics of regimes relied upon by investors. The tribunal in *Total S.A. v. Argentina* concluded that

---

[478] **C-001**, Energy Charter Treaty, Art. 10(1) (emphasis added).

[479] **CL-047**, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 173.

[480] **CL-044**, *Occidental Exploration and Production Company v. Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004, ¶ 183.

[481] *Id.*, ¶ 184.

[482] **CL-024**, *El Paso v. Argentina*, ¶ 400.

"[a]n operator-investor such as Total was entitled, therefore, to expect that the gas regime would respect certain basic features." While "[t]his did not mean that Total could rely on BIT protection to ensure the stability of the gas law regime without any possibility of change to that regime by Argentina in the light of the dramatic developments,"[483] Argentina's failure to implement an established re-adjustment mechanism violated the obligation of fair and equitable treatment.[484]   The tribunal in *Micula v. Romania* stressed the extensive character of the changes wrought by Romania to a prior incentives regime in finding a violation of fair and equitable treatment.  The respondent's actions, it found:

> [S]tripped EGO 24 of most of its practical content and reduced almost to nothing its advantages given that the purpose of the regime for disadvantaged areas was to attract investment in exchange for certain tax benefits.  After EGO 94/2004, the only tax benefit that remained was the Profit Tax Incentive, and only for existing PIC holders.  This is not a 'trimming down' of the incentives. It was an outright termination.[485]

384.   In similar vein, the *El Paso v. Argentina* tribunal concluded that a number of measures, while individually not denying fair and equitable treatment, together effected a total alteration in the prior legal regime relied upon by the investor, violating the fair and equitable treatment obligation:

> It cannot be denied that in the matter before this Tribunal the cumulative effect of the measures was a total alteration of the entire legal setup for foreign investments, and that all the different elements and guarantees just mentioned can be analysed as a special commitment of Argentina that such a total alteration would not take place.  As stated by the tribunal in *LG&E*, when evaluating the same events, 'here, the Tribunal is of the opinion that Argentina went too far by completely dismantling the very legal framework constructed to attract investors.'[486]

385.   Tribunals addressing the impact of Argentina's economic measures following its economic crisis of the late 1990s have similarly emphasized stability of the fundamentals of legal

---

[483] **RL-047**, *Total S.A. v. Argentina,* ICSID Case No ARB/04/1, Decision on Liability, 27 December 2010, ¶ 168.

[484] *Id.,* ¶ 175.

[485] **CL-031**, *Micula v. Romania*, ¶ 684.

[486] **CL-024**, *El Paso v. Argentina*, ¶ 517 (footnote omitted).

regimes under which investments were made as central to fair and equitable treatment. The *CMS v. Argentina* tribunal observed that the preamble to the treaty at issue there:

> [M]akes it clear [...] that one principal objective of the protection envisaged is that fair and equitable treatment is desirable 'to maintain a stable framework for investments and maximum effective use of economic resources.' There can be no doubt, therefore, that a stable legal and business environment is an essential element of fair and equitable treatment.[487]

386.    The *CMS* tribunal found that the disputed measures at issue "did in fact entirely transform and alter the legal and business environment under which the investment was decided and made,"[488] leading to a finding that respondent had violated its obligation to extend fair and equitable treatment.[489]    Other tribunals assessing Argentina's extensive changes in regulatory regimes and legislation relied upon by investors have similarly found that those changes violated the obligation of fair and equitable treatment:

- *LGE Energy Corp v. Argentina*: "Several tribunals in recent years have interpreted the fair and equitable treatment standard in various investment treaties in light of the same or similar language as the Preamble of the Argentina-US BIT.   These tribunals have repeatedly concluded based on the specific language concerning fair and equitable treatment, and in the context of the stated objectives of the various treaties, that the stability of the legal and business framework in the State party is an essential element in the standard of what is fair and equitable treatment.   As such, the Tribunal considers this interpretation to be an emerging standard of fair and equitable treatment in international law."[490]

- *BG Group Plc. v. Argentina*: "Argentina [...] entirely altered the legal and business environment by taking a series of radical measures [...] In so doing, Argentina violated the principles of stability and predictability inherent to the standard of fair and equitable treatment."[491]

---

[487] **CL-018**, *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005 [hereinafter, *CMS v. Argentina*, Award], ¶ 274.   While another portion of the CMS award was annulled, this portion was upheld as "adequately founded on the applicable law and the relevant facts." **CL-154**, *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8 (Annulment Proceeding), Decision of the Ad Hoc Committee on the Application for Annulment of the Argentina Republic, 25 September 2007, ¶ 85.

[488] **CL-018**, *CMS v. Argentina*, Award, ¶ 275.

[489] *Id.*, ¶ 281.

[490] **CL-035**, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 125 (footnote omitted, but citing, inter alia, *CMS v. Argentina*, *Occidental v. Ecuador*, and *MTD v. Chile*).

[491] **CL-007**, *BG v. Argentina*, ¶ 307.

387.    Claimants could not reasonably expect that there would be no change whatsoever in the RD 661/2007 regime over three or four decades.  As with any regulated investment, some changes had to be expected over time.[492]  However, Article 10(1) of the ECT entitled them to expect that Spain would not drastically and abruptly revise the regime, on which their investment depended, in a way that destroyed its value.  But this was the result of RDL 9/2013, Law 24/2013, RD 413/2014 and implementation of the new regime through Ministry implementing Order IET/1045/2014.[493]  As it was put in *Parkerings*: "any businessman or investor knows that laws will evolve over time. What is prohibited however is for a State to act unfairly, unreasonably or inequitably in the exercise of its legislative power."[494]

> (ii)    The Fundamental Changes Wrought by RDL 9/2013 and Subsequent Measures

388.    Claimants cite various measures adopted by Spain in 2012 and 2013 prior to adoption of RDL 9/2013 said to impair their investment, including the 7% tax on energy production,[495] sharply reducing the use of gas in generation,[496] changing the index for updating tariffs, and eliminating the premium option.[497]    However the solar plants in which Claimants invested only came on line during 2012.  Hence, the impact of these measures was limited in time and difficult to assess on the basis of the evidence.[498]  According to BDO's expert, Mr. Mitchell, at the Hearing:[499]

> In terms of Eiser, their operations started in 2012, so the period between 2012 and 2014 is quite limited, and so it is difficult to work out exactly what they received under the original regime, because

---

[492] Rev. Tr. Day 3 (ENG), 13:14-22 (Mr. Meissner).

[493] **C-100**, Order IET/1045/2014, 16 June 2014.

[494] **RL-042**, *Parkerings v. Lithuania*, ¶ 332.

[495] **C-025**, Law 15/2012.  Discussed at Cl. Reply, ¶ 233 *et seq.*

[496] **C-025**, Law 15/2012.  Discussed at Cl. Reply, ¶ 238 *et seq.*

[497] **C-026**, RDL 2/2013.  Discussed at Cl. Reply, ¶ 244 *et seq.*

[498] *See also, supra* ¶¶ 271, 296 (concluding that the claims concerning the 7% levy are outside of the Tribunal's jurisdiction or are inadmissible) and *infra*, ¶ 458 ("[t]he Tribunal has not found that the several piecemeal changes made by Respondent prior to [June 2014], individually or collectively, violated the ECT").

[499] Rev. Tr. Day 5 (ENG), 181:18-23 (Mr. Mitchell).

when they started operation [...] the disputed measures, some of them had factored in.[500]

389.    However, in 2013 and 2014, Respondent changed its regulatory regime in a far more drastic fashion. It adopted and implemented an entirely new regulatory approach, applying it to existing investments in a manner that washed away the financial underpinnings of Claimants' investments. The new regime reduced projected revenues of Claimants' ASTE 1-A plant by 66% compared to those projected under the prior regime.[501] Since, as described below, the plants were highly leveraged – as Respondent's regulatory authorities previously anticipated that such plants would be – this revenue cut had grave consequences for the investment.

390.    The foundation of the new regime is RDL 9/2013, which definitively replaced RD 661/2007.[502] RDL 9/2013 authorized a new regime intended to significantly reduce Respondent's financial support for concentrated solar power. At the Hearing, Mr. Mitchell of BDO testified that in his opinion, there was no relevant difference between the RD 661/2007 and RDL 9/2013 regimes:

> Q [...] Is it correct that your position is that the new regime and the old regime are the same, they are both based on reasonable return and therefore there is no liability incurred and therefore no damages. Is that a fair summary of your position?
>
> Mr. Mitchell: Yes.[503]

---

[500] *Id.*

[501] First Brattle Regulatory Report, ¶ 154. There is a discrepancy between the testimony of Mr. Montoya, the Spanish official responsible for preparation of Order IET/1045/2014, and other evidence in the case. In response to a question at the Hearing, Mr. Montoya testified that there was little change in the subsidies to Eiser's plants under the new regime, so he could not explain why Eiser believed its investment to have become essentially worthless. Rev. Tr. Day 3 (ENG), 108:3-17 (Mr. Montoya). His testimony in this regard is not consistent with the views of either Party's economic experts, or with the general understanding that the new regime was intended to, and did, significantly cut State support for renewables producers. First Brattle Regulatory Report, ¶¶ 98-100; Second BDO Regulatory Report, ¶ 30 ("Spain had to adopt containment measures that affected all renewable technologies [...]")

[502] Mr. Montoya agreed that RDL 9/2013 was the key announcement of the changed regime. Rev. Tr. Day 3 (ENG), 69:22-25 (Mr. Montoya).

[503] Rev. Tr. Day 5 (ENG), 142:12-17, 145:14-20 (Mr. Mitchell).

391.    The Tribunal does not agree.  The new system was based on quite different assumptions, and utilized a new and untested regulatory approach, all intended to significantly reduce subsidies to existing plants.

392.    Respondent stressed throughout the proceedings that, as a matter of Spanish law, Claimants were entitled only to a reasonable return on their investment, and could not reasonably have held any other expectations.  Spain's new regulatory regime deemed this reasonable return to be a pre-tax return of 7.398% on the hypothetical asset value of a hypothetical "efficient" plant.  This equated to 5.2% after tax on the hypothetical asset base.[504]  The new target return was calculated on the basis of Spain's ten-year government bonds, plus an unexplained differential of 3%.  Respondent deemed this target rate, which is identical in all "standard" installations, to be the "reasonable return" required by Spanish law.  By contrast, according to Respondent's Ministry of Industry, Energy and Tourism, the RD 661/2007 regime on the basis of which Claimants made and financed their investment was structured to provide substantially higher after-tax returns to successful CSP investors:

> With regard to technologies in need of a boost in view of their limited development, such as biogas or solar-thermoelectric, profitability shall rise to 8% for facilities that choose to supply distributors and between 7% and 11% return for those participating in the wholesale market.[505]

393.    Because the new system provided for the reduced target rate of return based on a hypothetical "efficient" plant, facilities like Claimants', which incurred higher initial construction and financing costs in order to attain increased production later, necessarily had a lower return on their investment.  As explained below, the Tribunal has serious reservations about basing the new regulatory regime on the hypothetical costs of a hypothetical "efficient" plant.  However, standing alone, the Respondent's decision to alter the target rate of return potentially available to existing investors as done here casts into question the fairness and equity of the change to the new regime.

---

[504] Second Brattle Quantum Report, ¶¶ 85-86.

[505] **C-270**, Ministry of Industry, Energy and Tourism Press Release, *The Government Prioritizes Profitability and Stability in the New Royal Decree-Law on Renewable Energy and Combined Heat and Power*, 25 May 2007.

394.   Respondent offered no clear explanation of the reasoning leading to its change of opinion between 2007 and 2013 regarding what constituted a reasonable return.  At the Hearing, Mr. Pérez of BDO testified that there was no meaningful change in the yield on 10-year Spanish government bonds, the reference point for determining the target rates of return under the two regimes, between 2007 and 2013.

> Q.  So there has, in fact, been no change in the 10-year bond yields between RD661/2007 and RDL 9/2013, has there?
>
> Mr. Pérez: In terms of the bond yield there is no meaningful difference from one measure to the other.[506]

395.   In response to the Tribunal's question, Mr. Mitchell of BDO acknowledged that his firm had not analyzed whether the Claimants had been overcompensated under the prior regime.

> Mr. Alexandrov: Well, have you looked into whether Eiser, the Luxembourg company, was overcompensated or not?
>
> Mr. Mitchell: No, we haven't looked into that.[507]

396.   Testimony at the Hearing, while involving rough approximations, indicates that the plants' actual pre-tax return falls well below the new regime's target rate.  In response to the Tribunal's questions, experts from both Brattle and BDO made rough estimates of the operating companies' rates of return based on the limited information available from 2014 financial reports, the most recent in the record. Using different methods, Respondent's expert's rough estimate of the pre-tax return was on the order of 5%,[508] while Claimants' expert estimated the pre-tax return on the project to be about 3.7%.[509]  In either case, the results fall well below Spain's target "reasonable return" under the new regime.

397.   Respondent's idealized reasonable return was calculated on the basis of its officials' estimates of the asset values and costs of a hypothetical "standard installation."  The testimony of Mr. Carlos Montoya, head of the solar department at IDEA, confirmed that Ministry officials made the crucial estimates and calculations in this regard as they

---

[506] Rev. Tr. Day 5 (ENG), 107:1-5 (Mr. Pérez).

[507] Rev. Tr. Day 5 (ENG), 181:24-182:1 (Mr. Mitchell).

[508] Rev. Tr. Day 5 (ENG), 195:20-24 (Mr. Pérez).

[509] Rev. Tr. Day 5 (ENG), 205:10 (Mr. Caldwell).

designed Ministerial Order IET/1045/2014. As Mr. Montoya testified, "obviously until 2014 you don't know exactly where the parameters are going to be of the new regime."[510] Estimates and calculations by Mr. Montoya and other officials were then applied to determine the level of subsidy to existing plants, regardless of the plants' actual characteristics and production.[511]

398.   The new regime pays no regard to actual costs (including loan servicing) or actual efficiencies of specific existing CSP plants.[512] Moreover, within limits intended to assure threshold amounts of production, remuneration no longer is based on the amount of electricity generated.[513] Instead, existing plants' remuneration is based on their generating capacity and regulators' estimates of the hypothetical capital and operating costs, per unit of generating capacity, of a hypothetical standard installation of the type concerned. [514] The regulatory regime also sets the regulatory life of a plant. Once set, neither the regulatory life nor the prescribed "initial value of the investment" can be changed.

399.   While some systems of utility regulation do set rates at a level designed to attain a pre-approved rate of return based on asset values, such regulation involves actual asset values and is typically confined to monopolies such as water utilities or pipelines.[515] RDL 9/2013's approach is quite different. Spain's regulators prescribed a target rate of return for a hypothetical efficiently run facility having hypothetical financial and operating costs per unit of generating capacity.

400.   Respondent then retroactively applied these "one size fits all" standards to existing facilities, like Claimants', that were previously designed, financed and constructed based on the very different regulatory regime of RD 661/2007. No account was taken of existing plants' specific financial and operating characteristics in establishing their remuneration.

---

[510] Rev. Tr. Day 3 (ENG), 70:16-17 (Mr. Montoya).

[511] **C-029**, RDL 9/2013, Art. 4.

[512] Rev. Tr. Day 3 (ENG), 72:5-8 (Mr. Montoya) ("[...] well, all plants were analyzed. For instance, from the advantage [sic] point of energy produced, the capacity, their technical characteristics, but obviously [...] not the financial aspects of each of them [...].")

[513] Rev. Tr. Day 5 (ENG), 103:3-104:1 (Mr. Pérez).

[514] Cl. Reply, ¶ 251 *et seq.*

[515] First Brattle Regulatory Report, ¶ 114.

401.    This approach contrasts with the position in *AES v. Hungary* in which the State developed a new regulatory approach for electrical generators that assessed the characteristics of individual plants, which was held not to be a breach of treaty.  Unlike the position in the present case, officials in that case "reviewed all electricity generators' financial statements for the last available reporting period and set price caps in a manner that would cover each generator's actual costs and still produce a 7.1% return on assets."[516]

402.    Respondent's new regime allows it, in setting remuneration going forward, to take account of supposedly excess returns received by a CSP plant prior to the change to the new system in 2014.  Thus, a CSP plant could in principle have its subsidies reduced or even eliminated altogether, should regulators conclude that it had previously received payments greater than required to attain the idealized target return.  This led to discussion at the Hearing of different meanings of retroactivity, and of the fairness and appropriateness of this aspect of the new regime.  However, the Tribunal was not directed to any evidence that payments to Claimants' operating companies were reduced in this manner.  In fact, the plants were only in operation for a short transitional prior to implementation of the new regime in 2014, so there may not have been "excess returns" subject to claw back.

403.    The level of subsidy required to attain the prescribed return thus rests upon government officials' estimates of the capital and operating costs, per unit of generating capacity, of a hypothetical "efficiently run standard installation" of the type and age concerned – and not the actual costs and other characteristics of particular existing installations.  Government officials in the Ministry of Industry, Energy and Tourism were responsible for estimating the costs and characteristics of "efficiently run standard installations" based on their review of professional literature and studies and other "relevant" information.[517]    While two groups of private consultants were engaged to support this effort, one group withdrew

---

[516] **RL-046**, *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision of the ad hoc Committee on the Application for Annulment, 29 June 2012, ¶ 73, citing **RL-039**, *AES Summit Generation Ltd and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶¶ 9.3.53-9.3.55.

[517] **C-263**, *The Government Approves Cuts to Renewables Without a Technical Report*, Europa Press, 13 March 2015 (quoting Ministry spokesman confirming that the standards were prepared exclusively by Ministry officials.)

under circumstances disputed by the Parties, while the second provided its report some time after regulators had announced their decisions.[518]

404.    The evidence regarding Respondent's justification for the costs of the hypothetical "standard installation" largely rested upon the written and oral testimony of Mr. Carlos Montoya, head of the solar department at IDAE.  Mr. Montoya stated that the estimated costs of the hypothetical standard installation were based upon a review of available studies and literature.  However, he added at the Hearing that he also relied upon his personal knowledge based upon a project or projects he had supervised.[519]   Mr. Montoya acknowledged in his testimony that the process was not based on a rigorous mathematical analysis of data, stating, "if you are looking for [...] a mean mathematical formula, you will not find it."  Instead, "[t]here is an analysis of the information on the bibliography and there is prior knowledge that we based ourselves on since we had already developed real plans, actual plans [...] and we know exactly how much those investments entailed."[520]   Mr. Montoya testified in this regard that he did not believe that changing the location of a plant would cause greater variability in costs.[521]

405.    While Mr. Montoya thus expressed confidence that he knew "exactly" the costs required to construct a CSP plant anywhere in Spain, he was less informative or informed regarding the financing of such plants.  When asked if such plants were usually constructed with project financing, he disavowed knowledge of the subject, saying "it's not something that I have analysed."[522]   When asked about a study[523] cited in the National Renewables Plan said to project that 77% of the cost of concentrated solar plants would involve external financing, Mr. Montoya insisted that the study was merely the work of a consultant and not

---

[518] Cl. Reply, ¶ 277 *et seq*.  Claimants and other critics of the new regulatory regime make much of the government's difficulties with its consultants, at least one of which apparently felt the proposed cuts in renewables were excessive. There is press speculation that the consultants refused/were reluctant to accept government's formulas, but few specifics.  *See, e.g.,* **C-263** (critical press account).

[519] Rev. Tr. Day 3 (ENG), 77:4-22 (Mr. Montoya).

[520] Rev. Tr. Day 3 (ENG), 78:25-79:4 (Mr. Montoya).

[521] Rev. Tr. Day 3 (ENG), 82:8-12 (Mr. Montoya).

[522] Rev. Tr. Day 3 (ENG), 59:14-60:1 (Mr. Montoya).

[523] **R-028**, Institute for Energy Diversification and Saving, Ministry of Industry, Tourism and Commerce, *Plan for the Promotion of Renewable Energies in Spain* 2005-2010, August 2005, § 4.3 at 276.

part of the Plan.[524]   Mr. Montoya also confirmed that he had not considered the financing of individual plants:

> Q: [...] what you didn't do with the new regime was to look at each plant individually in terms of its particular financial circumstances?
>
> A:   [...] obviously you are right, not the financial aspects of each of them.[525]

406.   Mr. Montoya's second witness statement disputed Brattle's conclusion that the costs of the hypothetical standard plant did not include certain potentially substantial local taxes.[526]   In Mr. Montoya's opinion, although these were not mentioned in the Ministry's listing of standard costs, they would have been paid by the Engineering, Procurement and Construction ("EPC") contractor under a normal EPC contract.   However, on cross-examination, Mr. Montoya acknowledged that the Claimants' projects had indeed paid €12 million in local taxes outside the framework of the EPC contract for the projects, a significant expense borne by these projects but not reflected in the hypothetical costs of a "standard" installation.[527]   Claimants' economic experts identified other financially significant characteristics of the plants that did not conform to the hypothetical standard costs of the hypothetical standard installation, including the fact that they owned, rather than rented, the real property on which they were located.[528]

407.   Notwithstanding Ministry officials' confidence in the chosen regulatory approach, other Spanish authorities and the CSP industry expressed reservations regarding its sweep and novelty, and disputed many of its assumptions.   Their concerns did not alter Respondent's course.

- The National Energy Commission (referred to by its Spanish initial, "CNE") cautioned that: "it is currently not known whether a similar compensation model exists" (as the Special Payment) "in any other jurisdiction in the European Union or in other countries with support systems which are known through international

---

[524] Rev. Tr. Day 3 (ENG), 63:6-12 (Mr. Montoya).

[525] Rev. Tr. Day 3 (ENG), 72:2-10 (Mr. Montoya).

[526] Second Montoya Statement, ¶ 21.

[527] Rev. Tr. Day 3 (ENG), 96:11-22 (Mr. Montoya).

[528] Second Brattle Quantum Report, ¶¶ 130-135; **BQR-105**, Brattle Quantum Hearing Presentation, at 33.

regulatory associations."[529] CNE further observed that "[t]he economic assessment that accompanies the proposal is terse and does not justify most of the changes introduced."[530]

- The Council of State drew attention to the dramatic scope of the proposed change: "[a] reform having a far greater scope than previous amendments to the compensation system under special provisions, given that the draft bill is bringing about the abolition of that system, with the exceptional possibility of substituting it for a specific compensation system based on different parameters [...]."[531]

- Industry comments were harshly critical: "The ambiguous criteria of 'efficient and well-managed company' cannot be taken to the extreme of using a hypothesis and calculations completely alienated from reality [...] On analyzing these values, we have confirmed that the figures listed therein are much lower than the economic reality of the thermosolar plants."[532]

408.    When asked at the Hearing about industry views, Mr. Montoya gave an equivocal answer: "[t]he response to the proposed measures was varied. That would be my answer. I can't tell you that there was a single uniform response from the operators."[533]

409.    Respondent's substitution of its new and very different regulatory regime had a devastating effect on Claimants' investments because of two key characteristics that were or should have been known to Respondent's regulators. When Claimants made their key investment decisions, Spain's regulators anticipated that concentrated solar plants would involve heavy front-end capital investments and would be highly leveraged. At the Hearing, Respondent's witnesses Mr. Montoya and Mr. Pérez both acknowledged that investments in CSP plants were necessarily concentrated in the early years of the project. Mr. Montoya testified that "[p]erhaps not all the costs, but yes, a large portion of what is dispersed is dispersed upfront."[534] BDO's Mr. Pérez was of like mind:

---

[529] Cl. Reply, ¶ 253; **C-249**, CNE Report 18/2013, 4 September 2013, at 6.

[530] **BRR-037**, CNE Report 18/2013 on the Proposal of Royal Decree to Regulate the Generation of Electricity by Renewable Projects, Cogeneration and Waste Plants, 4 September 2013, at 5 (translation as quoted at Rev. Tr. Day 6 (ENG), 25:8-10 (Ms. Gill) and **C-304**, Claimants' Closing Presentation, at 10). **BRR-037** at 5 also translated as "the report accompanying the proposal is very brief and does not offer justification for a large proportion of the changes introduced."

[531] Cl. Reply, ¶ 258, citing **C-251**, Council of State Opinion 937/2013, 12 September 2013, at 16.

[532] **R-195**, Letter from Mr. Luis Crespo Rodríguez, Secretary General of Protermosolar [CSP industry trade group] to National Market and Competition Commission, 25 February 2014, at 1-2.

[533] Rev. Tr. Day 3 (ENG), 106:19-22 (Mr. Montoya).

[534] Rev. Tr. Day 3 (ENG), 59:10-11 (Mr. Montoya).

> Q. Are we agreed that those investment costs are largely fixed at the beginning of the investment – by that I mean the costs that an investor incurs in developing, maintaining and building a plant, the majority of those costs is expended upfront; is that right?
>
> Mr. Pérez: Yes, that is true.[535]

410. Eiser's undisputed internal accounting shows that as of December 2010 – two years before the plants became operational – it had made front-end investments of at least €124.3 million in developing the projects.[536]

411. Similarly, notwithstanding Mr. Montoya's evident lack of familiarity with the financing arrangements used to build CSP plants, the evidence of record indicates that other officials clearly understood that they would be highly leveraged. In 2005, the Institute for Energy Diversification and Saving ("IDAE") of the Ministry of Industry, Tourism and Commerce, estimated that about 77% of the projected investment costs for renewables plants for the period 2005-2010 would be financed by debt, mainly through non-recourse project financing.[537]

412. The projects in which Eiser and its partners invested borrowed substantial amounts from external lenders; Eiser's internal documents show loans to the operating companies in excess of €640 million.[538] The operating companies in which Claimants invested were able to obtain this significant level of non-recourse financing because RD 661/2007 offered predictable subsidized prices for sale of the plants' production (including some electricity generated by gas) and guaranteed priority of access to the grid. These features enabled Claimants, their co-investors, and their lenders to design and finance CSP facilities reasonably anticipated to produce long term revenues sufficient to cover operating and capital costs and provide an acceptable stable return to the investors.

---

[535] Rev. Tr. Day 5 (ENG), 108:7-12 (Mr. Pérez).

[536] **R-207.29**, Asset Management Quarterly Review ASTE-XOL, December 2010, at 1. *See also* First Brattle Quantum Report, ¶ 7.

[537] **C -053**, Ministry of Industry, Tourism and Commerce & IDAE, *Renewable Energy Plan in Spain 2005 – 2010*, at § 4.2 ("[d]evelopers: 20%, other finance sources 77.1%, public finance 2.9%"); First Brattle Regulatory Report, n. 139; *see also* **C-190**, IDAE Presentation, *Solar Energy in Spain 2007: Current State and Prospects*, at 14.

[538] **C-168**, Eiser Global Infrastructure Fund LLP, General Partner's Report (Continued) – Aires Solar Termoeléctrica S.L ("ASTE") and Dioxipe Solar S.L. ("ASTEXOL"), 31 December 2013.

413.    The new system put into effect in 2014 by Ministerial Order IET/1045/2014 deprived
        Claimants of substantially the total value of their investment.  The new hypothetical
        "standard plant" utilized to determine the remuneration of Claimants' existing plants does
        not take account of their actual characteristics.  Reflecting decisions made years before to
        design plants capable of high production, the plants' historical capital costs were about
        40% higher than the level deemed "efficient" under the new regime.[539]  Their O&M costs
        were from 13% to 18% higher than those of the hypothetical "standard" plant.[540]

414.    The ASTE plants were designed to allow future addition of storage in anticipation of a
        stable regulatory situation.  While Respondent criticized this decision, it was not shown to
        be unreasonable given Spain's policies when it was made.  The Tribunal recalls in this
        regard that Claimants were early investors in an emerging field.  However, Respondent's
        new 2014 standards in effect retroactively prescribe design and investment choices that in
        regulators' view should have been incorporated in plants designed and built some years
        before.  Such design choices – for example, to design higher cost plants capable of higher
        annual production and therefore of generating higher revenues under the RD 661/2007
        regime – are retroactively condemned as inefficient and undeserving of subsidy.

415.    Respondent's expert BDO also urged that Claimants' level of third party financing was
        inappropriate, and that Claimants incurred unnecessary financing expenses by utilizing
        interest rate swaps.[541]  Respondent's experts' arguments in this regard are not persuasive.
        The level of external financing associated with Claimants' investments was well within the
        ranges anticipated by Spain's own regulatory authorities.  Moreover, the evidence shows
        that the use of interest rate swaps was and is a familiar and accepted technique for managing
        financial risk.[542]

---

[539] Second Brattle Quantum Report, ¶ 130 and Table 9.  Brattle attributes the higher capital costs to several factors, including that two of the plants owned (rather than leased) the underlying land, and additional costs incurred in anticipation of adding future storage. *Id.*, ¶¶ 131-135.

[540] Second Brattle Quantum Report, ¶ 136 and Table 10.

[541] *See*, First BDO Regulatory Report, ¶¶ 268-273.

[542] First Hector Statement, ¶¶ 62, 75; Second Hector Statement, ¶¶ 59-60; Rev. Tr. Day 4 (ENG), 88:14-22 (Mr. Lapuerta).

416.    The operating companies' financial reports for 2014 (the latest year available to the Tribunal) show revenues under the new regime to be far below the level required to cover the plants' actual financing and operating costs, let alone to provide any return on or of investment. In 2014, Aires Solar showed net operating income of about €19.92 million, well short of the almost €27.76 million required to service just its external lenders.[543] Dioxipe showed net operating income of €7.79 million, against debt service obligations to third parties of about €13.94 million.[544]

417.    This sharp fall of revenues from the levels anticipated under the RD 661/2007 regime forced the operating companies into debt rescheduling negotiations with their external lenders. Following these negotiations, for the next several years, all revenues above ASTE's operating costs go to the external lenders, leaving nothing to repay the investors' loans (which are being capitalized) or as return of capital.[545] Similar restructuring negotiations for the ASTEXOL project were anticipated in late 2015 or early 2016. The Tribunal did not receive further information regarding these negotiations.[546]

418.    In response to the Tribunal's question, Mr. Meissner testified that, at the end of 2014, "the investment was valued at 4 million [Euros], compared to an investment which we made, invested in the plants of about 125 million; so a very significant loss."[547] Respondent's repeal of RD 661/2007, and its decision to apply an entirely new method to reduce the remuneration for Claimants' existing plants, deprived Claimants of essentially all of the value of their investment. Doing so violated Respondent's obligation to accord fair and equitable treatment.

---

[543] **BQR-088**, 2014 Annual Accounts for ASTE, Annual Accounts Report, at 4.

[544] **BQR-089**, 2014 Annual Accounts for Dioxipe Solar, Profit and Loss Accounts, at 4.

[545] Second Meissner Statement, ¶ 30; Second Brattle Quantum Report, ¶ 26; Rev. Tr. Day 5 (ENG), 203:9-19 (Mr. Caldwell); Second Hector Statement, ¶¶ 68-71.

[546] Second Hector Statement, ¶ 73.

[547] Rev. Tr. Day 3 (ENG), 17:9-12 (Mr. Meissner).

## VII.   DAMAGES

419.   The Tribunal has found that Respondent violated its obligation under Article 10 of the ECT to accord Claimants fair and equitable treatment.   Accordingly, the Tribunal must now consider the appropriate standard for determining any compensation due for that breach, and determine the amount of any such compensation.

### A. The Applicable Standard

420.   ECT Article 10 does not set out a standard for compensation for breaches of its obligations. In contrast, ECT Article 13, concerning expropriation, establishes a reference point in the case of expropriations, barring expropriation except when accompanied by prompt, adequate and effective compensation reflecting the fair market value of the expropriated property.   While tribunals sometimes apply principles relevant to compensation for expropriation to other treaty violations without comment, fuller consideration of the issue is necessary.   As discussed below, a violation of a treaty obligation causing injury entitles an injured party to compensation for the injury sustained.

421.   An appropriate starting point is the Permanent Court of International Justice's 1928 judgment in the *Case Concerning the Factory at Chorzów*.   In its July 1927 decision on jurisdiction, the PCIJ determined:

> It is a principle of international law that a breach of an engagement involves an obligation to make reparation in an adequate form. Reparation therefore is the indispensible complement of a failure to apply a convention and there is no necessity for this to be stated in the convention itself.[548]

422.   In its September 1928 decision on the merits, the Permanent Court addressed the reparation due for such a breach:

> The essential principle contained in the actual notion of an illegal act [...] is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been

---

[548] *Case Concerning the Factory at Chorzów (Claim for Indemnity)*, Jurisdiction, 26 July 1927, PCIJ Series A, No. 9, at 21.

> committed. Restitution in kind, or if this is not possible, payment of
> a sum corresponding to the value which a restitution in kind would
> bear; the award, if need be, of damages for loss sustained which
> would not be covered by restitution in kind or payment in place of
> it – such are the principles which should serve to determine the
> amount of compensation due for an act contrary to international
> law.[549]

423.    The principles articulated by the Permanent Court have been accepted and applied to
breaches of international law generally in the work of the International Law Commission.
Article 31 of the Commission's State Responsibility Articles thus provides that in case of
a treaty breach or other internationally wrongful act:

> 1.   The Responsible State is under an obligation to make full
> reparation for the injury caused by the internationally wrongful act.
>
> 2.   Injury includes any damage, whether material of moral, caused
> by the internationally wrongful act of a state.[550]

424.    The Tribunal regards Article 31 as accurately reflecting the international law rules that are
to be applied here. International law requires that Respondent make full reparation for the
injury caused by failing to comply with its obligation to accord fair and equitable treatment
under ECT Article 10(1), so as to remove the consequences of the wrongful act.

## B.   What Reparation Is Due?

425.    In their Memorial and Reply, Claimants sought "restitution of the legal and regulatory
regime under which they made their investments or, in the alternative, damages."[551] The
Tribunal does not regard restitution in the form of restoring the RD 661/2007 regulatory
regime as an appropriate remedy in this situation. As indicated earlier, the Tribunal does
not question Respondent's sovereign right to take appropriate regulatory measures to meet
public needs, potentially including revision of the RD 661/2007 regime. However, it must

---

[549] **CL-012**, *Case Concerning the Factory at Chorzów (Claim for Indemnity)*, Merits, 13 September 1928, PCIJ Series A, No. 17, at 47.

[550] **CL-097**, International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts, Annexed to General Assembly Resolution 56/83 of 12 December 2001 and corrected by Document A/56/49 (Vol. I) Corr. 4 (2002), 28 January 2002.

[551] Cl. Reply, ¶ 858. *See also*, Cl. Mem., ¶ 461.

do so within the international legal framework it accepted when it adhered to the ECT, including the obligation to provide compensation for any breach of its commitments under the Treaty.

### (1)   The Parties' Positions

#### a.   Claimants' Position

426.   The appropriate measure to assess the full reparation required by international law depends on the circumstances of the case.   In this case, Claimants contend that the appropriate measure is the reduction of the fair market value of their investment as measured by the present value of past and future cash flows allegedly lost to them on account of the claimed violations of the ECT.

427.   Claimants retain minority shareholding interests in solar power generation plants that continue to produce cash flows, albeit far less than Claimants expected on the basis of the RD 661/2007 regime.   Claimants therefore calculated their claimed damages based on the reduction in past and future cash flows said to result from Respondent's regulatory changes.   Brattle, Claimants' valuation experts, utilized an approach addressing both past amounts allegedly lost during an eighteen-month period between adoption of Law 15/2012 in late December 2012 and 20 June 2014 (the date of publication of the Ministerial Order setting out the elements of the new regime) (sometimes described as "historic" losses)[552] and anticipated future losses.

428.   For historic losses, Brattle identified actual cash flows under Respondent's changed regulatory regime for the period between the plants' commissioning in 2012 and June 2014. They then estimated what cash flows would have been during this same period had the RD 661/2007 regime remained fully in force.   Claimants' claim for historic losses was the difference between the actual and estimated amounts.

429.   For the future period from June 2014 through a projected 40-year life of the plants, the experts estimated the value of lost future cash flows utilizing a similar approach.   Future

---

[552] First Brattle Quantum Report, ¶¶ 14-15.

cash flows were estimated in a "But For" world where the RD 661/2007 regime remained in operation unchanged for approximately 38 more years after the valuation date. The same was done for an alternative "Actual" scenario estimating projected future cash flows under the changed regime for the same period. The future cash flows projected under both scenarios were then discounted to present value using a Discounted Cash Flow ("DCF") analysis. The "future losses" claim is for the difference between the two assessments – "Actual" cash flows under Respondent's revised regime, and those that would have accrued in the "But For" world where RD 661/2007 remained in effect for 38 more years.

430.  Claimants defended the use of DCF analysis to quantify its projections of "Actual" and "But For" future cash flows, urging that DCF is an accepted and widely used valuation method that Respondent itself utilized.[553]  In Claimants' submission, DCF offered a particularly appropriate method with existing investments like those at issue here, characterized by predictable cash flows and stable financing, operating and maintenance costs:

> [T]he DCF method is the appropriate method to assess the fair market value in the circumstances because CSP projects have a relatively simple business model 'producing electricity, whose demand and long-run value can be analysed and modeled in detail based on readily available data.'[554]

431.  Claimants' calculation of their claimed damages increased by €5 million over the course of the proceedings. Claimants explained at the Hearing that the difference was attributable to a change in the manner in which Claimants' economic experts from the Brattle Group treated depreciation in response to a criticism by Respondent's experts from BDO.[555]  As presented by the witnesses from the Brattle Group at the Hearing, Claimants' claimed losses were as follows:

- Lost Cash Flows Through June 2014       €13 million

- Projected Through 40 years                    €196

---

[553] *See, e.g.*, Second Brattle Quantum Report, ¶¶ 74-76.
[554] Cl. Reply, ¶ 859.
[555] Rev. Tr. Day 2 (ENG), 23:23-24:11 (Ms. Stoyanov).

- Total of lost cash flows          €209 million[556]

432. Thus, the lion's share of Claimants' compensation claim – €196 million – reflects the value of future cash flows that Claimants contend they would have received "but for" Respondent's asserted breach of its treaty obligations.

433. In their Second Report, Claimants' experts offered an alternate damages claim said to respond to Respondent's contention that they were entitled only to a reasonable return on their investment. Brattle accordingly calculated the present value of the amount they contend Claimants would receive had they earned "the reasonable return that was implicit in the FIT offered by the Original Regulatory Regime."[557] Put in simplified form, the experts estimated a return at the rate of 9.5% after tax calculated on the basis of the projected costs of the "marginal plant" of the system, which they took as "the most expensive efficient plant on the system – the tower system."[558] The stated rationale for using tower plants – which are more costly to construct than the trough systems utilized by the plants here at issue – was that doing otherwise "would appropriate the efficiency benefits that investors have realized by developing plants that are cheaper and/or more efficient at producing electricity than the marginal or most efficient type."[559] This methodology resulted in a damages claim of €256 million.[560]

434. Without entering into the details of Claimants' experts' calculation of this alternate claim, and of Respondent's rebuttal to it, the Tribunal finds the legal theory underlying it unpersuasive. ECT Article 10(1) does not entitle Claimants to a "reasonable return" at any given level, but to fair and equitable treatment. Further, the Tribunal is not persuaded of the rationale for accepting the projected costs of the most expensive type of solar generation (towers) as the basis for calculating the future revenues that should accrue to Claimants' very different plants.

---

[556] **BQR-105**, Brattle Quantum Hearing Presentation at 3.

[557] Second Brattle Regulatory Report, ¶ 181.

[558] Second Brattle Quantum Report, ¶ 152(a).

[559] *Id.*

[560] Second Brattle Quantum Report, ¶ 153 (Table 11).

### b.  Respondent's Position

435.   Respondent's denied any breach of the ECT, and consequently denied that any compensation was due.[561]  In its Counter-Memorial, Respondent urged that Claimants' claimed damages were "totally and completely speculative;" that "the discounted cash flow method (DCF) is inappropriate in the light of the circumstances;" that Claimants' costs were inflated by transactions between related companies; and that Claimants' damages claims suffered from "[o]ther grave defects of the Brattle report (lack of information, etc.)."[562]

436.   Respondent's arguments in the Counter-Memorial largely reflected the 10 April 2015 Expert Report of BDO, Respondent's financial and valuation expert.[563]  In that report, BDO contended, *inter alia*, that:

- Approximately two-thirds of the costs of the three plants involved payments made to companies of the Elecnor group.[564]  (Elecnor held the engineering, procurement and construction contracts for the project.)  In BDO's view, such a high proportion of related party transactions "represents a high risk" because they "may not correspond to market prices."[565]

- Brattle's use of DCF valuation methods was inappropriate in this case, because the long time period at issue (38 years) led to "a high level of uncertainty."[566]  Further, in BDO's submission, Brattle failed to provide its calculations making it "impossible to check whether the data it contains is correct or not, from an arithmetical point of view [...]."[567]

- Eiser Infrastructure Ltd., the First Claimant, is merely a conduit company that makes investments on behalf of the limited partners of a limited partnership "whose identity is unknown."[568]

---

[561] Resp. C-Mem., ¶¶ 1204-1205.

[562] *Id.*, ¶ 1209.

[563] Resp. C-Mem., ¶ 1203 *et seq.*

[564] First BDO Financial Report, ¶ 34.

[565] *Id.*, ¶ 37.

[566] *Id.*, ¶ 40.

[567] *Id.*, ¶ 38.

[568] *Id.*, ¶ 56.  (The Tribunal addresses this last argument in connection with Respondent's several jurisdictional arguments, *supra*.)

(i)   Respondent's Alternative Valuations

437.   Accompanying Respondent's Rejoinder (submitted at a stage where the existing schedule
for written submissions on the merits left Claimants no opportunity to respond in writing),
BDO's experts expanded upon their prior objections, but also presented their own
appraisals of the value of Claimants' investment based on an operating life of 25 years.
BDO's first estimate rested on the premise that the plants had capacity greater than 50 MW,
and so would not be eligible for the favorable RD 661/2007 regime for plants of less than
50 MW.   Under this hypothesis, the BDO experts concluded that the value of Eiser's
investment at 20 June 2014 (estimated to be €31.714 million) was greater under the post-
June 2014 regime than under its predecessor, so no compensation could be due.[569]   As the
Tribunal has concluded *supra* (Section VI(B)(2)) that the plants were eligible for the
Special Regime provisions for plants of 50 MW or less, this valuation need not be
considered further.

438.   The experts' second valuation assumed the availability of the RD 661/2007 regime for
plants of 50 MW or less. This valuation assumed a loss to the investors resulting from the
change of regimes of €37.188 million.[570]

439.   As noted, Claimants did not have an opportunity to respond to these valuations in writing.
At the Hearing, the Parties' valuation experts debated the merits of their rival valuations.
Both sides' experts agreed that their respective valuations involved relatively similar
projected future cashflows.   Brattle's Mr. Caldwell observed that "overall the cashflows
that are being assumed by BDO in their model are relatively similar so [to] the cashflows
that are being assumed in our model."[571]   BDO's Mr. Pérez agreed with this conclusion as
to the 25-year period on which their assessment was based.[572]

---

[569] Second BDO Financial Report, ¶ 304.

[570] *Id.*, ¶ 307.

[571] Rev. Tr. Day 4 (ENG), 91:15-18 (Mr. Caldwell).

[572] Rev. Tr. Day 5 (ENG), 150:1-5 ("Q: [...] So what we can see is that the projected cashflows are relatively similar
in the BDO and Brattle but-for and the BDO and Brattle actual; right?" MR PÉREZ: Yes, for that particular period of
25 years, yes.")

440.    However, Mr. Caldwell cited other factors that in his opinion unreasonably depressed Respondent's valuation, including use of what he regarded as an excessive weighted average cost of capital, alleged "double dipping" of the liquidity discount (reflecting the limited market for solar plants), inconsistency in leverage assumptions, and other factors. Adjusting for these, Mr. Caldwell projected that Respondent's valuation should move to the range of €100-120 million.[573] For his part, Respondent's expert Mr. Pérez related much of the difference to Claimants' use of an unjustified 40-year service life, and to the use of an unreasonably low cost of capital based on bond prices at the time of valuation, rather than a higher rate from an earlier period that would compensate for what Mr. Pérez saw as higher regulatory risk under the "but for" scenario.[574]

**C.    The Tribunal's Analysis**

441.    The Tribunal agrees that the Claimants' approach for determining its damages – assessing the reduction of the fair market value of its investment by calculating the present value of cash flows said to have been lost on account of the disputed measures – offers an appropriate means to determine the amount of reparation due in the circumstances of this case.

442.    Before addressing the Parties' competing views regarding Claimants' assessment of the claimed damages, the Tribunal will consider three threshold issues involving significant claimed amounts: the plants' operational life, the tax "gross-up" claim, and the claim for injuries alleged prior to June 2014.

**(1)    The Plants' Operational Life**

443.    The first issue concerns the projected life of the investment. In calculating the damages claim, Claimants' experts from the Brattle Group projected that the solar power plants in which Claimants had an interest would have an operational life of 40 years, or roughly 38 years past Brattle's chosen June 2014 valuation date. At the Hearing, the Brattle experts indicated that projecting a 40-year operational life, rather than the 25 years posited by

---

[573] Rev. Tr. Day 4 (ENG), 105:12-14 (Mr. Caldwell).
[574] Rev. Tr. Day 5 (ENG), 160:9-161:3 (Mr. Pérez).

Respondent, significantly increased the present value of the plants' projected future revenues. A slide presented by the experts at the Hearing included a detailed chart showing the increase in present value attributable to the projected 40-year operational life to be €68.0 million.[575]  The structure of this chart shows that the €68.0 million figure was considered and deliberate. When €68.0 million is added to the amounts given for the five other elements shown on the chart, the sum corresponds to the difference between Brattle's damages calculation of €209.0 million and a much lower valuation of €37.2 million calculated by Respondent's experts from BDO.[576]

444.    Claimants' primary fact witnesses – senior Eiser executives Hans Meissner and Jaime Hector – did not engage with the question of the plants' operational lives in their witness statements or at the Hearing. Claimants did not introduce contract specifications or other contemporaneous documents regarding the design life of the projects, or testimony from persons with firsthand knowledge of these matters. The limited number of relevant documents of record were largely prepared for other purposes, lacked detail, and were inconsistent regarding the projects' projected service lives.

445.    Several of Claimants' internal financial and planning documents refer to a projected service life of 40 years, but they do not explain the basis for doing so. Several of these were prepared prior to the actual design of the project.[577] Other types of documents of record take a more conservative view of service life. The "base case" financial assessments prepared in connection with financing of the projects assumed a service life of 25 years.[578] The operating companies' accountants utilized a projected 25-year lifespan for calculating

---

[575] **BQR-105**, Brattle Quantum Hearing Presentation, at 40.

[576] Brattle's slides at the Hearing included a second, less detailed, introductory slide showing the corresponding figure as €60 million. **BQR-105**, Brattle Quantum Hearing Presentation, at 26. However, this figure is stated in isolation and apparently is a typographical error. Graphs in Claimants' experts' evidence show substantial additional future revenues projected from a 40-year plant life, but these do not permit calculation of the specific amounts involved. *See, e.g.,* First Brattle Quantum Report, Figure 5, "Projected Revenues for ASTE 1A".

[577] *See, e.g.,* **C-062**, ABN Infrastructure Capital Management Limited, *ASTE Screening Paper*, 7 June 2007, at 2; **C-070**, ABN Infrastructure, *General Partner's Report: General Partner's Review – Aries Solar Termoeléctrica S.L.*, 30 June 2008, at 1; **C-087**, EISER Infrastructure Limited, *Investment Committee Update*, 3 March 2010 at 10; **C-217**, EISER Infrastructure Limited, *Project ASTEXOL & Helianthus Asset Review*, June 2010, at 8.

[578] **BQR-067** and **BQR-068**, cited in Second BDO Financial Report, ¶ 242, n. 171.

impairments from the changes in regulatory regime and for the companies' annual accounts.[579]

446.    The most relevant technical documentation appears to be the comprehensive report of Garrigues, consulting engineers retained to do due diligence on the design of the projects. This report envisioned a 25-year life:

> Garrigues Medio Ambiente considers that by following the maintenance schedules recommended by the manufacturers of the major equipment and using the guarantees granted in the contracts, the major equipment will have a useful life in line with the project, i.e., 25 years.[580]

447.    The Tribunal also received expert reports and testimony from both Parties on this issue from established experts in solar power generation. Neither expert appears to have visited the plants at issue. Further, neither appears to have had access to contemporaneous design documents or other similar evidence establishing the design criteria for the plants, although Respondent's expert emphasized the Garrigues due diligence report.

448.    In his written opinion, Claimants' expert, Dr. Mancini, concluded "it is reasonable to assume that Eiser's three solar parabolic trough power plants, ASTEXOL-2, ASTE 1A, and ASTE 1B, will each have an operational lifetime of 40 years."[581] At the Hearing, Dr. Mancini framed his conclusion in slightly different and perhaps slightly more positive terms: "I'm very confident in offering the opinion that I believe these plants can operate – it's my opinion that these plants can operate for 40 years."[582]

449.    Dr. Mancini's opinion reflected his assessments that "if the O&M [Operation and Maintenance] of the solar plants is at the industry-standard level," *inter alia*, the major non-solar equipment in the plants will have an operational life of 40 years; other similar plants

---

[579] Second BDO Financial Report, ¶ 242, n. 175.

[580] **C-156**, Garrigues Environment, *Technical Evaluation Report on a Solar Thermal Electric Facility Developed by Dioxipe Solar, S.L. in Badajoz (Extremadura)*, 18 December 2009, at 22.

[581] First Mancini Report, ¶ 83.

[582] Rev. Tr. Day 3 (ENG), 159:3-5 (Dr. Mancini).

in the Mojave desert have been in commercial service from 24 to 30 years; and other key components are "refurbishable and maintainable."[583]

450. The competing analysis of Respondent's expert, Dr. Jorge Servert, disputed several of Dr. Mancini's technical assumptions. He contended, *inter alia*, that it was not correct to transpose the service lives of major components in coal-fired plants to the corresponding elements in solar plants because of what Dr. Servert viewed as significant differences in the components' designs and in the manner of operating the different types of plants. Dr. Servert urged that components of elaborate systems like the solar plants here at issue are designed to have an anticipated service life. Recalling his own experience in designing a solar plant with a design life of 25 years, he viewed this as "usual."[584] In his view, the major components in the Claimants' plants had design lives of 25 years or less, and were likely to degrade and require very extensive and expensive replacement more rapidly than estimated by Dr. Mancini.[585] For example, in Dr. Servert's opinion, turbines would normally be expected to be overhauled every six years, but performance would degrade significantly after the fourth overhaul, with the core turbine component holding the turbine blades coming to the end of its life.[586]

451. The Tribunal considers that Claimants have the burden of proving the facts relied on to support this portion of Claimants' damages claim. The documentary record is limited and inconsistent, but the primary document cited that addressed the project from a design or engineering standpoint – the Garrigues due diligence report – envisions a 25-year life. Both experts presented clear and well-informed evidence. However, the conclusions of both Dr. Mancini's report and his oral testimony supporting a 40 year service life were carefully worded: that "*it is reasonable to assume*" that the plants will have a 40-year life, the plants "*can* operate for 40 years." Dr. Servert was more categorical in support of his view that the plants were designed for and would have a service life of 25 years.[587]

---

[583] First Mancini Report, ¶¶ 77-78, 81.

[584] Rev. Tr. Day 4 (ENG), 9:11-13 (Dr. Servert).

[585] Rev. Tr. Day 4 (ENG), 11:24-12:4 (Dr. Servet).

[586] Rev. Tr. Day 4 (ENG), 28:5-29:17 (Dr. Servet).

[587] Rev. Tr. Day 4 (ENG), 17:5-12 (Dr. Servet).

452.   Dr. Servert's evidence raised questions regarding several of the key premises underlying Dr. Mancini's opinion and regarding the engineering approach that guides the design of such plants, questions that were not satisfactorily answered.   Given the totality of the evidence, including the absence of contemporaneous design documentation or other evidence showing that the plants were actually designed to have a 40-year service life, this portion of the damages claim must fail.   The evidence is not sufficient to sustain Claimants' claim to an additional €68 million in damages premised on a projected 40-year operational life.

**(2)   The Tax "Gross-Up" Claim**

453.   A second large component of Claimants' valuation was for €88 million as a "tax gross-up."   This substantial claim was predicated on the theory that in order to make Claimants whole, their recovery should be net of taxes.   However, Claimants offered no evidence establishing the nature, rate or amount of any tax that might be due.   The First Brattle Quantum Report states that "*we understand* that an award to EISER would attract income taxes at a rate of 29.22%, reflecting the income tax rate in Luxembourg."[588]   However, no evidence was offered regarding the basis for this "understanding" or otherwise substantiating the amount claimed.   In response to a question at the Hearing, it was confirmed that Brattle had not done independent analysis of the need for a "gross-up."[589]

454.   This large claim attracted little discussion or analysis in the written materials or at the Hearing.   Claimants' Memorial presented it in a single paragraph at the end.   Respondent's Counter-Memorial, which essentially denies any liability whatsoever, offered only a cursory denial,[590] prompting a similarly cursory response from Claimants.[591]   In the Rejoinder, at a point in the briefing schedule where Claimants had no opportunity to respond in writing, Respondent for the first time engaged with the issue, albeit briefly, objecting that:

---

[588] First Brattle Quantum Report, ¶ 183 (emphasis added).
[589] Rev. Tr. Day 4 (ENG), 189:11-12 (Mr. Caldwell).
[590] Resp. C-Mem., ¶ 1208.
[591] Cl. Reply, ¶ 866 (f).

(a)     The claim is barred by Article 21 of the ECT, which provides that nothing in the ECT "shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties." In Respondent's view, this embraces taxes imposed by Luxembourg as a Contracting Party, so that Respondent cannot incur obligations resulting from Luxembourg's action. Further, as a matter of State responsibility under international law, Respondent cannot be held responsible for taxes imposed by another State.[592]

(b)     The income would be in any event tax-exempt in Luxembourg, citing in this regard the opinion of BDO's Luxembourg tax affiliate.[593]

(c)     The claim was "overly speculative, uncertain and contingent."[594]

455.    At the Hearing Claimants' counsel did not address the first of these arguments, but briefly dismissed the second, contending that Respondent offered no analysis for its conclusion that no tax would be due.[595] As to the third, Claimants acknowledged that "we are unable to tell you what exactly will be taxable and therefore how [sic] the tax gross-up should be."[596] In lieu of proof of the amount of tax due, and indeed, of proof that any tax would be due, Claimants proposed several options under which the requested €88 million could be escrowed or Claimants could otherwise be made whole in the event of future tax liability.[597]

456.    Thus, the Tribunal received no evidence to show whether or in what amount any tax might actually be due on a future award and only limited argument regarding the issues raised by this claim. Given these circumstances, the Tribunal can make no decision as to whether or when a tax "gross-up" of the kind claimed here might be appropriate. Accordingly, this portion of Claimants' damages claim must fail.

---

[592] Resp. Rej., ¶¶ 1240-1249.
[593] Id., ¶¶ 1250-1255.
[594] Id., ¶¶ 1256-1260.
[595] Rev. Tr. Day 2 (ENG), 24:21-22 (Ms. Stoyanov).
[596] Rev. Tr. Day 2 (ENG), 25:4-6 (Ms. Stoyanov).
[597] Rev. Tr. Day 2 (ENG), 24:24-25:21 (Ms. Stoyanov).

146

### (3)   The Claim for Historic Damages

457.   A third substantial component of Claimants' damages claims is €13 million for "historic losses." These are estimated declines in the plants' net revenues said to result from Respondent's changes in the RD 661/2007 regulatory regime prior to June 2014 when it was definitively replaced by the new regime.

458.   Claimants contended that an array of changes to the regulatory framework prior to June 2014, viewed both individually and collectively, violated the ECT. However, the Tribunal's decision on liability is narrower in scope and does not encompass these claims. The Tribunal holds that Respondent "crossed the line" and violated the obligation to accord fair and equitable treatment at the point in June 2014 when the prior regulatory regime was definitively replaced by an entirely new regime. The Tribunal has not found that the several piecemeal changes made by Respondent prior to that time, individually or collectively, violated the ECT. Accordingly, this portion of Claimants' damages claim dealing with historic losses prior to June 2014 must fail.

459.   As this portion of the claim is not covered by the Tribunal's decision on liability, the absence of Tribunal jurisdiction regarding the claims involving the tax on energy production does not affect the calculation of Claimants' damages. (In any case, if the Tribunal had jurisdiction with respect to this claim, it would seem to have little or no effect on the result. Under the new regulatory regime implemented after June 2014, the 7% tax is included among the hypothetical costs of a standard plant on the basis of which the subsidies regime is calculated. Thus, going forward, the effect of the 7% tax in the "Actual Case" on projected future revenues will be substantially if not completely eliminated.[598])

### (4)   The Claim for Lost Future Cash Flows

460.   The Tribunal then comes to the largest element of Claimants' damages claim, for approximately €196 million for lost future cash flows for the period after June 2014. This includes approximately €68 million attributable to the estimated 40-year service life of the

---

[598] *See* Rev. Tr. Day 1 (ENG), 41:14-15 (Ms. Oñoro) ("The tax is one of the costs that is remunerated to the renewables producers [...]"); Rev. Tr. Day 4 (ENG), 153:11-14 (Mr. Lapuerta).

facilities.  As explained above, this amount must be deducted as unproven, leaving a claim for lost future revenues of approximately €128 million.

461.   Respondent disputed this portion of the claim in their written materials and in the reports of BDO, their economic and valuation experts, on multiple grounds.  Brattle's use of DCF valuation methods was said to be inappropriate because the long time period at issue led to "a high level of uncertainty."[599]  In BDO's view, using the DCF method here to assess the present value of lost future cash flows led to speculative and unwarranted valuations.

> While obviously being aware of the widespread use of the DCF method, in this case there are a series of circumstances that advise strongly against its use.  In this respect, arbitral case law firmly and clearly vetoes the application of the DCF method when it is excessively speculative in nature.[600]

462.   Rather than DCF, Respondent, and its economic experts contended that "the best indicator of the reasonable or market value for an efficient producer would be the cost of investment."[601]  Thus, in lieu of DCF, "the amount of investment itself provides a reasonable starting point for determining [fair market value]. [...] In most cases, the [fair market value] of recently acquired assets is unlikely to be substantially different from the cost of those assets."[602]  Hence, in BDO's view, the "Regulatory Asset Base" ("RAB") method utilized in some countries to regulate tariffs for some utilities should also be used to determine the assets' fair market value.  (BDO's reports did not make clear how a regulatory approach primarily conceived to determine tariffs for certain kinds of utilities should be used to determine fair market value.)[603]

463.   In keeping with the their preferred valuation approach emphasizing the asset base, BDO contended that the costs of the plants involved here might be artificially increased by

---

[599] First BDO Financial Report, ¶ 40.

[600] Resp. C-Mem., ¶ 1221.

[601] First BDO Financial Report, ¶ 194.

[602] Resp. C-Mem., ¶ 1229, n. 693, quoting **RL-058** Irmgard Marboe, *Calculation of Compensation and Damages in International Investment Law* 276 (Oxford University Press 2009).

[603] On cross-examination, BDO acknowledged that none of the examples of RAB regulation cited in its report involved power generation, Rev. Tr. Day 5 (ENG), 135:19-137:23 (Mr. Mitchell), and that in other instances cited, RAB was not used as primary method of valuation but as a check on valuations reached using DCF. Rev. Tr. Day 5 (ENG), 141:24-142:8 (Mr. Mitchell).

potentially inflated non-arms length transactions between the operating companies and their co-investor Elecnor, which held the engineering, procurement and construction contracts for the project.[604] In BDO's view, a high proportion of related party transactions "represents a high risk" because they "may not correspond to market prices."[605]

464.  BDO further complained that Brattle's valuation report was difficult to understand and lacked sufficient explanation, and that Brattle failed to provide its calculations, making it "impossible to check whether the data it contains is correct or not, from an arithmetical point of view [...]."[606] BDO's First Financial Report also criticized Brattle's calculations on the ground that the value calculated is inconsistent with the internal asset impairment tests applied by the accountants to reflect the changed regulatory regime; inappropriately ignored bankruptcy costs; and ignored the costs of debt.

465.  The Tribunal finds Respondent's objections to the use of the DCF method, both in general and as used here, to be unwarranted. DCF has frequently been applied as an appropriate and effective method for arriving at a valuation of a business operating as a going concern prior to adverse government actions. "DCF techniques have been universally adopted, including by numerous arbitral tribunals, as an appropriate method for valuing business assets [...]."[607] While in this case the Tribunal does not reach the expropriation claim, the calculation of damages involves a comparable assessment of potential future revenues of a going concern with predictable capital and operating costs and cash flows. The Tribunal finds persuasive in this regard Brattle's description of the business at issue.

> Power stations have a relatively simple business, producing electricity, whose demand and long-run value can be analyzed and modeled in detail based on readily available data. Moreover, the

---

[604] In his testimony regarding the plants' operational lives, Claimant's expert Dr. Thomas Mancini described Elecnor as "a large, diversified engineering company operating in 40 countries. With more than 50 years of history and experience [...] Elecnor has experience building power plants and providing O&M to industrial-scale facilities, including power plants [...]." First Mancini Report, ¶¶ 67-68. Respondent's expert Dr. Servert also spoke positively of Elecnor's capacity and experience. Rev. Tr. Day 4 (ENG), 10:1-3 (Dr. Servet).
[605] First BDO Financial Report, ¶ 37.
[606] First BDO Financial Report, ¶ 38.
[607] **CL-018**, *CMS v. Argentina*, Award, ¶ 416.

costs and operating performance of power stations are easy to
predict.[608]

466.    Respondent also contended that the level of investment in Claimants' plants was excessive
        and therefore "inefficient." This line of argument would seem relevant to BDO's preferred
        method of asset-based valuation. However, Respondent did not make clear how it related
        to the rival DCF method, which does not consider asset values in assessing the fair market
        value of a going concern.

467.    Even assuming that this argument might have relevance to a DCF valuation, it was not
        convincingly proven. Respondent and its experts hypothesized that the circumstances here
        posed a "high risk" of inflated prices, but offered very little to show that this had occurred.
        The evidence primarily cited was the difference between an initial information estimate of
        the project's cost in a collaboration agreement with the Council of Alcázar de San Juan in
        July 2008, early in the design process, and the eventual cost.[609] The Tribunal does not find
        that the fact that the delivered cost of the projects several years later was higher to be
        convincing proof of non-arms-length pricing, nor does it find convincing Respondent's
        contention that Elecnor "built the plants and was carrying out O&M at prices much higher
        than market prices."[610] The Tribunal finds more convincing the clear testimony of both
        Messrs. Meissner and Hector who described measures taken by the Claimants to assure
        market pricing in transactions with Elecnor.[611]

468.    The Tribunal also finds unconvincing BDO's contention that Brattle's valuation report was
        unclear and lacked critical information. Brattle's reports set out and explained the experts'
        assumptions and sources of data clearly and in substantial detail. While BDO complained
        that they did not have access to the resulting calculations, Brattle urged convincingly that
        they could have been duplicated with the information provided. Moreover, BDO did not
        ask Brattle provide its calculations, as frequently occurs in relations between contending
        valuation experts.

---

[608] First Brattle Quantum Report, ¶ 38.

[609] Second Hector Statement, ¶ 66.

[610] Rev. Tr. Day 6 (ENG), 68:19-20 (Mr. Fernandez).

[611] Second Hector Statement, ¶¶ 61-65; Rev. Tr. Day 2 (ENG), 223:21-224:3 (Mr. Meissner).

469.    While BDO raised objections to utilizing a DCF valuation, they did not directly engage
        with many aspects of Brattle's analysis.   BDO's first report disputed Brattle's valuation
        on the ground that it varied from the impairments taken by the accountants to reflect the
        changes in the regulatory regime, but Claimants satisfactorily explained the alleged
        discrepancy, contending that when like was compared to like, the two were within 10% of
        each other.[612]   BDO next contended that the valuation ignored possible costs associated
        with bankruptcy, but Claimants again satisfactorily responded, noting that Brattle's
        approach reflected standard valuation practice and that proceeding as BDO proposed would
        have resulted in higher damages.[613]   Claimants also disputed BDO's contention that the
        valuation had improperly considered debt, again observing that proceeding as BDO
        proposed would have increased damages.[614]

470.    At the Hearing, another difference between the contending valuations offered by Brattle
        and (eventually) by BDO was emphasized.   This was BDO's view that, in determining the
        discount rate, Brattle incorrectly based its "risk-free rate" on Spanish government bonds at
        the chosen value date in June 2014,[615] not at an earlier time when the interest rate on
        government bonds was significantly higher.[616]   BDO viewed this significantly higher rate
        as appropriate in order to reflect what it perceived as higher risk in the "but for" world.[617]
        The Tribunal does not find this explanation persuasive.   The basis of the Tribunal's finding
        of liability here is the wholesale replacement of the prior regulatory regime with another
        based on very difference premises.   Particularly given the large volume of litigation and
        controversy that has followed this decision, BDO does not establish a reasonable likelihood
        of risk that this will be repeated.

471.    Thus, the Tribunal was not offered a convincing critique of this part of Brattle's valuation
        of lost future cash flows. The Tribunal also notes that in several respects Brattle's appeared
        conservative in ways that did not benefit Claimants.   For example, the valuation reflects a

---

[612] Cl. Reply, ¶ 967(a).

[613] *Id.*, ¶ 967(b).

[614] *Id.*, ¶ 967(c).

[615] First Brattle Quantum Report, ¶¶ 88-89.

[616] Rev. Tr. Day 4 (ENG), 100:20-101:11 (Mr. Caldwell).

[617] Rev. Tr. Day 5 (ENG), 160:9-161:3 (Mr. Pérez).

18% reduction to reflect the illiquidity of the investments.[618]  Further, the experts used a risk-adjustment factor or beta "at the top end of the observed range" of the renewables companies sampled, thereby increasing the risk component of the discount rate and reducing the estimated damages.[619]

472.    Brattle's valuation reports and testimony at the Hearing were thorough and professional, and Respondent and its experts did not engage with the reports' specific assumptions and calculations in a manner that causes the Tribunal to question the essential conclusions reached.

473.    Accordingly, the Tribunal must determine the amount of compensation due, recognizing that in a case of such scope and complexity damages cannot be determined with mechanical precision.  While Brattle's work involves some assumptions about liability that differ from the position ultimately adopted by the Tribunal (notably regarding the service life of the facilities), the Tribunal concludes that it provides a reasoned and reasonable indication of the losses incurred by Claimants that has not been effectively countered by Respondent's experts.  As presented at the Hearing, Claimants' claim for the present value of lost future cash flows was approximately €196 million.  The Tribunal has found the evidence is insufficient to support €68 million of this amount, involving the claim of a 40-year service life for the plants.  Deducting this gives a balance of €128 million.  The Tribunal finds this to be a fair measure of Claimants' damages, so that they are entitled to an award of compensation in the amount of €128 million.

474.    By way of context, there is no serious dispute that Claimants invested on the order of €126 million.[620]  The Tribunal's assessment of the amount of compensation due – €128 million – is consistent with the amount Claimants invested.  This provides a "reality check" on the reasonableness of the Tribunal's conclusion regarding the compensation due to Claimants.

---

[618] First Brattle Quantum Report, ¶ 20; Second Brattle Quantum Report, ¶ 18.

[619] First Brattle Quantum Report, ¶ 97.

[620] First Hector Statement, ¶ 4; Second BDO Financial Report, ¶ 113.

### (5)   Interest

475.  The ECT does not directly address the question of interest for breaches of Article 10(1). By way of analogy, Article 13(1) (defining the compensation due to investors in cases of expropriation) provides: "[c]ompensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment."[621] Referring to this provision, Claimants requested pre-award interest from the June 2014 valuation to the date of the Award at the rate of 2.07% compounded monthly, taking as their benchmark:

> Spain's borrowing rate, which for the relevant period is 2.07%, compounded monthly. Awarding compound interest not only reflects the commercial reality of the situation, it is also consistent with the most recent practice of investment treaty tribunals. Indeed, since 2000, the majority of tribunals have awarded compound interest.[622]

476.  Claimants also submitted "that the Tribunal should order post-award interest at a rate higher than 2.07% that should also be compounded on a monthly basis."[623]

477.  For their part, Respondent's experts contended that the pre-award rate should be "a rate equal to the 2-year yield on Spanish bonds [...], which, to June 20, 2014 was 0.60%."[624]

478.  Taking account of the positions of the Parties, and in order to facilitate prompt payment of this Award, the Tribunal awards interest from 20 June 2014 to the date of this Award at the rate of 2.07%, compounded monthly. Further, the Tribunal awards interest from the date of the Award to the date of payment at the rate of 2.50%, compounded monthly.

---

[621] **C-001**, Energy Charter Treaty, Art. 13(1).

[622] Cl. Mem., ¶ 534.

[623] *Id.*, ¶ 535.

[624] Second BDO Financial Report, ¶ 311.

## VIII. COSTS

479.    Article 61(2) of the ICSID Convention addresses assessment and allocation of the costs of
        an ICSID arbitration:

> (2) In the case of arbitration proceedings the Tribunal shall, except
> as the parties otherwise agree, assess the expenses incurred by the
> parties in connection with the proceedings, and shall decide how and
> by whom those expenses, the fees and expenses of the members of
> the Tribunal and the charges for the use of the facilities of the Centre
> shall be paid.  Such decision shall form part of the award.

480.    The Convention thus addresses three elements of costs: expenses incurred by the parties,
        fees and expenses of the members of the Tribunal, and ICSID's own charges.  Unlike some
        other arbitration texts, the Convention does not indicate principles or presumptions
        regarding the allocation of costs.  Instead, Article 61(2) confers very broad discretion on
        the Tribunal in deciding how and by whom costs are to be borne.

481.    Rule 28(2) of the ICSID's Rules of Procedure for Arbitration Proceedings then provides:

> (2) Promptly after the closure of the proceeding, each party shall
> submit to the Tribunal a statement of costs reasonably incurred or
> borne by it in the proceeding and the Secretary-General shall submit
> to the Tribunal an account of all amounts paid by each party to the
> Centre and of all costs incurred by the Centre for the proceeding.
> The Tribunal may, before the award has been rendered, request the
> parties and the Secretary-General to provide additional information
> concerning the cost of the proceeding.

482.    As required by Rule 28(2), the Parties on 5 April 2016 both submitted statements of their
        claimed costs.  Both then updated their submissions on 16 September 2016.  In their 16
        September 2016 submission, Claimants sought a total of £4,287,446.99 in respect of legal
        and experts' fees and disbursements and payments to ICSID.  For its corresponding
        expenses, Respondent sought €2,884,439.90.

483.    The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's
        administrative fees and direct expenses, amount to (in USD):

154

Arbitrators' Fees and Expenses

| | | |
|---|---|---|
| Professor John R. Crook | USD | 277,929.26 |
| Dr. Stanimir Alexandrov | USD | 177,439.57 |
| Professor Campbell McLachlan QC | USD | 123,964.10 |
| ICSID's Administrative Fees | USD | 96,000.00 |
| Direct Expenses (estimated)[625] | USD | 280,826.65 |
| **Total** | **USD** | **956,159.58** |

The above costs of the arbitration have been paid out of the advances made by the Parties.[626]

484. The Tribunal is mindful that some ICSID tribunals have adopted the practice of awarding to the prevailing party some or all of its costs. However, in the circumstances of this case, the Tribunal determines that it is most appropriate for each Party to bear its own costs. The case involved a number of challenging procedural and legal issues, which both Parties addressed with professional and effective advocacy. While Claimants have in large measure prevailed on jurisdiction and have established a breach of the ECT's fair and equitable treatment standard, the Tribunal has not accepted all elements of their claims.

485. Accordingly, the Tribunal concludes that it is fair overall for each Party to bear its own legal and other expenses and its respective equal share of "the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre."

## IX.   AWARD

486. For the reasons stated in the body of this Award, the Tribunal makes the following decision:

(a)   It has jurisdiction under the ECT and the ICSID Convention over Claimants'

---

[625] This amount includes estimated charges relating to the dispatch of this Award (courier, printing and copying). The ICSID Secretariat will provide the Parties with a detailed Financial Statement of the case account once all invoices are received and the account is final.

[626] The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

claims, except that it sustains Respondent's preliminary objections with respect to the claim that Respondent's taxation measures, in particular the 7% tax on the value of electric energy production created by Law 15/2012, violate the ECT.

(b)     Respondent has violated Article 10(1) of the ECT by failing to accord fair and equitable treatment to Claimants. In view of this decision, the Tribunal need not determine Claimants' other claims of violation of the ECT.

(c)     On account of Respondent's violation of the ECT, Claimants are awarded, and Respondent shall pay, €128 million as damages.

(d)     Respondent shall pay interest on the sum awarded in (c) above from 20 June 2014 to the date of this Award at the rate of 2.07%, compounded monthly, and interest from the date of the Award to the date of payment at the rate of 2.50%, compounded monthly.

(e)     Each Party shall bear its legal and other expenses and its respective equal share of "the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre."

Dr. Stanimir Alexandrov
Arbitrator
Date: *April 20, 2017*

Professor Campbell McLachlan QC
Arbitrator
Date: *11 April 2017*

Professor John R. Crook
President
Date: *26 April 2017*