**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Eiser Infrastructure Limited and
Energia Solar Luxembourg S.A.R.L.,

*Petitioners*,

v.                                               Case No. 18-cv-01686-CKK

Kingdom of Spain,                                ORAL ARGUMENT REQUESTED

*Respondent*.

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS
## FOR LACK OF JURISDICTION UNDER THE FSIA

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
Joseph D. Pizzurro
(D.C. Bar No. 468922)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.:  (202) 452-7373
Fax:  (202) 452-7333
Email:  jpizzurro@curtis.com

-and-

Miriam K. Harwood (*pro hac vice* pending)
Kevin A. Meehan (*pro hac vice* pending)
Juan O. Perla (*pro hac vice* pending)
101 Park Avenue
New York, NY 10178
Tel.: (212) 696-6000
Fax:  (212) 697-1559
Email: mharwood@curtis.com
Email: kmeehan@curtis.com
Email: jperla@curtis.com

*Attorneys for Respondent*
*Kingdom of Spain*

Dated:  Washington, D.C.
            December 14, 2018

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND .................................................................................................. 3

    I.    Factual Background: the Underlying Dispute Giving Rise to an ICSID Award ..............3

        A.    The Parties: an EU Member State and Nationals of Other EU Member States ...... 3

        B.    Spain's Efforts to Develop Renewable Energy Sources ......................................... 3

        C.    The Eiser Parties Obtain an ICSID Award against Spain ...................................... 4

        D.    Spain Files for Annulment of the ICSID Award ................................................... 6

    II.    Legal Background: the FSIA, the ICSID Convention, the ECT and EU Law ................8

        A.    The Foreign Sovereign Immunities Act................................................................. 8

        B.    The ICSID Convention .......................................................................................... 9

        C.    The Energy Charter Treaty .................................................................................. 10

        D.    The Treaty on the Functioning of the European Union ....................................... 12

        E.    The CJEU's Decision in *Achmea* ....................................................................... 14

ARGUMENT ......................................................................................................................... 19

    I.    The Court Lacks Jurisdiction Because Spain Is Entitled to Immunity under the
        FSIA.............................................................................................................................20

        A.    The Arbitration Exception Does Not Apply ........................................................ 20

        B.    The Waiver Exception Does Not Apply ............................................................... 24

    II.    Declining Jurisdiction to Enforce the Award Is Consistent with the United
        States' Obligation under the ICSID Convention ..........................................................32

    III.    Spain Is Entitled to a Conclusive Determination of Its Sovereign Immunity
        Without Waiving Any Substantive Defenses against Enforcement .............................34

CONCLUSION...................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*Agrocomplect, AD v. Republic of Iraq*,
  524 F. Supp. 2d 16 (D.D.C. 2007), *aff'd*, 304 F. App'x 872 (D.C. Cir. 2008) ........................ 31

*Al Tech Specialty Steel Corp. v. United States*,
  28 Ct. Int'l Trade 1468 (C.I.T. 2004) .................................................................................. 22

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
  138 S. Ct. 1865 (2018) ............................................................................................... 22, 23

*Aquamar S.A. v. Del Monte Fresh Produce N.A.*,
  179 F.3d 1279 (11th Cir. 1999) ........................................................................................ 25

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ......................................................................................................... 19

*Aurum Asset Managers, LLC v. Banco Do Estado Do Rio Grande Do Sul*,
  No. 08-102, 2010 U.S. Dist. LEXIS 109577 (E.D. Pa. Oct. 13, 2010),
  *aff'd*, 441 F. App'x 822 (3d Cir. 2011) ............................................................................ 21

*Baxter Int'l Inc. v. Axa Versicherung AG*,
  908 F. Supp. 2d 920 (N.D. Ill. 2012) ............................................................................... 22

*Belize Soc. Dev., Ltd. v. Gov't of Belize*,
  794 F.3d 99 (D.C. Cir. 2015) ..................................................................................... 21, 29

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
  735 F.3d 72 (2d Cir. 2013) .......................................................................................... 20, 35

\*  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017) .......................................................................................... 19, 20, 34

\*  *Chevron Corp. v. Republic of Ecuador*,
  795 F.3d 200 (D.C. Cir. 2015) ........................................................................... 19, 20, 21, 24

\*  *Creighton Ltd. v. Gov't of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999) ................................................................................... passim

*Diag Human S.E. v. Czech Republic-Ministry of Health*,
  64 F. Supp. 3d 22 (D.D.C. 2014),
  *rev'd on other grounds,* 824 F.3d 131 (D.C. Cir. 2016) .............................................. 28

*DRC, Inc. v. Republic of Honduras*,
  71 F. Supp. 3d 201 (D.D.C. 2014) ................................................................................... 21

*EM Ltd. v. Banco Cent. De La República Argentina*,
  800 F.3d 78 (2d Cir. 2015) ............................................................................................... 34

*European Cmty. v. RJR Nabisco, Inc.*,
  764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds*, 136 S. Ct. 2090 (2016) ........................ 23

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
   12 F.3d 1270 (3d Cir. 1993) ................................................................... 35

*First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*,
   703 F.3d 742 (5th Cir. 2012) .................................................................. 21

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
   905 F.2d 438 (D.C. Cir. 1990) ........................................................... 26, 34

*Frolova v. Union of Soviet Socialist Republics*,
   761 F.2d 370 (7th Cir. 1985) ............................................................. 26, 30

*In re Newport Creamery, Inc.*,
   293 B.R. 293 (Bankr. D.R.I. 2003) ......................................................... 33

*In re Papandreou*,
   139 F.3d 247 (D.C. Cir. 1998) ............................................................... 34

*Instrumentation Assocs. v. Madsen Elecs. (Canada)*,
   859 F.2d 4 (3d Cir. 1988) ...................................................................... 22

*KenAmerican Res. v. Int'l Union, UMW*,
   99 F.3d 1161 (D.C. Cir. 1996) ............................................................... 24

\* *Mar. Int'l Nominees Establishment v. Republic of Guinea*,
   693 F.2d 1094 (D.C. Cir. 1982) ......................................................... passim

*Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*,
   722 F. Supp. 1032 (S.D.N.Y. 1989) ........................................................ 31

*Matsushita Elec. Indus. Co. v. Epstein*,
   516 U.S. 367 (1996) .............................................................................. 32

*Micula v. Gov't of Romania*,
   104 F. Supp. 3d 42 (D.D.C. 2015) .......................................................... 19

*Micula v. Gov't of Romania*,
   714 F. App'x 18 (2d Cir. 2017) .............................................................. 19

\* *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
   863 F.3d 96 (2d Cir. 2017) ........................................................ 19, 32, 35

*Monegasque de Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*,
   158 F. Supp. 2d 377 (S.D.N.Y. 2001), *aff'd*, 311 F.3d 488 (2d Cir. 2002) ........... 30

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
   850 F.2d 756 (D.C. Cir. 1988) ............................................................... 24

*Ohntrup v. Firearms Ctr., Inc.*,
   516 F. Supp. 1281 (E.D. Pa. 1981) ......................................................... 30

*Oxford Health Plans v. Sutter*,
   569 U.S. 564 (2013) .............................................................................. 24

*Philippines v. Pimentel*,
   553 U.S. 851 (2008) .............................................................................. 34

*Phoenix Consulting, Inc. v. Republic of Angola,*
   216 F.3d 36 (D.C. Cir. 2000) ............................................................... 20

*Practical Concepts, Inc. v. Republic of Bolivia,*
   811 F.2d 1543 (D.C. Cir. 1987) ............................................................ 20

*Price v. Socialist People's Libyan Arab Jamahiriya,*
   389 F.3d 192 (D.C. Cir. 2004) .............................................................. 34

*Princz v. Fed. Republic of Germany,*
   26 F.3d 1166 (D.C. Cir. 1994) .............................................................. 26

*Princz v. Fed. Republic of Germany,*
   998 F.2d 1(D.C. Cir. 1993) ............................................................ 34, 35

*Qi-Zhou v. Meissner,*
   70 F.3d 136 (D.C. Cir. 1995) ............................................................... 31

*Rein v. Socialist People's Libyan Arab Jamahiriya,*
   162 F.3d 748 (2d Cir. 1998) ................................................................. 35

*Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic,*
   877 F.2d 574 (7th Cir. 1989) ............................................................... 34

*S & Davis Int'l, Inc. v. Yemen,*
   218 F.3d 1292 (11th Cir. 2000) ............................................................ 28

*Seetransport Wiking Trader Schiffarhtgesellschaft MBH & Co.,*
   *Kommanditgesellschaft v. Navimpex Centrala,*
   989 F.2d 572 (2d Cir. 1993) ................................................................. 27

*Shapiro v. Republic of Bolivia,*
   930 F.2d 1013 (2d Cir. 1991) ............................................................... 26

*Strategic Techs. PTE, Ltd. v. Republic of China,*
   No. 05-cv-2311 (RMC), 2007 U.S. Dist. LEXIS 34258 (D.D.C. May 10, 2007) .................. 28

*Texas Trading & Milling Corp. v. Fed. Republic of Nigeria,*
   647 F.2d 300 (2d Cir. 1981) ................................................................. 20

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n,*
   455 U.S. 691 (1982) .......................................................................... 33

*United States v. Menasche,*
   348 U.S. 528 (1955) .......................................................................... 31

*United States v. Moats,*
   961 F.2d 1198 (5th Cir. 1992) .............................................................. 35

*Verlinden B.V. v. Cent. Bank of Nigeria,*
   461 U.S. 480 (1983) .......................................................................... 19

*Verlinden B.V. v. Cent. Bank of Nigeria,*
   488 F. Supp. 1284 (S.D.N.Y. 1980) ......................................................... 30

*World Wide Minerals, LTD. v. Republic of Kazakhstan,*
   296 F.3d 1154 (D.C. Cir. 2002) ............................................................ 25

## Statutes

22 U.S.C. § 1650a ................................................................................................ passim

28 U.S.C. § 1330 .......................................................................................... 1, 10, 20

28 U.S.C. § 1334(e) ................................................................................................ 33

28 U.S.C. § 1602 ............................................................................................... 1, 10

28 U.S.C. § 1603 ..................................................................................................... 19

28 U.S.C. § 1605(a)(1) .......................................................................... 20, 25, 29, 31

28 U.S.C. § 1605(a)(6) ..................................................................................... passim

28 U.S.C. § 1608 ..................................................................................................... 20

## Rules

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 1

Fed. R. Civ. P. 12(b)(2) ............................................................................................ 1

Fed. R. Civ. P. 44.1 ................................................................................................. 18

## Treaties

Convention on the Settlement of Investment Disputes between States and Nationals of
  Other States,
  Mar. 18, 1965, 17 U.S.T. 1270 (entered into force Oct. 14, 1966) .................... passim

Energy Charter Treaty,
  Dec. 17, 1994, 2080 U.N.T.S. 95 ..................................................................... passim

Treaty on the Functioning of the European Union,
  Mar. 25, 1957, 2012 O.J. (C 326) 47 ............................................................... passim

## Legislation and Legislative Histories

131 CONG. REC. 10455 (1985) ................................................................................. 30

*Convention on the Settlement of Investment Disputes: Hearing on S. 3498 Before the
  Subcomm. on Int'l Orgs. & Movement of the H. Comm. on Foreign Affairs, Hearing of
  the House Subcomm.*, 89th Cong. 18 (Jan. 15, 1966) ............................................ 10

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (1976) ........ 10, 29

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ...................... 27

*Hearing before the Subcomm. on Admin. L. & Governmental Relations of the H. Comm.
  on the Judiciary*, 100th Cong. 94 (1987) ............................................................... 30

*Hearing before the Subcomm. on Admin. L. & Governmental Relations of the H. Comm.
  on the Judiciary*, 99th Cong. 94 (1986) ................................................................. 30

## Other Authorities

CHRISTOPH SCHREUER, THE ICSID CONVENTION (2d ed. 2009) ..................................................... 9

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 487 (AM. LAW INST. 1987) .................. 29

## EU Cases

Bundesgerichtshof [BGH] [Federal Court of Justice] Nov. 8, 2018, I ZB 2/15 ........................... 18

*Draft International Agreement of the European Union to the European Convention for
    the Protection of Human Rights and Fundamental Freedoms,*
    CJEU Opinion 2/13, 2014, ECLI:EU:C:2014:2454 .................................................... 13, 14, 16

*Puligienica Facility Esco SpA (PFE) v. Airgest SpA,*
    CJEU Case C-689/13, 2016, ECLI:EU:C:2016:199 ............................................................. 13

\*   *Slovak Republic v. Achmea B.V.,*
    CJEU Case C-284/16, 2018, ECLI:EU:C:2018:158 ......................................................... passim

## Other EU Authorities

*Communication from the [European] Commission to the European Parliament and
    Council: Protection of Intra-EU Investment,*
    COM (2018) 547 final (July 19, 2018) ............................................................................ 23, 24

*Communication from the Legal Service of the European Commission to the Attorney
    General of the Kingdom of Spain* (October 26, 2018) ....................................................... 18, 35

European Commission, *Amicus Curiae* Submission, ICSID Case No. ARB/13/36 –
    Annulment Proceedings (Nov. 12, 2018) ................................................................................. 18

European Commission, Application for Leave to Intervene as a Non-Disputing Party,
    ICSID Case No. ARB/13/36 – Annulment Proceedings (July 19, 2018) ........................... 17, 18

European Commission, *Decision on State aid SA.40348 (2015/NN), Spain: Support for
    electricity generation from renewable energy sources, cogeneration and waste*
    2017 O.J. (C442) (Nov. 11, 2017) .................................................................................... 23, 35

The Kingdom of Spain submits this memorandum of points and authorities in support of its motion to dismiss the petition to enforce a foreign arbitral award ("Petition") filed by Eiser Infrastructure Limited ("Eiser") and Energía Solar Luxembourg S.A.R.L. ("Energía" and, together with "Eiser," the "Eiser Parties") for lack of subject matter and personal jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, pursuant to Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure.  Spain reserves all rights and defenses and does not waive any of its defenses or its sovereign immunity.

## PRELIMINARY STATEMENT

As a foreign state, Spain is entitled to a presumption of sovereign immunity – and thus this Court lacks subject matter jurisdiction – unless a plaintiff can demonstrate the applicability of an exception to immunity under the FSIA.  Under the controlling law of the D.C. Circuit and mandatory rules of statutory construction, the only exception that could possibly apply here is the arbitration exception, 28 U.S.C. § 1605(a)(6)(B), which confers jurisdiction over actions to enforce awards that may be governed by an international treaty such as the one invoked by the Eiser Parties: the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 17 U.S.T. 1270 (entered into force Oct. 14, 1966) ("ICSID Convention").  Yet the arbitration exception contains two additional substantive requirements: the existence of a valid arbitration agreement and the existence of an award made pursuant to that agreement.  As the D.C. Circuit has held, "[i]f there is no arbitration agreement or no award to enforce," a foreign state is entitled to immunity and the court must dismiss the action for lack of jurisdiction under the FSIA.  That is the proper course in this case.

No valid arbitration agreement exists between the Eiser Parties and Spain.  The arbitration agreement at issue here is based on Spain's consent to arbitrate disputes under the Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95 ("ECT"), a multilateral investment

treaty among fifty contracting parties, including the European Union ("EU") and its member states such as Spain, as well as non-EU states. The ECT's dispute resolution provision gives investors of a contracting party the option of bringing claims for alleged breaches of the ECT against another contracting party pursuant to various arbitration rules, including those set forth in the ICSID Convention.

However, under EU law, as incorporated into the governing law of the ECT, arbitration agreements between EU member states and nationals of other EU member states are invalid. As the Court of Justice of the European Union ("CJEU") – the highest judicial authority on EU law – recently held in *Slovak Republic v. Achmea*, agreements to arbitrate investment disputes between EU member states and nationals of other EU member states (so-called "intra-EU arbitration agreements") are invalid *ab initio* under EU law. Because the Eiser Parties are nationals of the United Kingdom and Luxembourg – both EU member states at the time they acceded to the ECT – and because the relationship between the Eiser Parties and Spain is governed by EU law under the ECT, a valid arbitration agreement and an award made pursuant to such an agreement do not exist in accordance with the CJEU's *Achmea* decision. Thus, the Eiser Parties cannot satisfy the requirements of the FSIA's arbitration exception to immunity, and the Petition must be dismissed for lack of jurisdiction under the FSIA.

Spain is entitled to invoke its sovereign immunity as an initial defense – and obtain a conclusive determination of that threshold issue – before it may be required to defend this lawsuit on the merits. Even though ICSID awards are not subject to substantive review by national courts, there are grounds (limited as they may be) for refusing to enforce an ICSID award under United States law consistent with the ICSID Convention. Furthermore, Spain has applied for annulment of the award as provided by the ICSID Convention on several grounds,

not the least of which is an attack on the legality of the amount of damages awarded. The annulment proceedings are still pending and, if Spain prevails, the award the Eiser Parties are currently seeking to enforce will no longer exist, providing another basis for dismissing this action for lack of subject matter jurisdiction under the FSIA and for resisting enforcement.

## RELEVANT BACKGROUND

I.      **Factual Background: the Underlying Dispute Giving Rise to an ICSID Award**

  A. The Parties: an EU Member State and Nationals of Other EU Member States

The Kingdom of Spain is a foreign state, and a member state of the EU. The Eiser Parties are nationals of other EU member states. Eiser is an investment fund incorporated under the laws of the United Kingdom, and its wholly owned subsidiary, Energía, is a private liability company incorporated under the laws of Luxembourg. Pet. ¶ 1; *see* Eiser Infrastructure Limited and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Award (May 4, 2017) ("Award"), ¶¶ 2, 114-15 (Ex. A to Decl. of Matthew S. Rozen (D.E. 1-1)).

  B. Spain's Efforts to Develop Renewable Energy Sources

For many years, Spain has supported the development of renewable energy production, including through Concentrated Solar Power ("CSP") plants, in accordance with its own national interests and the EU's binding objectives to produce clean energy and reduce greenhouse gases. Award ¶¶ 101-02. Spain is a signatory to various international agreements on energy production and environmental protection, such as the 1992 Framework Convention on Climate Change, the 1997 Kyoto Protocol and the ECT. In furtherance of these objectives, Spain has enacted national legislation and regulatory regimes for its electricity sector, including a special regime providing for certain incentives to encourage the production of renewable energy. Award ¶¶ 102-04.

In 2007, Spain updated its regulatory regime applicable to the renewable energy sector in the form of Royal Decree 661/2007 ("RD 661/2007"), which included subsidies to account for

the higher cost of producing renewable energy compared to conventional power.  Award ¶¶ 111-12; *see* Pet. ¶ 7.  Following the implementation of RD 661/2007, and in parallel with the international financial crisis that began in 2008, Spain became concerned about a large and increasing deficit between, on the one side, the income generated by the tariffs paid by energy producers and consumers for access to electricity grids and, on the other side, the costs of the electricity system that the tariffs were supposed to cover (e.g., production, transmission and distribution).  Accordingly, the Spanish government began considering and implementing measures aimed at reducing the tariff deficit and limiting the availability of RD 661/2007.  Award, ¶¶ 124, 127, 129-31.

The Eiser Parties, through Energía, own a minority shareholding interest in two Spanish companies, which own and operate three CSP plants in Spain.  Award ¶¶ 114, 224.  The CSP plants began operations in 2012.  Award ¶ 121.  Between 2012 and 2014, Spain enacted several tax and regulatory measures that modified RD 661/2007.  The underlying dispute between the Eiser Parties and Spain concerns several of those measures ("Disputed Measures").  Award ¶¶ 144-48.  The Eiser Parties claimed that the Disputed Measures negatively impacted their economic interests in the three CSP plants, constituting a violation of fair and equitable treatment and unlawful expropriation under Articles 10 and 13 of the ECT, respectively.  *See* Award ¶ 349; Pet. ¶¶ 7, 14.  Thus, the ECT provided the legal framework for the underlying dispute.

C.    The Eiser Parties Obtain an ICSID Award against Spain

In 2013, the Eiser Parties commenced arbitration against Spain under the ICSID Convention pursuant to Article 26 of the ECT.  Award ¶¶ 1, 6, 300.  Following the ICSID Convention's procedures, the parties constituted the tribunal with three arbitrators: Dr. Stanimir Alexandrov, a national of Bulgaria, appointed by the Eiser Parties; Professor Campbell McLachlan QC, a national of New Zealand, appointed by Spain; and Professor John R. Crook, a

national of the United States, appointed as presiding arbitrator by the chairman of the ICSID

Administrative Council.  Award ¶¶ 8-9.

From the outset, Spain contested the tribunal's jurisdiction on several grounds, including

that the arbitration provisions of Article 26 of the ECT did not apply to disputes between an EU

member state and investors of other EU member states (so-called "intra-EU disputes").  Award

¶¶ 160-73.  Spain explained that the proper process for resolving these intra-EU disputes

involved seeking relief in EU national courts, including the possibility of pursuing final recourse

to the CJEU, which has "the monopoly on the ultimate interpretation of EU law."  Award ¶ 163.

The European Commission ("EC") – the EU's principal executive body – also sought leave to

intervene in the arbitration, as provided for under the ICSID Arbitration Rules, and to file an

*amicus* submission on the question of the tribunal's jurisdiction over intra-EU disputes.  Award ¶

59.  However, the tribunal never considered the EC's *amicus* submission.  Award ¶¶ 62-66, 68-

70.  The tribunal ultimately concluded that it had jurisdiction under Article 26 of the ECT and

the ICSID Convention, except with respect to one of the Disputed Measures relating to taxes

based on the ECT's tax carve-out provisions.  Award ¶¶ 270-72, 486(a).

On the question of liability, the tribunal concluded that Spain had not breached its

obligation to provide fair and equitable treatment ("FET") to the Eiser Parties' investments with

respect to the Disputed Measures implemented before June 2014.  Award, ¶¶ 387-88, 458 &

n.498.  In assessing the FET claim, the tribunal found that Spain had a "sovereign right" to

modify its regulatory regime for renewable energy, including RD 661/2007, and that there were

no guarantees that the regulatory regime would remain unchanged for the life of the Eiser

Parties' projects in Spain.  Award ¶ 425; *see also id.*, ¶¶ 119, 362-63, 387.  Nevertheless, the

tribunal found that the later set of Disputed Measures implemented as of June 2014 did amount

to FET violations, because they supposedly constituted "an entirely new regime," which changed the regulations for renewable energy in "a far more drastic fashion" than the earlier measures. Award ¶¶ 348, 389, 458.[1]

In quantifying damages, the tribunal adopted the damages model proffered by the Eiser Parties' experts, The Brattle Group ("Brattle"), even though the tribunal knew or should have known that Brattle's calculations were not consistent with its determination on jurisdiction and liability, but based on "assumptions about liability that differ from the position ultimately adopted by the Tribunal," stating that damages could not be computed with "mechanical precision." Award ¶ 473. In May 2017, the tribunal issued an award in favor of the Eiser Parties in the amount of €128 million. Award ¶ 473.

### D.    Spain Files for Annulment of the ICSID Award

In July 2017, Spain filed a timely application to annul the award before an ICSID *ad hoc* Committee as provided for under Article 52 of the ICSID Convention ("Application for Annulment"). Spain's Application for Annulment is based on the following grounds. Harwood Decl. ¶¶ 11-15.[2]

First, after the tribunal rendered its decision, Spain learned that the Eiser Parties' party-appointed arbitrator, Dr. Alexandrov, had an undisclosed, fifteen-year business relationship with the Eiser Parties' experts from Brattle. In his private work as counsel, Dr. Alexandrov and his firm had frequently engaged Brattle as expert for his clients, and he was simultaneously working with the Eiser Parties' expert in two other arbitrations during the course of the *Eiser* arbitration. Neither Dr. Alexandrov nor Brattle disclosed this long-standing relationship, or the fact that they

---

[1] The tribunal chose not to address the expropriation claim, explaining that it was not "essential" to its decision. Award ¶¶ 352-56.

[2] References to "Harwood Decl." refer to the Declaration of Miriam K. Harwood in Support of Respondent's Motion to Dismiss, filed concurrently herewith.

were working together in other engagements during the *Eiser* case, despite their respective disclosure obligations.  Harwood Decl. ¶ 12.

Second, the apparent bias of one of the members of the tribunal in favor of Brattle is all the more troubling because the tribunal ultimately adopted Brattle's damages calculations as the basis for its award, notwithstanding the fact that Brattle's damages model was based on an all or nothing theory of liability that contradicted the tribunal's more limited jurisdictional and liability determination.  *See* Award ¶¶ 460, 473.  Had the tribunal requested a revised damages model that followed its own theory of liability, as other tribunals have done and as the law required, the damages award would have been closer to €7 million, nearly 95 percent less than the actual amount awarded.  Harwood Decl. ¶ 13.

Third, the tribunal's stated reason for finding an FET violation was that the regulatory measures implemented as of June 2014, the supposedly "new regime," caused a severe economic impact upon the Eiser Parties' investment that was "far more drastic" than the effects of the pre-June 2014 measures.  This fundamental premise was supposedly based on Brattle's submissions quantifying the impact of the Disputed Measures on the Eiser Parties' CSP plants.  However, Brattle's all or nothing damages model did not isolate the specific impact of any of the individual regulatory measures challenged by the Eiser Parties.  Thus, there was no basis for comparing the impact of the "new regime" with the effects of the earlier "piecemeal" measures that the tribunal found not to be FET violations.  Harwood Decl. ¶ 14.

Finally, Spain was denied its right to a full and equal opportunity to be heard, to present its case and to defend the claims, due to a series of procedural rulings subjecting Spain to unequal and prejudicial treatment.  This included refusing to allow the EC to submit an *amicus curiae* brief on the specific question of jurisdiction over intra-EU disputes unless the EC

undertook to compensate the parties' costs incurred in responding to such a submission, which the EC did not accept.  Harwood Decl. ¶ 15.

Each of these grounds provides an independent basis for annulling the award and, together, they make a compelling case for annulment.  The annulment proceedings have been fully briefed, and the hearings are scheduled for March 2019.  Harwood Decl. ¶ 19.

## II.     Legal Background: the FSIA, the ICSID Convention, the ECT and EU Law

In July 2018, the Eiser Parties filed the instant Petition to enforce the ICSID award. Spain now moves to dismiss the Petition for lack of jurisdiction under the FSIA.  Resolution of Spain's motion to dismiss implicates the interplay between the FSIA's jurisdictional provisions and foreign and international law, including the ICSID Convention, the ECT and the Treaty on the Functioning of the European Union, Mar. 25, 1957, 2012 O.J. (C 326) 47 ("TFEU"), one of the foundational instruments of the EU and EU law.

### A.     The Foreign Sovereign Immunities Act

As set forth below, the FSIA provides the sole basis for establishing jurisdiction over a foreign state in the United States.  Personal and subject matter jurisdiction under the FSIA is premised on the applicability of an exception to sovereign immunity.  One of the exceptions to immunity is known as the arbitration exception, which provides in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is brought . . . to confirm an award made pursuant to such an agreement to arbitrate, if . . . (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards[.]"

28 U.S.C. § 1605(a)(6)(B).  One of the treaties or international agreements covered by section 1605(a)(6)(B) is the ICSID Convention.

B.      The ICSID Convention

The ICSID Convention is an international treaty establishing a mechanism for resolving investment disputes between contracting states and nationals of other contracting states through arbitration.  The ICSID Convention creates a "self-contained" arbitration regime separate and apart from that which governs other international arbitration agreements and awards.  CHRISTOPH SCHREUER, THE ICSID CONVENTION 1103, 1154 (2d ed. 2009).

ICSID awards are not subject to review on the merits by domestic courts and can only be revised or annulled by an ICSID-appointed *ad hoc* Committee as provided for in the ICSID Convention.  *See* ICSID Convention art. 50-53.  Unless an award is annulled by an *ad hoc* Committee, each contracting state is required to enforce an ICSID award as if it were a final judgment of its domestic courts.  ICSID Convention art. 54.  However, "nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution."  ICSID Convention art. 55; *see* SCHREUER at 1154 ("The Convention does not enjoin the courts of States parties to the Convention to enforce ICSID awards if this would be contrary to their law governing the immunity from execution of judgments and arbitral awards.  Therefore, a State whose courts refuse execution of an ICSID award for reasons of State immunity is not in violation of Art. 54.").  Thus, the ICSID Convention reflects an intention to leave sovereign immunity undisturbed.

To that effect, in 1966, the United States implemented the ICSID Convention through federal legislation, which provides for the enforcement of an ICSID award in federal court "as if the award were a final judgment of a court of general jurisdiction of one of the several States."  22 U.S.C. § 1650a(a).  Section 1650a(a) expressly states that the Federal Arbitration Act ("FAA"), which implements the Convention on the Recognition and Enforcement of Foreign

Arbitral Awards ("<u>New York Convention</u>"), "shall not apply to enforcement of awards rendered pursuant to the [ICSID] convention."  During congressional hearings for the enactment of section 1650a, Andreas Lowenfeld, Deputy Legal Advisor to the State Department and a member of the United States delegation to the ICSID Convention, testified:

> As to whether [a district court] has jurisdiction over a party, *there is nothing in the convention that will change the defense of sovereign immunity*.  If somebody wants to sue Jersey Standard in the United States, on an award, no problem.  If somebody wants to sue Peru or the Peruvian Oil Institute, why it would depend on whether in the particular case that entity would or would not be entitled to sovereign immunity.

*Convention on the Settlement of Investment Disputes: Hearing on S. 3498 Before the Subcomm. on Int'l Orgs. & Movement of the H. Comm. on Foreign Affairs*, *Hearing of the House Subcomm.*, 89th Cong. 18 (Jan. 15, 1966) (emphasis added).  The United States later enacted the FSIA codifying the grant of sovereign immunity to foreign states in all cases except where the requirements of any one of the exceptions to immunity applied, such as the arbitration exception. *See* Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (1976) (codified as amended at 28 U.S.C. §§ 1330, 1602 *et seq*.)

    C.    <u>The Energy Charter Treaty</u>

The ECT is a multilateral investment treaty among fifty contracting parties, including the EU and its member states, as well as non-EU states.  Article 2 sets out the purpose of the ECT: "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter [ECT]."  The ECT includes various substantive protections for investments made by nationals of each contracting party in the territories of other contracting parties.  For instance, Article 13 prohibits unlawful expropriations and Article 10 guarantees

investors of a contracting party fair and equitable treatment in the territories of other contracting parties.

Article 26 of the ECT provides for resolution of disputes between investors of a contracting party and another contracting party through arbitration under various arbitral rules, including those set forth in the ICSID Convention where all contracting states concerned are also parties to that treaty.  ECT art. 26(4)(a)(i).  Spain, the United Kingdom and Luxembourg are all parties to the ICSID Convention.  Article 26 of the ECT states, in relevant part:

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3)     (a) * * * [E]ach Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of

- 11 -

other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention;

\*     \*     \*

(5)     (a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention

In short, under the ECT, an ICSID arbitration agreement is formed by combining Spain's consent under Article 26(3)(a) and the investor's consent pursuant to Article 26(4)(a)(i).  ECT art. 26(5)(a)(i).

Arbitral tribunals constituted under the ICSID Convention are required to "decide a dispute in accordance with such rules of law as may be agreed by the parties."  ICSID Convention art. 42(1).  And, under Article 26 of the ECT, the contracting parties have agreed that any tribunal established pursuant to Article 26(4), such as an ICSID tribunal, is bound to decide the dispute in accordance with the ECT "and applicable rules and principles of international law."  ECT art. 26(6).  These "rules and principles of international law" include EU law in intra-EU disputes because EU law is a product of international treaties among EU member states and because EU law governs the relationship between Spain and the Eiser Parties.

D.     The Treaty on the Functioning of the European Union

The TFEU is an international treaty and one of the constitutional instruments of the EU. Together with the other EU treaties, the TFEU establishes the various EU institutions, including the EC, the European Parliament and Council, and the CJEU.  Hindelang Decl. ¶ 10.[3]

---

[3] References to "Hindelang Decl." refer to the Declaration of Steffen Hindelang in Support of Respondent Kingdom of Spain's Motion to Dismiss, filed concurrently herewith.

The CJEU is composed of twenty-eight judges, one from each member state, appointed for renewable six-year terms, TFEU art. 253, and is the supreme judicial authority on EU law. The EU judicial system is designed "to ensure consistency and uniformity in the interpretation of EU law." *Draft International Agreement of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms*, CJEU Opinion 2/13, 2014, ECLI:EU:C:2014:2454, ¶ 174 [hereinafter "CJEU Opinion 2/13, *ECHR*"]. This is accomplished through the application and interplay of various provisions in the EU treaties, in particular Articles 267 and 344 of the TFEU. *See* Hindelang Decl. ¶¶ 22-23.

Under Article 267 of the TFEU, the highest national court of each EU member state is required to refer questions of EU law to the CJEU for a preliminary ruling.[4] This is referred to as the preliminary ruling procedure. A "judgment in which the [CJEU] gives a preliminary ruling is binding" on the national courts of EU member states, and national courts are thus "required to do everything necessary to ensure that that interpretation of EU law is applied." *Puligienica Facility Esco SpA (PFE) v. Airgest SpA*, CJEU Case C-689/13, 2016, ECLI:EU:C:2016:199,

---

[4] Article 267 of the TFEU states, in relevant part:

> The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:
>
> (a) the interpretation of the Treaties;
>
> (b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;
>
> \*       \*       \*
>
> *Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.*

TFEU art. 267 (emphasis added).

¶¶ 38, 42.  This interaction between the CJEU and the EU member states' national courts ensures the "uniform interpretation of EU law."  CJEU Opinion 2/13, *ECHR* ¶ 176; *see* Hindelang Decl. ¶¶ 22, 24-27.

Article 344 of the TFEU forbids member states from "submit[ting] a dispute concerning the interpretation or application of the Treaties [EU law] to any method of settlement other than" their national courts.[5]  As a result, member States cannot establish, or refer cases to, dispute resolution bodies, including arbitral tribunals, that might interpret or apply EU law outside the EU judicial system.  *See* CJEU Opinion 2/13, *ECHR* ¶ 212-13.  This ensures that only courts or tribunals that are able to refer questions to the CJEU under Article 267 may be called upon to interpret EU law.  *See id.* ¶ 210.  As the CJEU has explained, the relationship between the member states is "governed by EU law to the exclusion . . . of any other law," if EU law so requires.  CJEU Opinion 2/13, *ECHR* ¶ 212; *see* Hindelang Decl. ¶ 23.

    E.        The CJEU's Decision in *Achmea*

The effect of this supranational legal order on the validity of intra-EU arbitration agreements was recently addressed by the CJEU in *Slovak Republic v. Achmea B.V.*, CJEU Case C-284/16, 2018, ECLI:EU:C:2018:158.[6]  *See* Hindelang Decl. ¶ 32.

The question presented in *Achmea* was whether Article 8 of the bilateral investment treaty between the Netherlands and the Slovak Republic ("BIT") contained a valid offer to arbitrate and hence whether a valid arbitration agreement existed between Slovakia, a member state of the EU, and Achmea, a company incorporated under the laws of the Netherlands, another

---

[5] Article 344 of the TFEU reads in full: "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."  TFEU art. 344.

[6] The CJEU rendered its decision in *Achmea* on March 6, 2018, after the *Eiser* tribunal issued the award and after Spain had filed its Application for Annulment.

EU member state. *Achmea* ¶¶ 5, 23; *see* Hindelang Decl. ¶ 33. Under Article 8 of the BIT, each contracting state consented to arbitration with investors of the other contracting state. *Achmea* ¶ 4(1)-(2). Article 8 also required the arbitral tribunal to decide the case on the basis of the parties' agreements, the law of the contracting state concerned, and "the general principles of international law." *Achmea* ¶ 4(6).

Achmea commenced arbitration pursuant to that dispute resolution provision, alleging that Slovakia had breached its obligations under the BIT. *Achmea* ¶ 9. Slovakia objected to the tribunal's jurisdiction, arguing that, as a result of its accession to the EU, the dispute resolution provision in the BIT was incompatible with EU law. *Achmea* ¶¶ 11, 14. The tribunal disagreed and asserted jurisdiction over the dispute. *Achmea* ¶ 11. The tribunal eventually rendered an award in favor of Achmea. *Achmea* ¶ 12. The place of the arbitration was Germany, and thus German law, which includes EU law, governed the arbitration. *Achmea* ¶ 10; *see* Hindelang Decl. ¶ 34.

Slovakia applied to have the award set aside in the German courts on the grounds that the arbitration agreement between Slovakia and Achmea was "invalid under the law to which the parties have subjected it" because it was incompatible with EU law, namely Articles 18, 267, and 344 of the TFEU. *Achmea* ¶¶ 5, 12, 14. The German court of first instance dismissed the action, and Slovakia appealed to the Federal Court of Justice, Germany's highest court of civil jurisdiction.[7] *Achmea* ¶ 12. Because the case raised an important question of EU law on which the CJEU had not yet ruled, the Federal Court of Justice referred the matter to the CJEU in accordance with the preliminary ruling procedure. The German court requested a ruling on whether Articles 267 and 344 of the TFEU precluded the application of Article 8 of the BIT and

---

[7] *See* The Federal Court of Justice (Germany), http://www.bundesgerichtshof.de/EN/Home/home_node.html (last visited Dec. 14, 2018).

thus the enforcement of an arbitration agreement between an EU member state and an investor of another EU member state thereunder. *Achmea* ¶ 23; *see* Hindelang Decl. ¶ 35.

The CJEU first observed that, "according to settled case-law of the [CJEU], an international agreement cannot affect the allocation of powers fixed by the [EU] Treaties or, consequently, the autonomy of the EU legal system [.]" *Achmea* ¶ 32 (citing CJEU Opinion 2/13, *ECHR* ¶ 201). Specifically, under Article 344 of the TFEU, "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties [EU law] to any method of settlement other than those provided for in the Treaties." *Id.* Furthermore, "according to the settled case-law of the [CJEU], the autonomy of EU law with respect both to the law of the Member States and to international law is justified" by the EU's constitutional structure, by the fact that EU law stems from international agreements, by EU law's "primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves." *Achmea* ¶ 33 (citing CJEU Opinion 2/13, *ECHR* ¶¶ 165-67). The CJEU further noted that, "[i]n order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the [EU] Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law." *Achmea* ¶ 35 (citing CJEU Opinion 2/13, *ECHR* ¶ 174). In light of these principles, the CJEU found that "it is for the national courts and tribunals and the [CJEU] to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law." *Achmea* ¶ 36 (internal citations omitted). And one of the mechanisms established for that purpose is the "keystone . . . preliminary ruling procedure" under Article 267 of the TFEU, which sets up a dialogue between national courts and the CJEU

to secure the uniform interpretation and application of EU law.  *Achmea* ¶ 37; *see* Hindelang
Decl. ¶ 36.

In that regard, the CJEU found that Article 8 of the BIT necessarily required an arbitral
tribunal to interpret and apply EU law, because EU law formed "part of the law in force in every
Member State" and derived from "an international agreement between the Member States."
*Achmea* ¶ 41.  However, an arbitral tribunal constituted under Article 8 of the BIT was not a part
of the EU judicial system and therefore could not be tasked with interpreting and applying EU
law.  *Achmea* ¶¶ 45-46, 48-49.  Therefore, the CJEU concluded:

> Articles 267 and 344 TFEU must be interpreted as precluding a
> provision in an international agreement concluded between
> Member States, such as Article 8 of the BIT, under which an
> investor from one of those Member States may, in the event of a
> dispute concerning investments in the other Member State, bring
> proceedings against the latter Member State before an arbitral
> tribunal whose jurisdiction that Member State has undertaken to
> accept.

*Achmea* ¶ 62.  In effect, because arbitral tribunals constituted under an arbitration provision such
as the one found in Article 8 of the BIT may be called upon to interpret EU law in intra-EU
disputes, and because those same tribunals are not able to ensure the uniform application of EU
law through the preliminary ruling procedure, the CJEU held that arbitration provisions between
EU member states and nationals of other EU member states are unenforceable, and hence a valid
arbitration agreement does not exist, as a matter of EU law. [8]  *See* Hindelang Decl. ¶¶ 36, 38.

---

[8] In July 2018, following the CJEU's decision in *Achmea*, the EC applied for leave to file an
*amicus* submission in the *Eiser* annulment proceedings in support of annulling the Award on the
grounds that the *Eiser* tribunal manifestly exceeded its powers and seriously departed from a
fundamental rule of procedure.  European Commission, Application for Leave to Intervene as a
Non-Disputing Party ¶ 13, ICSID Case No. ARB/13/36 – Annulment Proceedings (July 19,
2018) (Ex. 1 to Harwood Decl.)  The EC reaffirmed its position that the *Eiser* tribunal lacked
jurisdiction because EU law precluded the formation of a valid arbitration agreement between
Spain and the Eiser Parties under Article 26 of the ECT, and asserted that *Achmea* confirmed that

Accordingly, in a decision published on November 8, 2018, the Federal Court of Justice

applied the CJEU's decision in *Achmea* and set aside Achmea's award because, under EU law,

"there is no arbitration agreement between the parties" and, under German law, "[t]he absence of

an arbitration agreement is equivalent to its invalidity."  Bundesgerichtshof [BGH] [Federal

Court of Justice] Nov. 8, 2018, I ZB 2/15, ¶¶ 14, 15 (internal citations omitted); *see* Hindelang

Decl. ¶ 37.

*       *       *

The threshold question before this Court therefore involves the applicability of the

CJEU's decision in *Achmea* to the issue of whether the arbitration provisions in the ECT,

pursuant to which the ICSID arbitration was conducted and the award rendered, constitute a

valid arbitration agreement between Spain and the Eiser Parties.[9]  As will be demonstrated

below, under binding D.C. Circuit precedent, that analysis must be undertaken by this Court for

---

view.  *See id.* at ¶¶ 14-26.  In October 2018, the ICSID *ad hoc* Committee issued a Procedural
Order granting the EC's request insofar as the EC would be permitted to file an *amicus*
submission "on whether the tribunal seriously departed from a fundamental rule of procedure,"
including the EC's views on the tribunal's jurisdiction "to the extent that they relate to its views
on whether there has been a serious departure from a fundamental rule of procedure."
Procedural Order No. 3 ¶¶ 35, 40.a, ICSID Case No. ARB/13/36 – Annulment Proceedings
(October 11, 2018) (emphasis removed) (Ex. 2 to Harwood Decl.).  In accordance with that
Procedural Order, the EC has filed its *amicus* submission in which it reasserts the position that
Article 26 of the ECT cannot form the basis of a valid arbitration agreement between an EU
member state and nationals of other EU member states, and that the CJEU's decision in *Achmea*
confirms that view.  European Commission, *Amicus Curiae* Submission ¶¶ 76-81, ICSID Case
No. ARB/13/36 – Annulment Proceedings (Nov. 12, 2018) (Ex. 3 to Harwood Decl.).
Meanwhile, Spain had requested a legal opinion from the EC's Legal Service regarding the EC's
position on the Award.  In a letter dated October 26, 2018, the EC's Legal Service confirmed the
EC's views that the CJEU's decision in *Achmea* applies to awards rendered under the ECT, such
as the *Eiser* Award.  *Communication from the Legal Service of the European Commission to the
Attorney General of the Kingdom of Spain* 2-3 (October 26, 2018) [hereinafter "EC Legal
Service Communication"] (Ex. 4 to Harwood Decl.).

[9] "In determining foreign law, the court may consider any relevant material or source, including
testimony, whether or not submitted by a party or admissible under the Federal Rules of
Evidence.  The court's determination must be treated as a ruling on a question of law."  Fed. R.
Civ. P. 44.1.

purposes of deciding its own subject matter jurisdiction under the FSIA before proceeding to the merits of the Petition. In other words, Spain is not raising a substantive merits defense against enforcement of the ICSID award at this stage. Rather, Spain asks this Court to engage in a straightforward application of the FSIA's jurisdictional immunity provisions.

Because the answer to the fundamental question of whether a valid arbitration agreement exists is no, this Court lacks subject matter jurisdiction and the Petition must be dismissed.

## ARGUMENT

The Kingdom of Spain is a foreign state as defined in the FSIA. 28 U.S.C. § 1603(a). Thus, the FSIA provides the sole basis for establishing jurisdiction over Spain with respect to any claim for which it is not entitled to sovereign immunity. *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 203 (D.C. Cir. 2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989), and citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488-89 (1983)). The federal statute implementing the ICSID Convention, 22 U.S.C. § 1650a, does not provide a separate basis of jurisdiction in an action to enforce an ICSID award against a foreign state. *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 112, 113 (2d Cir. 2017); *Micula v. Gov't of Romania*, 714 F. App'x 18, 21 (2d Cir. 2017); *accord Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 44 (D.D.C. 2015) (holding that ICSID awards must be enforced by "plenary action" in accordance with the FSIA).

A foreign state is entitled to "virtually absolute immunity" from suit unless the "substantive requirements" of any one of the FSIA's exceptions to immunity are satisfied. *Verlinden*, 461 U.S. at 486, 489; *accord Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1318 (2017) [hereinafter "*Helmerich & Payne*"]. "If no exception applies, a foreign sovereign's immunity under the FSIA is complete," and the district

court lacks jurisdiction over the case.[10]  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).  A court is obligated to make the sovereign immunity determination at the outset, and cannot proceed to enforcement of an award until that "threshold determination of FSIA immunity" has been conclusively and authoritatively resolved.  *See Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 80 (2d Cir. 2013); *see also Helmerich & Payne*, 137 S. Ct. at 1317, 1319, 1324.

## I.   **The Court Lacks Jurisdiction Because Spain Is Entitled to Immunity under the FSIA**

The Eiser Parties have invoked two exceptions to immunity under the FSIA for its action to confirm the award against Spain: the arbitration exception, 28 U.S.C. § 1605(a)(6), and the waiver exception, 28 U.S.C. § 1605(a)(1).  Neither applies.

### A.   The Arbitration Exception Does Not Apply

In *Chevron v. Ecuador*, the D.C. Circuit established a three-part test that a petitioner must satisfy for the arbitration exception to apply.  795 F.3d at 204.  The first step is determining that the award is or may be "governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards."  *Id*.  The ICSID Convention is such a treaty.  A district court must then make two additional findings: (1) the existence of a valid arbitration agreement, and (2) the existence of an enforceable award.  *Id*.  A "non-frivolous claim involving an arbitration award" is not enough to sustain jurisdiction; the Court must determine that each of these requirements has actually been met.  *Id*.  *Cf. Helmerich & Payne*, 137 S. Ct. at 1316, 1319

---

[10] Under the FSIA, personal jurisdiction over a foreign state is permissible where subject matter jurisdiction exists under section 1330(a) and service of process has been made according to 28 U.S.C. § 1608.  28 U.S.C. § 1330(b); *see Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987).  "In other words, under the FSIA, 'subject matter jurisdiction plus service of process equals personal jurisdiction.'"  *Practical Concepts*, 811 F.2d at 1548 n.11 (quoting *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981)).  Thus, if subject matter jurisdiction is unavailable because an exception to Spain's immunity does not apply, this Court would also lack personal jurisdiction over Spain.

(holding that a non-frivolous claim of a violation of international law is not enough to maintain jurisdiction under the expropriation exception). Although these jurisdictional questions may sometimes overlap with the merits, a court must still answer them before it takes jurisdiction under the FSIA. *Chevron*, 795 F.3d at 205 n.3, 207. Here, jurisdiction is unavailable because the Eiser Parties do not have a valid arbitration agreement with Spain.

In *Chevron*, the D.C. Circuit considered whether a valid arbitration agreement existed for purposes of satisfying the arbitration exception. The district court had asserted jurisdiction merely because the proceedings involved confirmation of an arbitral award under an applicable convention, but refused to address the question of whether a valid arbitration agreement existed for purposes of satisfying the arbitration exception to immunity. *Id.* at 205 n.3. The court of appeals found that that was error, and held that the district court had to decide whether a valid arbitration agreement in fact existed "as part of its jurisdictional analysis." *Id.* If a valid arbitration agreement does not exist, then the district court "lacks jurisdiction over the foreign state and the action must be dismissed." *Id.* at 204; *see Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (noting that the arbitration exception requires a "valid agreement . . . to submit to arbitration," quoting section 1605(a)(6), and that jurisdiction would be improper if a party "lacked authority to enter into the arbitration agreement"); *see also First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 756 (5th Cir. 2012) (concluding that section 1605(a)(6) did not apply where the parties had not entered into an arbitration agreement); *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 207-08 (D.D.C. 2014) (dismissing the case for lack of jurisdiction under section 1605(a)(6) because no arbitration agreement existed between the parties); *Aurum Asset Managers, LLC v. Banco Do Estado Do Rio Grande Do Sul*, No. 08-102, 2010 U.S. Dist. LEXIS 109577, at *13-18 (E.D. Pa. Oct. 13,

2010) (rejecting jurisdiction under section 1605(a)(6) because the parties "did not agree to arbitrate anything related to this case"), *aff'd*, 441 F. App'x 822 (3d Cir. 2011).

In this case, the existence of a valid arbitration agreement hinges on whether an agreement to arbitrate disputes under an investment treaty such as the ECT can be validly invoked in disputes between investors of EU member states such as the Eiser Parties and an EU member state such as Spain under the governing EU law.  The EU's highest judicial authority, the CJEU, answered this question in the negative in *Achmea*.  As the supreme authority on issues of EU law, the CJEU's decisions are controlling for determining the content of EU law.  *See Baxter Int'l Inc. v. Axa Versicherung AG*, 908 F. Supp. 2d 920, 925 (N.D. Ill. 2012) (concluding that a forum selection clause could not be enforced because a "binding [CJEU] decision" precluded its enforcement as between two EU nationals); *Al Tech Specialty Steel Corp. v. United States*, 28 Ct. Int'l Trade 1468, 1503 (C.I.T. 2004) (affording conclusive weight on the issue of EU law to a decision of the CJEU); *see also Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) (analogizing the process of determining foreign law to the rules for ascertaining state law, and observing that the decisions of a state's highest court are "binding on the federal courts" in deciding the content of state law); *Instrumentation Assocs. v. Madsen Elecs. (Canada)*, 859 F.2d 4, 8 (3d Cir. 1988) (following a decision of the Supreme Court of Canada in determining the substance of Canadian law).

In *Achmea*, the CJEU held that EU law precludes the application of arbitration provisions contained in an investment treaty between EU members states, and hence any agreement to arbitrate intra-EU disputes under the treaty is invalid as a matter of EU law, because arbitral tribunals constituted under such provisions are not part of the EU judicial system and therefore cannot be tasked with interpreting and applying EU law.  *Achmea* ¶¶ 45-46, 48-49, 62.  The

holding and reasoning in *Achmea* applies equally to the dispute resolution provisions in Article 26 of the ECT. *Communication from the [European] Commission to the European Parliament and Council: Protection of Intra-EU Investment*, at 3-4, COM (2018) 547 final (July 19, 2018) [hereinafter "EC Communication"]; *see also* European Commission, *Decision on State aid SA.40348 (2015/NN), Spain: Support for electricity generation from renewable energy sources, cogeneration and waste* 2017 O.J. (C442) ¶¶ 159-66 (Nov. 11, 2017) [hereinafter "EC Decision"] (explaining that the "ECT does not apply to investors from other Member States initiating disputes against another Member States [*sic*]" because "any provision that provides for investor-State arbitration between two Member States is contrary to Union [EU] law").[11] Because EU law constitutes part of the governing "rules and principles of international law" under Article 26(6), tribunals constituted under the ECT may be called upon to interpret and apply EU law in disputes between EU member states and investors from other EU member states. Hindelang Decl. ¶ 41. However, as with tribunals constituted under Article 8 of the BIT in *Achmea*, tribunals constituted pursuant to Article 26 of the ECT are not a part of the EU judicial system and cannot refer questions to the CJEU through the preliminary ruling procedure. Hindelang Decl. ¶¶ 39-40. *See* EC Communication 3-4; EC Decision ¶ 162. In short, there is no assurance that tribunals constituted under the ECT will be able to resolve intra-EU disputes "in a manner that ensures the full effectiveness of EU law [.]" *Achmea* ¶ 56.

Indeed, in the *Eiser* arbitration, the tribunal was called upon to interpret and apply EU law, including Article 344 of the TFEU, in deciding its own jurisdiction. Award ¶¶ 161-73.

_____

[11] A foreign state's views of its own laws are entitled to "respectful consideration." *Animal Sci. Prods.*, 138 S. Ct. at 1869. The European Union, the successor of the European Community, is considered a "foreign state" because it is an "organ of a foreign state" under the FSIA. *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 144 (2d Cir. 2014), *rev'd on other grounds*, 136 S. Ct. 2090 (2016). Thus, as the EU's principal executive body, the European Commission's views on EU law are entitled to respectful consideration.

Because the tribunal is not a part of the EU judicial system, however, the tribunal could not have referred the question to the CJEU for a preliminary ruling, even if it had tried. *See Achmea* ¶¶ 45-46, 48-49; Hindelang Decl. ¶ 40. Had the tribunal been able to refer the matter to the CJEU, as provided for under Article 267 of the TFEU, the CJEU would have been able to dispose of the issue in the ordinary course. As it happened, the tribunal rendered a decision on its own jurisdiction, which is now in conflict with EU law as set down by the CJEU in *Achmea*. *See* Hindelang Decl. ¶¶ 36, 42.

Accordingly, as a matter of EU law – the law governing the relationship between Spain and the Eiser Parties under the ECT – no valid arbitration agreement has formed between the Eiser Parties and Spain.[12] Moreover, because no valid arbitration agreement exists, no award made pursuant to such an agreement exists either. *See Chevron*, 795 F.3d at 204. Thus, this Court lacks subject matter jurisdiction under the arbitration exception, section 1605(a)(6)(B). *Id.*

B.     The Waiver Exception Does Not Apply

The Eiser Parties cannot establish jurisdiction under the FSIA's waiver exception. As set forth above, Spain's offer to arbitrate under the ECT does not extend to the Eiser Parties as a

---

[12] The fact that the *Eiser* tribunal found that it had jurisdiction over the dispute is of no moment. Where the parties "disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute," because "if there was never an agreement to arbitrate, there is no authority to require a party to submit to arbitration." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988) (internal quotations omitted). Thus, questions involving the formation of the arbitration agreement "must always be decided by the courts." *Id.* at 761; *see also, e.g., KenAmerican Res. v. Int'l Union, UMW*, 99 F.3d 1161, 1163 (D.C. Cir. 1996). Similarly, the validity of an arbitration agreement is for the court to decide, absent clear and unmistakable evidence that the issue was intended to be decided by arbitrators. *See Oxford Health Plans v. Sutter*, 569 U.S. 564, 569 n.2 (2013). Here, EU law as applied by the CJEU in *Achmea* precluded Spain from agreeing to have an arbitral tribunal decide the validity of an arbitration agreement found in an investment treaty between EU member states. *See* EC Communication 3 (explaining that, under *Achmea*, "any arbitration tribunal established on the basis of [arbitration clauses in intra-EU investment treaties] lacks jurisdiction due to the absence of a valid arbitration agreement").

matter of EU law and thus there is no valid arbitration agreement to form the basis of any waiver of immunity in this case.  Moreover, under the binding precedent of the D.C. Circuit and mandatory canons of statutory construction, the waiver exception is irrelevant.  That exception only applies where the foreign state has waived immunity from suit in the "courts of the United States" either "explicitly or by implication."  28 U.S.C. § 1605(a)(1).  Neither of those options is available here.

The Eiser Parties do not contend that Spain has "explicitly" waived immunity, nor could they.  "A foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so."  *World Wide Minerals, LTD. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (citing *Aquamar S.A. v. Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1292 (11th Cir. 1999) (internal quotation marks omitted) ("An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity."), and *Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1100 n.10 (D.C. Cir. 1982) [hereinafter "*MINE*"] (holding that under the FSIA, Congress contemplated waivers of a "specific and explicit nature")).

In *World Wide Minerals*, the D.C. Circuit found that Kazakhstan intended to waive immunity in the United States where two of the underlying agreements "contain[ed] express waivers of sovereign immunity – the latter referring specifically to the FSIA."  296 F.3d at 1162.  However, the court of appeals reversed the district court's decision insofar as it had found a waiver of immunity for claims brought under other agreements that did not contain express waivers, especially since other provisions in those contracts "suggest[ed] Kazakhstan did *not* contemplate that disputes over those agreements would be resolved in United States courts, but rather by arbitration in Kazakhstan and Sweden."  *Id*. at 1163.

Likewise here, the ECT does not contain any waivers of immunity.  And the ECT's dispute resolution provision does not contemplate suits in United States courts.  *See MINE*, 693 F.2d at 1103-04 (finding no waiver of immunity by agreeing to arbitrate under the ICSID Convention where the arbitration agreement did not expressly contemplate a role for courts in the United States); *see also Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 127 (D.C. Cir. 1999) (rejecting the argument that Qatar, by agreeing to arbitrate outside the United States, "should reasonably have anticipated the risk of being haled into court here" for an action to enforce the resulting award).  Thus, Spain has not explicitly waived immunity.

Nor has Spain implicitly waived its sovereign immunity in the courts of the United States.  There is "virtually unanimous" consensus that the FSIA's "implied waiver provision" must be construed "narrowly."  *Creighton*, 181 F.3d at 122 (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (observing that "cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed") (quoting *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985)).  Furthermore, the D.C. Circuit has held that, even for implied waivers, section 1605(a)(1) requires a showing that the foreign state "intended to waive its sovereign immunity."  *Creighton*, 181 F.3d at 122 (citing *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) ("[A]n implied waiver depends upon the foreign government's having at some point indicated its amenability to suit."), and *Foremost-McKesson*, 905 F.2d at 444 ("[C]ourts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended." (internal quotations omitted))).

In *Creighton,* the D.C. Circuit ruled that an agreement to arbitrate under an international treaty – the New York Convention – does not in and of itself constitute an implicit waiver of immunity from actions to enforce the resulting award in the United States.  181 F.3d at 122-23.  Qatar had agreed to arbitrate under the Rules of Conciliation and Arbitration of the International Chamber of Commerce in Paris, and Creighton obtained an award pursuant to that arbitration agreement.  *Id*. at 120.  Creighton then brought an action to confirm the award in the United States, arguing that jurisdiction was proper under the waiver exception because Qatar had agreed to arbitrate in France, a state party to the New York Convention.  The D.C. Circuit disagreed.  It explained that the "closest" Creighton came to arguing that Qatar "intended to waive its sovereign immunity" was to point to a statement in the FSIA's legislative history: "'[C]ourts have found [implicit] waivers in cases where a foreign state has agreed to arbitration in another country.'"  *Id*. at 122 (brackets in original) (quoting H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617) [hereinafter the "House Report"].  The D.C. Circuit joined other circuits in "rejecting such a broad reading of the 'implicit waiver' exception."  *Id*.  It reasoned:

> If the language of the legislative history [were] applied literally, a foreign government would be subject to the United States's jurisdiction simply because it agreed to have the contract governed by another country's laws, or agreed to arbitrate in a country other than itself, even though the agreement made no reference to the United States. Such an interpretation of § 1605(a)(1)'s "implicit waiver" exception would vastly increase the jurisdiction of the federal courts over matters involving sensitive foreign relations.

*Id*. (brackets in original) (quoting *Seetransport Wiking Trader Schiffarhtgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala*, 989 F.2d 572, 577 (2d Cir. 1993)).  *See also MINE*, 693 F.2d at 1102 n.13 (noting that "Congress did not endorse the literal wording of the House Report")).  Instead, the court found that the proper basis for maintaining jurisdiction over

Creighton's action was the arbitration exception.  *Creighton*, 181 F.3d at 124.  In effect, the D.C.

Circuit held that the waiver exception cannot apply solely on the basis that a foreign state agreed

to arbitrate under an international agreement that calls for the recognition and enforcement of

arbitral awards; jurisdiction in that situation is only proper under the arbitration exception.

*Accord S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292, 1301 (11th Cir. 2000).  *See also Strategic*

*Techs. PTE, Ltd. v. Republic of China*, No. 05-cv-2311 (RMC), 2007 U.S. Dist. LEXIS 34258, at

*10 (D.D.C. May 10, 2007) ("*Creighton* is clear – the election to arbitrate in another country

alone does not demonstrate the intent to waive sovereign immunity.").

       The same outcome is warranted here.  There is no indication that Spain intended to waive

its immunity in United States courts by signing the ECT, even though it contains provisions to

arbitrate under the ICSID Convention.  Nor does it matter that Spain is a party to the ICSID

Convention.  *See Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 31

(D.D.C. 2014) (finding no implied waiver by the Czech Republic based on agreement to arbitrate

under the New York Convention), *rev'd on other grounds,* 824 F.3d 131, 137 (D.C. Cir. 2016)

(finding jurisdiction under the arbitration exception only).  Although some district courts in this

circuit have relied on *dicta* in *Creighton* to find implied waivers where the foreign state itself is a

signatory to the applicable convention, that conclusion belies the D.C. Circuit's reasoning in

*Creighton* and *MINE*, as well as mandatory canons of statutory construction.

       The critical holding in both *Creighton* and *MINE* is that an agreement to arbitrate that

does not expressly provide for a waiver of immunity in United States courts is not enough to

satisfy the requirements of the waiver exception.  In *Creighton*, the court speculated that being a

party to the New York Convention – which Qatar was not – might result in an implied waiver.

181 F.3d at 121, 123.  But acceding to the New York Convention or the ICSID Convention has

nothing to do with a state's intention to waive its sovereign immunity.  The only significance is

that the state has undertaken an obligation to recognize and enforce arbitral awards rendered in

the territory of other signatories.  For instance, under the New York Convention, "the critical

element is the place of the award: if that place is in the territory of a party to the Convention, all

other Convention states are required to recognize and enforce the award."  *Id*. at 121 (quoting

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 487 cmt. b (AM. LAW INST. 1987)).

*Accord Belize Soc. Dev.*, 668 F.3d at 731 n.3 (noting that Belize's status as a non-signatory was

"irrelevant" because what matters for purposes of enforcement is that the award was made in the

territory of a contracting state) (citing *Creighton*, 181 F.3d at 121).

Hence, it was "undisputed" that the award the petitioner obtained in France was

enforceable in the United States, because France and the United States are both parties to the

New York Convention.  *Creighton*, 181 F.3d at 121.  Yet the *Creighton* court ruled that Qatar's

agreement to arbitrate under the New York Convention was not enough to infer a waiver of

immunity from enforcement in the United States under section 1605(a)(1), even though the

United States had a treaty obligation to enforce the award.  That is why the arbitration exception

exists.  *Creighton*, 181 F.3d at 126 (noting that, unlike section 1605(a)(1), "[s]ection 1605(a)(6)

reflects the decision of the Congress to deny a foreign state immunity from suit in the United

States if that state has agreed to arbitrate in any country that is party to a treaty (such as the New

York Convention)").

A review of the history of sections 1605(a)(1) and 1605(a)(6) sheds more light on this

point.  The FSIA, as originally enacted in 1976, included the waiver exception, section

1605(a)(1), but not the arbitration exception, section 1605(a)(6).  *See* Foreign Sovereign

Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (1976).  Congress did not add the

arbitration exception until 1988.  *See Creighton*, 181 F.3d at 125-26.  In the intervening years

between 1976 and 1988, courts split on the interpretation of the waiver exception based on

disagreements over the significance of the statement in the House Report.  By 1985, the Seventh

Circuit summarized the majority view as follows: "[M]ost courts have refused to find an implicit

waiver of immunity to suit in American courts from a contract clause providing for arbitration in

a country other than the United States."  *Frolova*, 761 F.2d at 377 & n.10 (collecting cases).  *See*

*also MINE*, 693 F.2d at 1103 n.15 (D.C. Cir. 1982) (observing that some "courts have found it

necessary to hold that only an agreement to arbitrate in *this* country will waive a sovereign's

immunity in United States courts") (citing *Ohntrup v. Firearms Ctr., Inc.*, 516 F. Supp. 1281,

1285 (E.D. Pa. 1981) and *Verlinden B.V. v. Cent. Bank of Nigeria*, 488 F. Supp. 1284, 1301-02

(S.D.N.Y. 1980)).  This divergence of opinion was at the center of Congress's decision to add

the arbitration exception to the FSIA, as reflected in the legislative history of the 1988

amendments.  *See Hearing before the Subcomm. on Admin. L. & Governmental Relations of the*

*H. Comm. on the Judiciary*, 99th Cong. 94 (1986) (statement of Mark Feldman, Chair of the

ABA's FSIA Comm.) ("[T]here is uncertainty whether the United States courts have jurisdiction

to enforce an arbitral award made against a foreign state in a third country even where the United

States has a treaty obligation to enforce such an award."); *Hearing before the Subcomm. on*

*Admin. L. & Governmental Relations of the H. Comm. on the Judiciary*, 100th Cong. 94 (1987)

(same).

      In recognition of this uncertainty, Congress enacted the arbitration exception to "'fill the

gaps' in the FSIA and 'perfect the jurisdiction of the court.'"  *Monegasque de Reassurances*

*S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 158 F. Supp. 2d 377, 384 (S.D.N.Y. 2001)

(quoting the 1988 amendments' legislative history, 131 CONG. REC. 10455 (1985) (statement of

Senator Mathias)), *aff'd*, 311 F.3d 488 (2d Cir. 2002).  Had Congress believed that section

1605(a)(1) was sufficient to encompass agreements to arbitrate outside the United States, it

would not have needed to add the arbitration exception.  *See Creighton*, 181 F.3d at 126; *Mar.*

*Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 722 F. Supp. 1032, 1037 n.3 (S.D.N.Y.

1989) (concluding that Congress enacted section 1605(a)(6) to codify the legislative history of

section 1605(a)(1), suggesting that the statement in the House Report did not reflect the law

before the enactment of the arbitration exception).[13]

Finally, compulsory rules of statutory construction preclude a finding that section

1605(a)(1) can apply in this case.  If the waiver exception were interpreted to encompass claims

involving international arbitral awards, then the relevant provision of the arbitration exception

dealing specifically with enforcement of awards under an applicable treaty – subsection

1605(a)(6)(B) – would become superfluous.  *See Agrocomplect, AD v. Republic of Iraq*, 524 F.

Supp. 2d 16, 20 n.7 (D.D.C. 2007) ("[T]he only theory of waiver advanced by the plaintiff is the

defendant's supposed agreement to arbitrate any disputes arising out of the Contract in another

country, which essentially collapses any inquiry under § 1605(a)(1) into the Court's analysis

under § 1605(a)(6)(B) . . . ."), *aff'd*, 304 F. App'x 872 (D.C. Cir. 2008) (analyzing only the

arbitration exception).  That is an untenable result because courts must interpret "two distinct

subsections" of the same statute "in a manner that gives meaning to both."  *Qi-Zhou v. Meissner*,

70 F.3d 136, 139 (D.C. Cir. 1995) (citing *United States v. Menasche*, 348 U.S. 528, 538-39

(1955) ("The cardinal principle of statutory construction is to save and not to destroy.  It is our

duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an

---

[13] Ever since the 1988 amendments, no court has asserted jurisdiction under the waiver exception
to enforce an award rendered outside the United States that did not also meet the arbitration
exception's substantive requirements.

entire section, as the Government's interpretation requires." (internal citation and quotations omitted))).

In brief, because neither the waiver nor the arbitration exception applies, Spain is immune from suit and this Court lacks jurisdiction under the FSIA.

## II.   Declining Jurisdiction to Enforce the Award Is Consistent with the United States' Obligation under the ICSID Convention

Dismissal of this action for lack of subject matter jurisdiction is not inconsistent with the United States' obligations under the ICSID Convention.  The ICSID implementing statute only requires that an ICSID award "be enforced and . . . be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a).  That language tracks the text of Article 54 of the ICSID Convention, which was adopted at the insistence of the United States:

> A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

ICSID Convention art. 54(1); *see Mobil*, 863 F.3d at 117 ("Article 54 affords ICSID arbitral awards the status of final *state court* judgments, and was included in the Convention at the insistence of the United States.") (emphasis added).  As the D.C. Circuit has explained, Article 54 of the ICSID Convention and the ICSID implementing statute require that ICSID awards "be enforced as judgments of sister states."  *MINE*, 693 F.2d 1094, 1103 n.14.  In effect, federal courts are obligated to treat ICSID awards the "same" as judgments of state courts – no worse, no better.

Although state court judgments are generally entitled to recognition and enforcement in federal court, "where the rendering forum lacked jurisdiction over the subject matter or the parties, full faith and credit is not required."  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S.

367, 386 (1996); *see also Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 705 (1982) ("If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given."). The "same full faith and credit" standard is to be applied to ICSID awards under section 1650a(a).

As explained above, the CJEU's decision in *Achmea* made clear that arbitration provisions in an investment treaty between EU member states are unenforceable as a matter of EU law because such provisions threaten the exclusive authority of the EU judicial system, including the jurisdiction of the CJEU as the highest authority for resolving questions of EU law. *Achmea* ¶¶ 45-46, 48-49; *see also* Hindelang Decl. ¶¶ 36-38. And, as the EC has confirmed, the same is true for the arbitration provisions found in Article 26 of the ECT. In consequence, the *Eiser* tribunal never had jurisdiction over Spain (or the Eiser Parties). Nor did it have jurisdiction over the subject matter, *i.e.*, an intra-EU dispute in which the tribunal might be called upon to apply EU law. If the *Eiser* Award were a state court judgment, this Court would not be obliged to extend it full faith and credit and therefore it need not be enforced under section 1650a(a).

Consider an analogous situation in which a court were asked to recognize and enforce a state court judgment purporting to authorize execution on a debtor's property during the pendency of an insolvency action commenced under the United States bankruptcy code. That judgment would not be entitled to full faith and credit because the state court would have lacked jurisdiction. *See In re Newport Creamery, Inc.*, 293 B.R. 293, 296 (Bankr. D.R.I. 2003) ("Because 28 U.S.C. 1334(e) gives [federal district courts] exclusive jurisdiction over the subject property and any proceeds related thereto, the order and execution obtained by McKenna in the state court regarding the $105,000 in Attorney Hayes' escrow account are clearly void.").

Similarly here, the Award is not entitled to full faith and credit under the ICSID Convention, as implemented by section 1650a(a), because the Award was rendered without jurisdiction as a matter of EU law, the law applicable to intra-EU disputes under the ECT.

### III.   Spain Is Entitled to a Conclusive Determination of Its Sovereign Immunity Without Waiving Any Substantive Defenses against Enforcement

This Court is required to decide Spain's sovereign immunity defense before proceeding to the merits of the Petition, and Spain is entitled to an immediate appeal from that threshold immunity determination without waiving any substantive defenses against enforcing the Award.

Foreign sovereign immunity is not only a defense to liability, but also a shield from the burdens and indignities of having to defend a lawsuit on the merits in a court that lacks jurisdiction over the claim. *See Helmerich & Payne*, 137 S. Ct at 1317, 1319 (explaining that "foreign sovereign immunity's basic objective" is "to free a foreign sovereign from *suit*"); *Philippines v. Pimentel*, 553 U.S. 851, 865 (2008); *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004); *Foremost-McKesson*, 905 F.2d at 443 (quoting *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 576 n.2 (7th Cir. 1989)); *cf. In re Papandreou*, 139 F.3d 247, 254-56 (D.C. Cir. 1998) (granting extraordinary mandamus relief to protect a foreign state's jurisdictional immunity).

The protections afforded by sovereign immunity are so important that courts of appeals have unanimously held that a foreign state is entitled to an immediate, interlocutory appeal from a denial of a motion to dismiss under the FSIA pursuant to the collateral order doctrine. *See also Helmerich & Payne*, 137 S. Ct. at 1323 (recognizing that foreign states "enjoy a right to take an immediate appeal" from denials of immunity under the FSIA before the merits are decided) (collecting cases); *Princz v. Fed. Republic of Germany*, 998 F.2d 1, 1 (D.C. Cir. 1993) (R.B. Ginsburg & Wald, JJ.) (per curiam) (citing *Foremost-McKesson*, 905 F.2d at 443); *EM Ltd. v.*

*Banco Cent. De La República Argentina*, 800 F.3d 78, 87 n.38 (2d Cir. 2015); *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1281 (3d Cir. 1993); *United States v. Moats*, 961 F.2d 1198, 1201 (5th Cir. 1992); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) ("A sovereign that is required to litigate a case on the merits before it can appeal the assertion of jurisdiction over it has not been afforded the benefit of the immunity to which it is entitled."). Indeed, district courts are divested of jurisdiction during an appeal of that "threshold" sovereign immunity determination. *Princz*, 998 F.2d at 1. ICSID enforcement proceedings are to be treated no differently. *Blue Ridge*, 735 F.3d at 80-81.

Thus, Spain is entitled to a conclusive threshold determination of its sovereign immunity before it may be required to present its merits defenses.[14]

---

[14] Although the ICSID Convention provides for annulment of awards only within the ICSID system, a United States court is not helpless against attempts to enforce invalid or defective ICSID awards. For the avoidance of doubt, Spain has non-FSIA grounds for defending against enforcement of the Award, and will properly raise and develop those defenses if necessary, once its sovereign immunity has been conclusively resolved. By way of preview, but not limitation, enforcement of the Award should be refused under the foreign compulsion doctrine, the act of state doctrine, and principles of international comity. The EC has issued a decision stating that any compensation paid by Spain as a result of any awards arising from changes to the regulatory regime for renewable energy at issue in the *Eiser* arbitration would constitute unlawful state aid under EU law, if paid without the EC's authorization. EC Decision ¶¶ 4-6, 89, 165-66. In addition, the EC's Legal Service has advised Spain that any payment of the *Eiser* Award specifically, without EU authorization, would constitute unlawful state aid. EC Legal Service Communication 2. If this Court were to enter an order directing Spain to pay damages to the Eiser Parties, it would be passing on the validity of the acts of a foreign sovereign, the EU, and directing Spain to defy the laws of the EU within its own jurisdiction. That would be an intolerable outcome. Furthermore, Spain has presented a serious challenge to the Award in its Application for Annulment, putting at issue the "finality of the award" and raising the possibility that enforcement "in the full amount [would be] improper." *Mobil*, 863 F.3d at 121.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Petition for lack of jurisdiction under the FSIA.  Spain reserves all rights and defenses and does not waive any of its defenses or its sovereign immunity.

Dated:  Washington, D.C.
       December 14, 2018

Respectfully submitted,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By:   _/s/ Joseph D. Pizzurro_
Joseph D. Pizzurro
(D.C. Bar No. 468922)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.:  (202) 452-7373
Fax:  (202) 452-7333
Email:  jpizzurro@curtis.com

-and-

Miriam K. Harwood (_pro hac vice_ pending)
Kevin A. Meehan (_pro hac vice_ pending)
Juan O. Perla (_pro hac vice_ pending)
101 Park Avenue
New York, NY 10178
Tel.: (212) 696-6000
Fax:  (212) 697-1559
Email: mharwood@curtis.com
Email: kmeehan@curtis.com
Email: jperla@curtis.com

_Attorneys for Respondent_
_Kingdom of Spain_

32824119