# HARWOOD EXHIBIT 1



EUROPEAN COMMISSION

Brussels. 19 July 2018
sj.c(2018) 4304806

## TO THE PRESIDENT AND MEMBERS OF THE AD HOC COMMITTEE

Prof. Ricardo RAMÍREZ HERNÁNDEZ, President

Judge Dominique HASCHER, Member

Makhdoom Ali KHAN, Member

## APPLICATION FOR LEAVE TO INTERVENE AS A NON-DISPUTING PARTY

submitted by the **European Commission**, represented by Steven NOË, Petra NEMECKOVA and Tim MAXIAN RUSCHE, members of its Legal Service, as agents, Rue de la Loi 200, B-1049 Brussels, who consent to service by e-mail via steven.noe@ec.europa.eu , petra.nemeckova@ec.europa.eu and tim.rusche@ec.europa.eu.

### In ICSID Case No. ARB/13/36 – Annulment Proceeding

### EISER
(Respondents on Annulment) (Claimant)

**v.**

### KINGDOM OF SPAIN
(Applicant on Annulment) (Respondent)

## 1. INTRODUCTION

1. According to the case register of ICSID Secretariat, available on its web site, an annulment procedure has been lodged by the Kingdom of Spain against the award rendered 4 May 2017 in ICSID Case No. ARB/13/36 (Eiser v Kingdom of Spain) ("the Award"), which is currently pending before your *Ad Hoc* Committee pursuant to Article 52 of the ICSID Convention and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings ("ICSID Arbitration Rules").

2. The European Commission ("Commission") has sought leave to intervene as a non-disputing party in the proceedings before the Arbitral Tribunal leading to the Award. However, by Procedural Order Nr. 7, the Arbitral Tribunal requested *"[a]s a condition for filing a non-disputing party submission and prior to any consideration of that submission by the Tribunal [...that] the Commission shall provide a written undertaking, satisfactory to the Tribunal, to pay the additional costs of legal representation reasonably incurred by the parties in responding to that submission"*. In a reasoned request to alter Procedural Order Nr. 7, the Commission set out that such a condition lacked any legal foundation in either Arbitration Rules or Arbitral Precedent. The Arbitral Tribunal, however, refused to alter Procedural Order Nr. 7. The Commission was not in a position to accept such a condition, as it would otherwise have violated its obligations under the European Union ("EU" or "Union") rules for executing the Union budget. Hence, it refused to provide the commitment. As a result, the Arbitral Tribunal disregarded the *amicus curiae* brief that had been filed by the Commission.[1]

3. The Commission has decided to request leave to intervene as a non-disputing party in the present Annulment Proceedings pending before your *Ad Hoc* Committee. The Director-General of the Legal Service has appointed the undersigning agents to represent the Commission (the Authority is enclosed as Annex 1). As regards its treatment of confidential information, the Commission intends to underline that, pursuant to Article 339 of the Treaty on the Functioning of the European Union ("TFEU"), the members of the institution, its officials and other servants are subject

---

[1] The Commission refrains from producing those orders at this stage, but is at the disposal of the *Ad Hoc* Committee for providing them, should they be needed to assess the Commission's request.

to a strict requirement not to disclose any information that they may acquire in the course of their duties.

## 2. LEGAL BASIS FOR THE EUROPEAN COMMISSION'S INTERVENTION AS A NON-DISPUTING PARTY

4. According to Rule 53 of the ICSID Arbitration Rules, Rule 37(2) of the ICSID Arbitration Rules applies *mutatis mutandis* to Annulment Proceedings. Your *Ad Hoc* Committee may therefore, after consulting both parties, allow a non-disputing party to file a written submission with the Tribunal regarding a matter within the scope of the dispute. When applying for leave to intervene as a non-disputing party, the non-disputing party shall set out the extent to which:

> "(a) its submission would assist the Tribunal in the determination of a factual or legal issue related to the proceeding by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties;
>
> (b) its submission would address a matter within the scope of the dispute;
>
> (c) the non-disputing party has a significant interest in the proceeding."

5. Neither the Applicant on Annulment nor the Respondent on Annulment have provided the Commission with precise information on the arguments raised by the parties in their written submissions to the *Ad Hoc* Committee. Therefore, the Commission will set out in **section 3** below in general terms, on the basis of the grounds for annulment that the Kingdom of Spain could invoke pursuant to Article 52 of the ICSID Convention, why it considers that it would assist the *Ad Hoc* Committee in the determination of a factual or legal issue related to the proceeding by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties. That section shows why the conditions set out in Rule 37(2)(a) and (b) of the ICSID Arbitration Rules are met.

6. In **section 4** below, the Commission will set out why it has a significant interest in the proceeding, showing that the conditions set out in Rule 37(2)(c) of the ICSID Arbitration Rules are met.

7. In **section 5** below, the Commission will set out why it considers that the *Ad Hoc* Committee, if asked to do so by the Kingdom of Spain, would be obliged to suspend enforcement of the award pursuant to Article 54 of the ICSID Arbitration Rules.

without asking the Kingdom of Spain for security, as has become practice of *Ad Hoc* Committees in recent years.

8. Should the *Ad Hoc* Committee deem it useful, the Commission is willing and prepared to participate in any hearing scheduled to take place in the current proceedings.

9. In addition, the Commission points out that Article 29(2) of Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union[2] provides:

> "Where the coherent application of Article 107(1) or Article 108 of the TFEU so requires, the Commission, acting on its own initiative, may submit written observations to the courts of the Member States that are responsible for applying the State aid rules.
>
> It may, with the permission of the court in question, also make oral observations.
>
> For the exclusive purpose of preparing its observations, the Commission may request the relevant court of the Member State to transmit documents at the disposal of the court, necessary for the Commission's assessment of the matter."

10. That provision is directly applicable in all the Member States of the Union and is therefore part of the domestic legal orders of Grand Duchy of Luxembourg and the United Kingdom of Great Britain and Northern Ireland. At the same time, that provision is Union law, which constitutes international law applicable between the parties.[3] Based on Article 26(6) of the Energy Charter Treaty, that provision forms hence part of the applicable law for the proceedings pending before the *Ad Hoc* Committee.[4] Neither an Arbitration Tribunal, nor an Ad Hoc Committee are a court of a Member State. Nevertheless, to the extent that they are bound to apply Union law, the Commission considers that this provision provides further support for the

---

[2]  OJ L 248, 24.9.2015, p. 9. The text is available under http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv:OJ.L_.2015.248.01.0009.01.ENG .

[3]  See, Court of Justice of the European Union, judgment in *Achmea*, Case C-284/16, EU:C:2018:158, paragraph 41: *"Given the nature and characteristics of EU law [...], that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States."* See also Court of Justice of the European Union, judgment in *Van Gend and Loos*, Case 26/62, EU:C:1963:1, p. 12: *"[...] the Community constitutes a new legal order of international law."*

[4]  ICSID Case No. ARB/07/19, *Electrabel v Hungary*, Award of 30 November 2012, paragraphs 4.119 to 4.126. This finding has not been disputed by subsequent tribunals. The Commission will therefore refrain from arguing that point in depth here. Should Your Tribunal have any doubt on it, the Commission is at its disposal to further expand on that question.

admission of the Commission as non-disputing party, to the extent that the Commission seeks to address points of EU State aid law.

11. In any event, the Commission considers that that provision recognises the Commission's significant interest in cases where EU State aid rules might be discussed and provides further support for the present request.

## 3.   SCOPE OF THE COMMISSION'S INTERVENTION

12. Pursuant to Article 52 of the ICSID Convention, annulment of an award may be sought for one or more of the following grounds:

> (a) the Tribunal was not properly constituted;
>
> (b) the Tribunal has manifestly exceeded its powers;
>
> (c) there was corruption on the part of a member of the Tribunal;
>
> (d) there has been a serious departure from a fundamental rule of procedure; or
>
> (e) the award has failed to state the reasons on which it is based.

13. The Commission considers that by rendering the Award, the Arbitration Tribunal has manifestly exceeded its powers and seriously departed from a fundamental rule of procedure, for the following reasons.

### 3.1.   The Arbitral Tribunal manifestly exceeded its powers with regard to jurisdiction, because it lacked jurisdiction to hear the case, and failed to state reasons in so far as the violation of Article 267 TFEU and the general principle of autonomy of Union law is concerned

14. The Tribunal has based its jurisdiction on Article 26 of the Energy Charter Treaty, which it considered gave it jurisdiction pursuant to Article 25 of the ICSID Convention.

15. The dispute before your *Ad Hoc* Committee has the particularity that it is an intra-EU dispute between investors from EU Member States, namely the Grand Duchy of Luxembourg and the United Kingdom of Great Britain and Northern Ireland, against another EU Member State, the Kingdom of Spain ("Spain").

16. The Energy Charter Treaty is an international treaty, to which the Union is a Contracting Party and which therefore is part of Union law[5] and which covers a field that is regulated by Union law. Regulation by Union law takes two different forms. First, the measures contested by the Claimants before the Tribunal reflect into Spanish law one of the options offered under Directive on Renewable Energy to comply with the obligation to achieve a national renewable energy target imposed upon Spain by such Directive. Second, the measures contested by the Claimant constitute State aid in the sense of Article 107(1) TFEU. This arises from Commission Decision SA.40348 of 10 November 2017.[6]

17. As such, and while the starting point of your analysis, in accordance with Article 26(6) ECT, is one of international law[7], it is also one of European Union law, which forms part of the public international law order for the purposes of this proceeding.[8]

18. The Tribunal has interpreted Article 26 of the Energy Charter Treaty as an investor-State arbitration clause in an international agreement concluded between Member States.

19. The Court of Justice of the European Union, in its judgment in *Achmea*, held that *"Articles 267 and 344 [... of the Treaty on Functioning of European Union] must be interpreted as <u>precluding a provision in an international agreement concluded between Member States</u> [...] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member*

---

[5]   98/181/EC, ECSC, Euratom: Council and Commission Decision of 23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects, OJ L 69, 9.3.1998, p. 1.

[6]   Commission Decision SA.40348 of 10 November 2017, summary published in the *Official Journal of the European Union*, OJ C 442, 22.12.2017, p. 1 (accessible on-line via the EUR-Lex website; see http://eur-lex.europa.eu/homepage.html?locale=en), whereas the full text was published at http://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf.

[7]   ICSID Case No. ARB/03/16 *ADC Affiliate Ltd. v Republic of Hungary*, award of 2 October 2006, at paragraph 290; ICSID Case No. ARB/01/7, *MTD Equity Sdn Bhd v. Republic of Chile*, award of 25 May 2004, at paragraph 86; and ICSID Case No. ARB/01/12 *Azurix Corp. v. Argentine Republic*, award of 14 July 14 2006, at paragraph 67; see also for further references *Antonio Parra*, "Applicable Law in Investor-State Arbitration", in: *Michael Rovine* (ed.), Contemporary Issues in International Arbitration and Mediation: The Fordham Papers, Martinus Nijhoff Publishers, 2008 p. 3, at pp. 7-8.

[8]   ICSID Case No. ARB/07/19, *Electrabel S.A. v Republic of Hungary* decision on jurisdiction of 30 November 2012, paragraphs 4.122, 4.189, and 4.195; and ICSID Case No. ARB/14/3, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v Italian Republic*, award of 27 December 2016, paragraph 278. *See also* judgment of the Court of Justice of 6 March 2018, Case C-284/16 *Achmea*, ECLI:EU:C:2018:158, paragraph 33.

*State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*" (emphasis added by the Commission).

20. The Court of Justice of the European Union has hence confirmed the view taken by the Commission in its *amicus curiae* submission before the Tribunal.

21. As the Commission has also detailed in its *amicus curiae* submission, and as has been recognized by a number of Arbitral Tribunals, starting from the Tribunal in *Electrabel* v *Hungary*, Union law takes precedence over the Energy Charter Treaty in case of conflict, at the very least in intra-EU situations, such as the present case. [9]

22. According to that arbitral precedence, there are two steps for integrating Union law into the analysis. First, an intra-EU Arbitration Tribunal based on Article 26 of the Energy Charter Treaty needs to take Union law into consideration when interpreting the extent of the offer for arbitration in Article 26 ECT. In the view of the Commission, based on the **principle of interpretation in conformity**, enshrined both in Article 31(1) letter c of the Vienna Convention on the Law of the Treaties ("VCLT") and in Union law, the Tribunal should have interpreted that Article as not containing an offer for arbitration by Spain to investors from other Member States, but as being directed only to investors from third countries.

23. Second, even if the Tribunal should have reached a different conclusion than the Commission, namely that such an interpretation in conformity is excluded, because it would be *contra legem*, the Tribunal would have been faced with a conflict between Article 26 of the Energy Charter Treaty and the general principles of Union law of autonomy, Article 19 TEU, and Articles 267 and 344 TFEU. This **conflict would have to be decided in favour of Union law**.

24. The Tribunal, however, has ignored the problem it was confronted with, by stating, at paragraph 199 of the Award:

> "However, the Tribunal need not address the possible consequences that might arise in case of a conflict between its role under the ECT and the European legal order, because no such conflict has been shown to exist."

---

[9]   ICSID Case No. ARB/07/19, *Electrabel* v *Hungary*, Award of 30 November 2012, paragraphs 4.178 to 4.191.

25. The subsequent paragraphs show a very superficial examination of the arguments put forward by the Kingdom of Spain, in particular of Article 344 TFEU. They fail completely to address the violation of Article 267 TFEU and the general principle of autonomy of Union law, which are fundamental, as shown by the Court of Justice of the European Union in *Achmea* and the *amicus curiae* submission of the Commission.

26. Therefore, the Commission considers that the Tribunal should have declined jurisdiction in the present case. By not doing so, and in particular not addressing at all the most problematic aspects of intra-EU investor-State arbitration under the Energy Charter Treaty, it has manifestly exceeded its powers and failed to state reasons.

**3.2. The Tribunal has manifestly exceeded its powers with regard to the applicable law, because it failed to apply Union law on State aid, and in particular the standing case-law of the Court of Justice of the European Union on the (exclusion of) legitimate expectations in case of unlawful State aid**

27. The Tribunal finds in paragraphs 322 to 325 of the Award that "*the Tribunal will decide the issues on the basis of the terms of the ECT and the applicable rules and principles of international law*". According to consistent arbitral precedent, in intra-EU disputes, Union law is part of the applicable law as "*applicable rules and principles of international law*".[10]

28. The Commission, in its *amicus curiae* submission, had drawn the attention of the Tribunal to the fact that the Spanish support scheme at stake in the arbitration proceedings constitutes State aid pursuant to Article 107(1) TFEU, and that it had not been authorised by the Commission pursuant to Article 108(3) TFEU. As a result, under Union law, any legitimate expectations of the claimants were precluded, in line with long-standing case-law of the Court of Justice, which has held that, save in exceptional circumstances, undertakings to which an aid has been granted may not, in principle, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in the Treaties.[11]

---

[10]   *Ibidem*, paragraphs 4.111 to 4.199. Confirmed many times since in subsequent awards.

[11]   Case C-5/89 *Commission* v *Germany* ECLI:EU:C:1990:320, paragraph 14.

29. The Tribunal does not discuss those questions at all. Hence, it has manifestly exceeded its powers, by not applying a provision of international law that was part of the law to be applied by it. At the same time, it fails to state reasons.

30. In any event, legitimate expectations must be reasonable in light of the law applicable to the investment. In light of the consistent case-law of the Court of Justice of the European Union this means that it would be unreasonable to consider that there is a legitimate expectation that aid be granted. A diligent economic operator must be assumed to be able to determine whether that procedure has been followed.[12]

31. The Tribunal not only failed to discuss those State aid obligations under Union law as a matter of law, but also and in the alternative as part of the relevant facts.

32. The fact that the Arbitration Tribunal has failed to address that point in its Award constitutes both a violation of Article 52 (b) ICSID Convention and Article 52 (e) ICSID Convention.

### 3.3. The Tribunal has seriously departed from a fundamental rule of procedure by requiring a commitment from the Commission to pay costs, and, as a result, refusing the Commission's *amicus curiae* submission

33. The Award is the first in a series of arbitration proceedings where Arbitration Tribunals have sought to curtail the procedural rights of the Commission by imposing, as a precondition for admitting the Commission as non-disputing party or *amicus curiae*, an open-ended commitment to bear the costs of the other parties related to that intervention.

34. As the Commission has explained in great detail in its request to alter Procedural Order Nr. 7, there is no legal basis in the ICSID arbitration rules for requiring such a commitment. It also goes against the rules applicable in national legal systems and for international courts and tribunals. Those are all based on the philosophy that the *amicus curiae* pays its own costs, but not the costs of the parties, because it serves the Tribunal, by bringing a different angle and outside expertise to the proceedings.

---

[12] Case C-5/89 *Commission v Germany* ECLI:EU:C:1990:320, paragraph 14.

35. The Tribunal has never provided a reasoned justification for a divergent view, but has simply ignored the arguments put forward by the Commission, which are grounded in consistent national and international case-law and rules of procedure.

36. The view taken by the Tribunal also constitutes disservice to investor-State arbitration and its perceived lack of openness. Indeed, requiring *amicus curiae* to provide for open-ended cost commitments will have a chilling effect on the participation of international organisations and non-governmental organisations in investor-State arbitration proceedings.

37. The fact that the Arbitration Tribunal has requested the commitment to pay costs, disregarded the amicus curiae submission of the Commission on that basis, and not provided any reasons for not following the view described by the Commission in its request to alter procedural order No. 7 constitutes both a violation of Article 52 (d) ICSID Convention and Article 52 (e) ICSID Convention.

38. Finally, that procedural irregularity has also had an impact on substance, as it prevented the Commission from setting out its view on the matter of jurisdiction and Union State aid law to the Tribunal. That in turn could have prevented the errors identified in sections 3.1 and 3.2 above.

## 4.   PARTICULAR INTEREST OF THE COMMISSION IN THE PRESENT PROCEEDINGS

39. The Commission has a central role in the interpretation and application of rules relating to investment protection within the Union in its role as guardian of the Treaties. Moreover, the Commission has a central role in the application of the system of control of State aid established in Articles 107 and 108 TFEU: it is entrusted with the task to keep under constant review systems of aid existing in Member States, and it has the exclusive competence for approving new aid that Member States intend to grant to undertakings. For the reasons set out above in section 3, Union law on State aid plays a decisive role in the annulment proceedings.

40. As a result of the Award and its manifest violation of Union law, the Commission had to include in its Commission Decision SA.40348 of 10 November 2017[13] clear

---

[13]   Commission Decision SA.40348 of 10 November 2017, summary published in the *Official Journal of the European Union*, OJ C 442, 22.12.2017, p. 1 (accessible on-line via the EUR-Lex website; see http://eur-lex.europa.eu/homepage.html?locale=en), whereas the full text was published at

language that Arbitration Tribunals, such as the *Eiser* Tribunal, lack competence to hear cases brought by EU investors, and that in any event, the measures taken by the Kingdom of Spain cannot violate the fair and equitable treatment standard.

41. That decision is part of Union law, and hence also part of the law applicable to the proceedings before this *Ad Hoc Committee* and as such binding upon the *Ad Hoc Committee*. In order to avoid further open conflict between investment arbitration and Union law, the Commission would appreciate the opportunity to set out in detail its reasoning before the *Ad Hoc Committee*, so as to enable your *Ad Hoc Committee* to assess the Award contested before it in the light of all relevant legal arguments.

42. Furthermore, the Commission acts as the guardian of the Treaties and has the power to initiate infringement procedures pursuant to Articles 108, 258 and 260 TFEU against Member States that fail to comply with their obligations. That includes national judges that may have to hear cases on recognition and enforcement of the Award.

## 5.   THE *AD HOC COMMITTEE* IS OBLIGED TO SUSPEND ENFORCEMENT OF THE AWARD PURSUANT TO ARTICLE 54 OF THE ICSID ARBITRATION RULES

43. The Commission would like to bring the following part of the Commission Decision SA.40348 of 10 November 2017[14] to the attention of the Arbitration Tribunal:

> "The Commission recalls that any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme by the notified scheme would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorise the granting of State aid. That is an exclusive competence of the Commission. If they award compensation, such as in *Eiser* v *Spain*, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation."

44. This finding is binding on the *Ad Hoc Committee*, because it forms part of Union law, and hence of the law applicable by the *Ad Hoc Committee*. Furthermore, it has not been challenged by *Eiser* in the Union Courts, and hence has become definitive.

---

http://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf, recitals 159 to 164.

[14]   Commission Decision SA.40348 of 10 November 2017, summary published in the *Official Journal of the European Union*, OJ C 442, 22.12.2017, p. 1 (accessible on-line via the EUR-Lex website: see http://eur-lex.europa.eu/homepage.html?locale=en), whereas the full text was published at

45. Prior to paying the Award, Spain hence has to comply with its obligation following from Commission Decision SA.40348, and has to notify the Award to the Commission, so that the Commission can assess the compatibility, or lack thereof, of the State aid granted by the Award with the internal market, pursuant to Article 107(3) TFEU.

46. Article 108(3) TFEU provides (emphasis added by the Commission):

> "The Commission shall be informed, in sufficient time to enable it to submit its comments, of any plans to grant or alter aid. If it considers that any such plan is not compatible with the internal market having regard to Article 107, it shall without delay initiate the procedure provided for in paragraph 2. The Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision."

47. Again, Article 108(3) TFEU forms part of Union law, and hence part of the law applicable to the dispute before the *Ad Hoc Committee*, and is binding on the *Ad Hoc Committee* and both parties to the dispute before the *Ad Hoc Committee*. It puts an obligation under EU law on Spain not to pay the award (or take any preparatory steps, such as providing a guarantee that is automatically handed over to Eiser in case Spain loses the case before the *Ad Hoc Committee*) until the Commission has taken a final decision on the compatibility, or lack thereof, of payment of the Award by Spain.

48. The legal effect of Article 108(3) TFEU is hence that the Kingdom of Spain may not pay the award.[15] That is an obligation not only under Union law, but also under international law applicable between the parties.

49. As a result, if *Eiser* was to seek to enforce the Award, it would act in violation of its obligations under international law (as it currently does before the United States Courts), and if your *Ad Hoc Committee* was to refuse to grant an unconditional stay on enforcement of the Award, it would equally violated its obligations under international law.

---

http://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf, recitals 159 to 164.

[15] See also Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania — Arbitral award Micula v Romania of 11 December 2013 (notified under document C(2015) 2112) (Only the Romanian text is authentic) (Text with EEA relevance), OJ L 232, 4.9.2015, p. 43–70.

**6. FORM OF ORDER SOUGHT**

50. For the reasons set out above, the Commission respectfully requests the *Ad Hoc* Committee to:

i) grant the Commission leave to intervene in the present proceedings;

ii) set a deadline for the Commission to file a written *amicus curiae* submission on the two points of law mentioned above;

iii) allow the Commission access to the documents filed in the case, to the extent necessary for its intervention in the proceedings;

iv) allow the Commission to attend hearings in order to present oral argument and reply to questions of the *Ad Hoc* Committee at those hearings, should the *Ad Hoc* Committee and the parties deem that useful.

Steven NOË        Petra NEMECKOVA        Tim MAXIAN RUSCHE

Agents of the Commission

# HARWOOD EXHIBIT 2

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

**Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l.**
Respondent on Annulment

**v.**

**Kingdom of Spain**
Applicant on Annulment

**(ICSID Case No. ARB/13/36) – Annulment Proceeding**

## PROCEDURAL ORDER No. 3

*Members of the Committee*
Mr. Ricardo Ramírez Hernández, President of the Committee
Mr. Makhdoom Ali Khan, Member of the Committee
Judge Dominique Hascher, Member of the Committee

*Secretary of the Committee*
Mr. Paul Jean Le Cannu

October 11, 2018

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*
(ICSID Case No. ARB/13/36) – Annulment Proceeding
**Procedural Order No. 3**

## I.  PROCEDURAL HISTORY

1.  On July 19, 2018, the ICSID Secretariat received an Application for leave to intervene as a non-disputing party by the European Commission (the "**Application for leave**"). In its Application for leave, the European Commission (the "**Commission**" or "**EC**") requested the *ad hoc* Committee to: i) grant the Commission leave to intervene in the proceedings, ii) set a deadline for the Commission to file a written *amicus curiae* submission on two points of law, iii) allow the Commission access to the documents filed in the case, to the extent necessary for its intervention in the proceedings, and iv) allow the Commission to attend hearings in order to present oral arguments and reply to questions of the *ad hoc* Committee at those hearings, should the *ad hoc* Committee and the Parties deem that useful.[1]

2.  The Commission based its request on Rule 53 and Rule 37(2) of the ICSID Arbitration Rules. In addition, the Commission pointed out that Article 29(2) of Council Regulation (EU) 2015/1589 of July 13, 2015 forms "part of the applicable law for the proceedings pending before the [*ad hoc*] Committee",[2] it recognizes its significant interest and provides further support for its request.[3]

3.  Regarding the scope of its intervention, it considers that the Tribunal manifestly exceeded its powers and seriously departed from a fundamental rule of procedure for three reasons: i) because it lacked jurisdiction to hear the case and failed to state reasons, ii) because it failed to apply European Union ("**EU**") law on State aid, and in particular the standing case-law of the Court of Justice of the European Union on the (exclusion of) legitimate expectations in case of unlawful State aid, and iii) the Tribunal has seriously departed from a fundamental rule of procedure by requiring a commitment from the Commission to pay costs, and, as a result, refusing the Commission's *amicus curiae* submission.[4]

4.  As to its first argument, the Commission contends that by not declining jurisdiction and not addressing at all the most problematic aspects of intra-EU investor-State arbitration under the Energy Charter Treaty, the Tribunal manifestly exceeded its powers and failed to state reasons.[5] Regarding its second argument, the Commission contends that under EU law any legitimate expectations of the Claimants were precluded.[6] Therefore, the fact that the Tribunal did not discuss State aid obligations under EU law as a matter of law or as part of the relevant facts, constitutes both a violation of Article 52(b) ICSID Convention and Article 52(e) ICSID Convention.[7] Concerning its third argument, the Commission states there is no legal basis in the ICSID Arbitration Rules for requiring a commitment to bear the costs of the other parties as a precondition. Thus, requiring such commitment, disregarding its *amicus curiae*

---

[1] Application for leave, para. 50.
[2] Application for leave, para. 10.
[3] Application for leave, paras. 4, 9, 10.
[4] Application for leave, paras. 13-38.
[5] Application for leave, para. 26.
[6] Application for leave, paras. 27, 28.
[7] Application for leave, para. 32.

## Procedural Order No. 3

submission on that basis, and not providing any reasons for following a divergent view, constitutes a violation of Article 52(d) ICSID Convention and Article 52(e) ICSID Convention. [8] The Commission alleges a particular interest in the present proceedings since it "has a central role in the interpretation and application of rules relating to investment protection within the Union [...]" as well as a "central role in the application of the system of control of State aid [...]."[9]

5.  Finally, it argues that Spain is under an obligation "not to pay the award"[10] until the Commission has taken a final decision on the compatibility of such payment and considers that if the Committee "was to refuse to grant an unconditional stay on enforcement of the Award, it would equally violate[] its obligations under international law."[11]

6.  On July 24, 2018, the Secretary of the *ad hoc* Committee invited the Parties to submit observations on the Application for leave.

7.  On August 7, 2018, the Kingdom of Spain ("**Spain**" or the "**Applicant**") submitted observations on the Application for leave (the "**Applicant's observations**"). On that same date, Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l ("**Eiser**", "**Eiser Parties**" or the "**Claimants**") provided its observations on the Application for leave (the "**Claimants' observations**").

## II.  POSITION OF THE PARTIES

### A.  The Applicant's Position

8.  In its observations, Spain alleges that the Committee may allow an entity that is not a party to the dispute to file a written submission regarding a matter with the scope of the dispute according to Rule 37 of the ICSID Arbitration Rules, which applies *mutatis mutandis* to the present proceeding. Spain argues that "the European Union's 'state aid' rules apply to any measure by a Member State that 'distorts or threatens to distort competition by favouring certain undertakings' and which may be 'incompatible with the internal market' of the European Union"[12] and the Commission has already stated that the *Eiser* Award constitutes notifiable "state aid" although it has not yet made a determination as to whether it is "incompatible" with the internal market.[13]

9.  According to Spain, since the Eiser Parties have disputed Spain's submissions regarding the potential conflict between the *Eiser* Award and EU law, a submission directly from the Commission "would provide the Committee with an authoritative 'perspective, particular knowledge or insight' other than that of either the Eiser Parties or Spain, which could facilitate

---

[8] Application for leave, paras. 33-38.
[9] Application for leave, para. 39.
[10] Application for leave, para. 47 (emphasis in original).
[11] Application for leave, para. 49. *See also* paras. 43-48.
[12] Applicant's observations, p. 2.
[13] Applicant's observations, pp. 1, 2.

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*
(ICSID Case No. ARB/13/36) – Annulment Proceeding

**Procedural Order No. 3**

its determination of this issue."[14] Additionally, Spain argues that the rejection of multiple requests of the Commission to make an *amicus curiae* submission is one of the grounds for annulment and the Committee will have the benefit of the Commission's perspective.[15]

10. Spain points that there is no risk that the submission would disrupt the proceeding or create undue burden or prejudice in terms of Rule 37 of the ICSID Arbitration Rules and, considering the timing of the Commission's Application for leave, "there is ample opportunity for both parties to review and present their observations and for the Committee to give the EC's submission due consideration."[16] Consequently, in Spain's view, the Commission "should be allowed to file an *amicus curiae* submission" and "be granted access to the parties' pleadings in this proceeding, as well as to attend the hearing to be held in January 2019."[17]

**B.    Eiser's Position**

11. In its observations, Eiser requests the Committee to reject the Commission's Application for leave as procedurally improper and/or because it fails to meet the requirements of ICSID Arbitration Rule 37(2). Alternatively, it requests the Committee that: i) the submission be limited to the issue of whether the *Eiser* Tribunal committed an annullable error by requiring the Commission to provide a cost undertaking as a condition to making a non-disputing party submission; ii) the Commission file its submission within 10 days from the decision of the Committee on the Application for leave; iii) the Commission's submission not exceed five pages in length including footnotes; iv) the Commission not be granted access to the documents filed in the case; v) the Commission not be granted permission to attend the annulment hearing; vi) as a condition for filing its submission and prior to any response being filed by the Parties, the Commission shall provide copies of all correspondence (including emails) between it and Spain in relation to the Award; vii) as a condition for filing a submission and prior to any consideration of that submission by the Committee, the Commission provide a written undertaking, satisfactory to the Committee, not to take any steps to undermine the Award or prevent Spain from paying the Award in full; and viii) the Parties be allowed to submit their observations on the Commission's non-disputing party submissions within 30 days of the Commission's submission.[18]

12. Eiser contends that the Commission fails to cite fully the cumulative criteria that the Committee must consider in deciding the Commission's Application for leave and it fails to demonstrate that the criteria are satisfied. In its view, the Application for leave does not attempt to demonstrate how the mandatory criteria are satisfied. Also, since the Commission's Application for leave goes to the substance of its position rather than establishing that the criteria under Rule 37 are satisfied, it should be disregarded.[19] Eiser identified ICSID

---

[14] Applicant's observations, p. 2.
[15] Applicant's observations, pp. 2-3.
[16] Applicant's observations, p. 3.
[17] Applicant's observations, p. 3.
[18] Claimants' observations, para. 7.1.
[19] Claimants' observations, paras. 1.5, 1.6, 2.6, 2.7.

### Procedural Order No. 3

Arbitration Rule 37 as the only relevant legal standard for the consideration of the Application for leave. Therefore, it contends that the Commission's reliance on secondary EU legislation is inapposite and that the Committee is not bound to apply EU law.[20]

13. Eiser argues that the Commission's Application for leave fails under Rule 37(2) because it identified two issues that are not in dispute before the Committee. First, "the *Eiser* Tribunal's alleged failure to 'decline[] jurisdiction' by allegedly ignoring 'the most problematic aspects of intra-EU investor-State arbitration under the Energy Charter Treaty.'"[21] Second, "the *Eiser* Tribunal's alleged 'fail[ure] to apply Union law on State aid especially, and in particular the standing case-law of the Court of Justice of the European Union on the (exclusion of) legitimate expectations in case of unlawful State aid.'"[22] However, it claims neither of those issues were raised by Spain as grounds for annulment and are not issues in dispute before the Committee. Additionally, Eiser contends that the Commission's submissions on the Committee's "obligation" to stay enforcement of the *Eiser v. Spain* award are improper and that it has no standing to make independent allegations for the annulment of the Award.[23]

14. In its observations, Eiser states that the refusal to allow the Commission to intervene without providing a cost undertaking is the only issue addressed by the Commission within the scope of the dispute, however, the Commission fails to establish that it can offer a perspective that the Parties are unable to offer as is required by Rule 37(2), thus it must be rejected. Moreover, its views are identical to Spain's and it has failed to inform the Committee of the fact that it has, in other cases, provided the very cost undertaking required by the *Eiser* Tribunal.[24]

15. Eiser continues to argue that the Commission has failed to establish that it has a significant interest in the proceeding, the Commission's argument is "premised on the flawed assumption that 'Union law on State aid plays a decisive role in the annulment proceedings'",[25] however the Committee "has no mandate to apply anything other than the provisions of the ICSID Convention and Arbitration Rules."[26] Moreover, in its view, the Commission is not seeking to intervene to assist this Committee by offering a different insight, or perspective on the issues in dispute. Instead, the Commission is seeking to act as a party, seeking annulment of the Award.[27]

16. Granting the Application for leave would in Eiser's view disrupt the proceedings and unduly burden and unfairly prejudice the Eiser Parties. It "would create a new procedural step, with the resulting detrimental impact on time and costs."[28] Eiser considers that the Commission "is also seeking to 'take sides' by putting forward arguments that would support Spain's position

---

[20] Claimants' observations, paras. 2.2, 2.3.
[21] Claimants' observations, para. 2.10.
[22] Claimants' observations, para. 2.11.
[23] Claimants' observations, paras. 1.7, 2.10-2.13.
[24] Claimants' observations, paras. 1.8, 2.15, 2.16, 2.20.
[25] Claimants' observations, para. 2.22.
[26] Claimants' observations, para. 2.24. *See also* paras. 2.22-2.25.
[27] Claimants' observations, paras. 1.9, 3.4.
[28] Claimants' observations, para. 4.2.

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*
(ICSID Case No. ARB/13/36) – Annulment Proceeding

**Procedural Order No. 3**

in the annulment to the detriment of the Claimants' case",[29] therefore, this would result in procedural inequality.[30]

17. Eiser indicates that if the Committee is minded to allow the Commission to make a written non-disputing party submission, it must impose certain restrictions on the Commission's participation "so that it does not unduly burden the Eiser Parties or the proceedings."[31] It must limit the Commission's submission to addressing the one issue it has identified that is within the scope of the dispute and the Committee should limit the submission to five pages and require that it be filed within 10 days of the Committee's decision. Eiser further requests that the Commission's submission should be made on a conditional basis. First, it should be required to provide an undertaking that it will promptly provide the Claimants and the Committee with copies of all correspondence (including emails) between it and Spain in relation to the Award. Second, the Commission should be required to provide an undertaking that it will not seek to prevent Spain from honouring its ICSID Convention obligations to satisfy the Award. [32]

18. Finally, Eiser does not consent to the Commission being granted access to the documents filed in this Proceeding nor do they consent to the Commission's attendance at the oral hearing, thus in terms Rule 32(2) the Committee must reject the Commission's requests. Eiser also considers the Commission's submissions on the application to stay the enforcement of the Award should be disregarded.[33]

## III.    THE COMMITTEE'S ANALYSIS

19. The arbitration procedure concerns the parties involved in a dispute. However, Arbitration Rule 37(2) provides a non-disputing party with the possibility to file a written submission:

> After consulting both parties, the Tribunal **may allow** a person or entity that is not a party to the dispute (in this Rule called the "non-disputing party") **to file a written submission** with the Tribunal **regarding a matter within the scope of the dispute**. In determining whether to allow such a filing, the Tribunal **shall consider**, among other things, the extent to which:

> (a) the non-disputing party submission **would assist the Tribunal** in the determination of a factual or legal issue related to the proceeding **by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties**;

---

[29] Claimants' observations, para. 4.3.
[30] Claimants' observations, paras. 4.1-4.3.
[31] Claimants' observations, para. 1.10.
[32] Claimants' observations, paras. 1.10, 1.11, 5.1, 5.2, 5.4, 5.8-5.10.
[33] Claimants' observations, paras. 1.12, 5.2, 5.4-5.7.

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*
(ICSID Case No. ARB/13/36) – Annulment Proceeding

**Procedural Order No. 3**

> (b) the non-disputing party submission would address a **matter within the scope of the dispute**;
>
> (c) the non-disputing party has a **significant interest** in the proceeding.
>
> The Tribunal **shall ensure** that the non-disputing party submission **does not disrupt the proceeding or unduly burden or unfairly prejudice either party**, and that both parties are given an opportunity to present their observations on the non-disputing party submission. (Emphasis added.)

20. Furthermore, ICSID Arbitration Rule 53 establishes that "[t]he provisions of these Rules shall apply *mutatis mutandis* to any procedure relating to the interpretation, revision or annulment of an award and to the decision of the Tribunal or Committee." Therefore, we begin our analysis with the text of ICSID Arbitration Rule 37(2). The language used in this provision makes clear that the decision to allow a non-disputing party to file a written submission is *discretionary*:

> The role of an *amicus curiae* is to provide *assistance to a tribunal* that it would not otherwise have from the disputing parties before it. A third and non-disputing party offers its help to the tribunal about a specific matter that is in dispute before the tribunal (from a particular perspective, with particular knowledge or with a particular insight that is different from that of the disputing parties) and the tribunal ***"may allow"*** a written submission regarding that specific matter […] *The tribunal has a margin of appreciation to determine whether a particular applicant is able to assist it or not, according to the terms of Art. 37 of the Rules.*[34]

21. The first sentence of paragraph (2) also provides a requirement regarding the submission that may be allowed, which is, it must be limited to "a matter within the scope of the dispute." Additionally, it provides for certain elements that the Committee must consider mandatorily in its decision-making process. *First*, the *extent* to which such submission *would assist* the Committee in the determination of *a factual or legal issue* related to the proceeding by bringing a perspective, particular knowledge or insight that is *different from that of the disputing parties*. *Second*, the extent to which it would *address* a *matter within the scope of the dispute*. *Third*, the extent to which the non-disputing party has a *significant interest* in the proceeding.

22. The text "shall consider, among other things" in paragraph (2) connotes that these elements do not constitute an exhaustive list. This seems to be confirmed by the last paragraph of Arbitration Rule 37, according to which the Committee "shall ensure" that such submission

---

[34] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain* ("*RREEF v. Spain*"), ICSID Case No. ARB/13/30, Procedural Order No. 7, January 14, 2016, para. 12 (CL-0310) (emphasis added).

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*
(ICSID Case No. ARB/13/36) – Annulment Proceeding

**Procedural Order No. 3**

"does not disrupt the proceeding or unduly burden or unfairly prejudice either party, and that both parties are given an opportunity to present their observations." Both of these elements address due process for the parties.

23. The elements set out through subparagraphs a) to c) do not incorporate the disjunctive connector "or." This indicates that those are cumulative elements, all of which must be considered by the Committee. We find support for our interpretation in the views expressed by the *RREEF v. Spain* Tribunal regarding the conditions set forth by Arbitration Rule 37(2). We note that in *RREEF v. Spain,* the Tribunal agreed that the Applicant had not attempted to demonstrate it met the three *cumulative conditions* that had to be considered according to Rule 37(2):

> *The Tribunal shares the Claimants' view that* the Applicant "has made no attempt at demonstrating that it meets any of the *three cumulative conditions* that the Tribunal must consider according to Rule 37." The Claimants are right. In abstaining from addressing *those obligatory factors*, the European Commission has deprived both the disputing parties and the Tribunal of any possibility to discuss them in full knowledge. This is a *fatal failure* on the part of the Applicant that cannot be remedied by the Parties or the Tribunal guessing what the Applicant might or might not have set out, had it cared to do so.[35]

24. Furthermore, the Tribunal was concerned that the application submitted in that case "[did] not attempt to address the three conditions set out in Rule 37" observing that: "[t]he European Commission has correctly stated the requirement that rests on an applicant under Rule 37(2) but then, having stated what it must to, it does not do it."[36]

25. However, as already mentioned, the Committee must also make sure that the submission does not disrupt the proceeding *or* unduly burden *or* unfairly prejudice either Party. The use of the connector "or" indicates the Committee's obligation to ensure the submission either does not disrupt the proceeding or unduly burdens or unfairly prejudices; on the other hand, the word "and" indicates the Committee's obligation to ensure that both parties have an opportunity to present their observations. Finally, the Committee notes that this article only provides for the opportunity to file a "written submission" and does not envisage other rights. This *ad hoc* Committee notes that, in light of the discretion granted by Arbitration Rule 37(2) and the consideration of its terms, the Commission has been allowed to participate as non-disputing party in other procedures.[37] In *Micula v. Romania*, the Committee noted its "authority to permit a non-disputing party to file a written submission in the context of the annulment proceeding"

---

[35] *RREEF v. Spain*, ICSID Case No. ARB/13/30, Procedural Order No. 2, February 5, 2015, para. 30 (CL-0309) (emphasis added).
[36] *RREEF v. Spain,* ICSID Case No. ARB/13/30, Procedural Order No. 2, February 5, 2015, para. 29 (CL-0309).
[37] *Electrabel S.A v. Hungary* ("*Electrabel v. Hungary*"), ICSID Case No. ARB/07/19, Award, November 25, 2015, para. 22 (CL-0275), and *Ioan Micula, Viorel Micula and Others v. Romania* ("*Micula v. Romania*"), ICSID Case No. ARB/05/20, Decision on Annulment, February 26, 2016, para. 61 (CL-0249).

and the criteria to be met on: i) the subject matter of the application, ii) the applicant and iii) procedural fairness.[38] Moreover, it noted that "due to the limited scope of annulment proceedings, a request for leave by a non-disputing party must be dealt with in a more restrictive and circumscribed manner."[39] In that case, the Committee also observed the different role of the Commission in the annulment proceeding, which was limited to "its knowledge and perspective directly related to the grounds for annulment."[40]

### A.    Whether the Application for leave fulfills the elements of subparagraphs a) to c) of ICSID Arbitration Rule 37(2)

26. The Commission addresses three main arguments in support of its Application for leave. Particularly, those arguments aim to show "why the conditions set out in Rule 37(2)(a) and (b) of the ICSID Arbitration Rules are met."[41] In a separate section, the Commission addresses its interest in the proceedings.[42] The Committee will examine these three arguments and whether they meet the elements that must be considered in accordance with Rule 37(2).

27. The first argument is that the *Eiser* Tribunal manifestly exceeded its powers because it lacked jurisdiction to hear the case. The second argument is that the Tribunal manifestly exceeded its powers with regard to the applicable law because it failed to apply EU law on State aid. The third argument is that the Tribunal has seriously departed from a fundamental rule of procedure by requiring a commitment from the Commission to pay costs.[43]

28. The first two arguments are based on the grounds of annulment b) and e) of Article 52 of ICSID Convention. The Commission states that the Tribunal should have interpreted Article 26 of the Energy Charter Treaty as not containing an offer for arbitration; it mentions that the conflict between such provision and the general principles of EU law of autonomy and other EU law provisions would have to be decided in favor of the latter; it states that by not declining jurisdiction and by not applying EU law on State aid, the Tribunal exceeded its powers and failed to state reasons.[44]

29. The Committee considers that, in strict sense, those issues do not address a matter within the scope of the dispute. Whilst Spain's Application for Annulment mentions as grounds that the Tribunal manifestly exceeded its powers and failed to state reasons, the specific arguments addressed by the Commission in its Application for leave were not raised by Spain as grounds

---

[38] "The Committee noted that, in line with *Vivendi v. Argentina*, three criteria must be met to allow a non-disputing party to participate in the proceedings: (i) the subject matter of the application must be appropriate; (ii) the applicant must be suitable to act as *amicus curiae*; and (iii) procedural fairness must be respected." *Micula v. Romania*, para. 62 (CL-0249).
[39] *Micula v. Romania,* para. 63 (CL-0249).
[40] *Id.*
[41] Application for leave, para. 5.
[42] Application for leave, paras. 39-42.
[43] Application for leave, paras. 14-38.
[44] Application for leave, paras. 22, 23, 26, 28-32.

for annulment.[45] Consequently, the Committee fails to see how those specific arguments would assist the Committee in its determination as to the grounds of annulment put forward by Spain under Article 52(1)(b) and (c), and address a matter within the scope of the dispute, regardless of the fact that the Commission may have a significant interest on those matters.

30. The third argument raised by the Commission is that the Tribunal has seriously departed from a fundamental rule of procedure by requiring a commitment from the Commission to pay costs and refusing the Commission's *amicus curiae* submission. The Committee considers that a written submission by the Commission on this issue may assist in the determination of a factual or legal issue related to the proceeding, as provided in subparagraph a), since it would address a ground of annulment raised by Spain. In its Application for Annulment, Spain argues that:

> *The Tribunal had required, as a condition of submission*, that the EC provide an *undertaking* to reimburse the "additional costs of legal representation reasonably incurred by the parties in responding to that submission," which the EC declined. *This denied Spain the benefit of the EC's intervention, which would have provided the Tribunal with authoritative clarification and confirmation of Spain's obligations as a member State of the European Union in regard to the matters at issue in the case*.[46]

31. In its Application for leave, the Commission asserts that "there is no legal basis in the ICSID arbitration rules for requiring such a commitment" and that "[t]he Tribunal has never provided a reasoned justification for a divergent view, but has simply ignored the arguments put forward by the Commission." Additionally, it states that "that procedural irregularity has also had an impact on substance, as it prevented the Commission from setting out its view on the matter of jurisdiction and Union State aid law to the Tribunal."[47]

32. While the views of the Commission may concur with the views expressed by Spain, the Commission could nonetheless provide a particular insight as an institution of the European Union on whether such request and refusal constitute a ground for annulment.

33. For the same reason, this issue would fall as "a matter within the scope of the dispute" as provided by subparagraph b).

34. Regarding subparagraph c), the Application for leave indicates that the Commission has a significant interest in the proceeding. In its Application for leave, the Commission argues that such "irregularity […] prevented the Commission from setting out its view on the matter of jurisdiction", that it has a "central role in the interpretation and application of rules relating to

---

[45] Application for annulment, paras. 32-40, 41-50.
[46] Application for Annulment, para. 58 (emphasis added).
[47] Application for leave, paras. 34, 35, 38.

Case 1:18-cv-01686-CKK   Document 16-3   Filed 12/14/18   Page 26 of 74

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*
(ICSID Case No. ARB/13/36) – Annulment Proceeding

**Procedural Order No. 3**

investment protection" and in the "application of the system of control of State aid."[48] Overall, the Commission considers that:

> In order to avoid further open conflict between investment arbitration and Union law, the Commission would appreciate the opportunity to set out in detail its reasoning before the [*ad hoc*] Committee, so as to enable your [*ad hoc*] Committee to assess the Award contested before it in the light of all relevant legal arguments.[49]

35. The Committee considers that the Commission has indicated a significant interest in this procedure. Consequently, it would be appropriate to receive a submission from the Commission on whether the Tribunal *seriously departed from a fundamental rule of procedure by requiring a commitment from the Commission to pay costs and refusing the Commission's amicus curiae submission*. The Committee concedes that the Commission's view on this ground of annulment could intertwine with the substantive issues on jurisdiction and EU State aid law, which the Commission has indicated it considers were affected as a result of a procedural irregularity. Therefore, the Committee considers such issues could be addressed to the extent that they relate to its view on whether there has been a serious departure from a fundamental rule of procedure.

36. According to Arbitration Rule 37(2), the Committee shall ensure that the non-disputing party submission *does not disrupt the proceeding or unduly burden or unfairly prejudice either party*. The Committee is of the view that allowing a written submission by the Commission would not disrupt the procedure, or unduly burden or unfairly prejudice either Party. While this may involve an additional step in the process, the Eiser Parties' Rejoinder is due on October 29 and the hearing will be held on March 2019. Therefore, the Committee considers there is sufficient time for the Commission to submit a written submission and for both parties to present their observations without disrupting the procedure or representing an unduly burden. In order not to disrupt the filing of the Eiser Parties' Rejoinder, the Committee considers that the appropriate time for the Commission's submission is November 12, 2018. In addition, in the interest of not putting an undue burden on the Parties making comments to the submission, the Committee considers a page limit of 30 pages should be set. Finally, since the participation of the Commission as non-disputing Party will be limited to only that submission, the Committee finds no justification to conditioning its filing to the provision of copies of the correspondence between the Commission and Spain in relation to the *Eiser* Award or a written undertaking not to take steps to undermine the award.

37. Regarding the Commission's request to have access to the documents filed in the case and attend the hearings, the Committee finds no legal basis to allow that under the ICSID Arbitration Rules agreed by the Parties. Moreover, Rule 37(2) is clear as to the extent of the

---

[48] Application for leave, paras. 38, 39.
[49] Application for leave, para. 41.

participation of a non-disputing party, which is limited to *filing a written submission*. As the Tribunal in *Philip Morris v. Uruguay* observed:

> Acceptance of a submission shall confer to the petitioner neither the status of a party to the arbitration proceeding nor the right to access the file of the case or to attend hearings. The need to safeguard the integrity of the arbitral process requires in fact that no procedural rights or privileges of any kind be granted to the non-disputing parties.[50]

38. Finally, Rule 32(2) provides that the Tribunal may allow other persons to attend or observe all or part of the hearings, *unless either party objects*. In this case, the Eiser Parties have objected to the Commission's participation in the hearing. Therefore, the Committee rejects the Commission's requests in this regard.

## B.   Whether the *ad hoc* Committee has an Obligation to Suspend Enforcement of the Award

39. The Commission included in its Application for leave several assertions regarding the stay of enforcement. In its Application for leave, the Commission states that "if your [*ad hoc*] Committee was to refuse to grant an unconditional stay on enforcement of the Award, it would equally violate[] its obligations under international law."[51] The Commission presents its view that the Committee is "obliged to suspend enforcement of the award" pursuant to Arbitration Rule 54. The Committee observes that, within the context of a stay of enforcement, the provisions governing an application in that regard confer rights to the Parties. Non-disputing parties are not authorized by the ICSID Arbitration Rules to apply for such stay and their participation is limited to a matter within the scope of the dispute subject to the requirements already addressed. The Committee's reasoning for refusing to grant the stay is set out in the Decision on the Stay of Enforcement of the Award pursuant to Article 52(5) of the ICSID Convention issued on March 23, 2018. Therefore, this is a matter in which the Commission's views would not assist the Tribunal and would not need to be further addressed in its submission.

## IV.   DECISION

40. In view of the above, the Committee hereby:

   a.   Allows the Commission to file a written submission as a non-disputing party, in accordance with Arbitration Rule 37(2), on whether the Tribunal *seriously departed from a*

---

[50] *Philip Morris Brand Sàrl (Switzerland), Philip Morris Products S.A. (Switzerland) and Abal Hermanos S.A. (Uruguay) v. Oriental Republic of Uruguay* ("*Philip Morris v. Uruguay*"), ICSID Case No. ARB/10/7, Procedural Order No. 3, February 17, 2015, para. 22 (CL-0285).
[51] Application for leave, para. 49 (emphasis omitted).

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*
(ICSID Case No. ARB/13/36) – Annulment Proceeding

**Procedural Order No. 3**

> *fundamental rule of procedure by requiring a commitment from the Commission to pay costs and refusing the Commission's amicus curiae submission*;

b. Decides that the Commission shall file its written submission on Monday, November 12, 2018; the submission shall be limited to 30 pages;

c. Rejects the Commission's request to have access to the documents filed in the case and rejects its request to attend the hearing;

d. Rejects the Eiser Parties' request to condition the filing of the Commission's written submission to the provision of copies of all correspondence or a written undertaking;

e. Authorizes both disputing parties to present their views to the Commission's written submission no later than Wednesday, December 12, 2018; and

f. Decides that this Procedural Order shall be communicated to the Commission for its exclusive use in this annulment proceeding.

On behalf of the Committee,

_____
Ricardo Ramírez Hernández
President of the Committee

12

# HARWOOD EXHIBIT 3

 EUROPEAN COMMISSION

Brussels, 12 November 2018
sj.c(2018)

TO THE PRESIDENT AND MEMBERS OF THE
*AD HOC* COMMITTEE

Prof. Ricardo RAMÍREZ HERNÁNDEZ, President

Judge Dominique HASCHER, Member

Makhdoom Ali KHAN, Member


Secretary of the Committee

Mr. Paul Jean Le Cannu


*Amicus Curiae* **submission**


submitted by the **European Commission**, represented by Steven NOË,
Petra NEMECKOVA and Tim MAXIAN RUSCHE, members of its Legal
Service, as agents, Rue de la Loi 200, B-1049 Brussels, who consent to
service by e-mail via steven.noe@ec.europa.eu ,
petra.nemeckova@ec.europa.eu and tim.rusche@ec.europa.eu.

**In ICSID Case No. ARB/13/36 – Annulment Proceeding**

**EISER**
(Respondents on Annulment) (Claimant)

**v.**

**KINGDOM OF SPAIN**
(Applicant on Annulment) (Respondent)

## 1. INTRODUCTION

1. The Commission expresses its gratitude to the *Ad Hoc* Committee for granting it leave to intervene.

2. As decided by the *Ad Hoc* Committee in Procedural Order No. 3, this brief is limited to setting out arguments "*on whether the Tribunal seriously departed from a fundamental rule of procedure by requiring a commitment from the Commission to pay costs and refusing the Commission's amicus curiae submission*".[1] The Commission has also taken note that "*[t]he Committee concedes that the Commission's view on this ground of annulment could intertwine with the substantive issues on jurisdiction and EU State aid law, which the Commission has indicated it considers were affected as a result of a procedural irregularity. Therefore, the Committee considers such issues could be addressed to the extent that they relate to its view on whether there has been a serious departure from a fundamental rule of procedure*".[2]

3. The Commission will first set out the relevant facts (**2.**) and the fundamental rules of procedure from which the Arbitral Tribunal has departed (**3.**). Against that background, the Commission will show why the requirement "*to pay the additional costs of legal representation reasonably incurred by the parties in responding to that submission*" imposed upon the Commission in Procedural Order No. 7 of the Arbitral Tribunal[3] and maintained in Procedural Order No. 8 of the Arbitral Tribunal,[4] despite a reasoned request by the Commission to alter Procedural Order No. 7,[5] constitutes a serious departure from those fundamental procedural rules (**4.**). In a final step, the Commission will demonstrate that, had the Arbitral Tribunal had at its disposal the *amicus curiae* submission of the Commission, it may have reached a different conclusion both on jurisdiction and on merits. This further underlines the seriousness of the Arbitral Tribunal's departure (**5.**).

---

[1] See Procedural Order No. 3, paragraphs 35 and 40(a).

[2] *Ibid.*, paragraph 35.

[3] **Annex EC-2**.

[4] **Annex EC-3**.

[5] **Annex EC-4**.

## 2.   DESCRIPTION OF THE RELEVANT FACTS[6]

4.   The Commission had sought leave to intervene as a non-disputing party in the proceedings before the Arbitral Tribunal leading to the Award that is contested before the *Ad Hoc* Committee ("contested Award").[7]

5.   By Procedural Order Nr. 7,[8] the Arbitral Tribunal admitted the Commission as non-disputing party. In that Procedural Order, the Arbitral Tribunal decided that the Commission fulfilled all conditions set out in ICSID Arbitration Rule 37(2). In application of ICSID Arbitration Rule Article 37(2) second sub-paragraph, the Arbitral Tribunal set a short deadline of ten days, ending on 31 December (and thus including the end of year holidays) for filing an *amicus curiae*[9] brief. Furthermore, it limited the length of the submission to 25 pages. These conditions were deemed necessary in order not to disrupt the proceedings (which were relatively far advanced when the Commission filed its request) and not to unduly burden or unfairly prejudice one party.

6.   In addition to those two measures (very short deadline and very limited number of pages), the Arbitral Tribunal requested, still on the same legal basis, "*[a]s a condition for filing a non-disputing party submission and prior to any consideration of that submission by the Tribunal […that] the Commission shall provide a written undertaking, satisfactory to the Tribunal, to pay the additional costs of legal representation reasonably incurred by the parties in responding to that submission*". This requirement will be referred to as "contested undertaking on costs".

7.   In a reasoned request to alter Procedural Order Nr. 7,[10] the Commission set out that the contested undertaking on costs lacked any legal foundation in either the applicable rules (i.e. the Energy Charter Treaty, the ICSID Convention and the ICSID Arbitration Rules) or general principles of international law (as expressed in

---

[6]   See also paragraphs 59 to 70 of the contested Award.

[7]   The request for leave to intervene is attached as **Annex EC-1**.

[8]   **Annex EC-2**.

[9]   The Commission is aware that the ICSID Arbitration Rules use the term "*non-disputing party",* rather than *amicus curiae.* However, the historical development leading to ICSID Arbitration Rule 37 shows that that rule is really about *amicus curiae.* Accordingly, in the practice of arbitral tribunals, both terms are used in an interchangeable manner.

[10]   **Annex EC-4**.

international or national procedural rules or precedent of international courts and arbitral tribunals or national courts). The Arbitral Tribunal, however, refused to alter Procedural Order Nr. 7 in Procedural Order No. 8.[11] It justified the contested undertaking on costs on the basis of the consideration that the Commission's request had been filed only after the parties had completed their exchange of memorials, and relatively shortly before the oral hearing.

8.   The Commission was not in a position to accept such a condition, as it would otherwise have violated its obligations under the European Union ("EU" or "Union") rules for executing the Union budget, which would not allow it to incur expenditures that lack a legal basis and hence are without a valid legal foundation.

9.   Therefore, it refused to provide the commitment.[12] As a result, the *amicus curiae* brief that had been filed by the Commission was destroyed, without entering the record of the proceedings.


**3.   FUNDAMENTAL RULES OF PROCEDURE FROM WHICH THE ARBITRAL TRIBUNAL HAS DEPARTED**

10.   The Arbitral Tribunal, in Procedural Order No. 8, identifies as legal basis for the contested undertaking on costs ICSID Arbitration Rule 37(2), and more precisely the beginning of the second sub-paragraph, which reads: "*The Tribunal shall ensure that the non-disputing party submission does not disrupt the proceeding or unduly burden or unfairly prejudice either party* […]".[13]

11.   ICSID Arbitration Rule 28 stipulates:

> "Rule 28
>
> Cost of Proceeding
>
> (1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:
>
> (a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;

---

[11]   **Annex EC-3**.

[12]   **Annex EC-5**.

[13]   **Annex EC-4**, paragraphs 9 to 14.

(b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.

(2) Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding."

12.  While there is significant authority to suggest that arbitral tribunals have discretion in their award for costs under the ICSID Convention, it is clear from the wording of Rule 28 that the provision a costs can only be made <u>between the parties</u> to the proceedings. An *amicus curiae* is not a party to the proceedings. The relevant, non-contested precedent in this regard are the Orders in Response to Transparency and *Amicus Curiae* Petition in *Suez and AWG* v *Argentina*:[14]

"An amicus curiae is, as the Latin words indicate, a "friend of the court," and is not a party to the proceeding. Its role in other forums and systems has traditionally been that of a <u>nonparty</u>, and the Tribunal believes that an amicus curiae in an ICSID proceeding would also be that of a <u>nonparty</u>. The traditional role of an amicus curiae in an adversary proceeding is to help the decision maker arrive at its decision by providing the decision maker with arguments, perspectives, and expertise that the litigating parties may not provide. In short, a request to act as amicus curiae is an offer of assistance – an offer that the decision maker is free to accept or reject. <u>An amicus curiae is</u> a volunteer, a friend of the court, <u>not a party</u>." (emphasis added)

13.  Tribunals constituted under the ICSID Convention have long adopted one of two approaches concerning the allocation of costs arising under disputes, namely:[15]

"(1) *"Pay your own way"*, whereby the parties share the costs of the proceedings and bear their own legal costs[16]; and

(2) the "*costs follow the event*" approach, under which the losing party bears the costs of the proceedings and the legal costs of the winning party[17]. Often, this is applied *pro rata* - according to the relative success of the parties. The costs of the

---

[14]   ARB/03/19, Order of 19 May 2005 (**Annex EC-6**), paragraph 13.

[15]   See, in detail, *Kateryna Bondar*, "Allocation of costs in investor-State and commercial arbitration: towards a harmonized approach", in: 32 Arbitration International (2016), pp. 45-58 (**Annex EC-7**), on pp. 47-53; *Christoph Schreuer*, The ICSID Convention. A Commentary, Commentary on Article 61 ICSID Convention (**Annex EC-8**), paragraphs 15 to 74.

[16]   E.g. *Nations Energy* v. *Panama*, ARB/06/19, Award of 24 November 2010.

[17]   E.g. *Spyridon Roussalis* v. *Romania*, ARB/06/1, Award of 7 December 2011.

winning party are not automatically shifted to the losing party; rather the tribunal will subtract those issues, claims or events on which the winning party is itself the loser."

14. In both those approaches and in line with ICSID Arbitration Rule 28, the costs are allocated <u>exclusively</u> between the <u>parties to the dispute</u>, rather than burdening any *amicus curiae* with all or part of these expenses. In fact, the Commission was unable to retrieve a single award or decision on costs rendered under the auspices of the ICSID Convention and outside the intra-EU arbitration context, where a non-disputing party was requested to provide the costs that would arise from its limited, single submission intervention.

15. Finally, ICSID Arbitration Rule 47(1)(i) provides that the award shall set out the reasons for the decision of the arbitral tribunal on each decision made in the award. This includes the obligation to provide reasoning for the allocation of costs.[18] A decision on costs can also form the object of annulment proceedings.[19]

**4.   THE CONTESTED UNDERTAKING ON COSTS CONSTITUTES A SERIOUS DEPARTURE FROM THOSE PROCEDURAL RULES, WHICH ARE FUNDAMENTAL**

**4.1.   Introduction**

16. In the Commission's view, the Arbitral Tribunal has seriously departed from a fundamental rule of procedure by requiring the contested undertaking on costs, and, as a result, refusing the Commission's *amicus curiae* submission.

17. There is, however, no legal basis in ICSID Arbitration Rules, or in the ICSID Convention or in general principles of international law, for requiring such a commitment.

18. The contested undertaking on costs also goes against the rules applicable in national legal systems, in particular the common law jurisdictions where the legal institute of the *amicus curiae* has its source, and for international courts and tribunals. Those converge on the principle that the *amicus curiae* pays its own costs, but not the costs of the parties related to its intervention, because it serves the Tribunal, by bringing a different angle and outside expertise to the proceedings.

---

[18]   *Christoph Schreuer*, The ICSID Convention. A Commentary, Commentary on Article 61 ICSID Convention (**Annex EC-8**), paragraphs 41 to 45 and 62 to 74.

[19]   *Ibid.*, paragraph 71

19.  The Commission will start by providing the necessary background on the role of *amicus curiae*. It is a fundamental principle of investment arbitration that *amicus curiae* interventions are admitted, in particular to enhance transparency and legitimacy of investment arbitration, which involves important matters of public interest (**4.2**). The Commission will then show that ICSID Arbitration Rule 37(2) is a fundamental rule of procedure, because it governs the *amicus curiae* in ICSID arbitration, and that neither that rule nor any other provision of the ICSID Convention or international law confers power upon an arbitration tribunal to make the acceptance of the *amicus curiae* brief conditional upon an undertaking such as the contested undertaking on costs (**4.3**). In that context, the rules applicable in national legal systems and for international courts and tribunals are of crucial importance, because the institution of *amicus curiae* has been incorporated into investment arbitration from other international courts and tribunals. Those rules confirm that the *amicus curiae* only bears its own costs. That shows, on the one hand, the fundamental nature of the rule and the seriousness of the departure from it. On the other hand, it also shows that the Arbitral Tribunal could not have found a legal basis in the international practice or a generally recognized principle (**4.4**). The Commission will conclude by recalling the considerations of judicial policy that militate strongly against the contested undertaking on costs (**4.5**).

### 4.2.  Background on *amicus curiae* submissions in general and on the Commission's request before the Arbitral Tribunal in particular

#### 4.2.1.  *The institute of the* amicus curiae: expertise, public interest and transparency

20.  Pursuant to ICSID Arbitration Rule 37(2), an arbitral tribunal may allow a third party (or non-disputing party) to file a written submission (or *amicus curiae* brief) regarding a matter within the scope of the dispute.

21.  The institution of *amicus curiae* has for a long time played an important role in common law jurisdictions. The role of the *amicus* has evolved over time.[20] Initially, the main consideration was the <u>expertise</u> of the *amicus*. In the words of the Arbitral Tribunal in *Suez and AWG* v *Argentina*, the *amicus* "*provid[es] the decision maker*

---

[20]   See, in detail, *Samuel Krislov*, "The Amicus Curiae Brief: From Friendship to Advocacy", in: The Yale Law Journal 73 (1963), pp. 694-715 (**Annex EC-9**); *David S. Clark*, "Use of the *Amicus Curiae* Brief in American Judicial Procedure in Comparative Perspective", in: RabelsZ 80 (2016), pp. 327-371 (**Annex EC-10**), the latter also including a description of the use of the institute in other, including civil law, jurisdictions.

*with arguments, perspectives, and expertise that the litigating parties may not provide*".[21] The institution of *amicus curiae* allows third parties to participate in proceedings by way of offering assistance to the court or tribunal. The *amicus curiae* may provide to the judges or arbitrators additional information or its expert scientific or technical knowledge, in particular when the specific issues are outside the judges' or arbitrators' areas of expertise.

22. Therefore, the *amicus curiae* can improve the quality of judgments, decisions and awards. The objective of *amicus curiae* briefs is thus that the tribunal and the parties benefit from the special knowledge or expertise of the third party and its perspective on the issues.

23. The second justification for admitting *amicus curiae* interventions has been to ensure that the decision-maker has full knowledge not only of the interests of the disputing parties, but also of the interests of all other entities that are potentially concerned, as well as the <u>general, common or public interest</u>.[22]

24. By definition, the *amicus curiae* is a "*friend of the court*". Its aim is to serve the court or tribunal by bringing a different angle and outside expertise to the proceedings, and to inform the decision maker about matters that may otherwise not come to its attention, or not in the same objective maimer.[23]

25. The institution of *amicus curiae* is today widely recognized not only in common law jurisdictions, but also in civil law jurisdictions.[24] Furthermore, it is a common feature before international courts and tribunals.[25] Indeed, it would seem that the institution was first transplanted from common law to international law, and then

---

[21]   See full quote above at paragraph 12.

[22]   See, for a comprehensive analysis of the case-law of arbitration tribunals, in particular the seminal decisions in *Methanex*, *UPS* and *Suez*, Alexis Mourre, "Are Amici Curiae the proper reponse to the public's concerns on   transparency in investment arbitration", in: The Law and Practice of International Courts and Tribunals 5 (2006), pp. 257-271 (**Annex EC-11**).

[23]   *Ibid.*, p. 269.

[24]   *Steven Kochevar*, "Amici Curiae in Civil Law Jurisdictions", in: The Yale Law Journal 122 (2013), pp. 1653-1669 (**Annex EC-12**); *David S. Clark*, "Use of the *Amicus Curiae* Brief in American Judicial Procedure in Comparative Perspective", in: RabelsZ 80 (2016), pp. 327-371 (**Annex EC-10**).

[25]   See for overviews: *Lance Bartholomeusz*, "The *Amicus Curiae* before International Courts and Tribunals", in: Non-State Actors and International Law 5 (2005), pp. 209-286 (**Annex EC-13**); *Luigi Crema*, "Testing *Amici Curiae* in International Law: Rules and Practice, in: The Italian Yearbook of International Law XXII (2012), pp. 91-132 (**Annex EC-14**).

diffused back on the national level in civil law jurisdictions.[26] In international law, the *amicus curiae* first appeared in WTO and human rights law, before arbitral tribunals, referring explicitly to those precedents, accepted *amicus curiae* briefs in investment arbitration.[27]

26. Today, *amicus curiae* briefs "*constitute an evolving global procedural norm*".[28] And, as will be shown in detail in section 4.4, one common feature of that evolving global procedural norm is that the *amicus* is, to use the words of the arbitral tribunal in *Suez and AWG* v *Argentina*, "*a volunteer*",[29] that is he pays his own expenditure (different from an expert, which is paid by the court/the parties), but he is not burdened with any other costs. This is intuitive, because, by definition, the *amicus curiae* is a "*friend of the court*" and cannot be a "*friend of the parties*" (or one of the parties). Its aim is to <u>serve</u> the court or tribunal, not a party.

### 4.2.2.   The Commission's request before the Arbitral Tribunal

27. The benefits of an *amicus curiae* brief in investment arbitration have been recently summarized as follows:[30]

> "First, [...] amicus curiae participation can promote a general interest in procedural openness and ensure that the broader public does not perceive the arbitration process as 'secretive' [...] There is a public interest in the enhancement of procedural legitimacy of investment arbitration by means of greater participation. [...]
>
> [Second], there may in fact be instances where third-party involvement actually serves both to improve the legal quality of the award and to assist in the systemic development of international investment law as a whole. As to the first point, in some cases parties to a proceeding may have a specific vested interest in not disclosing all the facts pertinent to the issues in dispute [footnote omitted]. For instance, in AES it is possible that neither Hungary nor the investor would have

---

[26]  *Steven Kochevar*, "Amici Curiae in Civil Law Jurisdictions", in: The Yale Law Journal 122 (2013), pp. 1653-1669 (**Annex EC-12**); *Anna Dolidze*, "Bridging Comparative and International Law: *Amicus Curiae* Participation as a Vertical Legal Transplant", in: The European Journal of International Law 26 (2016), pp. 851-880 (**Annex EC-15**).

[27]  ARB/03/19, Order of 19 May 2005 (**Annex EC-6**), paragraph 15, at the end.

[28]  *Steven Kochevar*, "Amici Curiae in Civil Law Jurisdictions", in: The Yale Law Journal 122 (2013), pp. 1653-1669 (**Annex EC-12**), p. 1669.

[29]  See above paragraph 12.

[30]  *Eugenia Levine*, "Amicus Curiae in International Investment Arbitration: The Implications of an Increase in Third-Party Participation", in: Berkeley Journal of International Law 29 (2011), pp. 200-224 (**Annex EC-16**).

an interest in emphasizing the fact that the contracts between them may violate the EC's restrictions on State aid [footnote omitted] The claimant would certainly not wish to emphasize that a contract may be based on an illegality, as this may impact their ability to claim damages. As for Hungary, the State may consider it detrimental to emphasize this issue as its primary defence, since its acknowledgement of engaging in State aid may give rise to further actions by the Commission within the EU sphere. In this regard, the Commission's involvement could potentially highlight relevant legal issues that may not otherwise have prominence."

28.  The example chosen – EU State aid law – is of particular importance also for the present case. The particular expertise of the Commission in this field – as well as on the interplay between EU law and international law and the question of jurisdiction – has been recognized by an important number of tribunals, including those established under the Energy Charter Treaty, such as the arbitral tribunal in *Electrabel* v *Hungary*, which noted:[31]

>"Albeit with hindsight, it is unfortunate that the European Commission could not play a more active role as a non-disputing party in this arbitration, given that […] the European Commission has much more than "a significant interest" in these arbitration proceedings".

29.  The Commission stresses that it did not seek to intervene in the Arbitral Tribunal in support of one of the parties or to vindicate rights of its own, but solely to assist the Arbitral Tribunal in deciding a dispute that raises fundamental questions of European Union law. Those questions are novel and pertinent. In this regard, and it is not only in the Commission's interest, but first and foremost in the interest of the disputing parties, the Arbitral Tribunal, the coherence of international law and the sound administration of justice that they are properly considered. A failure to consider the implications of European Union law in a context such as the one of the present dispute which concerns an investor of an EU Member State against another EU Member State, might affect the enforceability of a future award, expose the Respondent and the Claimant to procedures before the Commission and the Court of Justice of the European Union, and ultimately undermine the trust in and the legitimacy of investor-State arbitration.

30.  The Arbitral Tribunal has to exercise its discretion in determining whether the *amicus* is trustworthy and whether it is prejudicial to one of the parties in an unfair

---

[31]  *Electrabel* v Hungary, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012, part IV, paragraph 4.92, The Commission assumes that this text is already before the *Ad Hoc* Committee. Should you require a copy, the Commission will provide it immediately.

manner. In the present case, the Arbitral Tribunal had confirmed the trustworthiness and the absence of unfair prejudice.

31. This should come as no surprise, given the very peculiar role of the Commission:

32. The Commission has a central role in the interpretation and application of rules relating to investment protection within the Union. Those rules include in particular the so-called Four Freedoms that characterize the Union's Single Market,[32] but also the sector-specific legislation concerning energy, and in particular renewable electricity.

33. That central role derives, first, from its task as "*guardian of the Treaties*". Pursuant to Article 17 of the Treaty on European Union ("TEU"), the Commission is tasked with promoting the general interest of the European Union and taking appropriate initiatives to that end.. In that context, it has in particular the power to initiate infringement procedures pursuant to Articles 108, 258 and 260 of the Treaty on the Functioning of the European Union ("TFEU") against Member States that fail to comply with their obligations. That includes national judges that may have to hear the cases on recognition and enforcement of the contested Award.

34. Moreover, the Commission has a central role in the application of the system of control of State aid established in Articles 107 and 108 TFEU: it is entrusted with the task to keep systems of aid existing in Member States under constant review, and it has the exclusive competence for approving new aid that Member States intend to grant to undertakings. Union law on State aid plays a decisive role in the annulment proceedings and in particular the rules on State aid plays a decisive role in the annulment proceedings, particularly when the dispute concerns an investors of a EU Member State against another EU Member State.

35. The Commission Decision SA.40348 of 10 November 2017[33] contains clear language that arbitration tribunals, such as the *Eiser* Tribunal, lack competence to

---

[32]   See in detail Communication "*Protection of Intra-EU Investment*" of 19 July 2018, COM(2018)547 final, p. 3, **Annex EC-17**.

[33]   Commission Decision SA.40348 of 10 November 2017, summary published in the *Official Journal of the European Union*, OJ C 442, 22.12.2017, p. 1 (accessible on-line via the EUR-Lex website; see http://eur-lex.europa.eu/homepage.html?locale=en), whereas the full text was published at http://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf, recitals 159 to 164.

hear cases brought by EU investors, and that in any event, the measures taken by the Kingdom of Spain cannot violate the fair and equitable treatment standard.

36. That decision is part of Union law, and hence also part of the law applicable to the proceedings before this *Ad Hoc* Committee, which concerns an EU investor, and as such binding upon the *Ad Hoc* Committee.[34]

37. Before the Arbitration Tribunal, and as recognized by the Arbitration Tribunal, the Commission did not intervene in support of one of the parties, but rather solely for the purpose of assisting the Arbitral Tribunal in deciding the novel questions raised by the dispute regarding EU law. More specifically, the Arbitral Tribunal had held that the "*that the circumstances [regarding the application] here are sufficient to satisfy the three numbered factors listed in ICSID Arbitration Rule 37(2)*".[35] To recall, these are the following:

"Rule 37(2)

(a) the non-disputing party submission would assist the Tribunal in the determination of a factual or legal issue related to the proceeding by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties;

(b) the non-disputing party submission would address a matter within the scope of the dispute;

(c) the non-disputing party has a significant interest in the proceeding."

### 4.3.   Article 37(2) does not provide a legal basis for the contested undertaking on costs

38. ICSID Arbitration Rule 37(2) second sub-paragraph states that "*The Tribunal shall ensure that the non-disputing party submission does not disrupt the proceeding or unduly burden or unfairly prejudice either party [ …]*"

39. The Commission does not contest that the involvement of *amicus curiae* can increase the arbitration costs and can generate delays, and, in general, should not

---

[34]   See in detail below

[35]   Procedural Order No. 7.

overburden the process. The Commission is, in fact, mindful of the often extensive costs incurred in investor-State arbitration cases.

40. An arbitral tribunal may use procedural measures to reduce the costs and delays associated with handling *amicus* briefs. In line with arbitral practice and academic literature, such tools may involve: page limits, subject matter limits, temporal limits, and the tribunal may request potential *amici* to coordinate their efforts and submit a joint *amicus curiae* brief.[36]

41. In its Procedural Order No. 7, the Arbitral Tribunal set a strict deadline for the submission by the Commission of ten days after the transmission of the order, and a page limit of 25 pages maximum.

42. The temporal limit – the deadline of ten days – already significantly reduces the delay in the arbitration proceedings, limits the time and resources the *amicus* can spend preparing the brief, and thereby also limits the brief and arguments to which the disputing parties have to respond to. More importantly, thestrict time limit ensured that the procedural timetable agreed between the Arbitral Tribunal and the parties was not disrupted, and that the date of the hearing did not have to be changed.

43. The single submission direction and page limit imposed – 25 pages – has a similar effect. It reduces the amount of materials that the parties have to respond to and that the tribunal has to assess, which in turn leads to a minimization of the cost incurred by the parties through the non-disputing party, and equally keeps delays for the proceedings to a minimum. In addition, a page limit also has the indirect effect of limiting the subject matter that the *amicus curiae* can reasonably bring forward and in turn causes the *amicus* to narrow its submission to the most essential points it would like to make.

44. The further requirement for the contested undertaking on costs does not add anything of substance in this regard. The question of who pays the costs does not

---

[36] See *Fernando Dias Simoes*, "Friends with Benefits? Amicus Curiae in the TPP Investor-State Dispute Settlement Mechanism" in *J Chaisse et al* (eds), *Paradigm Shift in International Economic Law Rule-Making* (Springer 2017), p. 123 (**Annex EC-18**); *Christina Knahr*, "Transparency, Third Party Participation and Access to Documents in International Investment Arbitration" 23 (2007) Arbitration International, p. 327, 351-353 (**Annex EC-19**); *Mariel Dimsey*, 'Article 4 Submission by a third person' in *D Euler, M Gehrig and M Scherer* (eds), *Transparency in International Investment Arbitration* (Cambridge University Press), p. 19 (**Annex EC-20**).

have any impact on a possible disruption of the proceedings – that merely is a method  to fit the *amicus curiae* brief into the pre-existing schedule and to organise how much potentially new material the parties have to digest.

45. The question of undue prejudice or unfair burden equally is not affected by the contested undertaking on costs. Indeed, which party has to bear the additional costs incurred by the *amicus curiae* submission is purely a question of the method of cost allocation adopted by the Arbitral Tribunal, i.e. "*pay your own way*" or "*costs follow the event*" (see above paragraph 13).

46. This view is also confirmed by the relevant academic writing. For instance, *Thomas Ruthemeyer* concludes in his PhD thesis on the institution of *amicus curiae* in international investment law: "*It already seems questionable whether the arbitration rules provide for a legal basis, on which arbitral tribunals could base a decision requiring an* amicus curiae [*to pay the costs of the other parties ...*]". Furthermore, even *de lege ferenda*, he recommends not to introduce such a legal basis into arbitration rules.[37]

47. In any event, even if in theory the contested undertaking on costs could exceptionally have been based on ICSID Arbitration Rule 37(2) second sub-paragraph, *quod non*, the Arbitral Tribunal should have reasoned why the temporal and page limit were not sufficient in ensuring that the Commission's brief would not disrupt the proceedings or unduly burden or unfairly prejudice either party. There is no doubt that a tribunal has a large degree of discretion regarding the submission of amicus brief and setting the procedural limits for doing so. However, setting such a requirement in asking the *amicus curiae*, the Commission, to pay the additional costs incurred by the parties, the Arbitral Tribunal should have at the very least provided a reasoned justification.

**4.4. The contested undertaking on costs goes against against the rules applicable in national legal systems and for international courts and tribunals**

48. Precedent of Arbitral Tribunals, ordinary courts as well as other international courts and tribunals shows, that whilst the amicus should always cover its own costs, it

---

[37]    *Thomas Ruthemeyer*, Der amicus curiae brief im Internationalen Investitionsschutzrecht, (**Annex EC-21**), pp. 295 and 296

does not bear the financial burden incurred by the parties. The rule that *amici* bear their own costs is key for keeping their independence within the proceedings.

49. In that context, the Commission first recalls that it did not seek to recover any of its own costs. It strongly believes, however, that it is unwarranted to ask that as a precondition for filing a Non-Disputing Party Submission, the Commission shall undertake to pay the additional costs reasonably incurred by the parties.

50. The Commission respectfully submits that it is aware of no precedent for assigning a non-disputing party an obligation to pay or reimburse the parties' costs in the event of an *amicus curiae* brief submission.

51. On the contrary, there appears to be a generally accepted principle that in the light of the function and role of the *amicus curiae* (set out above under 4.2.), it is appropriate that the *amicus curiae* bears its own costs, but not those of the other parties. Any other view may, in fact, have an undue chilling effect on interventions by non-disputing parties and constitute a barrier to entry for non-disputing parties to participate in arbitration proceedings. This is particularly so where a public body and international institution, like the Commission, has been tasked wieht a specific public mandate (under Article 17(1) TEU), and seeks to defend this interest also before arbitral tribunals. The fact that the Working Paper to the currently-proposed amendments to the ICSID Arbitration Rules specifically expresses the need for a carve out for non-disputing parties with a public mandate only underlines this necessity.[38]

### 4.4.1.   Precedent from Arbitral Tribunals

52. Arbitral tribunals under ICSID Arbitration Rules, such as the arbitral tribunals in *Electrabel v Hungary, AES v Hungary,* and *Micula v Romania*,[39] as well as the *Ad Hoc* Committee in the last case,[40] have not required from the Commission an undertaking on costs, such as the contested undertaking on costs, but applied the

---

[38]    *See* Proposals for Amendment of the ICSID Rules – Working Paper, Volume 3, point 469.

[39]    See ICSID Case No ARB/05/20, *Micula v Romania,* Award of 11 December 2013, ICSID Case No ARB/07/19 *Electrabel v Hungary,* Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012, and ICSID Case No ARB/07/22 *AES v Hungary,* Award of 23 September 2010.

[40]    *Ad hoc* Committee's Decision on Annulment dated February 26, 2016.

general principle that the *amicus curiae* only covers its own costs. This position has been most recently confirmed by the arbitral tribunal in *Vattenfall* v *Germany*.[41]

53. ICSID Arbitration Rule 37(2) defines the conditions whereby the arbitral tribunal may allow a person or entity that is not a party to the dispute to file a written submission with the arbitral tribunal. There is no mention whatsoever of such a person bearing part of the costs of the arbitration, and hence there is no legal basis to require them to do so. Rule 28 of the ICSID Arbitration Rules provide that the costs of arbitration are borne by the <u>parties</u>, which the *amicus curiae* admitted on the basis of Rule 37 of the ICSID Arbitration Rules is not.

54. The approach taken by the Arbitral Tribunal (requirement of the contested undertaking on costs) constitutes a clear departure from consistent arbitral practice.

55. The Commission observes, with regard to other procedural rules and practices thereunder relevant for investor-State arbitration, that there are no rules on *amicus curiae* under UNCITRAL 1976 rules, and *a fortiori* no rules on costs. However, the arbitral tribunals in *Methanex* and *United Parcel Services* did not require a commitment on costs from the *amicus curiae* either, nor did the *Suez* arbitral tribunals. The most recent UNCITRAL Arbitration Rules (UNCITRAL Arbitration Rules with new Article 1(4) as adopted in 2013) incorporate the UNCITRAL Transparency Rules, which provide for rules on *amicus curiae* submissions that are very similar to ICSID Rule 37 (see Article 4 of the UNCITRAL Transparency Rules). In this regard, it is significant to note that Article 4(5) of the UNCITRAL Transparency Rules contains a similar provision as the ICSID rules on *amicus* interventions on the condition not to "*disrupt or burden the proceedings*" without however mentioning anything on costs, whereas Article 3(5) of the same Transparency Rules explicitly provides that non-disputing parties may have to bear some costs for accessing particular categories of documents. Based on an *a contrario* reasoning, this shows that *amicus* does have to bear its own costs, but not the costs that the parties have in relation to its intervention.

### 4.4.2.   Precedent from ordinary jurisdictions

56. The Commission would underline that it seems that most (if not all) ordinary jurisdictions do not normally require *amici curiae* to bear the costs of the parties.

---

[41]   ARB/12/12, Decision on the *Achmea* issue, of 31 August 2018, paragraphs 22 and 23.

57.   For instance, in preliminary ruling procedures before the Court of Justice of the European Union, the Commission always intervenes as an *amicus curiae,* bearing only its own costs. Similarly, in proceedings before national courts where the Commission intervenes as an *amicus curiae* under Article 15(3) of Regulation No 1/2003 on the implementation of the competition rules laid down in Articles [101 and 102 of the Treaty on the Functioning of the European Union][42] or Article 29 of Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union,[43] the practice of these courts and tribunals is not to order the Commission to bear other costs than its own.[44]

58.   Furthermore, in England and Wales, the new Supreme Court rules[45] provide:

   *"Orders for costs will not normally be made either in favour of or against interveners but such orders may be made if the Court considers it just to do so (in particular if an intervener has in substance acted as the sole or principal appellant or respondent)."*

59.   Other jurisdictions, such as the Republic of Ireland, New Zealand, and France, do not seem to have laid down explicit statutory rules on the matter, but judges generally order the *amicus curiae* to bear its own costs only.[46]

---

[42]   OJ L 1, 4.1.2003, p. 1 (**Annex EC-22**).

[43]   OJ L 248, 24.9.2015, p. 9 (**Annex EC-23**).

[44]   As can be seen on the Commission's website, see for instance, with respect to amicus curiae interventions under Article 15(3) of Regulation No 1/2003 http://ec.europa.eu/competition/court/antitrust_amicus_curiae.html .

[45]   Rule 46(3), Supreme Court Rules 2009 (SI 2009/1603) (**Annex EC-24**). That provision appears to have been inspired by the 2006 decision of the House of Lords in R *(Barker)* v *London Borough of Bromley* (**Annex EC-25**). Similarly, in the recent *JFS* case (R (E) v *The Governing Body of JFS and others* [2009] EWCA Civ 626.) (**Annex EC-26**), the United Synagogue took on the running of the respondent's case with the agreement of the parties. In that case, it seems clear that the United Synagogue crossed the line from being an intervener in the public interest (if, indeed, it ever was), into standing in the shoes of the respondent. In such circumstances, assuming that NGO interveners are aware of the costs implications of acting as *de facto* parties, this seems a reasonable exception to the general rule that there should be no orders for costs against interveners.

[46]   See for example for the Republic of Ireland: *hvala* v. *Minister for Justice, Equality and Law Reform* [2004] 1 ELRM 27 (**Annex EC-27**); for France: Cour d'appel d'Angers chambre sociale, Audience publique du mardi 18 décembre 2001, № de RG: 2000/01042 (**Annex EC-28**); and for New Zealand: *Levy* v *Victoria (1997)* 189 CLR 579, per Brennan CJ at 604. 10 (**Annex EC-29**)

60. On the contrary, the more discussed and pertinent question, as highlighted by extensive US case law on the subject, is whether the costs of the *amicus curiae,* given the valuable service they provide, must be covered by the parties or by public funds.[47]

61. Costs are only ever awarded against the *amicus curiae* if it abuses its appearance or unnecessarily protracts the proceedings.[48]

62. The line set out here has also recently been recommended in a PhD dissertation.[49]

63. The relevance of precedent from ordinary courts and tribunals for this *Ad Hoc* Committee is twofold: first, the respondent is a Member State of the European Union, so that general principles of the legal order of the European Union and its Member States are relevant rules of law for deciding the dispute. Second, Article 38 of the Statute of the International Court of Justice recognizes the general principles of law recognized by civilized nations, as well as judicial decisions of the various nations as sources of international law. That same consensus is also expressed in the ALI/UNIDROIT Principles of Transnational Civil Procedure, which also explicitly foresee the participation of *amicus curiae* and an award of costs only against the parties to the procedure, but not against the *amicus curiae.*[50]

### 4.4.3.   Precedent from international courts and tribunals

64. The view taken by the Commission is furthermore supported by the practice of courts and tribunals established under public international law. For instance, in the

---

[47]   Fifth Circuit: *Schneider* v. *Lockheed Aircraft Corp.,* 658 F.2d 835, 854 (D.C. Cir. 1981) (**Annex EC-30**), *cert, denied,* 455 U.S. 994 (1982); Ninth Circuit: *Miller-Wohl Co.* v. *Coiran'r of Labor & Indus., State of Mont.,* 694 F.2d 203) (9th Cir. 1982) (**Annex EC-31**); Second Circuit: *Wilder* v. *Bernstein,* 965 F.2d 1196, 1203 (2d Cir. 1992) (**Annex EC-32**)

[48]   See for an example from Australia: *Breen* v *Williams* [1994] 35 NSWLR 522, per Kirby P at 533 (**Annex EC-33**).

[49]   See Séverine Menétrey, Ľ amicus curiae, vers un principe commun de droit procédural?, Dalloz, Nouvelle Bibliothèque de thèses, n° 97, 2010. That PhD dissertation tries to develop best practices for amicus curiae participation (including in the French legal system), and suggests in its concluding part:« *L'amicus curiae, sauf si le tribunal en décide autrement, supporte les frais de sa participation. L'augmentation du coût de la procédure liée à sa participation est supportée par les parties au titre des frais du procès.* » (**Annex EC-34**).

[50]   See  http://www.unidroit.org/english/principles/civilprocedure/ali-unidroitprinciples-e.pdf  , principle 13 (on *amicus curiae* participation) and principle 25 (on costs) (**Annex EC-35**)

World Trade Organization Panels and Appellate Bodies, the *amicus curiae* only bears its own costs.[51]

65. Similarly, the rules of procedure of international criminal courts stipulate that the *amicus curiae* only bears its own costs.[52] Finally, the European Court of Human Rights, where *amicus curiae* interventions are frequent, does not have the power to order the *amicus curiae* to pay the costs that other parties incur as a consequence of the *amicus curiae* brief.[53] The Inter-American Court of Human Rights also sees frequent *amicus curiae* interventions and does not order costs against the *amicus curiae*.[54]

66. Precedent from international courts and tribunals is of particular importance for investment arbitration, because the institute of *amicus curiae* in investment arbitration is inspired by precedent from international courts and tribunals.[55]

### 4.4.4.   Conclusion

67. In conclusion, the position taken by the Arbitral Tribunal goes squarely against the practice and written rules that can be found in investment arbitration, national courts, and international economic, criminal, and human rights tribunals.

68. That shows, on the one hand, the fundamental nature of the rule and the seriousness of the departure from it.

69. On the other hand, it also shows that the Arbitration Tribunal could not have found a legal basis in international practice or a generally recognized principle.

---

[51]   The practice at the WTO is that all parties, and all *amicus curiae* bear exclusively their own costs.

[52]   See, for example, Article 7 of the Practice Direction for the Special Court for Sierra Leone (**Annex EC-36**), and Article 9 of the Practice Direction relating to *Amicus Curiae Briefs* presented before the Special Tribunal for Lebanon (**Annex EC-37**), and Article 103 of the Rules of Procedure of the International Criminal Court (**Annex EC-38**).

[53]   See Rule 44 § 3 of the Rules of Court (which authorize the amicus curiae intervention) in conjunction with Practice Directions, Just Satisfaction Claims, III. 4 (which sets out the rules on costs), both available at http://www.echr.coe.int/Documents/Rules Court ENG;pdf (**Annex EC-39**).

[54]   See Rule 44 of the Rules of Procedure of the Inter-American Court of Human Rights (**Annex EC-40**).

[55]   ARB/03/19, Order of 19 May 2005 (**Annex EC-6**), paragraph 15, at the end.

70. The Tribunal has never provided a reasoned justification for a divergent view, but has simply ignored the arguments put forward by the Commission, which are grounded in consistent national and international case law and rules of procedure.

71. At the very least, after the Commission's contestation of this requirement, the Arbitral Tribunal should have engaged with this extensive body of precedent and rules. Without such a reasoned justification, the Tribunal has set a dangerous precedent, which could discourage valuable contributions made by *amici curiae* in the future. This therefore entails clear violations under Article 52(1)(d) and (e) of the ICSID Convention.

### 4.5. Considerations of judicial policy militate strongly against undertakings such as the contested undertaking on costs

72. The view taken by the Tribunal also constitutes a disservice to investor-State arbitration and its perceived lack of openness. Indeed, requiring *amicus curiae* to provide for undertakings such as the contested undertaking on costs will have a chilling effect on the participation of international organisations and non-governmental organisations in investor-State arbitration proceedings.

### 4.6. Conclusion

73. The fact that the Arbitration Tribunal has requested the commitment to pay costs, disregarded the *amicus curiae* submission of the Commission on that basis, and not provided any reasons for not following the view described by the Commission in its request to alter Procedural Order No. 7 constitutes both a violation of Article 52 (d) ICSID Convention and Article 52 (e) ICSID Convention. This, taken on its own, is sufficient to lead to the annulment of the contested award.

## 5. IN THE ALTERNATIVE: HAD THE ARBITRAL TRIBUNAL HAD AT ITS DISPOSAL THE *AMICUS CURIAE* SUBMISSION OF THE COMMISSION, IT MAY HAVE REACHED A DIFFERENT CONCLUSION BOTH ON JURISDICTION AND ON MERITS

74. Should the *Ad Hoc* Committee take the view that in addition to demonstrating a serious deviation from ICSID Arbitration Rules 37(2), 28 and 47(1)(i), it is also necessary to demonstrate that the Arbitral Tribunal may have reached a different conclusion if it had had at its disposal the *amicus curiae* submission at the time of the adoption of the contested award, *quod non*, then the Commission considers that this condition is met as well.

75. The serious departure from a procedural rule set out in section 4 above prevented the Commission from setting out its view on the matter of jurisdiction of the Arbitration Tribunal (5.1) and on the relevance of Union law in general and EU State aid law in particular to the Tribunal (5.2). For the reasons set out above at paragraphs 32 to 35, the Commission was particularly well placed to serve as *amicus curiae* on those points.

### 5.1. The Arbitral Tribunal has lacked the following elements on jurisdiction, which the Commission could have placed before it and which could have changed the outcome of the case

76. The Commission, first, recalls that there is an obligation for arbitration tribunals to assess their own jurisdiction *ex officio*. This means, in particular, that they are not limited by the arguments the parties put before them. As a consequence, the Arbitration Tribunal would have been obliged to assess any additional argument the Commission would have put before it in its *amicus curiae* brief, irrespective of whether Respondent would have incorporated that argument into its own pleadings.

77. The Commission has carefully read the contested Award. When assessing whether Article 26 Energy Charter Treaty constituted a valid offer for arbitration from Respondent to Applicant, the Arbitral Tribunal has in particular in paragraphs 179 to 207 of the contested Award not at all or wrongly addressed the following arguments, on which the Commission could have brought before it in its *amicus curiae* submission additional relevant information:

> *5.1.1. Conflict with Article 19 TEU, Article 267 TFEU, the general principle of mutual trust and the general principle of autonomy of the EU legal order, to be solved on the basis of the general principle of primacy of EU law.*

78. The Arbitral Tribunal fails completely to engage with a possible conflict with those provisions.

79. The Court of Justice of the European Union, in its judgment in Achmea, held that "Articles 267 and 344 [… of the Treaty on Functioning of European Union] must be interpreted as <u>precluding a provision in an international agreement concluded between Member States</u> […] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal

whose jurisdiction that Member State has undertaken to accept" (emphasis added by the Commission).

80. The Court of Justice of the European Union has hence confirmed the view taken by the Commission before the Court of Justice of the European Union. If it had been admitted as *amicus curiae* before the Arbitral Tribunal, the Commission would have submitted those same considerations to the Arbitral Tribunal. submission before the Tribunal.

81. As the Commission would have detailed in its *amicus curiae* submission before the Arbitral Tribunal, and as has been recognized by a number of Arbitral Tribunals, starting from the Tribunal in *Electrabel* v *Hungary*, Union law takes precedence over the Energy Charter Treaty in case of conflict, at the very least in intra-EU situations, such as the present case. [56] Primacy has been long-standing case-law of the Court of Justice since the landmark judgment in *Costa/ENEL*.[57] It is now, since 2009, also explicitly enshrined in Declaration 17 annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon.[58] EU law has primacy over not only domestic law (*stricto sensu*) of each Member State but also international treaties concluded between two Member States. That reasoning is based on the settled case-law of the Court of Justice, whereby "*in matters governed by the EEC Treaty, that Treaty takes precedence over agreements concluded between Member States before its entry into force*".[59] The Court of Justice specified that primacy also applies to international treaties that have been concluded between a Member State and another Member State, which acceded to the Union only after the conclusion of that agreement. In such a situation, EU law takes precedence as of

---

[56] ICSID Case No. ARB/07/19, *Electrabel* v *Hungary*, Award of 30 November 2012, paragraphs 4.178 to 4.191. The Commission will refrain in this section from attaching any of the quoted documents as evidence, as the Ad hoc Committee is not in a position to rule in substance, but needs to assess whether, had such arguments and such proof been presented to the Arbitral Tribunal, the outcome of the contested Award could have been different. Should the Ad Hoc Committee wish to receive all those documents, the Commission will immediately send copies of those.

[57] Case 6/64, ECLI:EU:C:1964:66.

[58] Against this background, the findings of the Arbitral Tribunal in *Vattenfall* v *Germany*, Decision on the Achmea issue, paragraphs 224 to 226 that there was a lack of clarity and a substantial need for interpretation to derive the conflict rule of primacy is impossible to understand and accept.

[59] Judgment in *Commission* v *Italy*, 10/61, EU:C:1962:2, p. 1. See also judgment in *Commission* v *Slovakia*, C-264/09, EU:C:2011:580, paragraph 41; judgment in *Commission v. Austria*, C-147/03, EU:C:2005:427, paragraph 58; and judgment in *Commission* v *Luxembourg*, C-473/93, EU:C:1996:263, paragraph 40.

the day of accession.[60] This view also finds very broad support in the academic literature on international law. *Thomas Eilmansberger* writes: "*the intentions of the parties are expressed in the most authoritative way by conflict rules included in the later treaty,* [footnote omitted] *and the EC Treaty (being the later Treaty in this case) does indeed contain such a conflict rule, namely the already mentioned Article 307 EC*".[61] Similarly, *Martti Koskenniemi* writes in his report for the International Law Commission on fragmentation: "*The EC Treaty takes absolute precedence over agreements that Member States have concluded.*"[62]

### 5.1.2. Relationship of the rules of interpretation in Article 31 VCLT – the ordinary meaning of the terms does not enjoy superiority to the other means of interpretation:

82. In paragraphs 182 and 207 of the contested Award, the Arbitral Tribunal gives decisive importance to the literal interpretation of the Energy Charter Treaty pursuant to Article 31(1) VCLT.

83. However, the *travaux préparatoires* of the VCLT show that there is no such hierarchy. This follows both from the Waldock Report VI, recital 4, and from the Commentary of the International Law Commission, recital 8. It suffices to quote here the latter, which rejects fears of hierarchisation expressed by governments as follows: "*The Commission, by heading the article "General rule of interpretation" in the singular and by underlining the connexion between paragraphs 1 and 2 and again between paragraph 3 and the two previous paragraphs, intended to indicate that the application of the means of interpretation in the article would be a single combined operation. All the various elements, as they were present in any given case, would be thrown into the crucible, and their interaction would give the legally relevant interpretation.*"

---

[60]   Judgment in *Budějovický Budvar*, C-478/07, paragraphs 97 to 99; see also the earlier judgments in *Conegate*, 121/85, EU:C:1986:114, para. 25; *Matteucci* v *Communauté française de Belgique*, C-235/87, EU:C:1988:460, para. 22; and *Exportur*, C-3/91, EU:C:1992:420, para. 8.

[61]   *Thomas Eilmansberger*, "Bilateral Investment Treaties and EU Law", in: (2009) 46 Common Market Law Review, pp. 383-429, at page 421 and 425.

[62]   "Fragmentation of international law. Report of the Study Group of the International Law Commission." Finalized by *Martti Koskenniemi*. Available at: http://legal.un.org/docs/?symbol=A/CN.4/L.682, paragraph 283.

### 5.1.3.   Transfer of competence for energy policy to the Union

84. The Arbitral Tribunal finds that Respondent failed to demonstrate that EU Member States have transferred competence for energy policy to the Union. It observes in addition that EU Member States still enjoy broad margins of discretion when implementing Union law on energy, and that other Contracting Parties had not been aware of that transfer (paragraph 200 of the contested Award).

85. The Energy Charter Treaty was from the outset a European project, rather than an intergovernmental project.[63] The origins of the ECT can be traced back to a memorandum which the Dutch prime minister *Ruud Lubbers* presented in June 1990 to the European Council of Dublin.[64] The President of the Commission, *Jacques Delors*, further developed that idea in a speech on 21 November 1990 at the Conference for Security and Cooperation in Europe's ("CSCE") Summit in Paris. That summit, which closed with the adoption of the "*Charter of Paris for a New Europe*", had the purpose of laying the foundation for "*a new era of democracy, peace and unity*" (and led to the transformation of the CSCE into the Organisation for Security and Cooperation in Europe). The preamble of the ECT therefore refers to the Charter of Paris. Shortly thereafter, the European Council of Rome endorsed in December 1990 the proposals made by *Lubbers* and the Commission.[65] In February 1991, the Commission presented a draft for that European Energy Charter, which would give life to the commitment of the Charter of Paris.[66] Then, in 1991, the EU convened an international conference to negotiate and agree on such a charter, funded that conference and provided its secretariat. The final text of the European Energy Charter, which contains the broad political objectives, was adopted in December 1991 in The Hague. The special role of the EU is also

---

[63]   *Johann Basedow*, "The European Union's international investment policy Explaining intensifying Member State cooperation in international investment regulation", PhD thesis, The London School of Economics and Political Science (LSE), 2014, page 156.

[64]   At that time, shortly after the fall of the Berlin wall, the centrally-planned economies of the Union of Soviet Socialist Republics (and then Russia and the Commonwealth of Independent States) and the countries of Central and Eastern Europe started to reforms into market economies. They all were short of capital. Therefore, *Lubbers*' memorandum suggested the creation of a European Energy Community to capitalize on the complementary relationship between the EU, the USSR and the countries of Central and Eastern Europe. The idea was to secure investment flows from West to East, so that the energy flows from East to West would be secure.

[65]   See Conclusions of the Presidency on the European Council in Rome.

[66]   See Communication from the Commission on European Energy Charter, COM(91) 36 final of 14 February 1991.

reflected in the recitals of the European Energy Charter itself. Those acknowledge furthermore the obligations of EU Member States under the EU Treaties (and other existing international agreements). The precise wording of those recitals is as follows:

> "Assured of support from the European Community, particularly <u>through completion of its internal energy market</u>;
>
> Aware of the <u>obligations under major relevant multilateral agreements</u>, of the wide range of international energy co-operation, and of the extensive activities by <u>existing international organisations in the energy field</u> and willing to take full advantage of the expertise of these organisations in furthering the objectives of the Charter". (Emphasis added by the Commission.)

86.   The reference to the internal energy market makes it clear that all signatory states, also the non-EU Member States, were fully aware that the EU was using its internal shared competence for energy, and had set up an autonomous regime. The reference to the obligations under other multilateral agreements obviously includes the obligations under Union law. Those two recitals, read together, make it hence abundantly clear that the European Energy Charter had no intention whatsoever to be applied within the internal energy market of the Union. The ECT has the objective of implementing the policy objectives set out in the European Energy Charter. Article 2 ECT expresses that as follows:

> "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the [European Energy] Charter."

87.   It follows from that historical process, which ultimately led to the conclusion of the European Energy Charter (a policy document) and the ECT (the translation of that policy document into international law, as witnessed by the reference in the preamble and in Article 2 ECT to the European Energy Charter), that the objective of the ECT is to create an international framework for cooperation in the energy sector between the European Communities, on the one hand, and Russia, the CIS and the countries of Central and Eastern Europe, on the other hand.[67] The ECT was

---

[67]   Additionally, on the first conference held in Brussels on July 1991, the European Communities also invited the other members of the Organization for Economic Cooperation and Development ("OECD") that were not EU Member States to participate in the negotiations on the Energy Charter.

perceived as part of the European Communities' underline(external) energy policy.[68] It was never intended that the ECT should influence their underline(internal) energy policy. Johann Basedow, whose excellent historical research on this point has not yet been taken into account by Arbitration Tribunals, explains this at length in this PhD thesis in the chapter on the historical origins of the ECT:

> "From the beginning, the Commission underlined that the ECT was conceived as the international relations component of the emerging Single Market for energy. The ECT should extend the Single Market for energy beyond the EU's borders. The underlying reasoning was that the Single Market for energy would only function efficiently and securely, fi the supply and transmission countries also embraced a market-based approach to the regulation of their energy sectors. The Commission clearly formulated this view in its communication accompanying the draft text for the European Energy Charter of spring 1992.
>
> [The European Energy Charter…] finds itself fully integrated within the energy policy which the Commission wishes to promote […] with a view to completing the internal energy market and providing an external relations policy to back it up.'"[69]

88. Indeed, the creation of the European Communities' internal energy market was well under way when the ECT was negotiated: Energy has been included into the internal market from its outset. Indeed, one of the first and most prominent cases brought to the ECJ, *Costa* v *E.N.E.L.*[70], concerned investments in energy. Special rules applied until 2002 for coal (European Coal and Steel Community, "ECSC") and still apply for nuclear energy (European Atomic Energy Community, "EURATOM"). In 1985, the European Council in Milan endorsed the Commission's proposal for creating a single market by 1992. In order to implement that commitment, the Council adopted Directives 90/547/EEC on the transit of electricity through transmission grids[71] and 91/296/EEC on the transit of natural gas through grids[72]. In 1991, the Commission proposed more comprehensive rules liberalising the entire electricity and gas

---

[68] This point is also underlined in ICSID Case No. ARB/07/19, *Electrabel* v *Hungary*, Award of 30 November 2012, at paragraph 4.132, quoting *Thomas Wälde*.

[69] *Johann Basedow*, "The European Union's international investment policy Explaining intensifying Member State cooperation in international investment regulation", PhD thesis, The London School of Economics and Political Science (LSE), 2014, page 160.

[70] ECJ, Judgment in *Costa* v *E.N.E.L.*, 6/64, EU:C:1964:66.

[71] OJ L 313, 13.11.1990, p. 30.

[72] OJ L147, 12.6.1991, p. 37.

sector.[73] Parliament and Council adopted the legislation in 1996 (electricity)[74] and 1998 (gas)[75]. Those initiatives are explicitly mentioned and recognized in the European Energy Charter and were known to all Contracting Parties of the ECT (see above). Those rules have been overhauled in 2003 and in 2009, when Parliament and Council agreed on the texts as they are on the books today.[76] The two main liberalisation directives have been complemented over time by an important number of other pieces of Union law, including on renewable energy, so that the Union has today a highly developed set of rules governing the internal market for electricity and gas.

89.  As a result of those acts of Union law, the external competence for energy is with the Union. This does not exclude that Member States preserves internally a certain discretion as to how to implement Union acts in detail.

### 5.1.4.  Lack of relevance of disconnection clause.

90.  A further important point in the reasoning of the Arbitral Tribunal is the absence of a disconnection clause (paragraphs 186, 198 and 199 of the contested Award). That view, which is also widely echoed in academic literature, can be traced back to one single academic article by *Christian Tietje*[77].

91.  However, the view expressed by *Christian Tietje* in his often-referenced (and regrettably never questioned) article is not supported by the academic sources he

---

[73]  OJ C 65, 14.3.1992, p.4 (for electricity) and p. 14 (for gas).

[74]  Directive 96/92/EC of the European Parliament and of the Council of 19 December 1996 concerning common rules for the internal market in electricity, OJ L 27, 30.1.1997, p. 20.

[75]  Directive 98/30/EC of the European Parliament and of the Council of 22 June 1998 concerning common rules for the internal market in natural gas, OJ L 204, 21.7.1998, p. 1.

[76]  Third Energy Package, comprising: Directive 2009/72/EC of the European Parliament and of the Council of 13 July 2009 concerning common rules for the internal market in electricity, OJ L 211, 14.8.2009, p. 55; Directive 2009/73/EC of the European Parliament and of the Council of 13 July 2009 concerning common rules for the internal market in natural gas and repealing Directive 2003/55/EC, OJ L 211, 14.8.2009, p. 94; Regulation (EC) No 713/2009 of the European Parliament and of the Council of 13 July 2009 establishing an Agency for the Cooperation of Energy Regulators, OJ L 211 14.8.2001, p. 1; Regulation (EC) 714/2009 of the European Parliament and of the Council of 13 July 2009 on conditions for access to the network for cross-border exchanges in electricity and repealing Regulation (EC) No 1228/2003, OJ L 211, 14.8.2009, p. 15; and Regulation 715/2009 of the European Parliament and of the Council of 13 July 2009 on conditions for access to the natural gas transmission networks and repealing Regulation (EC) No 1775/2005, OJ L 211, 14.8.2009, p. 36.

[77]  *Christian Tietje*, The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States. Halle: Institute of Economic Law, 2008, pp. 7-16.

claims to rely on. In order to support the view that *inter se* obligations between Member States are the rule, and that an exception to that rule is only possible where the multilateral agreement contains a disconnection clause, he relies, first, on the article by *Pieter Jan Kuijper*.[78] By selectively quoting *Kuijper*, *Tietje* distorts the view of *Kuijper*, which is, in fact, the opposite of that of *Tietje*; namely, that such *inter se* obligations are a theoretical possibility, but in practice never created. The paper by *Maja Smrkolj*[79], quoted as second authority by *Tietje*, also does not provide any support for his view. To the contrary: As *Smrkolj* points out, a disconnection clause is <u>only</u> needed where the application of Union law (and not of the international treaty) between the Member States "*affect[s] the enjoyment by <u>other parties</u> of their rights under the treaty or performance of their obligations*" (emphasis added) or "*relate[s] to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.*" In other words, a disconnection clause is only needed where the application of Union law between the Member States is not in line with Article 41(1)(b) VCLT. Where, on the contrary, as in the present case, the rights and obligations of third countries are not affected, "*the insertion of the EU-specific 'disconnection clause' seems to be entirely superfluous*".[80] Also, the last two sources on which *Tietje* relies are misquotes: *Raphael Oen*[81] and *Christoph Herrmann*[82] take the view that, even in the absence of a disconnection clause, a multilateral agreement may create *inter se* obligations <u>only for those areas where Member States retain their external</u>

---

[78] *Pieter Jan Kuijper*, "The Conclusion and Implementation of the Uruguay Round Results by the European Community", (1995) 6 *European Journal of International Law*, issue 1, pp. 222-244, at p. 228 and 229

[79] *Maja Smrkolj*, "The Use of the 'Disconnection Clause' in International Treaties: What does it tell us about the EC/EU as an Actor in the Sphere of Public International Law?", paper presented at the GARNET Conference, "The EU in International Affairs", Brussels, 24-26 April 2008.

[80] *Ibidem*, p. 9.

[81] *Raphael Oen*, Internationale Streitbeilegung im Kontext gemischter Verträge der Europäischen Gemeinschaft und ihrer Mitgliedstaaten, Berlin: Duncker and Humblot, 2005, S. 73: „*Festgehalten wurde bisher nur, dass eine völkerrechtliche Bindung der Mitgliedstaaten zueinander jedenfalls in Bereichen ausschließlicher Gemeinschaftszuständigkeit ausscheide. Die Bindung komme nur für solche Bestimmungen in Betracht, die der (ausschließlichen oder konkurrierenden) mitgliedstaatlichen Zuständigkeit unterfielen*".

[82] *Christoph Herrmann*, „Rechtsprobleme der parallelen Mitgliedschaft von Völkerrechtssubjekten in Internationalen Organisationen – Eine Untersuchung am Beispiel der Mitgliedschaft der EG und ihrer Mitgliedstaaten in der WTO", in: *Gabriele Bauschke* et al., Pluralität des Rechts – Regulierung im Spannungsfeld der Rechtsebenen, Boorberg: Stuttgart, 2003, pp. 139 and following, at p. 159: „*Soweit die Kompetenzen auf die EG übertragen worden sind, kann ein gemischtes Abkommen zwischen den Mitgliedsstaaten wohl keine Verpflichtungen begründen*".

<u>competence</u>. However, the EU Member States did not retain their external competence for those areas, because the Union had acquired external competence for energy policy and commercial policy.

92.   Furthermore, disconnection clauses have traditionally been used in international treaties where the Union could not become a Contracting Party itself due to the rules of the international organisation under whose auspices the international treaty was negotiated, in particular the Council of Europe. In such a setting, disconnection clauses may indeed be useful, as – despite those agreements being mixed agreements insofar as it concerns the question of competence – the Union does not appear in the text of the international treaty, and the disconnection clause serves as a "reminder" of its existence.

93.   The situation is completely different in international treaties where the Union is a party, and which explicitly recognize its role as REIO, as is the case for the ECT in Article 1(3) and 1(10) thereof. Here, all Contracting Parties are fully aware of the specificities of the Union's legal order.

### 5.1.5.   *Conflict on substance with EU law*

94.   The Arbitral Tribunal, at paragraph 199 of the contested Award, claims that there is no conflict between the support scheme under scrutiny and EU law. That is wrong: Spain had implemented the support scheme in violation of Article 108(3) TFEU, because it had not sought prior State aid approval from the Commission. As a result, the measure on which Claimant relies is contrary to EU law (see in detail section 5.2 below).

### 5.2.   **The Tribunal has lacked the following elements on Union law, and on particular on EU law on State aid, which the Commission could have placed before it and which could have changed the outcome of the case**

95.   The Tribunal finds in paragraphs 322 to 325 of the Award that "*the Tribunal will decide the issues on the basis of the terms of the ECT and the applicable rules and principles of international law*". According to consistent arbitral precedent, in intra-EU disputes, Union law is part of the applicable law as "*applicable rules and principles of international law*".[83]

---

[83]   *Ibidem*, paragraphs 4.111 to 4.199. Confirmed many times since in subsequent awards.

96. The Commission, in its *amicus curiae* submission, could have drawn the attention of the Tribunal to the fact that the Spanish support scheme at stake in the arbitration proceedings constitutes State aid pursuant to Article 107(1) TFEU, and that it had not been authorised by the Commission pursuant to Article 108(3) TFEU. As a result, under Union law, any legitimate expectations of the claimants were precluded, in line with long-standing case law of the Court of Justice of the European Union, which has held that, save in exceptional circumstances, undertakings to which an aid has been granted may not, in principle, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in the Treaties.[84] Any investor which had carried out a proper legal due diligence would have been told that no one can rely on representations or promises by a EU Member States to receive State aid which has not previously been approved by the Commission.

97. The Tribunal did not discuss those questions at all. Hence, it has manifestly exceeded its powers, by not applying a provision of international law that was part of the law to be applied by it. At the same time, it fails to state reasons.

98. In any event, legitimate expectations must be reasonable in light of the law applicable to the investment. In light of the consistent case law of the Court of Justice of the European Union this means that it would be unreasonable to consider that there is a legitimate expectation that aid be granted. A diligent economic operator must be assumed to be able to determine whether that procedure has been followed.[85]

99. The Tribunal not only failed to discuss those State aid obligations under Union law as a matter of law, but also in the alternative as part of the relevant facts.

100. The fact that the Arbitration Tribunal has failed to address that point in its Award constitutes both a violation of Article 52 (b) ICSID Convention and Article 52 (e) ICSID Convention.

---

[84]   Case C-5/89 *Commission* v *Germany* ECLI:EU:C:1990:320, paragraph 14; Judgment of 11 November 2004, *Demesa et Territorio Histórico de Álava* v *Commission*, C-183/02 P and C-187/02 P, EU:C:2004:701, paragraphs 44 and 45; Judgment of 9 June 2011, *Diputación Foral de Vizcaya and Others* v *Commission*, C-465/09 P to C-470/09 P, EU:C:2011:372, paragraph 150.

[85]   Case C-5/89 *Commission* v *Germany* ECLI:EU:C:1990:320, paragraph 14.

\*\*\*

101. The Commission remains at the disposal of the Ad Hoc Commission for any question it may have.


Steven NOË          Petra NEMECKOVA          Tim MAXIAN RUSCHE

Agents of the Commission

# HARWOOD EXHIBIT 4



COMISIÓN EUROPEA

SERVICIO JURÍDICO
Director General

Bruselas, 26 de octubre de 2018
sj.c(2018)6177842

Sra. Consuelo Castro Rey
Abogada General del Estado
Ministerio de Justicia
C/ Ayala, 5
ES-28001 Madrid

Email:   aearbitraje@mjusticia.es
Tlf: 913904736 | Fax: 913904740

**Asunto:**   **Su solicitud sobre la posición de la Comisión Europea en relación con el laudo arbitral EISER dictado al amparo del Tratado de la Carta de la Energía**

Estimada Sra. Abogada General,

En su carta del 10 de octubre de 2018, la Abogacía General del Estado del Reino de España solicitó la opinión de los servicios de la Comisión Europea sobre las consecuencias jurídicas de una supuesta ejecución del laudo arbitral del 4 de mayo de 2017, dictado en el marco del Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (CIADI). Este laudo condena al Reino de España al pago de 128 millones de euros en concepto de indemnización por daños, más intereses, a Eiser Infrastructure Limited (laudo EISER). Dicho laudo se encuentra actualmente sujeto a un procedimiento de anulación del CIADI. Asimismo, el 3 de octubre de 2018, las autoridades españolas han procedido a notificar el pago de la indemnización establecida en el laudo EISER ante la Comisión Europea como ayuda de Estado.

En su carta plantea tres preguntas, a las que procedemos responder a continuación:

1) ¿Es necesario, en vista de la notificación de la indemnización como ayuda de Estado, esperar el análisis de la compatibilidad que realice la Comisión? En caso afirmativo, para proceder al pago de la indemnización, ¿bastaría con la decisión de la Comisión o sería necesario esperar a que transcurriese el plazo para su recurso o, incluso, para su eventual firmeza de una sentencia del TJUE al respecto frente a una impugnación de la Decisión de la Comisión?

2) Si el demandante decide ejecutar el laudo en un Estado miembro, ¿el reconocimiento y la ejecución del laudo sería contrario al Derecho de la Unión?

Commission européenne/Europese Commissie, 1049 Bruxelles/Brussel, BELGIQUE/BELGIË - Tel. +32 22991111
Office: BERL 1/80 – Tel. direct line +32 229-02/2995150
E-mail : Luis.Romero-Requena@ec.europa.eu

3) ¿Qué consecuencias tendría para España si se ejecuta el laudo sin que la Comisión se haya pronunciado sobre la compatibilidad de la ayuda?

La respuesta a la primera parte de la primera pregunta debe ser afirmativa. En efecto, en virtud del artículo 108, apartado 3, del Tratado de Funcionamiento de la Unión Europea (TFUE), los Estados miembros no pueden ejecutar las medidas de ayuda estatal sin la aprobación previa de la Comisión de la ayuda de Estado en cuestión como ayuda compatible con el mercado interior.

En respuesta a la segunda parte de la primera pregunta, los servicios de la Comisión señalan que las decisiones de la Comisión gozan de presunción de legalidad[1] y, a pesar de la existencia de un recurso de anulación basado en el artículo 263 TFUE, despliegan efectos jurídicos para sus destinatarios. Asimismo, con arreglo al 278 TFUE los recursos interpuestos ante el Tribunal de Justicia de la Unión Europea no tendrán efecto suspensivo.

En vista de lo anterior, y en respuesta a sus preguntas segunda y tercera, el pago de la indemnización antes de que la Comisión se pronuncie sobre su compatibilidad sería contrario al Derecho de la Unión, en particular al artículo 108, apartado 3 TFUE. Conviene recordar, además, que la obligación de suspensión establecida en el artículo 108, apartado 3, TFUE da lugar para las partes interesadas (por ejemplo los competidores del beneficiario)[2] a derechos individuales que surten efecto directo. De esta manera, estas partes interesadas, en particular los competidores y otros terceros afectados por la ayuda estatal ilegal, pueden hacer valer sus derechos interponiendo ante los tribunales nacionales competentes una acción judicial contra el Estado miembro que concede la ayuda. Como consecuencia de ello, los órganos jurisdiccionales nacionales disponen de diversas medidas en protección de estas partes interesadas: pueden impedir el pago de la ayuda ilegal, recuperar la ayuda ilegal (independientemente de la compatibilidad); recuperar los intereses por el periodo de ilegalidad; reparar los daños y perjuicios de competidores y otros terceros; y dictar medidas cautelares contra la ayuda ilegal.[3]

Por añadidura, aparte de las consecuencias jurídicas de la obligación de suspensión de ejecución de ayudas de Estado en virtud del artículo 108, apartado 3, TFUE, es preciso recordar que el laudo EISER, y por ende su reconocimiento y ejecución, serían contrarios al Derecho de la Unión en aras de la jurisprudencia *Achmea*.[4] La Comisión expuso su posición sobre las consecuencias de la sentencia *Achmea* en su Comunicación al

---

[1]   Véase sentencia de 9 de julio de 2015, Comisión / Francia, C-63/14, EU:C:2015:458, apartado 44.

[2]   Se consideran partes interesadas cualquier Estado miembro o cualquier persona, empresa o asociación de empresas cuyos intereses puedan verse afectados por la concesión de una ayuda y, concretamente, el beneficiario de la misma, las empresas competidoras y las asociaciones socioprofesionales (artículo 1, letra h), del Reglamento (UE) 2015/1589 del Consejo de 13 de julio de 2015 por el que se establecen normas detalladas para la aplicación del artículo 108 del Tratado de Funcionamiento de la Unión Europea (versión codificada), DO L 248, 24.9.2015, p. 9–29).

[3]   Véase la Comunicación de la Comisión relativa a la aplicación de la normativa sobre ayudas estatales por los órganos jurisdiccionales nacionales, DO C 85, 9.4.2009, p. 1–22.

[4]   Sentencia de 6 de marzo de 2018, Achmea, C-284/16, ECLI:EU:C:2018:158, apartados 56 y 58.

Parlamento Europeo y al Consejo "Protección de la inversión intra-UE", de 19 de julio de 2018[5], en los párrafos citados a continuación:

> "En la sentencia Achmea, el Tribunal de Justicia resolvió que las cláusulas arbitrales entre inversor y Estado establecidas en los TBI [tratados bilatelares de inversión] intra-UE socavan el sistema de recursos jurídicos previsto en los Tratados de la UE, con lo que ponen en peligro la autonomía, la eficacia, la primacía y el efecto directo del Derecho de la Unión, así como el principio de mutua confianza entre los Estados miembros. El recurso a estas cláusulas desvirtúa el procedimiento de decisión prejudicial previsto en el artículo 267 del TFUE y no es compatible con el principio de cooperación leal. Esto implica que todas las cláusulas arbitrales entre inversor y Estado de los TBI intra-UE son inaplicables, y que todo tribunal arbitral establecido sobre la base de estas cláusulas carece de jurisdicción, dada la ausencia de un acuerdo de arbitraje válido. Por consiguiente, los tribunales nacionales tienen la obligación de anular cualquier laudo arbitral dictado sobre esta base y deben rehusar aplicarlo. Los Estados miembros que son partes en asuntos pendientes, en cualquier calidad, también deben extraer de la sentencia Achmea todas las consecuencias necesarias. Por otra parte, en virtud del principio de seguridad jurídica, están obligados a poner fin a los TBI intra-UE.
>
> La sentencia Achmea también es relevante para el mecanismo de arbitraje entre inversor y Estado establecido en el artículo 26 del Tratado sobre la Carta de la Energía en lo referente a las relaciones intra-UE. Correctamente interpretada, esta disposición no prevé una cláusula arbitral entre inversor y Estado aplicable entre inversores de un Estado miembro de la UE y otro Estado miembro de la UE. Dada la primacía del Derecho de la Unión, si se interpretase que es aplicable con carácter intra-UE, esta cláusula sería incompatible con el Derecho primario de la UE y, por tanto, inaplicable. Por el contrario, el razonamiento del Tribunal en el asunto Achmea afecta igualmente a la aplicación intra-UE de esta cláusula, que, del mismo modo que las cláusulas de los TBI intra-UE, brinda la posibilidad de llevar estos litigios a un organismo que no forme parte del sistema judicial de la UE. El hecho de que la UE también sea parte en el Tratado sobre la Carta de la Energía no afecta a esta conclusión: la participación de la UE en este Tratado solo ha creado derechos y obligaciones entre la UE y países terceros y no ha afectado a las relaciones entre los Estados miembros de la UE."

El Servicio Jurídico de la Comisión está a su disposición para cualquier otra asistencia que requiera, en aras del principio de sincera cooperación previsto en el apartado 3 del artículo 4 TUE.

Le saluda atentamente,

Luis Romero Requena

---

[5]   COM(2018) 547 final

**ENGLISH TRANSLATION**



**EUROPEAN COMMISSION**

LEGAL SERVICE
Director-General

Brussels, 26 October 2018
sj.c(2018)6177842

Mrs. Consuela Castro Rey
State Attorney General
Ministry of Justice
C/ Ayala, 5
ES-28001 Madrid

Email:   aearbitraje@mjusticia.es
Phone: 9139047361 Fax: 913904740

**Subject:**    **Your request concerning the position of the European Commission regarding the EISER arbitral award rendered under the Energy Charter Treaty**

Dear Mrs. Attorney General,

In your letter of October 10, 2018, the State Attorney General of the Kingdom of Spain requested the opinion of the services of the European Commission on the legal consequences of an alleged enforcement of the arbitral award of May 4, 2017, rendered within the framework of the International Centre for Settlement of Investment Disputes (ICSID).   This award orders the Kingdom of Spain to pay 128 million euros in compensation for damages, plus interests, to Eiser Infrastructure Limited (EISER award). This award is currently subject to an ICSID annulment proceeding.  In addition, on October 3, 2018, the Spanish authorities have notified to the European Commission the payment of the compensation provided for in the EISER award as State aid.

In your letter you raise three questions, to which we shall now reply:

1) Is it necessary, in view of the notification of compensation as State aid, to wait for the Commission's compatibility analysis? If so, would the Commission's decision suffice to pay the compensation or would it be necessary to wait for the remedy period to expire or, even to wait for the possible finality of an ECJ judgement in this respect in the face of a challenge to the Commission's Decision?

2) If the claimant decides to enforce the award in a Member State, would the recognition and enforcement of the award be contrary to Union Law?

3) What would be the consequences for Spain if the award were to be enforced without the Commission having ruled on the compatibility of the aid?

Commission européenne/Europese Commissie, 1049 Bruxelles/Brussel, BELGIQUE/BELGIË- Tel. +32 22991111
Office:  BERL 1/80- Tel. direct line +32 229-02/2995150
E-mail : Luis.Romero-Requena@ec.europa.eu

The answer to the first part of the first question must be yes. Indeed, under Article 108(3) of the Treaty on the Functioning of the European Union (TFEU), Member States cannot put the State aid measures into effect without prior approval by the Commission of the State aid in question as aid compatible with the internal market.

In reply to the second part of the first question, the services of the Commission state that the Commission decisions benefit from a presumption of legality[1] and, despite the existence of an annulment remedy based on Article 263 TFEU, they have legal effects for their recipients. Furthermore, under article 278 TFEU, actions brought before the Court of Justice of the European Union shall not have suspensory effect.

In view of the foregoing, and in answer to your second and third questions, the payment of compensation before the Commission rules on its compatibility would be contrary to Union Law, in particular to Article 108(3) TFEU. It should also be recalled that the standstill obligation laid down in Article 108(3) TFEU gives interested parties (e.g. the competitors of the beneficiary)[2] individual rights that have direct effect. In this respect, these interested parties, in particular competitors and other third parties affected by the unlawful State aid, can enforce their rights by bringing an action before the competent national courts against the Member State granting the aid. As a result, national courts have various measures to protect these interested parties: they can prevent the payment of unlawful aid, recover unlawful aid (irrespective of compatibility); recover interests for the period of illegality; recover damages from competitors and other third parties; and order injunctive relief against unlawful aid.[3]

Furthermore, apart from the legal consequences of the standstill obligation related to the execution of State aid under Article 108(3) TFEU, it should be recalled that the EISER award, and hence its recognition and enforcement, would be contrary to Union Law in light of the *Achmea* judgement.[4] The Commission set out its position on the consequences of the *Achmea* judgment in its Communication to the European Parliament and the Council "Protection of intra-EU investment" of July 19, 2018,[5] in the following paragraphs:

> "In the Achmea judgment the Court of Justice ruled that the investor-to-State arbitration clauses laid down in intra-EU BITs undermine the system of legal remedies provided for in the EU Treaties and thus jeopardise the autonomy, effectiveness, primacy and direct effect of Union law and the principle of mutual trust between the Member States. Recourse to such clauses undermines the preliminary ruling procedure provided for in Article 267 TFEU, and is not compatible with the principle of sincere cooperation. This implies that all investor-State arbitration clauses in intra-EU BITS are inapplicable and that any arbitration tribunal established on the basis of such clauses lacks jurisdiction due to the absence of a valid arbitration agreement. As a consequence, national courts are under the obligation to annul any arbitral award rendered on that basis and to refuse to enforce it. Member States that are parties to pending cases, in whatever

---

[1] *See* judgment of July 9, 2015, Commission/France, C-63/14, EU:C:2015:458, paragraph 44.

[2] Interested parties are any Member State and any person, undertaking or association of undertakings whose interests might be affected by the granting of aid, in particular the beneficiary of the aid, competing undertakings and trade associations (Article 1(h) of Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (codified version), OJ L 248, 24.9.2015, p. 9-29).

[3] *See* Commission notice on the enforcement of State aid law by national courts, OJ C 85, 9.4.2009, p. 1–22.

[4] Judgment of March 6, 2018, Achmea, C-284/16, ECLI:EU:C:2018:158, paragraphs 56 and 58.

[5] COM(2018) 547 final.

Commission européenne/Europese Commissie, 1049 Bruxelles/Brussel, BELGIQUE/BELGIË- Tel. +32 22991111
Office: BERL 1/80- Tel. direct line +32 229-02/2995150
E-mail : Luis.Romero-Requena@ec.europa.eu

capacity, must also draw all necessary consequences from the Achmea judgment. Moreover, pursuant to the principle of legal certainty, they are bound to formally terminate their intra-EU BITs.

The Achmea judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations.  This provision, if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from a Member States of the EU and another Member States of the EU.  Given the primacy of Union law, that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable.  Indeed, the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU.  The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States."

The Legal Service of the Commission is at your disposal for any other assistance you may require, for the sake of the principle of sincere cooperation provided for in Article 4(3) TEU.

Sincerely yours,

[Illegible signature]

Luis Romero Requena

Commission européenne/Europese Commissie, 1049 Bruxelles/Brussel, BELGIQUE/BELGIË- Tel. +32 22991111
Office:  BERL 1/80- Tel. direct line +32 229-02/2995150
E-mail : Luis.Romero-Requena@ec.europa.eu

**Certificate of Accuracy**

I hereby certify that the foregoing translation of the European Commission's "Communication from the Legal Service of the European Commission to the Attorney General of the Kingdom of Spain, dated October 26, 2018" as defined in, and attached to, the Harwood Declaration (Exhibit 4), is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Executed:      New York, New York
               December 14, 2018

Juan O. Perla, Esq.

Sworn to and signed before ME this
14 day of December, 2018.

Notary Public

LYNN M. MOONEY
Notary Public, State of New York
No. 01MO4841073
Qualified in Queens County
Certificate Filed in New York County
Commission Expires June 30, 20 19

# HARWOOD EXHIBIT 5

# THE ICSID CONVENTION:
## A COMMENTARY

A Commentary on the Convention on the Settlement of Investment
Disputes between States and Nationals of Other States

SECOND EDITION

CHRISTOPH H. SCHREUER

with

LORETTA MALINTOPPI
AUGUST REINISCH
ANTHONY SINCLAIR



CAMBRIDGE
UNIVERSITY PRESS

Copyright © 2009. Cambridge University Press. All rights reserved.

Schreuer, Christoph H.. The ICSID Convention : A Commentary, Cambridge University Press, 2009. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/nyli/detail.action?docID=451905.
Created from nyli on 2018-12-04 11:34:04.

CAMBRIDGE UNIVERSITY PRESS
Cambridge, New York, Melbourne, Madrid, Cape Town, Singapore,
São Paulo, Delhi, Dubai, Tokyo

Cambridge University Press
The Edinburgh Building, Cambridge CB2 8RU, UK

Published in the United States of America by Cambridge University Press, New York

www.cambridge.org
Information on this title: www.cambridge.org/9780521885591

© Christoph H. Schreuer, Loretta Malintoppi, August Reinisch and Anthony Sinclair
2009

This publication is in copyright. Subject to statutory exception and to the
provision of relevant collective licensing agreements, no reproduction of any part
may take place without the written permission of Cambridge University Press.

First published in print format 2009

ISBN-13 978-0-511-59567-7 eBook (EBL)

ISBN-13 978-0-521-88559-1 Hardback

Cambridge University Press has no responsibility for the persistence or accuracy
of urls for external or third-party internet websites referred to in this publication,
and does not guarantee that any content on such websites is, or will remain,
accurate or appropriate.

Copyright © 2009. Cambridge University Press. All rights reserved.

Schreuer, Christoph H.. The ICSID Convention : A Commentary, Cambridge University Press, 2009. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyli/detail.action?docID=451905.
Created from nyli on 2018-12-04 11:34:14.

The exclusive nature of the remedies provided by the Convention against awards **19** is related to the Convention's general exclusive remedy rule in Art. 26. But the rule as reflected in Art. 26 applies only "unless otherwise stated" by the parties (see Art. 26, paras. 17–109). By contrast, Art. 53 is not open to modification by the parties (see also Art. 48, para. 3). Therefore, the parties may not agree on appeals procedures beyond those provided by the Convention.[25] This does not affect the parties' right to reach an agreed settlement which is at variance with the terms of the award.

## a) National Courts

The self-contained and exhaustive nature of review procedures under the ICSID **20** Convention is one of the Convention's distinctive features. It serves the interest of finality of awards and provides a clear advantage over other arbitration mechanisms. Awards stemming from arbitration systems such as the ICC, the AAA or UNCITRAL are subject to potentially protracted and costly review procedures by the courts of the arbitration forum.[26]

The *ad hoc* Committee in *MINE* v. *Guinea* expressed this effect of Art. 53 in **21** the following terms:

> 4.02 Article 53 of the Convention provides that the award shall be binding on the parties "and shall not be subject to any appeal or to any other remedy except those provided for in this Convention". The post-award procedures (remedies) provided for in the Convention, namely, addition to, and correction of, the award (Art. 49), and interpretation (Art. 50), revision (Art. 51) and annulment (Art. 52) of the award are to be exercised within the framework of the Convention and in accordance with its provisions. It appears from these provisions that the Convention excludes any attack on the award in national courts. The award is final in that sense. It is also final in the sense that even within the framework of the Convention it is not subject to review on the merits. It is not final, on the other hand, in the sense that it is open to being completed or corrected, interpreted, "revised" or annulled.[27]

This independence from national procedures for review of arbitral awards means **22** that the place of arbitration in ICSID proceedings is irrelevant for the award's validity and enforcement. ICSID arbitration is delocalized and independent of judicial control in the country where the proceedings take place and the award is rendered (see Art. 44, paras. 3, 21, 54). Consequently, a party to ICSID proceedings may not initiate action before a domestic court to seek the annulment or another

Copyright © 2009. Cambridge University Press. All rights reserved.

---

25 *Amerasinghe, C. F.*, Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes, 5 Journal of Maritime Law and Commerce 211, 244/5 (1973/74).

26 *Berger, K. P.*, The Modern Trend Towards Exclusion of Recourse Against Transnational Arbitral Awards: A European Perspective, 12 Fordham International Law Journal 605 (1989); *Delaume, G. R.*, Reflections on the Effectiveness of International Arbitral Awards, 12 Journal of International Arbitration 5 (1995).

27 *MINE* v. *Guinea*, Decision on Annulment, 22 December 1989, para. 4.02. *Cf.* also *loc. cit.*, paras. 4.04 and 5.08.

Schreuer, Christoph H.. The ICSID Convention : A Commentary, Cambridge University Press, 2009. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyli/detail.action?docID=451905.
Created from nyli on 2018-12-04 11:31:53.

protection under Art. 27(1) and may lead to the submission of the dispute to the International Court of Justice in accordance with Art. 64[5] (see Art. 53, paras. 35–38; Art. 54, para. 115).

**8**      Art. 55 may be seen as the Achilles' heel of the Convention. The otherwise effective machinery of arbitration has its weak point when it comes to the actual execution against States of pecuniary obligations under awards. The self-contained nature of the procedure which excludes the intervention of domestic courts does not extend to the stage of execution.[6] Arbitral tribunals do not have the power to order execution of their own awards. The Convention does not enjoin the courts of States parties to the Convention to enforce ICSID awards if this would be contrary to their law governing the immunity from execution of judgments and arbitral awards. Therefore, a State whose courts refuse execution of an ICSID award for reasons of State immunity is not in violation of Art. 54. This weakness of the enforcement procedure may make itself felt long before the stage of execution is reached. It may affect the bargaining position of the parties before or during the ICSID proceedings and may be reflected in a settlement between the parties (see Art. 48, paras. 69–87). It may also lead to a discount factor in an agreement concerning compliance with an award.[7]

## II. INTERPRETATION

### A. "Nothing in Article 54 shall be construed as derogating..."

**9**      Art. 55 leaves the law on State immunity from execution intact. This was the result of a conscious decision in the Convention's drafting. The inclusion of a waiver of immunity from execution would have been technically possible. But it was felt that the time was not ripe for such a drastic step. An attempt to include such a waiver would have run into the determined opposition of developing countries and would have jeopardized the wide ratification of the Convention.[8]

**10**      During the Convention's drafting, the concept of preserving immunity was barely questioned, although the idea that the Convention should provide for a waiver of immunity from enforcement as a consequence of consent to jurisdiction was aired at one point (History, Vol. II, pp. 345, 575). Also, there was some dissatisfaction at the prospect of unequal treatment of awards depending on which country was chosen for their enforcement (at pp. 429, 671). But Mr. *Broches*

Copyright © 2009. Cambridge University Press. All rights reserved.

---

5   See *Delaume, G. R.*, Sovereign Immunity and Transnational Arbitration, 3 Arbitration International 28, 43 (1987).

6   *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 246 *et seq.* (1990).

7   See *Schreuer, C.*, State Immunity: Some Recent Developments 125 (1988); *Craig, W. L.*, The Final Chapter in the Pyramids Case: Discounting an ICSID Award for Annulment Risk, 8 ICSID Review – FILJ 264, 282 *et seq.* (1993).

8   *Broches, A.*, The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 136 Recueil des Cours 331, 403 (1972-II); *Broches*, Awards Rendered, pp. 333, 334.

Schreuer, Christoph H.. The ICSID Convention : A Commentary, Cambridge University Press, 2009. ProQuest Ebook Central,
     http://ebookcentral.proquest.com/lib/nyli/detail.action?docID=451905.
Created from nyli on 2018-12-04 11:32:38.