IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Eiser Infrastructure Limited and Energia Solar
Luxembourg S.A.R.L.,

          *Petitioners*,

   v.

Kingdom of Spain,

          *Respondent*.

**Civil Action No. 1:18-cv-01686-CKK**

**Petitioners' Response to Spain's Motion to Dismiss and
Reply in Support of Petition to Enforce Arbitral Award**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

GLOSSARY ...................................................................................................................... xii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE CASE............................................................................................ 2

    I.    Eiser's Investment In Spain ...................................................................................... 2

    II.   The Energy Charter Treaty And The ICSID Convention ......................................... 3

    III.  The ICSID Arbitration ............................................................................................. 5

    IV.  The *Achmea* Decision ............................................................................................. 6

    V.   This Enforcement Proceeding................................................................................... 8

ARGUMENT ...................................................................................................................... 9

    I.    This Court Has Jurisdiction Under The Foreign Sovereign Immunities Act Without Regard To Any Challenge To The Tribunal's Determination That Spain Consented To Arbitration ........................................................................................................... 10

        A.   This Court Has Jurisdiction Under The FSIA's Waiver Exception Because Spain's Signing Of The ICSID Convention Waived Its Immunity To Enforcement Of ICSID Awards In United States Court ............................... 11

        B.   Spain Cannot Dispute This Court's Jurisdiction Under The FSIA's Arbitration Exception Because The Tribunal's Ruling That Spain Consented To Arbitration Is Binding On This Court ......................................... 16

            1.   Under The ICSID Convention, The Tribunal's Rulings Are Entitled To Full Faith And Credit, Resulting In Issue Preclusion .......................... 17

            2.   Under The Energy Charter Treaty, The Question Of Whether Spain Consented To Arbitration Is For The Tribunal, Not This Court ............... 19

        C.   Spain's Argument Is Contrary To The ICSID Convention And The FSIA ....... 22

    II.   The Tribunal's Determination That Spain Consented To Arbitration Was Correct............... 23

        A.   European Union Law Permits Arbitration Of Intra-EU Disputes Under The Energy Charter Treaty ................................................................................. 24

## TABLE OF CONTENTS (*CONTINUED*)

                                                                                              **Page**

    B.    Under International Law, Spain's Consent To Arbitrate Is Valid
Regardless Of Whether It Complies With European Union Law........................ 29

III.    The Court Should Enter Judgment In Eiser's Favor Upon Denying Spain's Motion To
Dismiss ...........................................................................................................................37

    A.    Spain Is Not Entitled To Delay Presentation Of Its Purported Merits
Defenses......................................................................................................... 38

    B.    This Court Can And Should Enter Judgment Without Waiting For Spain
To Complete An Interlocutory Appeal ............................................................ 41

CONCLUSION........................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. McCurry,*
    449 U.S. 90 (1980)........................................................................................17

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.,*
    138 S. Ct. 1865 (2018)..................................................................................28

*Apostol v. Gallion,*
    870 F.2d 1335 (7th Cir. 1989) .....................................................................44

*Baker by Thomas v. Gen. Motors Corp.,*
    522 U.S. 222 (1998)......................................................................................40

*Blue Ridge Invs., L.L.C. v. Republic of Argentina,*
    735 F.3d 72 (2d Cir. 2013)......................................................................13, 41

*Cabiri v. Gov't of Republic of Ghana,*
    165 F.3d 193 (2d Cir. 1999).........................................................................12

*CalPortland Co., Inc. v. Fed. Mine Safety & Health Review Comm'n on Behalf of*
    *Pappas,*
    839 F.3d 1153 (D.C. Cir. 2016)...............................................................42, 43

*Carr v. Dist. of Columbia,*
    646 F.2d 599 (D.C. Cir. 1980).....................................................................19

*Chevron Corp. v. Republic of Ecuador,*
    795 F.3d 200 (D.C. Cir. 2015).................................................................20, 21

*Chevron Corp. v. Republic of Ecuador,*
    949 F. Supp. 2d 57 (D.D.C. 2013) ...............................................................21

*Chubb & Son, Inc. v. Asiana Airlines,*
    214 F.3d 301 (2d Cir. 2000).........................................................................30

*Contec Corp. v. Remote Sol., Co.,*
    398 F.3d 205 (2d Cir. 2005).........................................................................21

*Creighton Ltd. v. Gov't of State of Qatar,*
    181 F.3d 118 (D.C. Cir. 1999)..............................................12, 13, 14, 15, 44

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
    244 F. Supp. 3d 100 (D.D.C. 2017) .............................................................22

# TABLE OF CONTENTS (*CONTINUED*)

**Page**

*CTS Corp. v. EPA,*
  759 F.3d 52 (D.C. Cir. 2014) ........................................................................... 38

*Diag Human S.E. v. Czech Republic-Ministry of Health,*
  64 F. Supp. 3d 22 (D.D.C. 2014) ..................................................................... 14

*First Options of Chicago, Inc. v. Kaplan,*
  514 U.S. 938 (1995) .......................................................................................... 20

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
  905 F.2d 438 (D.C. Cir. 1990) ......................................................................... 43

*Gold Reserve Inc. v. Bolivarian Republic of Venezuela,*
  146 F. Supp. 3d 112 (D.D.C. 2015) ................................................................. 22

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
  No. 17-1272 (U.S. Jan. 8, 2019) ................................................................. 17, 20

*KenAmerican Res. v. Int'l Union, UMW,*
  99 F.3d 1161 (D.C. Cir. 1996) ......................................................................... 20

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
  376 F.3d 1123 (D.C. Cir. 2004) .................................................................. 42, 43

*La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya,*
  533 F.3d 837 (D.C. Cir. 2008) ......................................................................... 41

*Made in the USA Found. v. United States,*
  242 F.3d 1300 (11th Cir. 2001) ....................................................................... 31

*Maritime Int'l Nominees Establishment v. Republic of Guinea,*
  693 F.2d 1094 (D.C. Cir. 1982) .................................................................. 14, 15

*Mary Ann Pensiero, Inc. v. Lingle,*
  847 F.2d 90 (3d Cir. 1988) ............................................................................... 44

*Medellin v. Texas,*
  552 U.S. 491 (2008) .......................................................................................... 31

*Micula v. Gov't of Romania,*
  104 F. Supp. 3d 42 (D.D.C. 2015) ..................................................................... 8

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela,*
  863 F.3d 96 (2d Cir. 2017) ....................................................... 8, 9, 17, 20, 38, 43

# TABLE OF CONTENTS (*CONTINUED*)

**Page**

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009) ............................................................................................42, 43

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
    850 F.2d 756 (D.C. Cir. 1988) ...................................................................................20

*Newco Ltd. v. Gov't of Belize*,
    650 F. App'x 14 (D.C. Cir. 2016) .............................................................................40

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.*,
    830 F.2d 449 (2d Cir. 1987).......................................................................................39

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
    724 F.3d 1069 (9th Cir. 2013) ...................................................................................21

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017)...................................................................................10

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
    724 F.3d 230 (D.C. Cir. 2013)..............................................................................23, 35

*Oxford Health Plans LLC v. Sutter*,
    569 U.S. 564 (2013)...................................................................................................19

*Philipp v. Fed. Republic of Germany*,
    894 F.3d 406 (D.C. Cir. 2018)...................................................................................40

*Pigeon River Improvement, Slide and Boom Co. v. Charles W. Cox, Ltd.*,
    291 U.S. 138 (1934)...................................................................................................31

*Princz v. Fed. Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) ..................................................................................11

*Princz v. Fed. Republic of Germany*,
    998 F.2d 1 (D.C. Cir. 1993) .................................................................................43, 44

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010).....................................................................................................19

*Republic of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014)...................................................................................................41

*S & Davis Int'l, Inc. v. The Republic of Yemen*,
    218 F.3d 1292 (11th Cir. 2000) .......................................................................13, 14, 15

# TABLE OF CONTENTS (*CONTINUED*)

**Page**

*San Remo Hotel, L.P. v. City of San Francisco*,
    545 U.S. 323 (2005)..................................................................................17

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993)..................................................................................10

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*,
    87 F.3d 1356 (D.C. Cir. 1996)...............................................................28

*Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*,
    900 F.2d 360 (D.C. Cir. 1990)...............................................................18

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*
    *Kommanditgesellschaft v. Navimpex Centrala Navala*,
    989 F.2d 572 (2d Cir. 1993).....................................................................12

*Stati v. Republic of Kazakhstan*,
    199 F. Supp. 3d 179 (D.D.C. 2016)........................................................13

*Strategic Techs. PTE, Ltd. v. Republic of China (Taiwan)*,
    No. 1:05-cv-2311, 2007 WL 1378492 (D.D.C. May 10, 2007) ........................13, 14

*Tatneft v. Ukraine*,
    301 F. Supp. 3d 175 (D.D.C. 2018)................................................12, 44

*Tidewater Investment SRL v. Bolivarian Republic of Venezuela*,
    No. 1:17-cv-1457, 2018 WL 6605633 (D.D.C. Dec. 17, 2018) ........................9, 19

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar.*
    *Ass'n*,
    455 U.S. 691 (1982)..................................................................................19

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013)...............................................................30

*United States v. Martinez*,
    755 F. Supp. 1031 (N.D. Ga. 1991).......................................................31

*United States v. Rodriguez-Rosado*,
    909 F.3d 472 (1st Cir. 2018)...................................................................44

*V.L. v. E.L.*,
    136 S. Ct. 1017 (2016)............................................................................19

# TABLE OF CONTENTS (*CONTINUED*)

**Page**

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l,*
    493 U.S. 400 (1990)............................................................................40

*Weinberger v. Rossi,*
    456 U.S. 25 (1982)............................................................................30

*Will v. Hallock,*
    546 U.S. 345 (2006)......................................................................42, 43

*Wis. Mut. Ins. Co. v. United States,*
    441 F.3d 502 (7th Cir. 2006) ..............................................................44

*Yamaha Corp. of Am. v. United States,*
    961 F.2d 245 (D.C. Cir. 1992)........................................................17, 18

**Foreign Judicial Decisions**

*Bundesgerichtshof*, Oct. 31, 2018,
    ECLI:DE:BGH:2018:311018BIZB2. 15.0 (Ger.)....................................32

*Efler v. Comm'n.*,
    Case T-754/14, ECLI:EU:T:2017:323 (May 10, 2017)..........................29

Opinion 2/15, *Opinion on Free Trade Agreement with Singapore*,
    ECLI:EU:C:2017:376 (May 16, 2017) ..................................................29

*Slovak Republic v. Achmea BV*,
    Case C-284/16, ECLI:EU:C:2018:158 (Mar. 6, 2018)......................2, 6, 7, 10, 16, 18, 22, 24,
                                             25, 26, 27, 28, 29, 32, 33

Judgment of 1 July 2009,
    *Jan Rudolf Maas v. Comm'n*,
    Joined Cases T-81/07, T-82/07 and T-83/07, EU:T:2009:237 ................39

**Arbitration Decisions**

*Blusun S.A. v. Italian Republic*,
    ICSID Case No. ARB/14/3, Award (Dec. 27, 2016).........................32, 33

*Foresight Lux. Solar 1 S.a.r.l. v. Kingdom of Spain*,
    SCC Arbitration V (2015/150), Final Award (Nov. 14, 2018)................27

*Greentech Energy Systems A/S et al. v. Italian Republic*,
    SCC Arbitration V (2015/095), Final Award (Dec. 23, 2018) ...............27

# TABLE OF CONTENTS (*CONTINUED*)

**Page**

*Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain,*
    ICSID Case No. ARB/14/1, Award (May 16, 2018) ...........................................27

*Vattenfall AB v. Fed. Republic of Germany,*
    ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue (Aug. 31, 2018)
    .............................................................................................27, 34, 35, 36, 37

**Statutes**

9 U.S.C. § 9 .............................................................................................................8

9 U.S.C. § 10 ...........................................................................................................8

9 U.S.C. § 15 .........................................................................................................40

22 U.S.C. § 1650a ..............................................1, 8, 9, 10, 11, 17, 23, 37, 38, 39

28 U.S.C. § 1291 ...............................................................................................41, 42

28 U.S.C. § 1330 .....................................................................................................8

28 U.S.C. § 1391 .....................................................................................................8

28 U.S.C. § 1604 ...................................................................................................23

28 U.S.C. § 1605(a)(1)......................................................................................11, 16

28 U.S.C. § 1605(a)(6)..........................................................................11, 16, 22, 23

28 U.S.C. § 1608....................................................................................................8, 9

**Federal Rules**

Fed. R. App. P. 8(a) ...............................................................................................44

Fed. R. Civ. P. 62(b) .............................................................................................44

**Treaties**

Energy Charter Treaty, art. 1 ...............................................................................4, 24

Energy Charter Treaty, art. 10 ...............................................................................4

Energy Charter Treaty, art. 16 .........................................................................34, 35

# TABLE OF CONTENTS (*CONTINUED*)

**Page**

Energy Charter Treaty, art. 26 ...............................................4, 5, 6, 21, 23, 27, 29, 36, 37

Energy Charter Treaty, art. 46 ...............................................................................33

Energy Charter Treaty, art. 47 ...............................................................................35

ICSID Convention, art. 25 .......................................................................................4

ICSID Convention, art. 41 ...................................................................................4, 21

ICSID Convention, art. 48 .......................................................................................4

ICSID Convention, art. 53 ...............................................1, 5, 8, 9, 13, 18, 22, 38, 39, 41

ICSID Convention, art. 54 ...................................................................1, 5, 8, 13, 18

ICSID Convention, pmbl. ........................................................................................4

Treaty Establishing the European Community, art. 234................................................25

Treaty Establishing the European Community, art. 292................................................25

Treaty Establishing the European Economic Community, art. 177................................25

Treaty Establising the European Economic Community, art. 219................................25

Treaty on European Union, art. 17.........................................................................29

Treaty on the Functioning of the European Union, art. 108 .......................................39

Treaty on the Functioning of the European Union, art. 258 ...................................29, 32

Treaty on the Functioning of the European Union, art. 267 .....................25, 32, 34, 35

Treaty on the Functioning of the European Union, art. 344 ...................5, 6, 7, 18, 25, 26, 34, 35

Vienna Convention, art. 6 ......................................................................................30

Vienna Convention, art. 26 ...............................................................................30, 31

Vienna Convention, art. 27 ......................................................................................31

Vienna Convention, art. 30 ...............................................................................34, 37

Vienna Convention, art. 31 ......................................................................................34

# TABLE OF CONTENTS (*CONTINUED*)

                                                                                        **Page**

Vienna Convention, art. 46 ...................................................................................31, 33

**Other Authorities**

Arbitral Awards: Hearing on H.R. 3106, et al. Before the Subcomm. on Admin.
    Law & Gov. Relations of the H. Comm. on the Judiciary, 99th Cong. (1986)
    (statement of Mark B. Feldman)......................................................................15, 16

Decisions with respect to the ECT, Annex 2 to the Final Act of the European
    Energy Charter Conference.....................................................................................36

Draft Treaty, Basic Agreement for the European Energy Charter (Aug. 12, 1992) .....................36

Energy Charter Treaty, *European Union and Euratom* (July 31, 2015),
    https://energycharter.org/who-we-are/members-observers/countries/european-
    union-and-euratom/..................................................................................................3

Energy Charter Treaty, *France* (July 31, 2015), https://energycharter.org/who-we-
    are/members-observers/countries/france/ .................................................................4

Energy Charter Treaty, *Ireland* (July 31, 2015), https://energycharter.org/who-we-
    are/members-observers/countries/ireland/ ................................................................4

Energy Charter Treaty, *Signatories/Contracting Parties* (June 5, 2015),
    https://energycharter.org/process/energy-charter-treaty-1994/energy-charter-
    treaty/signatories-contracting-parties/...................................................................3, 4

Energy Charter Treaty, Trade Amendment and Related Documents,
    https://www.italaw.com/sites/default/files/laws/italaw6101%2838%29.pdf ...........................3

European Commission, Decision on State Aid SA.40348 (2015/NN), *Spain:
    Support for electricity generation from renewable energy sources,
    cogeneration and waste* 2017 O.J. (C442) (Nov. 11, 2017)......................................39

European Commission Press Release, IP/15/5198, Commission Asks Member
    States To Terminate Their Intra-EU Bilateral Investment Treaties (Jun. 18,
    2015) ......................................................................................................................29

European Union, *Countries*, https://europa.eu/european-union/about-
    eu/countries_en#tab-0-1.............................................................................................4

ICSID, *List of Member States*–ICSID/3,
    https://icsid.worldbank.org/en/Pages/icsiddocs/List-of-Member-States.aspx ...........................4

## TABLE OF CONTENTS (*CONTINUED*)

**Page**

Opinion of Advocate General Wathelet, Case C-284/16,
*Slovak Republic v. Achmea BV*,
ECLI:EU:C:2017:699 (Sept. 19, 2017) ...................................................................33

Restatement (Fourth) of Foreign Relations Law: Treaties, Tentative Draft No. 2
§ 102 (Mar. 20, 2017) ............................................................................................31

Restatement (Second) of Judgments § 27 (1982) .........................................................18

Restatement (Third) of Foreign Relations Law § 441 (1987)..................................38, 39

Scalia & Garner, *Reading Law: The Interpretation of Legal Text* (Thomas/West
2012) ......................................................................................................................35

UN Int'l Law Comm'n Rep't on Fragmentation of Int'l Law (Apr. 13, 2006) .............36

United Nations Treaty Collection, *Vienna Convention on the Law of Treaties*,
https://treaties.un.org/Pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=
XXIII-1&chapter=23&Temp=mtdsg3&clang=_en ...................................................30

William P. Rogers, U.S. Secretary of State, *Report on the Vienna Convention on
the Law of Treaties*, 65 Dep't St. Bull 684 (Dec. 13 1971) .....................................30

## GLOSSARY

**CJEU** ............................................................Court of Justice of the European Union

**ECT** ..............................................................Energy Charter Treaty

**EU** ................................................................European Union

**FAA** .............................................................Federal Arbitration Act

**FSIA** ............................................................Foreign Sovereign Immunities Act

**ICSID** ..........................................................Convention on the Settlement of Investment Disputes between States and Nationals of Other States

**TFEU** ...........................................................Treaty on the Functioning of the European Union

## INTRODUCTION

Petitioners Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. ("Eiser") hold a €128 million arbitral award plus interest against Respondent, the Kingdom of Spain ("Spain"), resulting from arbitration pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention").  The ICSID Convention is a treaty entered into by the United States, Spain, and most nations of the world that provides a comprehensive framework for resolving investment disputes between its signatory nations and the private investors of other signatory nations.

A critical feature of the Convention and its implementing legislation in the United States is that they provide for streamlined enforcement procedures against signatory nations.  ICSID awards are treated as "binding," "final judgment[s]" that are not "subject to any appeal or to any other remedy except those provided for in th[e] Convention."  ECF No. 1-2 (the "ICSID Convention"), arts. 53, 54.  In the United States, they are entitled to the same "full faith and credit" as the judgments of a state court, and are not subject to any of the defenses to confirmation of an arbitration award that ordinarily are available under the Federal Arbitration Act ("FAA").  22 U.S.C. § 1650a(a).  United States courts thus universally have agreed that foreign states have no right to oppose enforcement of an ICSID award entered against them by challenging the arbitration tribunal's jurisdiction or merits determinations.  Instead, Congress has provided that federal courts are required to enforce an ICSID award expeditiously by converting the award into a federal judgment as soon as the foreign state is served and the court's jurisdiction is established.

Spain's motion to dismiss seeks to subvert that straightforward process by relitigating questions that have already been conclusively decided by the arbitration tribunal.  This Court should reject Spain's transparent attempt to circumvent the limits on judicial review of an ICSID award established by Congress and the treaty obligations of the United States.  The Court need not—

indeed, may not—independently determine whether Spain consented to arbitration because the arbitration tribunal already decided the issue and issued a binding award on that basis.  By signing the ICSID Convention, Spain agreed that ICSID awards against it would be subject to enforcement in United States court, and thus waived its immunity under the Foreign Sovereign Immunities Act ("FSIA") from such enforcement proceedings.  Spain is also subject to jurisdiction under a separate provision of the FSIA that permits suits against foreign states to confirm arbitration awards.  Spain attempts to defeat jurisdiction under this provision by arguing that the recent decision by the Court of Justice of the European Union ("CJEU") in Case C-284/16, *Slovak Republic v. Achmea BV*, ECLI:EU:C:2018:158 (Mar. 6, 2018) ("*Achmea*") (Ex. 1 hereto) renders Spain's consent to arbitration invalid under European Union ("EU") law, thus (in Spain's view) stripping this Court of jurisdiction over this dispute under the FSIA.  But this Court is bound by the arbitration tribunal's determination that Spain's consent was valid.  And even if this Court were not bound, the tribunal was correct that Spain validly consented to arbitration:  Spain's consent was unambiguous and fully compatible with EU law and, regardless of EU law, was binding under international law.

To further delay enforcement, Spain also asserts that it is entitled to an immediate interlocutory appeal if this Court finds jurisdiction, followed by briefing on Spain's purportedly separate merits defenses to enforcement of the award.  Because the ICSID Convention leaves no room for such defenses, there is no basis for delay.  This Court accordingly should grant Eiser's petition and immediately enter judgment in favor of Eiser in the amount and currency specified in the award.

## STATEMENT OF THE CASE

### I.    Eiser's Investment In Spain

The two Eiser parties—Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L.—are, respectively, UK- and Luxembourg-based companies that beginning in 2007 invested approximately €128 million in concentrated solar power projects in Spain.  ECF No. 1-1,

Ex. A ("Award") ¶¶ 102-03, 114-15, 474.  Eiser made these investments in reliance on a series of laws enacted by Spain to promote the development of renewable energy, including concentrated solar power projects.  *Id.* ¶¶ 101-08.  In particular, Eiser relied on the promise of financial incentives and inducements that Spain had recently enacted for the purpose of "establishing a stable subsidy system that [would] guarante[e] attractive profitability for electricity production" and provide "legal certainty."  *Id.* ¶¶ 108, 111.

Spain's favorable treatment of renewable energy investment was short lived.  Between 2012 and 2014, Spain adopted a series of measures retrenching on, and eventually revoking, the economic incentives on which Eiser had relied in making its investments.  Award ¶¶ 137-54.  As a result, the revenues generated by Eiser's investments "dropped sharply," to the point of stripping those investments of "virtually all of the[ir] value."  *Id.* ¶¶ 151-54, ¶ 365.

## II.    The Energy Charter Treaty And The ICSID Convention

Eiser's investments in Spain were protected by two treaties:  the Energy Charter Treaty, ECF No. 1-3 (the "ECT"), and the ICSID Convention.

The ECT is a multilateral investment treaty among 52 nations and regional organizations—including Spain, the UK, Luxembourg, and the EU[1]—to "establish a legal framework [for] promot[ing] long-term cooperation in the energy field" and "creat[e] a stable . . . legal foundation for cross-border energy relations."  Award ¶ 99.  When the treaty was adopted in 1998, its signatories included the EU and every EU member state at that time, all of whom had individually ratified the treaty by 1999.[2]  The current parties to the treaty include the EU and every current EU member

---

[1]  *See* Energy Charter Treaty, *Signatories/Contracting Parties* (June 5, 2015), https://energycharter.org/process/energy-charter-treaty-1994/energy-charter-treaty/signatories-contracting-parties/.

[2]  *Compare* Energy Charter Treaty, Trade Amendment and Related Documents, at 137-39, https://www.italaw.com/sites/default/files/laws/italaw6101%2838%29.pdf (listing countries that signed or ratified ECT as of 1998); Energy Charter Treaty, *European Union and Euratom* (July

except Italy, which withdrew from the treaty as of 2016.[3]  The treaty protects investments in the

territory of a "Contracting Party" to the treaty (*e.g.*, Spain) by "Investors" (*e.g.*, Eiser) located or

incorporated in "other Contracting Parties" (*e.g.*, the UK and Luxembourg).  ECT, arts. 1(7), 10(1),

26.  As relevant here, Contracting Parties agree to "accord . . . fair and equitable treatment" to the

investments of other Contracting Parties' investors, *id.*, art. 10(1), and "unconditional[ly] consent"

to the submission of investment disputes arising under the treaty to "international arbitration" in

accordance with the terms of the treaty, at the election of the investor, *id.*, art. 26(2), (3)(a).

The ICSID Convention further protects investors like Eiser by facilitating enforcement of

arbitration awards arising from violations of the ECT.  The Convention is a treaty among 154

nations—including Spain, the UK, Luxembourg, and the United States[4]—that provides a compre-

hensive framework for arbitrating investment disputes "between Contracting States and nationals

of other Contracting States."  ICSID Convention, pmbl.  Arbitral tribunals constituted under the

ICSID Convention are responsible for conclusively deciding not only the merits of any dispute

submitted to them, *id.*, art. 48, but also all issues pertaining to their jurisdiction, including the scope

and validity of the parties' consent to arbitrate, *id.*, arts. 25, 41.  By signing the ICSID Convention,

Spain agreed to be bound by, "abide by," and "comply with" all awards issued pursuant to the

Convention, and agreed that such awards would be enforceable in the courts of any Contracting

---

31, 2015), https://energycharter.org/who-we-are/members-observers/countries/european-union-and-euratom/ (showing EU signature), *with* European Union, *Countries*, https://europa.eu/european-union/about-eu/countries_en#tab-0-1 (listing EU countries by year of entry).  France and Ireland ratified the treaty in 1999.  *See* Energy Charter Treaty, *France* (July 31, 2015), https://energycharter.org/who-we-are/members-observers/countries/france/; Energy Charter Treaty, *Ireland* (July 31, 2015), https://energycharter.org/who-we-are/members-observers/countries/ireland/.

[3]  *Compare* Energy Charter Treaty, *Signatories/Contracting Parties*, *supra*, *with* https://europa.eu/european-union/about-eu/countries_en; *see also* https://energycharter.org/who-we-are/members-observers/countries/italy/.

[4]  *See* ICSID, *List of Member States–ICSID/3*, https://icsid.worldbank.org/en/Pages/icsiddocs/List-of-Member-States.aspx.

State—including the United States—as "final judgment[s]" without being "subject to any appeal or to any other remedy except those provided for in th[e] Convention." *Id.*, arts. 53-54. The ECT provides for arbitration under the ICSID Convention when both the investor's nation and the opposing party are parties to the ICSID Convention, ECT, art. 26(4)(a)(i), ensuring that arbitration under the ECT will be binding and conclusive as to all issues litigated, and that any resulting arbitration awards are broadly and expeditiously enforceable nearly worldwide, without any challenge to the validity of the award or the conclusions of the arbitral tribunal.

## III.    The ICSID Arbitration

In December 2013, Eiser submitted a request for arbitration with Spain under the ICSID Convention. Award ¶ 6. Eiser alleged that by revoking the financial incentives for investment in renewable energy projects, Spain had violated its obligation under Article 10(1) of the ECT to provide fair and equitable treatment to Eiser. *Id.* ¶ 155. Eiser invoked Spain's consent under Article 26 of the ECT to arbitrate disputes under that treaty. *Id.* ¶ 176. An ICSID arbitral tribunal (the "Tribunal") was constituted in July 2014, and held a six-day Hearing on Jurisdiction and Merits in February 2016. *Id.* ¶¶ 10, 12, 73.

In the arbitration, Spain challenged the Tribunal's jurisdiction on several grounds. As relevant here, Spain argued that EU law precludes the application of the ECT to so-called "intra-EU" disputes between EU member states and EU-based investors. Award ¶¶ 166-69. Spain relied on Article 344 of the Treaty on the Functioning of the European Union ("TFEU") (Ex. 2 hereto), which provides that EU members states "undertake not to submit a dispute concerning the interpretation or application of [the EU's foundational treaties] to any method of settlement other than those provided for" in those treaties, TFEU, art. 344. *See* Award ¶ 167.

The Tribunal rejected Spain's jurisdictional arguments and on May 4, 2017 issued an Award in favor of Eiser. With respect to jurisdiction, the Tribunal found that the plain terms of

Article 26 of the ECT encompass intra-EU disputes, and that the ECT does not conflict with Article 344 of the TFEU or any other provision of EU law.  Award ¶¶ 182-87, 193-96, 199-204.  On the merits, the Tribunal found that Spain breached its obligations under Article 10(1) of the ECT by failing to accord fair and equitable treatment to Eiser's investment.  *Id*. ¶ 486(b).  The Award requires Spain to pay €128 million as damages to Eiser, *id*. ¶ 486(c), plus interest on these damages at a rate of:  (1) 2.07 percent from June 20, 2014 to May 4, 2017, compounded monthly; and (2) 2.50 percent from May 4, 2017 until the Award is paid in full, compounded monthly, *id*. ¶ 486(d).

After the Award was issued, Spain filed an application for annulment with ICSID and requested a stay of enforcement of the Award during the annulment proceedings.  *See* Declaration of Miriam K. Harwood, ECF No. 16-2 ("Harwood Decl."), ¶ 11.  The Committee overseeing those proceedings denied Spain's stay request, finding "no circumstances that require[d] the stay to be continued pending its decision on annulment."  Decision on Stay of Enforcement (Ex. A to Declaration of Matthew S. Rozen ("Rozen Decl.") (Ex. 3 hereto)), ¶ 71(a).  The Committee accepted Eiser's undertaking that it would "promptly . . . repay Spain any and all amounts received in satisfaction of the Award to the extent that the annulment application is successful" and would not "disburse or transfer any amounts received in satisfaction of the Award to their investors or to any other third party while the annulment proceeding is ongoing."  *Id.* ¶ 71(b).

## IV.    The *Achmea* Decision

In March 2018, the CJEU—the highest judicial authority on EU law—issued its decision in *Achmea*.  In that case, an EU member state (Slovakia) challenged the arbitration provisions of a "bilateral investment treaty" between itself and another EU member state (the Netherlands), which provided for arbitration of disputes between each state and the other state's investors.  *Achmea*, ¶¶ 3-4, 23.  The CJEU entered a "preliminary ruling" that found that the arbitration provision in the treaty was incompatible with EU law because the arbitration provision may have required

the arbitral tribunal to determine issues of EU law. *Id.* ¶¶ 1, 40-42.  Thus, submitting those issues

to arbitration could lead to the resolution of questions of EU law outside the "judicial system of

the EU," *id.* ¶¶ 43-55, contravening the TFEU, *id.* ¶ 60—including Article 344, the provision Spain

had invoked in the arbitration here.

The CJEU's decision is limited to intra-EU disputes under the "bilateral" investment treaty

at issue in that case.  *Achmea*, ¶¶ 23, 60.  It distinguished those treaties from multilateral treaties

that (like the ECT) are signed "by the EU" itself:  Whereas the EU retains authority to enter "in-

ternational agreement[s]" "binding" itself to the decisions of tribunals outside of the EU judicial

framework, the CJEU concluded that granting the same authority to member states acting individ-

ually would threaten intra-EU "cooperation" and "respect for EU law." *Id.* ¶¶ 34, 57-58.

Spain has not sought annulment based on the *Achmea* decision.  *See* Harwood Decl. ¶¶ 11-

15.  The European Commission ("Commission")—the EU's principal executive body—has filed

an *amicus* submission in Spain's annulment proceeding in which it relies on *Achmea* to argue that

the ECT does not authorize intra-EU arbitration, *id.* ¶¶ 17-18, but the argument is only before the

Committee indirectly in connection with particular issues not relevant to this proceeding.[5]  The

Award remains in force—and not subject to a stay—while the Committee considers Spain's argu-

ments for annulment.  *See* Procedural Order No. 2, ¶ 56 (Ex. B to Rozen Decl.).

---

[5]  Specifically, the Committee limited the Commission's brief to the purely procedural argument that the Commission should have been permitted to file an *amicus* brief in the underlying arbitration without paying the parties' resulting costs.  Procedural Order No. 3 (Ex. 2 to Harwood Decl.), ¶ 35.  The Commission invokes *Achmea* only to attempt to show that the *amicus* brief that it hoped to file would have been material to the arbitration.  European Commission *Amicus Curiae* Submission (Ex. 3 to Harwood Decl.) ¶¶ 74, 79.

## V.      This Enforcement Proceeding

Despite its agreement to "abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed," ICSID Convention, art. 53(1), Spain has not paid any portion of the Award.  Eiser accordingly commenced this proceeding to enforce the Award.

Enforcement of ICSID awards in the United States is governed by 22 U.S.C. § 1650a, which implements the treaty obligations of the United States, as a contracting party to the ICSID Convention, to ensure that U.S. courts treat an ICSID award "as if it were a final judgment" of a state court.  ICSID Convention, art. 54(1).  Section 1650a thus provides, in relevant part, that "[t]he pecuniary obligations imposed by [an ICSID] award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  22 U.S.C. § 1650a(a).  Enforcement is commenced by "fil[ing] a plenary action under section 1650a" to "convert [the] award into an enforceable judgment" in federal court, *Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 49-51 (D.D.C. 2015), in compliance with the requirements for commencing a civil action under the Federal Rules of Civil Procedure, and with the personal jurisdiction, service, and venue requirements of the FSIA, 28 U.S.C. §§ 1330, 1391(f), 1608; *see Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 100, 117-20 (2d Cir. 2017).  Further, the statute specifies that the FAA—which provides limited grounds for vacating or refusing confirmation of an ordinary arbitration award, 9 U.S.C. §§ 9-10—"shall not apply to enforcement of awards rendered pursuant to the convention," 22 U.S.C. § 1650a(a).  "By expressly precluding the FAA's application to enforcement of ICSID Convention awards, Congress intended to make these grounds of attack unavailable to ICSID award-debtors in federal court enforcement proceedings."  *Mobil Cerro Negro*, 863 F.3d at 120-21.

Consistent with these established procedures, Eiser commenced this proceeding in July 2018 by filing a Petition to Enforce Arbitral Award requesting that this Court:  (1) enforce the

Award pursuant to 22 U.S.C. § 1650a in the same manner as a final judgment of a court of one of

the several states; and (2) enter judgment against Spain in the amount and currency specified in

the Award.  ECF No. 1.  As jointly stipulated by the parties, Eiser effected service of process on

Spain in accordance with the FSIA, 28 U.S.C. § 1608(a), as of October 5, 2018.  ECF No. 14, ¶ 1.

## ARGUMENT

Spain's motion to dismiss Eiser's Petition to Enforce Arbitral Award for lack of subject-

matter jurisdiction under the FSIA is an illegitimate attempt to collaterally attack Eiser's ICSID

award.  Under the plain terms of the ICSID Convention, the United States is obligated by treaty to

enforce such awards without permitting "any appeal or . . . *any other remedy* except those provided

for in th[e] Convention."  ICSID Convention, art. 53(1) (emphasis added).  Section 1650a, which

implements the Convention, provides that "[t]he pecuniary obligations imposed by . . . an [ICSID]

award shall be enforced" and "be given the same full faith and credit" as a state court judgment.

22 U.S.C. § 1650a(a).

Section 1650a thus envisions a "perfunctory role . . . for federal district courts," *Tidewater

Investment SRL v. Bolivarian Republic of Venezuela*, No. 1:17-cv-1457, 2018 WL 6605633, at *6

(D.D.C. Dec. 17, 2018), in which an award debtor "[is] not . . . permitted to make substantive

challenges to the award," *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d

96, 100, 118 (2d Cir. 2017).  District courts "are . . . not permitted to examine an ICSID award's

merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the

award."  *Id.* at 102.  Instead, courts "may do no more than examine the judgment's authenticity

and enforce the obligations imposed by the award."  *Id.*

Spain seeks to avoid these clear limitations by framing its challenge to the Award as an

argument that this Court lacks subject-matter jurisdiction under the FSIA.  Spain argues mainly

that under the CJEU's decision in *Achmea*, EU law prohibits the arbitration of intra-EU disputes

under the ECT, thus undermining Spain's consent to arbitration and thereby (in Spain's view) eliminating a necessary prerequisite for jurisdiction under the FSIA.  Spain Br. 22-24.  Spain's arguments under *Achmea* are irrelevant, however, because—consistent with the ICSID Convention—the FSIA creates subject-matter jurisdiction over Eiser's petition to enforce the Award without regard to any challenge to the Tribunal's determination that Spain consented to binding arbitration under the ECT.  And even if this Court were to reach Spain's arguments under *Achmea*, it should reject them:  Neither *Achmea*'s holding nor its reasoning applies to the ECT (to which the EU itself is a signatory), and even if they did, the decision merely interprets EU law; it has no bearing on the force of Spain's consent to arbitration, which is solely a matter of *international law* under the ECT.

Finally, because the ICSID Convention and Section 1650a do not permit any substantive defenses to enforcement of ICSID awards, there is no basis to delay enforcement of the Award once this Court concludes that it has jurisdiction under the FSIA.  This Court should accordingly grant Eiser's petition and immediately enter judgment for the amount of the Award.

## I.  This Court Has Jurisdiction Under The Foreign Sovereign Immunities Act Without Regard To Any Challenge To The Tribunal's Determination That Spain Consented To Arbitration

The FSIA is the exclusive basis for a federal court's exercise of jurisdiction over a foreign state.  *See Owens v. Republic of Sudan*, 864 F.3d 751, 763 (D.C. Cir. 2017).  Under the FSIA, foreign states are "presumptively immune" from the jurisdiction of federal courts, unless one of its specific, enumerated exceptions applies.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Two exceptions to Spain's jurisdictional immunity apply here, each without regard to any challenge to Spain's consent to arbitrate this dispute.

*First*, under the FSIA's waiver exception, a foreign state is subject to jurisdiction in any case in which it "has waived its immunity either explicitly or by implication."  28 U.S.C.

§ 1605(a)(1).  Because the ICSID Convention expressly contemplates enforcement of ICSID awards against signatory states in the courts of other signatories, including the United States, Spain's signing of the Convention necessarily waived its immunity from such enforcement in U.S. court.  And since that waiver is based on Spain's consent to *enforcement* in *the ICSID Convention*, jurisdiction in no way depends on whether Spain consented to *arbitration* in *the ECT*.

*Second*, under the FSIA's arbitration exception, a foreign state is also subject to jurisdiction in an action "to confirm an award made pursuant to . . . an agreement to arbitrate" that is "made by the foreign state with or for the benefit of a private party."  28 U.S.C. § 1605(a)(6).  Eiser's petition to enforce the Award falls squarely within that exception.  While Spain argues that the ECT does not create a valid arbitration agreement applicable to this case, Section 1650a obligates this Court to accord full faith and credit to the Tribunal's determination in the Award that Spain consented in the ECT to arbitrate the underlying dispute.

**A.    This Court Has Jurisdiction Under The FSIA's Waiver Exception Because Spain's Signing Of The ICSID Convention Waived Its Immunity To Enforcement Of ICSID Awards In United States Court**

While Spain's motion to dismiss focuses on challenging this Court's jurisdiction under the FSIA's arbitration exception, this Court need not even reach that challenge because its jurisdiction under another exception is beyond dispute:  Under settled precedent, the FSIA's waiver exception strips a foreign state of its immunity in a proceeding to enforce an arbitral award, where (as here) the state is a signatory to an international treaty such as the ICSID Convention that provides for the enforcement of such awards in United States court.

**1.**  The FSIA provides that a foreign state is not immune from suit in U.S. court "in any case . . . in which the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  To waive immunity by implication, a foreign state need only "indicat[e] its amenability to suit" in U.S. court.  *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174

(D.C. Cir. 1994).  Waiver may be implied where the state:  (a) demonstrates "a subjective intent to waive immunity"; (b) "take[s] an act that objectively can be interpreted as exhibiting an intent to waive immunity"; or (c) "take[s] acts that forfeit its right to immunity, irrespective of whether it has intended to do so." *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 202 (2d Cir. 1999).

Applying these principles, courts have repeatedly found foreign states to have impliedly waived sovereign immunity from proceeding to enforce arbitral awards when the foreign state has signed an international treaty providing for the enforcement of arbitral awards in U.S. courts.  In *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572 (2d Cir. 1993), for example, the Second Circuit held that a signatory to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") "implicitly waive[s] any sovereign immunity defense" when it "becomes a signatory to th[at] Convention." *Id.* at 578-79.  Because the Convention requires "[e]ach Contracting State" to "recognize arbitral awards [under the Convention] as binding and enforce them" in accordance with local rules, the Second Circuit held that the Convention's signatories "must have contemplated enforcement actions in other signatory States." *Id.* at 578.  The D.C. Circuit agreed with *Seetransport* in *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999), concluding that the Second Circuit "correctly" found an "implied waiver" in that case because "a signatory to the [New York] Convention . . . must have contemplated enforcement actions in other signatory states." *Id.* at 123 (quoting *Seetransport*, 989 F.2d at 578).  This Court recently applied *Creighton* to hold that Ukraine impliedly waived its sovereign immunity because, as "a signatory to the [New York] Convention," "it should have anticipated enforcement actions in signatory states." *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 191-92 (D.D.C. 2018) (Kollar-Kotelly, J.), *appeal docketed* No. 18-7057 (D.C. Cir., Apr. 24, 2018) (argued Nov. 28, 2018); *see also*

*Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 190 (D.D.C. 2016) (holding that Kazakhstan impliedly waived immunity to enforcement actions by signing the New York Convention).

The same rule applies to the ICSID Convention.  Signatories to the Convention agree to "enforce the pecuniary obligations imposed by [an] award within its territories as if it were a final judgment of a court in that State."  ICSID Convention, art. 54(1); *see also* Declaration of Andrea K. Bjorklund ("Bjorklund Decl.") ¶ 54, filed herewith.  They also agree to "abide by and comply with" all awards against them, ICSID Convention, art. 53(1), subject to such enforcement.  Signatories thus necessarily "contemplat[e] enforcement actions in other Contracting States," including the United States.  *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013) (alterations omitted). [6]  As a result, a foreign state "waive[s] its sovereign immunity" from enforcement of an ICSID award "by becoming a party to the ICSID Convention."  *Id.*

Because Spain has signed the ICSID Convention,[7] it has waived its immunity to enforcement of ICSID awards, cementing this Court's jurisdiction under the FSIA's waiver exception.

**2.**  Spain's signature of the ICSID Convention is the controlling distinction that separates this case from cases cited by Spain (at 27-28) in which foreign states that were *not* signatories to the New York Convention agreed to arbitrate disputes in *other* countries that were signatories to the New York Convention.  *See*, *e.g.*, *Creighton*, 181 F.3d at 121, 123; *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1301 (11th Cir. 2000); *Strategic Techs. PTE, Ltd. v. Republic of China (Taiwan)*, No. 1:05-cv-2311, 2007 WL 1378492, at *3 (D.D.C. May 10, 2007).  In *Creighton*, the government of Qatar, which had "*not* . . . signed the [New York] Convention," agreed to arbitrate a dispute in France, which *is* a party to the Convention, 181 F.3d at 121, 123

---

[6]  A Contracting State's commitments under the ICSID Convention therefore are not limited, as Spain contends, to "recogniz[ing] and enforc[ing] arbitral awards" against *other* signatories. Spain Br. 28-29.  Contracting States also agree to enforcement of awards *against themselves*.

[7]  *See* ICSID, *List of Member States–ICSID/3*, *supra*.

(emphasis added).   The D.C. Circuit held that *signing* the New York Convention would waive immunity from enforcement of an award in the United States, but Qatar's "agreement to arbitrate in [France], *without more*" did not effect such a waiver of immunity from suit in the United States. *Id.* at 123 (emphasis added).   *S & Davis* and *Strategic Technologies* mechanically applied this holding in identical circumstances.   *See S & Davis*, 218 F.3d at 1301 (no waiver by Yemen under *Creighton* where "the United States and England are signatories to the Convention," but "Yemen is not"); *Strategic Techs.*, 2007 WL 1378492, at *3 ("Like Qatar, the ROC is not a signatory to the New York Convention.").   The plaintiffs in these cases based their waiver arguments on the foreign state defendants' *arbitration agreements* alone, not on any allegation that those states had signed an *international treaty* that permits *enforcement* of an arbitration award in the courts of the United States.   Their outcomes are thus inapposite.

Spain cites just two cases in which the state defendant *was* a signatory to any treaty governing the enforcement of an arbitral award.   But in each case, the award at issue fell outside the scope of that treaty.   In *Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22 (D.D.C. 2014), the defendant (the Czech Republic) was a signatory to the New York Convention, but the Convention "d[id] not apply" to the case because it only covers "commercial" disputes, and the underlying arbitration involved "'traditional tort-based claims,' not commercial ones." *Id.* at 28-29, 30 n.3.   In *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094 (D.C. Cir. 1982) ("*MINE*"), the defendant (Guinea) was a signatory to the ICSID Convention, *id.* at 1103 n.14, and the parties had agreed to arbitrate under that Convention, *id.* at 1100-01, but the dispute was arbitrated instead before the American Arbitration Association ("AAA"), *id.* at 1096-97.   The D.C. Circuit held that Guinea's signature to the ICSID Convention did not waive its immunity from suit to enforce awards issued under other arbitral regimes.   *Id.* at 1104.   Indeed,

the D.C. Circuit (in 1982) expressly *declined* to "decide whether Guinea's signing of the ICSID treaty would . . . waive its immunity from proceedings enforcing *ICSID awards*," because the case involved "a proceeding to confirm an *AAA* arbitration," not an ICSID award.  *Id.* at 1103 n.14 (first emphasis added).  Neither case casts doubt on the conclusion recognized by numerous courts that signing the New York or ICSID conventions waives immunity from enforcement of an award *covered by one of those treaties*.

Spain asserts that applying the waiver exception to *any* "claims involving international arbitra[tion]" would render the FSIA's separate "arbitration exception . . . superfluous."  Spain Br. 31.  But multiple cases cited in Spain's own brief illustrate that applying the waiver exception to signatories of the New York Convention and the ICSID Convention would not swallow the arbitration exception.  Instead, the arbitration exception remains the exclusive jurisdictional basis for enforcing arbitration awards against foreign states like Qatar and Yemen that have *not* waived immunity by signing a treaty that provides for enforcement of arbitration awards in the courts of the United States.  *See Creighton*, 181 F.3d at 124; *S & Davis*, 218 F.3d at 1302.

Thus, what Spain complains of is not *superfluity* of the arbitration exception, but its *overlap* with the waiver exception.  But such overlap is demonstrably what Congress intended.  The FSIA's legislative history indicates that even before the arbitration exception was enacted, "Congress expected arbitration awards to be executed against commercial assets of foreign states under [the waiver exception]."  Arbitral Awards: Hearing on H.R. 3106, et al. Before the Subcomm. on Admin. Law & Gov. Relations of the H. Comm. on the Judiciary, 99th Cong. 92 (1986) (statement of Mark B. Feldman) ("Hearing on H.R. 3106").  When courts reached conflicting outcomes about whether the waiver exception permitted this result, *see* Spain Br. 30 (citing cases), Congress enacted the arbitration exception to resolve the "uncertainty," Hearing on H.R. 3016, 99th Cong. at

94.  But far from Congress "replac[ing]" the waiver exception with the arbitration exception, the legislative history reflects Congress's intent that courts "may still hold that a particular agreement to arbitrate constitutes a waiver of immunity and consent to the jurisdiction of the court." *Id.* at 96.  Indeed, the arbitration exception *expressly* provides that it applies in some cases in which the waiver exception "is otherwise applicable."  28 U.S.C. § 1605(a)(6)(D) (referencing *id.* § 1605(a)(1)).  Adopting the arbitration exception did not narrow the waiver exception.

This Court thus has jurisdiction under the FSIA's waiver exception, and Spain's challenge to jurisdiction under the arbitration exception is entirely irrelevant.

## B.    Spain Cannot Dispute This Court's Jurisdiction Under The FSIA's Arbitration Exception Because The Tribunal's Ruling That Spain Consented To Arbitration Is Binding On This Court

This Court also has jurisdiction under the FSIA's arbitration exception, which permits a proceeding against a foreign state to "confirm an award" made pursuant to an agreement "by the foreign state," "with or for the benefit of a private party," to "submit to arbitration," if the "award is . . . governed by a treaty," such as the ICSID Convention, that is "in force for the United States" and that "call[s] for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6).

Spain does not dispute that this is a proceeding to "confirm an award" under the ECT, or that the award is "governed by" the ICSID Convention.  Instead, it claims Eiser "do[es] not have a valid arbitration agreement with Spain" because in its view, the CJEU's *Achmea* decision bars application of the ECT's arbitration provision to intra-EU disputes.  Spain Br. 21-22.  As shown below, the *Achmea* decision does no such thing, but the more immediately dispositive point is that the Tribunal already rejected Spain's argument that the ECT's "arbitration dispute settlement mechanism . . . is not applicable to an intra-EU dispute," Award ¶¶ 160-61, 197-207.  Principles of issue preclusion made applicable by Section 1650a bar Spain from collaterally attacking that

determination.  And if that were not enough, the ECT indisputably delegates questions of arbitra-

bility to the Tribunal, and the Supreme Court has recognized (again) that courts may not override

contracting parties' decisions to commit questions of arbitrability to arbitration.  *See Henry Schein,*

*Inc. v. Archer & White Sales, Inc.*, No. 17-1272 (U.S. Jan. 8, 2019).

### 1.    Under The ICSID Convention, The Tribunal's Rulings Are Entitled To Full Faith And Credit, Resulting In Issue Preclusion

Under the ICSID Convention and its implementing legislation, Spain is precluded from

challenging the Tribunal's determination that Spain agreed to arbitrate this dispute.  Courts are

"not permitted to examine an ICSID award's merits, its compliance with international law, or the

ICSID tribunal's jurisdiction to render the award," and "may do no more than examine the judg-

ment's authenticity and enforce the obligations imposed by the award."  *Mobil Cerro Negro*, 863

F.3d at 102.  To that end, Section 1650a requires this Court to give the Award "the same full faith

and credit" as a state court judgment in "enforc[ing]" the "pecuniary obligations imposed by [the

Award]."  22 U.S.C. § 1650a(a).  "'[F]ull faith and credit,'" in turn, "has long been understood to

encompass . . . collateral estoppel, or issue preclusion," *San Remo Hotel, L.P. v. City of San Fran-*

*cisco*, 545 U.S. 323, 336 (2005), meaning that once a tribunal "decide[s] an issue of fact or law

necessary to its judgment" (or here, award) the decision "preclude[s] relitigation of the issue."

*Allen v. McCurry*, 449 U.S. 90, 94 (1980).

The requirements for issue preclusion are easily satisfied here.  Issue preclusion prohibits

the relitigation of an issue of fact or law where the issue was (1) "contested by the parties and

submitted for judicial determination in the prior case" and (2) "actually and necessarily determined

by a court of competent jurisdiction in that prior case," and (3) "preclusion in the second case

[does] not work a basic unfairness to the party bound by the first determination."  *Yamaha Corp.*

*of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992).  Here, Spain actively argued in the

arbitration that the ECT's arbitration provision "is not applicable to an intra-EU dispute," and that applying it to such a dispute would be "incompatible with EU law," Award ¶¶ 160-73.  The Tribunal actually decided the issue, holding both that the ECT applied by its own terms to Eiser's intra-EU dispute with Spain, *id.* ¶ 194, and that Article 344 of the TFEU does not "'preven[t] EU Member States [from] submit[ting] to arbitration their disputes with investors of other Member States'" under the ECT, *id*. ¶ 204.  This holding was necessary to the Tribunal's determination that it had "jurisdiction under the ECT." *Id.* ¶ 486(a).  And Spain had every "incentive to litigate the point" in the arbitration, so there is no fundamental "unfairness" in binding it here. *Yamaha*, 961 F.2d at 254.[8]

Spain argues that this Court is not bound by the Tribunal's holding that Spain consented to arbitration because that holding implicates the Tribunal's "jurisdiction."  Spain Br. 32-34.  Spain observes that if its consent to arbitration in the ECT was "unenforceable," then "the tribunal never had jurisdiction," and, Spain contends, courts to which an arbitral award is tendered for enforcement always may examine whether the arbitral panel exceeded its jurisdiction.  Thus, Spain claims that the Tribunal's jurisdictional determination is "of no moment."  Spain Br. 24 n.12.  If this were correct, then an arbitral tribunal's determination of arbitrability *never* could be accorded preclusive effect, because all such arbitrability questions can be formulated as questions concerning the tribunal's "jurisdiction."  But that is not the law.  Indeed, Spain's cases hold the opposite:  "'[A]

---

[8]  Spain cannot avoid issue preclusion by purporting to raise "new arguments . . . to obtain a different determination of th[e] issue[s]" already decided by the Tribunal. *Yamaha*, 961 F.2d at 254 (quoting Restatement (Second) of Judgments § 27 cmt. c (1982)).  "[O]nce an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." *Id.* (citing *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 900 F.2d 360, 364-65 (D.C. Cir. 1990)).  Notably, Spain has not relied on the CJEU's decision in *Achmea* in the ongoing annulment proceedings before ICSID—which is the only context in which the ICSID Convention allows such arguments to be made. *See* ICSID Convention, art. 53. Spain's failure to do so does not give it leave to raise those arguments in this Court, where they are barred by full faith and credit.

judgment is entitled to full faith and credit—*even as to questions of jurisdiction*—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.'" *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 706 (1982) (emphasis added). "When the question of the [initial] tribunal's [subject-matter] jurisdiction is raised in the original action," therefore, its "determination of th[at] issue" is "conclusive under the usual rules of issue preclusion," *Carr v. Dist. of Columbia*, 646 F.2d 599, 607-08 (D.C. Cir. 1980), even if the second court "disagrees with the reasoning underlying the judgment," *V.L. v. E.L.*, 136 S. Ct. 1017, 1020 (2016).  This is true "even as to questions of *ICSID's jurisdiction*," as this Court recently confirmed.  *Tidewater*, 2018 WL 6605633, at *6 n.4 (emphasis added).  Where, as here, that question "has been 'fully and fairly litigated and finally decided' by the tribunal, this Court has no authority to relitigate the matter."  *Id.*

And so it is here.  Spain fully litigated before the Tribunal its contention that its consent in the ECT to arbitrate is invalid, and it lost.  That determination is entitled to preclusive effect.

### 2.    Under The Energy Charter Treaty, The Question Of Whether Spain Consented To Arbitration Is For The Tribunal, Not This Court

Even if issue preclusion did not apply, this Court would be required to defer to the Tribunal's determination that Spain consented to arbitration because the ECT delegated that question to the Tribunal, not the courts.  It is now settled that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010), including "'whether [the] parties have a valid arbitration agreement,'" *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013).  Just last week, the Supreme Court reaffirmed that "parties may agree to have an arbitrator decide . . . 'whether the parties have agreed to arbitrate.'"  *Henry Schein, Inc. v.*

*Archer & White Sales, Inc.*, No. 17-1272, slip op. at 4 (U.S. Jan. 8, 2019).  When issues of arbitrability have been delegated to the arbitrator, a court "must defer to [the] arbitrator's arbitrability decision." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995).

Spain contends that "questions involving the formation of [an] arbitration agreement 'must always be decided by the courts,'" Spain Br. 24 n.12, but the cases it cites for that proposition (*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756 (D.C. Cir. 1988), and *Ken-American Res. v. Int'l Union, UMW*, 99 F.3d 1161 (D.C. Cir. 1996)) involve ordinary arbitration between private parties—not ICSID awards, which are entitled to full faith and credit and confirmation without any "examin[ation]" of the "tribunal's jurisdiction," *Mobil Cerro Negro*, 863 F.3d at 102.  And those very cases confirm that even where an award is not due full faith and credit, courts decide "question[s] of arbitrability" only if the parties have not "indicate[d] that arbitrability issues are to be decided by an arbitrator." *KenAmerican*, 99 F.3d at 1163.  Even Spain recognizes that courts do not decide "the validity of an arbitration agreement" if "the issue was intended to be decided by arbitrators."  Spain Br. 24 n.12.

The same analysis applies under the FSIA's arbitration exception. *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015)—which applied the New York Convention, *id.* at 203—lays out the standard that would apply in the absence of issue preclusion.  A plaintiff meets its "initial burden" of establishing that a foreign state has "agreed to arbitrate" simply by "producing the [agreement], [the] notice of arbitration . . . , and the tribunal's arbitration decision," *id.* at 204-05—as Eiser unquestionably has done here.  *See generally* ECT (ECF No. 1-3); Request for Arbitration (Ex. C to Rozen Decl.); Award (ECF No. 1-1, Ex. A).  The "burden" then "shift[s]" to the foreign state to show that there is not "a valid arbitration agreement between the parties."

*Chevron*, 795 F.3d at 205.  In *Chevron*, the district court made this determination applying a "deferential standard of review" because the parties "agreed to have the arbitrator resolve issues of arbitrability."  *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 63, 67 (D.D.C. 2013).[9] The D.C. Circuit found this deferential analysis adequate to establish jurisdiction under the arbitration exception.  *See* 795 F.3d at 205 n.3 (citing 949 F. Supp. 2d at 63 and quoting *id.* at 67).

The same deference is due here because the ECT unmistakably delegates issues of arbitrability to the Tribunal, not the courts, by incorporating the ICSID Convention.  An arbitration agreement delegates arbitrability to an arbitrator if it "explicitly incorporate[s] [arbitration] rules that empower [the] arbitrator to decide issues of arbitrability." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005).  In *Chevron*, for example, the agreement delegated arbitrability to the arbitrator by providing for arbitration "'in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law,'" which in turn provide that "'the arbitral tribunal shall have the power to rule on objections that it has no jurisdiction.'"  795 F.3d at 207-08.[10]

Here, the ECT unmistakably provides for arbitration under the ICSID Convention, ECT, art. 26(4)(a)(i), and the ICSID Convention unmistakably provides that "[t]he Tribunal shall be the judge of its own competence," and shall consider "[a]ny objection . . . that [a] dispute is not within the jurisdiction of [ICSID], or . . . the competence of the Tribunal," ICSID Convention, art. 41.

---

[9]   The court stated that it was applying this "deferential standard" in holding that "Ecuador did consent to arbitration." *Chevron*, 949 F. Supp. 2d at 64.  It later applied this deferential standard in holding that the dispute involved an "investment" covered by the arbitration agreement, *id.* at 67-69, and expressly relied on that holding in finding "a valid agreement to arbitrate," *id.* at 67.

[10]   Similarly, "[v]irtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" because those rules allow arbitrators to determine their own jurisdiction.  *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) (citing authority from five other circuits).

This court has already held that incorporation of rules with materially identical language—providing that "'[t]he Tribunal shall have the power to rule on its competence'"—constituted a clear intention to delegate questions of arbitrability. *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 121 (D.D.C. 2015); *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 112 (D.D.C. 2017) (same). The question of arbitrability—including whether Spain consented to arbitration—was thus for the Tribunal to decide, and this Court must defer to that determination.[11]

### C.     Spain's Argument Is Contrary To The ICSID Convention And The FSIA

Should this Court have any doubt that the FSIA permits enforcement of the Award without permitting Spain's collateral attack on the Tribunal's findings, the ICSID Convention and the FSIA require it to resolve that doubt in favor of finding jurisdiction. Nothing in the Convention's text permits the United States to condition enforcement of an ICSID award on a court's independent assessment of the validity of Spain's consent to arbitration. To the contrary, the Convention requires the United States to enforce ICSID awards without permitting "any appeal or . . . *any other remedy* except those provided for in th[e] Convention." ICSID Convention, art. 53(1) (emphasis added). Declining enforcement on jurisdictional grounds would thus violate the Convention.

The FSIA is expressly drafted to avoid this type of treaty conflict. It grants foreign states jurisdictional immunity only "[s]ubject to existing international agreements to which the United

---

[11]   Even if it were true (it is not) that "questions involving the formation of [an] arbitration agreement 'must always be decided by the courts,'" it would not matter because the dispute here concerns the "validity" of Spain's consent to arbitration, not its "formation." Spain Br. 24 n.12 (drawing this distinction). Spain does not deny that it entered into the ECT, or that by its plain text, the ECT applies to this dispute. *See supra* at 3 & n.1; *infra* at 23-24. The ECT itself is thus an agreement made by Spain "for the benefit of a private party" (investors) to "submit to arbitration," which (if valid) is enough to satisfy the arbitration exception. 28 U.S.C. § 1605(a)(6). Spain's argument is not that the ECT was not *formed*; it is that the ECT is not "valid" under *Achmea*. Spain Br. 21. Spain concedes that issues of validity can be delegated to an arbitrator. *See supra* at 20.

States [was] a party" when the FSIA was enacted in 1976. 28 U.S.C. § 1604. The ICSID Convention—ratified by the United States in 1966—is such a pre-existing "international agreemen[t]," *id.*, so its mandate must control to the extent of any conflict with the FSIA. Further, under longstanding principles of statutory interpretation, courts in this Circuit must interpret federal statutes "to avoid . . . conflicts" with preexisting treaties. *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 724 F.3d 230, 233-34 (D.C. Cir. 2013). This Court should therefore reject Spain's invitation to subvert the ICSID Convention's unequivocal directive by pitting it against the FSIA. Both the FSIA and settled rules of interpretation demand an interpretation of the FSIA that avoids any conflict with the United States' obligations under the ICSID Convention.

## II.      The Tribunal's Determination That Spain Consented To Arbitration Was Correct

For the reasons just stated, this Court need not and should not reach the merits of Spain's improper collateral attack on the Tribunal's determination that Spain validly consented to arbitrate this dispute. There is no need to consider the submissions of the parties' dueling experts on EU and international law because the law of the United States—specifically, 22 U.S.C. § 1650a—binds this Court to accept the Tribunal's conclusion that it had jurisdiction to resolve the dispute, and that, in turn, disposes of Spain's strained contention that this case is not one to "confirm an award made pursuant to" an agreement to arbitrate within the meaning of 28 U.S.C. § 1605(a)(6). Should the Court nonetheless revisit the issue of arbitrability afresh as Spain urges, it should reject Spain's argument because the Tribunal was correct: Spain undeniably consented to arbitrate this dispute, and its consent was valid under both EU law and international law.

Spain does not contest the Tribunal's holding that the ECT's arbitration provision—Article 26—by its "literal" terms, encompasses this dispute. Award ¶ 194. That provision expresses each Contracting Party's consent to arbitrate all "[d]isputes between a Contracting Party and an Investor of another Contracting Party" concerning investments covered by the treaty. ECT, art. 26(1).

Spain is undeniably a "Contracting Party," *id.*, art. 1(2); *see supra* at 3-4 & n.1; the Eiser parties undeniably are "Investors of" the UK and the Netherlands because they are "organized in accordance with the law" of those countries, ECT, art. 1(7); and those countries undeniably also are "Contracting Parties," *id.*, art. 1(2); *see supra* at 2, 3-4 & n.1; *see also* Bjorklund Decl. ¶¶ 71-73. In the arbitration Spain argued that because the EU itself signed the ECT, the Eiser parties "do not derive from 'another Contracting Party,'" Award ¶ 161, but the Tribunal rightly rejected this convoluted reading of the ECT's straightforward terms, *id.* ¶ 194, and Spain has abandoned any defense of that argument here.

Rather than contest the treaty's plain terms, Spain argues that they are fundamentally a lie. Spain claims its own unambiguous consent to arbitrate this investment dispute was "invalid" because "EU law precludes the application of arbitration provisions contained in an investment treaty between EU members states." Spain Br. 22. That contention is meritless. EU law in no way prohibited Spain from consenting to arbitrate intra-EU disputes in the ECT, a multilateral investment treaty that was joined by all EU member states and *the EU itself*. And even if EU law somehow interposed an objection to the arbitration of intra-EU disputes, the EU's internal law does not override Spain's consent under *international law* to arbitrate this dispute.

## A.    European Union Law Permits Arbitration Of Intra-EU Disputes Under The Energy Charter Treaty

Spain's challenge to the validity of its consent to arbitrate rests on an unwarranted extrapolation from the decision of the high EU court—the CJEU—in *Achmea*. *Achmea* held that the arbitration provision of a "bilateral investment treaty" between two EU member states was not "compatible" with EU law because it permitted a tribunal constituted by just two member states to resolve questions of EU law outside of the "judicial system of the EU." *Achmea*, ¶¶ 58-60. Unlike the bilateral treaty in *Achmea*, however, the ECT is a multilateral treaty originally, ratified by all

EU members at the time and the EU itself, and governed by international law rather than EU law. *See supra* at 3 & n.2.  As *Achmea* itself makes clear, EU law permits intra-EU arbitration in these circumstances, so Spain's consent to arbitration in the ECT is fully consistent with EU law.  *See* Declaration of Sir Alan Dashwood ("Dashwood Decl.") ¶ 50, filed herewith.

The *Achmea* decision was based on two provisions of EU law:  Articles 267 and 344 of the TFEU, which is one of the treaties that form the basis for EU law.  Article 267 establishes a procedure for the "court or tribunal of [an EU] member state" to refer questions of EU law to the CJEU so the CJEU can provide a "preliminary rulin[g]" on those questions.  TFEU, art. 267.  Article 344 provides that EU members states "undertake not to submit a dispute concerning the interpretation or application of [the EU's foundational treaties] to any method of settlement other than those provided for" in those treaties.  *Id.*, art. 344.  These articles have been a part of EU law since the European Economic Community (the predecessor to the EU) was formed in 1957, and have remained materially unchanged through successive renaming and renumbering of the EU's foundational treaties.[12]  They thus long predate the ECT, which came into force in 1998.

*Achmea* interpreted these Articles as prohibiting the parties' agreement to arbitrate intra-EU investment disputes under the Slovakia-Netherlands "BIT" (bilateral investment treaty).  *Achmea*, ¶¶ 58-60.  The CJEU reasoned that the arbitration tribunal under that BIT "may be called on to interpret or . . . apply EU law," *id.* ¶ 42, but in doing so could not "refe[r] [questions of EU law] to the [CJEU] for a preliminary ruling" as provided for in Article 267, *id.* ¶ 49.  The agreement

---

[12]   Articles 267 and 344 of the TFEU were originally codified as Articles 177 and 219 of the 1957 Treaty Establishing the European Economic Community (the "EEC" or "Rome Treaty").  *See* EEC, arts. 177, 219 (Ex. 4 hereto).  The 1992 Treaty on European Union (the "Maastricht Treaty") renamed the EEC Treaty the Treaty Establishing the European Community ("TEC"), and renumbered Articles 177 and 219 as Articles 234 and 292.  *See* TEC, arts. 234, 292 (Ex. 5 hereto).  The 2007 Treaty of Lisbon renamed the TEC as the TFEU, and gave the two articles their current numbering.  *See* TFEU, arts. 267, 344.

thus created the "the possibility of submitting [EU law] disputes to a body which is not part of the judicial system of the EU." *Id.* ¶ 58. Because this possibility was "provided for by an agreement . . . concluded not by the EU but by Member States," the CJEU concluded that it threatened "mutual trust" and "sincere cooperation" between EU members, *id.*, and thus could not be considered one of the methods of settling EU-law disputes permitted by Article 344, *see id.* ¶¶ 31-32, 60.

Nothing in *Achmea*, however, limits the authority of the EU and its member states *collectively* to consent to arbitrate intra-EU disputes, as they did in the ECT. *See* Dashwood Decl. ¶ 74. The question referred to the CJEU in *Achmea* was expressly limited to "intra-EU BIT[s]," *Achmea*, ¶ 23—and thus did not encompass multilateral treaties signed by the EU, like the ECT. The CJEU accordingly limited its holding to "agreement[s] . . . between Member States," *id.* ¶ 60, and expressly distinguished such agreements from those "concluded . . . by the EU," *id.* ¶ 58. Indeed, to the extent *Achmea* discusses treaties signed by the EU at all, it *affirms* the EU's authority to enter "international agreement[s]" "binding" itself to the decisions of tribunals outside of the EU judicial framework. *Id.* ¶ 57. While Article 344 limits the authority of "Member States" to submit disputes of EU law for resolution other than as "provided for" in the EU's founding treaties, it imposes no limit on the *EU's* authority to authorize such arbitration. TFEU, art. 344. Further, since the ECT was signed and ratified by the EU and all of its members at the time, it does not implicate the concerns that animated the CJEU's decision: It "cannot plausibly be seen as a betrayal of the mutual trust" or as "Member States colluding in order to circumvent the EU judicial system." Dashwood Decl. ¶ 72; *see also id.* ¶¶ 73-75.

The ECT also differs from the BIT in *Achmea* in another key way: It calls for investment disputes to be resolved under "applicable rules and principles of *international law*," ECT, art.

26(6) (emphasis added), rather than national law ("the law in force of the Contracting Party concerned") and EU treaties ("other relevant agreements between the Contracting Parties"), as in *Achmea*, *id.* ¶¶ 38-42.  *See* Dashwood Decl. ¶¶ 62-70.  The international law "applicable" under the ECT is comprised of "general and customary principles of international law" applicable equally to all signatories, *id.* ¶¶ 65-67—including general principles of treaty interpretation, *see* Bjorklund Decl. ¶¶ 118-19—not (as Spain contends at 23) specific EU treaties applicable only to individual members.  As a result, an arbitration tribunal constituted under the ECT is not "called on to interpret or . . . apply EU law," as in *Achmea*, *id.* ¶ 42, so *Achmea*'s concern for ensuring the CJEU's oversight of questions of EU law is not remotely implicated, Dashwood Decl. ¶ 70.

In light of these critical distinctions, it is no surprise that every arbitration tribunal to consider the issue has held that *Achmea*'s limitations on arbitration of intra-EU investment disputes do not preclude arbitration of disputes arising under the ECT.  *See Greentech Energy Sys. A/S v. Italian Republic*, SCC Arbitration V (2015/095), Final Award, ¶¶ 336-55, 388-403 (Dec. 23, 2018);[13] *Foresight Lux. Solar 1 S.a.r.l. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, ¶ 220 (Nov. 14, 2018);[14] *Vattenfall AB v. Fed. Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, ¶¶ 163-64 (Aug. 31, 2018) ("*Vattenfall*");[15] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, ¶ 679 (May 16, 2018).[16]

---

[13]  https://www.iareporter.com/wp-content/themes/iareporter/download.php?post_id=32322

[14]  https://www.italaw.com/sites/default/files/case-documents/italaw10142.pdf

[15]  https://www.italaw.com/sites/default/files/case-documents/italaw9916.pdf

[16]  https://www.italaw.com/sites/default/files/case-documents/italaw9710.pdf

Even if the CJEU were to conclude otherwise, it would almost certainly give that ruling "purely prospective effect," rather than upset the settled expectations of investors that have invested hundreds of millions of dollars in reliance on the ECT in the unbroken absence of the slightest hint that the treaty is incompatible with EU law.  Dashwood Decl. ¶¶ 89-95.  While the question of retroactive effect was not raised in *Achmea*, *id.* ¶ 89, the CJEU is unlikely to retroactively invalidate the treaty commitments of the EU and its member states, given its stated concerns for the principle of "legal certainty," *id.* ¶¶ 91, 95.  That is especially so given that the only parties to benefit from such an upheaval would be the very states that (according to Spain) signed onto the ECT in violation of law, and would now be permitted to enjoy the benefits of foreign investment while avoiding their own treaty commitments, to the detriment of investors that reasonably relied on those treaties.  *Id*. ¶¶ 93-94.

The only legal authority Spain claims to cite for extending *Achmea* to the ECT is two statements issued by the EU's executive body, the European Commission.  *See* Spain Br. 23.  The Commission is not the EU, and, even if it were, federal courts are "not bound to accord conclusive effect to [a] foreign government's statements" interpreting its own laws.  *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018).  Indeed, it is doubtful that the Commission's contentions are entitled any deference at all because the Commission lacks power to offer authoritative interpretations of EU law.  *Cf.*, *e.g.*, *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996) (*Chevron* deference does not apply where an agency "has not been entrusted to administer, and thus has no authority to interpret" a statute).  Far from having the power to interpret EU law, the Commission is tasked with "oversee[ing] the application of [EU] law," "execut[ing] the budget and manag[ing] programmes," "ensur[ing] the [EU]'s external representation," and proposing legislation to the EU parliament.  *See* Treaty on

European Union, art. 17(1)-(2) (Ex. 6 hereto); Dashwood Decl. ¶ 52.  It is the CJEU, not the Commission, that decides the meaning of EU law, *id.*, and in doing so it regularly disagrees with the Commission, *see*, *e.g.*, Opinion 2/15, *Opinion on Free Trade Agreement with Singapore*, ECLI:EU:C:2017:376, ¶¶ 12, 238, 305 (May 16, 2017) (rejecting Commission's view that the EU had exclusive competence to conclude the trade agreement);[17] Case T-754/14, *Efler v. Comm'n*, ECLI:EU:T:2017:323 (May 10, 2017) (rejecting Commission's view that a proposed citizens' initiative constituted an inadmissible interference in the legislative procedure).[18]  If the Commission believes Member States (and the EU itself) have breached EU law by becoming signatories to the ECT, it can bring an infringement action before the CJEU, which can provide an authoritative interpretation of EU law's implications in those circumstances.  *See* TFEU, art. 258.  Tellingly, however, while it has brought infringement actions against EU members who refused to terminate the type of intra-EU *bilateral* investment treaties at issue in *Achmea*, *see* European Commission Press Release, IP/15/5198, Commission Asks Member States To Terminate Their Intra-EU Bilateral Investment Treaties (Jun. 18, 2015),[19] it has never brought an infringement proceeding against any EU member for failing to withdraw from the ECT, *see* Bjorklund Decl. ¶¶ 94-96.

### B.       Under International Law, Spain's Consent To Arbitrate Is Valid Regardless Of Whether It Complies With European Union Law

Even if Spain's consent to arbitrate this dispute were incompatible with EU law, that would not invalidate its consent.  The ECT is an international agreement among the EU and 52 nations, including EU members and numerous other non-members.  Unsurprisingly, then, the ECT provides that it is governed by "international law," not EU law.  ECT, art. 26(6).  Thus, the EU and Spain

---

[17]  http://curia.europa.eu/juris/document/document.jsf?text=&docid=190727&doclang=EN

[18]  http://curia.europa.eu/juris/document/document.jsf?docid=190563&doclang=EN

[19]  http://europa.eu/rapid/press-release_IP-15-5198_en.htm.

submitted to the governance of customary international law, and under that body of law, the internal law of any one signatory of the ECT (which is all the EU is for this purpose) does not control the external effects of the treaty.

**1.**  "The customary international law of treaties" is "codified in the Vienna Convention on the Law of Treaties," 1155 U.N.T.S. 331, 8 I.L.M. 679 (Jan. 27, 1980) ("Vienna Convention") (Ex. 7 hereto).  *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 308 (2d Cir. 2000).  Spain has acceded to the Vienna Convention and is therefore bound by its rules.[20]  Though the United States is not a signatory to the Vienna Convention, the State Department recognizes that the Vienna Convention is "the authoritative guide to current treaty law and practice."  William P. Rogers, U.S. Secretary of State, *Report on the Vienna Convention on the Law of Treaties*, 65 Dep't St. Bull 684, 685 (Dec. 13 1971); *see also* Bjorklund Decl. ¶ 77.  Federal courts apply it accordingly.  *Chubb*, 214 F.3d at 308 (citing, *e.g.*, *Weinberger v. Rossi*, 456 U.S. 25, 29 n.5 (1982)); *see also United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) (Vienna Convention establishes "[b]asic principles of treaty interpretation").

**2.**  A central premise of treaty law, reflected in the Vienna Convention, is that every sovereign state "possesses capacity to conclude treaties," and "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith."  Vienna Convention, arts. 6, 26. This is true regardless of the state's internal views of the validity of its commitments:  A state may neither "invoke the provisions of its internal law as justification for its failure to perform a treaty," nor "invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent."

---

[20]  *See* United Nations Treaty Collection, *Vienna Convention on the Law of Treaties*, https://treaties.un.org/Pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=XXIII-1&chapter=23&Temp=mtdsg3&clang=_en.

Vienna Convention, arts. 27, 46; *see also* Bjorklund Decl. ¶¶ 140-43.  The sole exception is if the "violation was manifest and concerned a rule of its internal law of fundamental importance"—*i.e.*, if the parties affected by the treaty had notice that it was unlawful when it was adopted.  *Id.*, art. 46.  This rule ensures the "stability of treaty relations" by preventing states from "seek[ing] to avoid [their] treaty obligations by invoking decisions by [their] courts or other constructions of [their] domestic law."  Restatement (Fourth) of Foreign Relations Law: Treaties, Tentative Draft No. 2 § 102, Reporter's Note 6 (Mar. 20, 2017).

These principles are familiar to United States courts.  United States treaties "may comprise international commitments" and impose "international law obligation[s] on the part of the United States" even if they never come into effect as "'domestic law'" and are not "enforceable in United States courts."  *Medellin v. Texas*, 552 U.S. 491, 504-05 (2008); *cf. Pigeon River Improvement, Slide and Boom Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 160 (1934) (government's "international obligation [would] remai[n] unaffected" by repeal of statute implementing treaty).  As a result, under the Vienna Convention, a treaty signed by the President "create[s] a binding international obligation" that "remain[s]" in effect "even if [a domestic court] . . . declare[s] [the treaty] unconstitutional for purposes of domestic law."  *Made in the USA Found. v. United States*, 242 F.3d 1300, 1310 n.23 (11th Cir. 2001) (citing Vienna Convention, arts. 26, 46).  Similarly, a treaty with the United States "remains in force [against a foreign signatory] under principles of international law" even if that country's courts "declar[e] [the treaty] unconstitutional" so that the treaty "is not domestically binding" in that country.  *United States v. Martinez*, 755 F. Supp. 1031, 1032-33 (N.D. Ga. 1991) (citing Vienna Convention, art. 46).  Articles 27 and 46 of the Vienna Convention apply these same principles to all treaties.

These principles prevent Spain from invoking the EU's internal law to invalidate its own international-law commitments under the ECT. EU law, as interpreted by the CJEU, is *internally* binding within the EU in specific ways. For example, the courts of EU member states must accept the CJEU's interpretation of the EU's founding treaties, *see* TFEU, art. 267, and if EU members breach their EU-law obligations, the European Commission may "bring the matter before the Court of Justice of the European Union," *id.*, art. 258. But neither of these provisions allow the CJEU to invalidate the EU's or its members' international law obligations. *See* Bjorklund Decl. ¶¶ 13, 140-41. Indeed, even if the CJEU were to conclude that the ECT is incompatible with EU law, that interpretation of EU law—though binding on the national courts of EU members—would not compel even those courts to treat the ECT as *invalid* or *void*. *See* Dashwood Decl. ¶¶ 86-87. The effect of any incompatibility in any country's courts largely would remain to be resolved under international law and each country's national laws. *Id.* The only certain effect would be that the EU or its members, as appropriate, must take steps to withdraw from the impugned international obligation or face sanctions under EU law.

*Achmea* illustrates these points: In the underlying dispute, a German court referred a question of EU law to the CJEU and recognized the CJEU's decision as binding on that question on remand. *See Bundesgerichtshof*, Oct. 31, 2018, ECLI:DE:BGH:2018:311018BIZB2. 15.0 (Ger.) (ECF No. 16-7, Ex. 36). And the Commission has brought infringement actions against EU members who it alleges violated the provisions at issue in *Achmea* by refusing to terminate their intra-EU bilateral investment treaties. *See supra* at 29. The CJEU's decision in *Achmea* thus operates on "an internal . . . plane" within the EU, and is subject to the Vienna Convention's rule that a State "may not invoke provisions of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance." *Blusun*

*S.A. v. Italian Republic*, ICSID Case No. ARB/14/3, Award ¶ 283 (Dec. 27, 2016) (citing Vienna Convention, art. 46) ("*Blusun*");[21] *see also* Bjorklund Decl. ¶¶ 13, 140-41. Absent such a manifest violation, the EU and its members cannot rely on EU law to vitiate their consent to the ECT under international law.  *Blusun*, ¶ 283.

Spain does not and cannot contend that any purported conflict between the ECT and EU law was "manifest" when the ECT was signed in 1994 or ratified in 1998.  The "Member States to the EU signed the ECT without qualification or reservation," *Blusun*, ¶ 283, and indeed the ECT permitted "[n]o reservations," ECT, art. 46, so the EU and its members could not sign it without fully consenting to its terms, *see* Bjorklund Decl. ¶ 135.  "[N]o EU institution and no Member State sought an opinion from the [CJEU] on the compatibility of that treaty with the [founding EU treaties] . . . because none of them had the slightest suspicion that it might be incompatible."  Opinion of Advocate General Wathelet ¶ 43, Case C-284/16, *Slovak Republic v. Achmea BV*, ECLI:EU:C:2017:699 (Sept. 19, 2017).[22]  Today, the *Achmea* decision *still* gives every indication that the ECT's intra-EU arbitration provisions are lawful, as every arbitration tribunal to consider the question since *Achmea* has agreed.  *See supra* at 27.  Even if those tribunals all were wrong (they were not), they certainly were not so *manifestly* wrong as to undermine the effectiveness of Spain's consent to arbitration in the ECT.

**3.**  Spain contends that EU law also has external consequences under "'international law'" because it is a "product of international treaties."  Spain Br. 12, 23.  But it cites no principle of international law under which the EU's treaties supersede Spain's competing obligations under the ECT.  The views of the EU (as a signatory to the ECT) are not entitled to any weight when it comes to interpreting the content of the international obligations imposed by the ECT on its signatories,

---

[21]  https://www.italaw.com/sites/default/files/case-documents/italaw8967.pdf

[22]  http://curia.europa.eu/juris/document/document.jsf?text=&docid=194583&doclang=EN

because only collective action by all parties to a treaty—for example, an "agreement between the parties regarding . . . interpretation" or an instrument made by one party and "accepted by the other parties"—can modify its plain meaning and effect.  Vienna Convention, art. 31(2)(b), (3)(a); *see also* Bjorklund Decl. ¶¶ 91-92.  Here assertions of the "primacy" of EU law invoke a principle of EU law that governs the interaction between EU law and the domestic laws of EU member states, not the relationship between EU law and the international obligations of the EU and its members.  Dashwood Decl. ¶ 82.  Instead, under international law, to the extent there is any conflict between the ECT and the EU treaty provisions addressed in *Achmea*—Articles 267 and 344 of the TFEU— the ECT controls by its plain terms and under the ordinary treaty interpretation principles.

The ECT expressly provides that its dispute resolution provisions supersede prior treaties that are less protective of investors' rights.  Under the heading "Relation to Other Agreements," Article 16 of the ECT specifies precisely how the ECT should be applied when there is a "prior" or "subsequent" treaty concerning the same "subject matter" as the ECT's dispute resolution pro- visions.  ECT, art. 16(2).  If the ECT's provisions are "more favourable to the Investor" than the other agreement, the ECT controls, and the other agreement may not "be construed to derogate from" the rights granted to investors by the ECT, including "any right to dispute resolution."  *Id*.  As a matter of international law, therefore, the TFEU *cannot* be construed to "derogate from an Investor's right to dispute resolution" under the ECT's arbitration provision.  *Vattenfall*, ¶ 195; *see also id.* ¶¶ 193-96; Bjorklund Decl. ¶¶ 130-31, 134.

The result would be the same even absent Article 16 of the ECT under the rule of *lex posteriori*, which recognizes that where two treaties are at issue, "the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty."  Vienna Convention,

art. 30; *see also* Bjorklund Decl. ¶¶ 136-38.  In the event of a "conflict between two treaties," "the more recent . . . controls."  *Owner Operator Indep. Drivers Ass'n*, 724 F.3d at 233.

Here, the ECT is the more recent substantive enactment because Articles 267 and 344 were already in effect under earlier versions of the TFEU when the ECT was signed and ratified.  *See supra* at 25 n.12.  The adoption of the ECT thus superseded those provisions to the extent of any conflict.  *See* Bjorklund Decl. ¶ 138.  In 2007, the Treaty of Lisbon renumbered the TFEU, gave Articles 267 and 344 their current numbers, and made minor technical modifications to those provisions that are not relevant to this case.  *See supra* at 25 n.12.  Even if an amendment to a treaty *could* qualify as a later-enacted instrument for purposes of *lex posterior* in some circumstances, purely "stylistic [and] nonsubstantive" alterations normally are not construed to have legal effect, Scalia & Garner, *Reading Law: The Interpretation of Legal Text* 256 (Thomas/West 2012), and therefore the 2007 amendments to Articles 267 and 344 were plainly not intended to modify the relationship between the ECT and EU law.  Instead, the ECT is the last word on the issue as a matter of treaty law.[23]

If the EU and its members had intended for the EU treaties to control in the event of a conflict and thus to limit the application of the ECT's arbitration agreement to intra-EU disputes, they had other means to do so.  "At the time of entering into the ECT, the EU was well aware of the possibility of including a disconnection clause, which would operate as a carve-out to ensure that the provisions of [such agreements] would not apply between EU Member States."  *Vattenfall*, ¶ 203.  In fact, the EU has included such disconnection clauses in at least 17 other multilateral

---

[23]  Even if the 2007 Treaty of Lisbon were considered the later treaty for purposes of *lex posteriori*, it would not control.  Article 16 of the ECT expressly supersedes both prior *and* "subsequent international agreement[s]," that are less protective of investors than the ECT.  ECT, art. 16; *see also* Bjorklund Decl. ¶ 139.  Nor could the Lisbon Treaty be construed as a "withdrawal" from the ECT, because the ECT requires that withdrawals occur by a signatory "giv[ing] written notification . . . of its withdrawal," ECT, art. 47(1)—which Spain has not done.

treaties.  *See* UN Int'l Law Comm'n Rep't on Fragmentation of Int'l Law ¶ 289 & n. 386 (Apr. 13, 2006) (Ex. 8 hereto); *see also Vattenfall*, ¶ 203 ("The EU had already included disconnection clauses in treaties prior to the ECT."); Dashwood Decl. ¶¶ 13-14.

The EU did not include a disconnection clause in the ECT.  Instead, the ECT's drafters explicitly *rejected* a proposal—made by the European Commission, no less—to include language requiring "[EU] Contracting Parties . . . [to] apply Community rules and . . . not . . . apply the rules arising from [the ECT] except insofar as there is no Community rule governing the particular sub-ject concerned."  *See* Draft Treaty, Basic Agreement for the European Energy Charter, at 84 (Aug. 12, 1992) (Ex. 9 hereto); *see also* Bjorklund Decl. ¶ 80.  There were "very good reasons" for rejecting this proposal.  Dashwood Decl. ¶ 73.  The ECT sought to provide investor protection "on a reciprocal basis, implying equality of respect between all the parties to the agreement" and "[e]xcluding arbitration under Article 26 between EU Member States, as a bloc, could have been taken to imply that, while these states trusted each other's courts, they did not trust the courts of the third country Parties."  *Id.*  That the proposed language was not included in the ECT as ratified confirms the ECT's drafters' conscious choice to subordinate EU law to the ECT.  *See Vattenfall*, ¶ 206 ("In these circumstances, the Tribunal can only conclude that a disconnection clause was intentionally omitted from the ECT.").

This omission is particularly striking because the ECT does address how its provisions relate to other international agreements in the event of conflict.  For example, the ECT provides that "[i]n the event of a conflict between [its provisions and] the [Svalbard Treaty]," "the [Svalbard Treaty] shall prevail."  *See* Decisions with respect to the ECT, Annex 2 to the Final Act of the European Energy Charter Conference (Ex. 10 hereto); *see also* Dashwood Decl. ¶ 24.  It "would

have been a simple matter to draft the ECT so that Article 26 does not apply to [intra-EU disputes]," *Vattenfall*, ¶ 187, and, if this had been done, that clause would have had effect as a matter of international law, *see* Vienna Convention, art. 30(2) ("When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail."). But the drafters of the ECT did not do so. The "absence of [a disconnection clause thus] confirms that the ECT was intended to create obligations between Member States of the EU, including in respect of potential investor-State dispute settlement." *Vattenfall*, ¶ 206; *see also* Dashwood Decl. ¶¶ 10-26; Bjorklund Decl. ¶ 80.

The ECT's plain terms and bedrock principles of international law thus leave no doubt that Spain's agreement to arbitrate intra-EU disputes under Article 26 of the ECT is valid as a matter of international law, any purportedly contrary provisions in the TFEU notwithstanding.

## III. The Court Should Enter Judgment In Eiser's Favor Upon Denying Spain's Motion To Dismiss

Because this Court has subject-matter jurisdiction and the ICSID Convention and Section 1650a do not permit any substantive defense to enforcement of an ICSID award, this Court should immediately grant Eiser's petition and enter judgment for the amount of the Award.

Spain vaguely alludes to additional "merits defenses" that it intends to present if its motion to dismiss is denied, and claims it is entitled to an "immediate appeal" before even briefing these purported defenses. Spain Br. 34-35. The Court should reject this transparent attempt at delay. Spain forwent its opportunity to raise any merits defenses to enforcement of the award under the parties' stipulated briefing schedule, which called for any "opposition to Eiser's Petition" to be filed by December 14, 2018. ECF No. 14, ¶ 3. It cites no authority that any merits defense is even cognizable, and ignores clear authority to the contrary. Because Spain presented no merits defense

when it was obligated to do so, and because no such defense is legally colorable, there is no basis for a suspensive interlocutory appeal, and no valid reason to delay entry of judgment.

### A. Spain Is Not Entitled To Delay Presentation Of Its Purported Merits Defenses

Spain has no right to wait to raise "merits defenses." Spain Br. 34-35. It arbitrated and lost, and the United States committed itself by treaty to enforcing the resulting award without providing "any appeal *or . . . any other remedy* except those provided for in [the ICSID] Convention." ICSID Convention, art. 53(1) (emphasis added); *see also* Bjorklund Decl. ¶¶ 61-62. Once this Court finds jurisdiction, therefore, it "may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award," without permitting any "substantive challenges to the award." *Mobil Cerro Negro*, 863 F.3d at 102, 118; *see supra* at 8-9. If Spain had arguments to abnegate the command of Section 1650a, it was obligated to present them fully in its brief responding to the petition. Its breezy reference to potential defenses in a footnote does not save it from forfeiture. "[H]iding an argument [in a footnote] and then articulating it in only a conclusory fashion results in forfeiture." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014). In any event, the supposed "defenses" Spain identifies are transparently ineffective to prevent application of Section 1650a's command that the award be accorded full faith and credit as if it were a judgment of a state court.

*First*, Spain references the "foreign compulsion doctrine," Spain Br. 35 n.14, which provides that a U.S. court should not "require a person" to "do an act in another state that is prohibited by the law of that state." Restatement (Third) of Foreign Relations Law § 441 (1987). Spain claims "pay[ing] damages" to Eiser would "defy the laws of the EU," to which Spain has acceded

by treaty. Spain Br. 35 n.14. That assertion is risible.[24] But even if it were true (it is not), Spain's purported inability to pay a judgment has no possible bearing on the "full faith and credit" to which the Award is expressly entitled by statute. 22 U.S.C. § 1650a(a). The ICSID Convention *already* obligates Spain to pay ("comply with") the Award, ICSID Convention, art. 53(1), so converting the Award into a judgment in the United States would not "require" Spain to "do" anything new— let alone to do so "in another state," *i.e.*, outside the United States, Restatement (Third) of Foreign Relations Law, *supra*, § 441. It would merely facilitate enforcement of Spain's existing obligations against its assets in the United States, which the United States has agreed by treaty to facilitate. Further, the doctrine typically applies to private parties bound by governments which they do not control. *E.g.*, *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.*, 830 F.2d 449, 453 (2d Cir. 1987). There is no warrant for extending it, as Spain proposes, to allow Spain to invoke its *own purported commitments* to the EU to avoid paying the Award.

*Second*, Spain asserts that enforcement is barred by "the act of state doctrine" because enforcing the Award would require this Court to "pas[s] on the validity of the acts of a foreign sovereign." Spain Br. 35 n.14. Yet not even the FAA—which unlike the ICSID Convention *does* provide grounds for challenging arbitration awards within its purview, *see supra* at 8—permits

---

[24] Spain relies on a statement by the European Commission that an intra-EU *arbitration award* under the ECT would constitute "state aid" that would have to be approved by the Commission under Article 108(3) of the TFEU before it could lawfully take effect. Spain Br. 35 n.14 (citing European Commission, Decision on State Aid SA.40348 (2015/NN), *Spain: Support for electricity generation from renewable energy sources, cogeneration and waste 2017 O.J.* (C442) ¶¶ 4-6, 89, 165-66 (Nov. 11, 2017) (citing TFEU, art. 108(3))). The statement does not indicate that such approval would be denied, let alone that a *judgment by a United States court* would be subject to the same requirement. Regardless, the European Commission's statement has no legal force, as it is not found in the dispositive part of the decision, *see* Judgment of 1 July 2009, *Jan Rudolf Maas v. Comm'n*, Joined Cases T-81/07, T-82/07 and T-83/07, EU:T:2009:237, ¶ 46 ("[R]egardless of the grounds on which the contested decision is based, only the operative part thereof is capable of producing legal effects"), and the Commission's interpretation of EU law is not binding in any event, *see supra* at 28-29.

courts to refuse to enforce an award "on the basis of the Act of State doctrine."  9 U.S.C. § 15 (prohibiting challenges on that basis).  The doctrine could not be a basis for denying enforcement of an arbitration award because it "merely requires that . . . the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid" in U.S. court.  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).  Confirming the Award does not require the Court to deem any act of Spain invalid.  The Court need only determine that Spain has not paid the Award and that the Award is entitled to full faith and credit.  If anything, it is Spain that seeks to have the Court declare its own act (its consent to arbitrate) "invalid."  Spain Br. 2.

*Third*, Spain invokes nebulous "principles of international comity."  Spain Br. 35 n.14.  But "'international comity' . . . does not . . . override 'the emphatic federal policy in favor of arbitral dispute resolution.'"  *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016).  Nor would it be consistent with international comity for the United States, through its courts, to ignore the obligations to which the United States bound itself by treaty.  Comity is not a basis for denying confirmation of an arbitration award, even under the New York Convention, which permits a court to deny enforcement based on public policy concerns.  *Id.*  It is even less so under the ICSID Convention, which does not permit public policy concerns to override enforcement, since there is "no roving 'public policy exception' to . . . full faith and credit."  *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998); *see also* Bjorklund Decl. ¶ 58.  Further, the FSIA "leaves no room" for a foreign state to invent additional "common-law" defenses "based on the very same considerations of comity" that underpin the FSIA.  *Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 416 (D.C. Cir. 2018).  Congress has decided how these diplomatic considerations should be balanced, and Spain's "'international comity'" concerns "are better directed to th[e] branch of

government with authority to amend the [FSIA]." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 147 (2014).

*Fourth*, Spain claims that its pending request to ICSID to annul the Award "put[s] at issue the 'finality of the award.'" Spain Br. 35 n.14. This is nonsense. The ICSID Convention makes ICSID awards binding "except to the extent that enforcement [is] stayed" under the Convention. ICSID Convention, art. 53(1). Here, the Committee presiding over Spain's annulment request denied a stay, *see supra* at 6, so the Award plainly is immediately enforceable.

## B.     This Court Can And Should Enter Judgment Without Waiting For Spain To Complete An Interlocutory Appeal

Given Spain's failure to offer any nonfrivolous defense against the Award, there is no reason to delay entry of judgment. Spain claims it would lose "'the benefit of [its] immunity'" if forced to bear the "burdens and indignities" of merits litigation before an "immediate, interlocutory appeal" of its FSIA defenses. Spain Br. 34-35. But that argument rings hollow under the ICSID Convention, which does not contemplate merits litigation. Any "burden" Spain incurs in briefing its frivolous, non-cognizable "merits defenses" is self imposed, and cannot justify further delay.

Nor can those same self-imposed burdens justify a collateral order doctrine appeal. While the Second Circuit has allowed a collateral order doctrine appeal from a denial of immunity in an action to confirm an ICSID award, it gave no explanation of why the doctrine applies in that context. *Blue Ridge*, 735 F.3d at 79-81. Properly understood, the doctrine does not apply here.

Appeals ordinarily "cannot be taken from the district court to the courts of appeals until final judgment" has been entered. *La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 842-43 (D.C. Cir. 2008); *see* 28 U.S.C. § 1291 (providing for review of "final decisions of the district courts of the United States"). The Supreme Court has, however, given this final judgment rule "a 'practical rather than a technical construction,'" such that "the

statute encompasses not only judgments that 'terminate an action,' but also a 'small class' of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). "That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id*.

The Supreme Court has repeatedly emphasized that the collateral order doctrine is "narrow." *Will v. Hallock*, 546 U.S. 345, 350 (2006). "[P]iecemeal, prejudgment appeals undermin[e] 'efficient judicial administration' and encroac[h] upon the prerogatives of district court judges," so "[t]he justification for immediate appeal must . . . be sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes." *Mohawk*, 558 U.S. at 106-07. Accordingly, the collateral order doctrine applies only where "each of these conditions [is] satisfied": (1) The order "'conclusively determine[s] a disputed question'"; (2) it "'resolve[s] an important issue completely separate from the merits of the action'"; and (3) it would be "'effectively unreviewable on appeal from a final judgment.'" *CalPortland Co., Inc. v. Fed. Mine Safety & Health Review Comm'n on Behalf of Pappas*, 839 F.3d 1153, 1160 (D.C. Cir. 2016). These "conditions are 'stringent,'" and must be applied accordingly lest "the [collateral order] doctrine . . . overpower the substantial finality interests § 1291 is meant to further: judicial efficiency . . . and the 'sensible policy of avoid[ing] the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals.'" *Will*, 546 U.S. at 349-50.

Applying these factors, courts have held that a foreign state may immediately appeal a district court's decision denying sovereign immunity. *See, e.g.*, *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). The collateral order rule applies in this context because sovereign immunity is "'an immunity from trial and the attendant burdens of

litigation, and not just a defense to liability on the merits.'" *Id*. at 1126.  Thus, allowing an inter-locutory appeal from a denial of sovereign immunity is (in most cases) consistent with the collat-eral order doctrine because there are normally merits questions that are left to decide and, absent an interlocutory appeal, a denial of immunity would be "effectively unreviewable on appeal from a final judgment." *CalPortland Co.*, 839 F.3d 1153, 1160.

But the collateral order doctrine has no relevance where (as here) the foreign state's claim of immunity will *not* be rendered "effectively unreviewable on appeal from a final judgment." *CalPortland Co.*, 839 F.3d at 1160.  Once this Court finds jurisdiction, it "may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award," without permitting any "substantive challenges to the award." *Mobil Cerro Negro*, 863 F.3d at 102, 118; *see also supra* at 8-9; Bjorklund Decl. ¶ 61.  There will be nothing left but to enter judgment, from which Spain can appeal and challenge the denial of its motion to dismiss.  There is no risk that Spain will be subjected to a "'trial and the attendant burdens of litigation'" absent interlocutory appeal because there are no "merits" issues for this court to address.  *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990).  Allowing an interlocutory appeal would merely condone "obstruction," *Will* 546 U.S. at 349-50, and "undermin[e] efficient judicial administration." *Mohawk*, 558 U.S. at 106.

With no right to interlocutory appeal, there is no reason to delay entry of judgment.  But even if Spain does appeal before this Court enters judgment, that would not divest this Court of jurisdiction to move forward with entering judgment.  Spain claims that under *Princz v. Fed. Re-public of Germany*, 998 F.2d 1 (D.C. Cir. 1993), "district courts are divested of jurisdiction during an appeal of [a court's] 'threshold' sovereign immunity determination."  Spain Br. 35.  But the so-

called "divestiture" rule that the D.C. Circuit relied on in *Princz* is "not a hard-and-fast jurisdictional rule" that may be applied on a categorical basis. *United States v. Rodriguez-Rosado*, 909 F.3d 472, 477 (1st Cir. 2018). It is a "prudential doctrine" that "should not be applied when to do so would defeat its purpose of achieving judicial economy." *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 97 (3d Cir. 1988). Whereas *Princz* applied the rule to prevent a district court from "proceed[ing] to trial" pending appeal, here Eiser seeks only the ministerial act of entering a judgment to which Spain is not permitted to raise defenses. "[A]n appeal taken from an interlocutory decision does not prevent the district court from finishing its work and rendering a final decision." *Wis. Mut. Ins. Co. v. United States*, 441 F.3d 502, 504 (7th Cir. 2006). If Spain nonetheless wants to delay entry or enforcement of a judgment pending appeal, its remedy is to post a supersedeas bond or justify an unconditional stay pending appeal without bond. *See* Fed. R. Civ. P. 62(b); Fed. R. App. P. 8(a).

Even if a collateral order doctrine appeal on FSIA immunity ordinarily divested a district court of jurisdiction to enforce an ICSID award, it would not do so here because Spain's claim of immunity is squarely foreclosed by the D.C. Circuit's holding in *Creighton* that a foreign state waives jurisdictional immunity if it signs a treaty that (like the ICSID Convention) "'contemplate[s] enforcement actions in other signatory states'" including the United States. 181 F.3d at 123; *see supra* at 12-14. Indeed, jurisdiction may become even more apparent if the D.C. Circuit affirms this Court's decision to that effect in *Tatneft*. "If the claim of immunity is a sham . . . the notice of appeal does not transfer jurisdiction to the court of appeals, and so does not stop the district court in its tracks." *Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir. 1989). Instead, the "district court may certify to the court of appeals that the appeal is frivolous and get on with the trial"—or, here, the ministerial act of entering judgment. *Id.* (citing multiple circuits).

## CONCLUSION

The Court should deny Spain's Motion to Dismiss and enter judgment on the Award in Eiser's favor in the amount and currency specified in the Award.

Dated: January 14, 2019

Respectfully submitted,

/s/ Stuart F. Delery

Stuart F. Delery, D.C. Bar #449890
sdelery@gibsondunn.com
Matthew McGill, D.C. Bar #481430
mmcgill@gibsondunn.com
Matthew S. Rozen, D.C. Bar #1023209
mrozen@gibsondunn.com
Ankita Ritwik, D.C. Bar #1024801
aritwik@gibsondunn.com
Benjamin Hayes, D.C. Bar #1030143
bhayes@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Eiser Infrastructure Limited and
Energia Solar Luxembourg S.A.R.L.*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 14, 2019, I caused the foregoing Response to Spain's Motion to Dismiss and Reply in Support of Petition to Enforce Arbitral Award, and exhibits thereto, to be filed with the Clerk for the U.S. District Court for the District of Columbia through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

<div style="margin-left:50%">

 /s/ Stuart F. Delery
Stuart F. Delery
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
sdelery@gibsondunn.com

</div>