IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L., <br><br> *Petitioners*, <br><br> v. <br><br> Kingdom of Spain, <br><br> *Respondent*. | Civil Action No. 1:18-cv-01686-CKK |

**Expert Declaration of Andrea K. Bjorklund**

# EXHIBIT 18

INTERNATIONAL COURT OF JUSTICE

PLEADINGS, ORAL ARGUMENTS, DOCUMENTS

LEGAL CONSEQUENCES FOR STATES OF THE
CONTINUED PRESENCE OF SOUTH AFRICA IN
NAMIBIA (SOUTH WEST AFRICA)
NOTWITHSTANDING SECURITY COUNCIL
RESOLUTION 276 (1970)

VOLUME I

Request for Advisory Opinion, Documents, Written Statements

COUR INTERNATIONALE DE JUSTICE

MÉMOIRES, PLAIDOIRIES ET DOCUMENTS

CONSÉQUENCES JURIDIQUES POUR LES ÉTATS DE
LA PRÉSENCE CONTINUE DE L'AFRIQUE DU SUD
EN NAMIBIE (SUD-OUEST AFRICAIN)
NONOBSTANT LA RÉSOLUTION 276 (1970)
DU CONSEIL DE SÉCURITÉ

VOLUME I

Requête pour avis consultatif, documents, exposés écrits



C.I.J.

*Page*

WRITTEN STATEMENT OF THE GOVERNMENT OF THE UNITED STATES OF
AMERICA . . . . . . . . . . . . . . . . . . . . . . . . . . . .   843

  Introductory . . . . . . . . . . . . . . . . . . . . . . . . .   843
    The Question . . . . . . . . . . . . . . . . . . . . . . . .   843
    Issues presented . . . . . . . . . . . . . . . . . . . . . .   843
    Jurisdiction of the Court . . . . . . . . . . . . . . . . . .   843
  Part I. Statement of facts . . . . . . . . . . . . . . . . . . .   845
    South Africa's administration of South West Africa under the
      League of Nations Mandate . . . . . . . . . . . . . . . . .   845
    The 1950 Advisory Opinion . . . . . . . . . . . . . . . . . .   846
    The 1955 Advisory Opinion . . . . . . . . . . . . . . . . . .   847
    The 1956 Advisory Opinion . . . . . . . . . . . . . . . . . .   848
    The contentious cases . . . . . . . . . . . . . . . . . . . .   848
    General Assembly resolution 2145 (XXI) and subsequent General
      Assembly and Security Council resolutions . . . . . . . . .   849

  Part II. Statement of law . . . . . . . . . . . . . . . . . . .   852

    Chapter I. The United Nations validly terminated South Africa's
      Mandate over the Territory of Namibia . . . . . . . . . . .   852

      Section I. Scope of the question . . . . . . . . . . . . . .   852
      Section II. The Mandate as a treaty in force . . . . . . . .   854
      Section III. There is a legal obligation to observe treaties in
        good faith . . . . . . . . . . . . . . . . . . . . . . . .   855
      Section IV. A material breach of a treaty entitles the other party
        to suspend its operation in whole or in part . . . . . . . .   856
      Section V. The League of Nations had the right to terminate
        rights under a mandate in the event of a material breach of its
        obligations by the Mandatory Power . . . . . . . . . . . .   857
      Section VI. The United Nations succeeded to the right to ter-
        minate South Africa's mandate in the event of a material
        breach . . . . . . . . . . . . . . . . . . . . . . . . . .   860
      Section VII. South Africa has been in material breach of its
        mandate obligations . . . . . . . . . . . . . . . . . . . .   863

        A. By refusing to submit reports, transmit petitions, and
          otherwise recognize the authority of the United Nations . .   863
        B. By systematic rejection of the recommendations of the
          General Assembly and the Security Council . . . . . . .   864
        C. By application of *apartheid* in Namibia . . . . . . . . .   864

          1. Freedom of movement . . . . . . . . . . . . . . . . .   866
          2. Freedom of residence and right to own land . . . . . .   867
          3. Freedom of employment . . . . . . . . . . . . . . .   867
          4. Right to participate in government . . . . . . . . . .   868
          5. The right to family life . . . . . . . . . . . . . . .   868
          6. The right to education . . . . . . . . . . . . . . . .   869

      Section VIII. The United Nations had the right to terminate
        South Africa's authority under the Mandate because of South
        Africa's material breaches of its mandate obligations, and
        such termination was a reasonable exercise of United Nations
        supervisory authority . . . . . . . . . . . . . . . . . . .   871
      Section IX. The United Nations has the legal capacity to as-
        sume the functions of the Mandatory Power . . . . . . . .   872

*Page*

Chapter II. South Africa by virtue of its continued presence in Namibia notwithstanding Security Council resolution 276 (1970) is occupying Namibia illegally and is obligated to transfer administration of Namibia to the United Nations . . . . . . . . . . 874

Section I. South Africa is in illegal occupation of Namibia . . 874
Section II. South Africa should have transferred the administration of Namibia to the United Nations . . . . . . . . 876

Chapter III. From South Africa's continued presence in Namibia flow certain legal consequecnes for South Africa and other States . . . . . . . . . . . . . . . . . . . . . . . . . . 878

Section I. South Africa has certain duties concerning Namibia under international law. . . . . . . . . . . . . . . . . 878

  A. The duty under the Mandate to promote the well-being and development of the inhabitants is impressed upon the Territory and survives termination of South Africa's rights under the Mandate . . . . . . . . . . . . . . . . . 878
  B. South Africa has the duty to act in conformity with Chapter XI of the United Nations Charter concerning non-self-governing territories. . . . . . . . . . . . . . 880
  C. South Africa has the duty to act in conformity with Chapter IX and other provisions of the United Nations Charter . . . . . . . . . . . . . . . . . . . . . . . 881
  D. South Africa has the duty under general international law to adhere to certain standards in the administration of Namibia as occupied territory . . . . . . . . . . . . 881
  E. The preceding duties are unaffected by the fact that South Africa is occupying Namibia illegally . . . . . . . . . 882

Section II. States have certain duties under international law with respect to Namibia among which are:

  A. To respect the direct responsibility of the United Nations for Namibia . . . . . . . . . . . . . . . . . . . . . 882
  B. To apply certain legal rules with respect to treaties affecting Namibia . . . . . . . . . . . . . . . . . . . . . . 884

Part III. Conclusions . . . . . . . . . . . . . . . . . . . . 888

WRITTEN STATEMENT OF THE GOVERNMENT OF NIGERIA . . . . . . . . . 889

LETTRE DU SECRÉTAIRE D'ETAT SUPPLÉANT AUX AFFAIRES ÉTRANGÈRES DE LA RÉPUBLIQUE SOCIALISTE FÉDÉRATIVE DE YOUGOSLAVIE À LA COUR INTERNATIONALE DE JUSTICE . . . . . . . . . . . . . . . . . . . . 898

# WRITTEN STATEMENT OF THE GOVERNMENT OF THE UNITED STATES OF AMERICA

## INTRODUCTORY

### The Question

On 29 July 1970, the Security Council, "Reaffirming the special responsibility of the United Nations with regard to the terrritory and people of Namibia", adopted resolution 284 (1970) requesting the International Court of Justice to give an advisory opinion on the following question:

> "What are the legal consequences for States of the continued presence of South Africa in Namibia, notwithstanding Security Council resolution 276 (1970)?"

### Issues Presented

The Government of the United States believes that, apart from some preliminary and incidental questions, the following legal issues need to be discussed in connection with this request:

(1) Whether the rights and authority of South Africa with respect to Namibia (South West Africa) were validly terminated by United Nations action.
(2) Whether South Africa is in illegal occupation of Namibia.
(3) The legal consequences for South Africa and other States of South Africa's continued presence in Namibia.

### Jurisdiction of the Court

The jurisdiction of the Court derives from Article 96, paragraph 1, of the Charter of the United Nations:

> "The General Assembly or the Security Council may request the International Court of Justice to give an advisory opinion on any legal question."

The statute of the Court, in Article 65, paragraph 1, authorizes the Court to respond to such requests:

> "The Court may give an advisory opinion on any legal question at the request of whatever body may be authorized by or in accordance with the Charter of the United Nations to make such a request."

Both the Charter and the Statute of the Court require that a request for an advisory opinion concern a legal question. The statute also provides that the giving of an advisory opinion is a matter for the Court's discretion. The United States believes that the Court should give an opinion on the important legal question submitted to it by the Security Council.

In its most recent Advisory Opinion, *Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, page 151, the Court noting that its power was discretionary, reaffirmed what it had previously stated in the *Interpretation of Peace Treaties* case, namely that "the

844                    NAMIBIA (SOUTH WEST AFRICA)

reply of the Court, itself an 'organ of the United Nations', represents its participation in the activities of the Organization, and, in principle, should not be refused". (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, First Phase, Advisory Opinion, I.C.J Reports 1950*, p. 65, at p. 71.) The Court also cited *The Administrative Tribunal* case where it said only "compelling reasons" would justify a refusal to give a requested advisory opinion. (*Judgments of the Administrative Tribunal of the I.L.O. upon Complaints Made against Unesco, Advisory Opinion, I.C.J. Reports 1956*, p. 77, at p. 86.) Indeed, in no case has the International Court of Justice declined a request to give an advisory opinion on a legal question referred to it in accordance with Article 96 of the Charter.

The question now before the Court by its very terms is a legal one: "What are the *legal consequences* for States of the continued presence of South Africa in Namibia ... ?" (italics added). The Security Council has requested the Court to assist it by clarifying the legal consequences of an illegal situation. This request clearly falls within the advisory jurisdiction of the "principal judicial organ of the United Nations".

# PART I

### Statement of Facts

*South Africa's Administration of South West Africa under the League of Nations Mandate*

South West Africa was annexed by Germany in 1884. On 9 July 1915 the Territory was surrendered to forces of the Union of South Africa. Under Article 119 of the Treaty of Versailles Germany renounced all her rights and titles over the Territory in favour of the Principal Allied and Associated Powers. Representatives of the Principal Allied and Associated Powers decided that the Territory should be placed under the League of Nations mandates system as a Class "C" Mandate. Following the entry into force of the Covenant of the League of Nations, that organization, acting under the terms of Article 22, defined and confirmed the terms of each of the Mandates. On 17 December 1920, under an agreement with the Council of the League, His Britannic Majesty, acting for and on behalf of South Africa, agreed to accept the Mandate and "to exercise it on behalf of the League of Nations" in accordance with the provisions of that agreement. The Court in the *International Status of South West Africa, Advisory Opinion, I.C.J. Reports 1950*, after having recalled that the twin pillars of the mandates system were "the principle of non-annexation and the principle that the well-being and development of [the] peoples formed 'a sacred trust of civilization'", observed that under the terms of the Mandate—

". . . the Union of South Africa (the 'Mandatory') was to have full power of administration and legislation over the Territory as an integral portion of the Union and could apply the laws of the Union to the Territory subject to such local modifications as circumstances might require. On the other hand, the Mandatory was to observe a number of obligations, and the Council of the League was to supervise the administration and see to it that these obligations were fulfilled." (*I.C.J. Reports 1950*, pp. 131, 132.)

The League supervised South Africa's administration of the Mandate until 1940. Although it did not exercise its authority during the Second World War, the League retained supervisory power until its dissolution in 1946. In Chapter XI of the Charter of the United Nations, which had meanwhile entered into force in 1945, the Members which had assumed or which were later to assume responsibilities for the administration of territories whose peoples had not yet attained a full measure of self-government recognized the paramountcy of the interests of the inhabitants of those territories and accepted as a sacred trust the obligation to promote to the utmost the well-being of those inhabitants. In Chapter XII the Members of the United Nations established an international trusteeship system which incorporated principles corresponding to those in Article 22 of the Covenant.

On 18 April 1946, a date subsequent to the entry into force of the Charter, the Assembly of the League of Nations in paragraph 3 of its final resolution on mandates specifically noted that Chapters XI and XII of the Charter embodied those principles. (League of Nations *Official Journal* (21st Sess., Plenary) (1946), p. 58.) In paragraph 4 it referred to the—

tentative agreement on the terms of this Mandate between the Principal Allied and Associated Powers to be proposed by the Council of the League of Nations and a formal confirmation agreement on the terms therein explicitly defined by the Council and agreed to between the mandatory and the Council representing the League and its Members. It is an instrument having the character of a treaty or convention and embodying international engagements for the mandatory as defined by the Council and accepted by the mandatory." (*Ibid.*, p. 331.)

Before bringing to a close its discussion of the South African preliminary objection the Court cited the language from its 1950 Opinion, quoted above, and remarked:

"The unanimous holding of the Court in 1950 on the survival and continuing effect of Article 7 of the Mandate, continued to reflect the Court's opinion today. Nothing has since occurred which would warrant the Court reconsidering it. All important facts were stated or referred to in the proceedings before the Court in 1950." (*Ibid.*, p. 334.)

It concluded its rejection of the objection with the following sentence:

"The validity of Article 7, in the Court's view, was not affected by the dissolution of the League, just as the Mandate as a whole is still in force for the reasons stated above." (*Ibid.*, p. 335.)

### Section III

*There Is a Legal Obligation to Observe Treaties in Good Faith*

In 1969 the United Nations Conference on the Law of Treaties brought to a successful close more than 15 years' work within the Organization relating to the codification of treaty law. The Convention that was produced by the combined efforts of the 110 States participating in the Conference, although it is not yet in force, constitutes a primary source of reference for determining what are the customary principles of treaty law applicable to the Mandate.

Article 4 of the Vienna Convention on the Law of Treaties provides that the Convention applies only to treaties which are concluded by States after entry into force of the Treaties Convention with regard to such States. However it specifically preserves the applicability to all treaties of rules of customary treaty law that are contained in the Convention. Many of the provisions of the Convention codify pre-existing customary law. In this regard the Legal Counsel of the United Nations has pointed out that the debates and decisions of the Conference—

"... may show the opinions of governments about what the present rules are, and thus may furnish evidence of existing customary international law. If a rule was adopted by a very large majority and with a general understanding that it represents existing law, it may be taken to formulate such law." (Letter of 11 May 1970 from the Legal Counsel (Stavropoulos) to Secretary-General (Twight), International Civil Aviation Organization.)

Two articles of the Treaties Convention which both on the basis of their content and according to the criteria laid down by the Legal Counsel of the United Nations may be taken to formulate existing law are those relating to *pacta sunt servanda* (Art. 26) and to the consequences of breach of a treaty (Art. 60).

Article 26 provides that a State is bound to carry out in good faith its treaty obligations. The International Law Commission described the rule as "the fundamental principle of the law of treaties". (*Reports of the International Law Commission on the Second Part of its Seventeenth Session and on Its Eighteenth Session, GA, OR, 21st Session*, Supplement No. 9, p. 42.) The formulation of this principle proposed by the Commission was adopted without any negative vote at the second session of the Conference.

The Preamble to the Charter of the United Nations affirms the determination of the peoples of the United Nations "to establish conditions under which justice and respect for the obligations arising from treaties ... can be maintained". Paragraph 2 of Article 2 expressly provides that Members "shall fulfil in good faith the obligations assumed by them in accordance with the ... Charter".

International tribunals have also affirmed the principle of good faith performance of treaty obligations. In the *North Atlantic Coast Fisheries* case, a tribunal of the Permanent Court of Arbitration declared: "Every State has to execute the obligations incurred by treaty *bona fide*..." (UN, *Reports of International Arbitral Awards*, Vol. XI, p. 186.) A former Judge and distinguished commentator on the Permanent Court observed: "The assumption runs throughout its jurisprudence that States will in good faith observe and carry out the obligations which they have undertaken." (M. O. Hudson, *The Permanent Court of International Justice 1920-1942* (1943), p. 636.)

In *Certain Norwegian Loans, Judgment, I.C.J. Reports 1957*, page 53, Judge Lauterpacht stated: "Unquestionably, the obligation to act in accordance with good faith, being a general principle of law, is also part of international law."

Commenting on this statement Sir Gerald Fitzmaurice declared:

> "Action in good faith is an international law obligation ... and accordingly action not in good faith must be considered as a breach of international law ..." ("Hersch Lauterpacht—The Scholar as Judge: Part II", 38 *Brit. Yr. Bk. of Int. Law* 9 (1962).)

### Section IV

#### *A Material Breach of a Treaty Entitles the Other Party to Suspend its Operation in Whole or in Part*

A second relevant rule of treaty law, codified in Article 60 of the Convention, deals with termination or suspension of the operation of a treaty as a consequence of its breach. Paragraph 3 of that Article restricts its application to cases of material breach, which is defined as:

"*(a)* a repudiation of the treaty ..., or
*(b)* the violation of a provision essential to the accomplishment of the object or purpose of the treaty".

The basic principle embodied in the Article is that a material breach of a treaty on one side may give rise to a right on the other side to abrogate the treaty or suspend its operation in whole or in part. The commentary to the corresponding article in the Harvard Draft summarizes traditional international law doctrine regarding breach and demonstrates that the principle has been recognized in municipal courts since late in the eighteenth century. (29 *American*