IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L., <br><br>      *Petitioners*, <br><br>   v. <br><br> Kingdom of Spain, <br><br>      *Respondent*. | **Civil Action No. 1:18-cv-01686-CKK** |

## <u>Expert Declaration of Sir Alan Dashwood</u>

## I.    INTRODUCTION

1.      I am a Barrister in Henderson Chambers, London specialising in the law of the European Union (EU).  I advise clients, including Governments, on issues of EU law and its interplay with national law and international law.  I have appeared frequently before EU courts and am currently instructed in cases before the High Court of England and Wales and the Supreme Court of the United Kingdom, as well as before the General Court of the European Union.  I was Professor of European Law at Cambridge and a Fellow of Sidney Sussex College from 1995 until my retirement in 2009 and am now Emeritus.  I was a part-time Professor at City University of London from 2012 to 2017.  Prior to my appointment at Cambridge, from 1987 to the end of 1994, I was a Director in the Legal Service of the Council of the EU.  At an earlier stage in my career I was Legal Secretary to Advocate General J-P Warner at the Court of Justice of the European Communities (as it then was).  I am co-author of a textbook, *Wyatt & Dashwood's European Union Law*, now in its 6th edition, and a frequent contributor to academic literature.  I was the founding Editor of *European Law Review* and later became one of the Editors of *Common Market Law Review*.  I was appointed CBE in 2004 and KCMG in 2013 for services to the development of EU law.  A full CV is attached at Annex 1.

2.      I have been invited by Gibson, Dunn & Crutcher LLP, counsel to Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. (**the Petitioners**), to provide an expert declaration on certain legal issues that are considered relevant to the proceedings going forward in the United States District Court for the District of Columbia, in which the Petitioners are seeking the enforcement of an Award (**the Award**) issued in their favour against the Kingdom of Spain (**Spain**) by a Tribunal established under the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of other States[1] and Article 26 of the Energy Charter Treaty (**ECT**).  The Award, rendered on 4 May 2017, is currently the subject of annulment proceedings before an ICSID *ad hoc* Committee.[2]  The *ad hoc* Committee has lifted the provisional stay on enforcement of the Award, thus rendering the Award enforceable in the courts of signatories to the ICSID Convention.[3]

3.      The Petitioners invested in renewable energy facilities in Spain.  The dispute which was the subject of the ICSID arbitration relates to the withdrawal by the Spanish authorities of certain economic incentives on which the Petitioners had relied in making their investments.[4]  The Petitioners' countries of registration are Member States of the EU (respectively, the United Kingdom and Luxembourg), as evidently Spain is also.

4.      In opposing the enforcement of the Award, Spain contends that "a valid arbitration agreement and an award made pursuant to such an agreement do not exist in accordance with the CJEU's *Achmea* decision."[5]  *Achmea* is a recent ruling by the Court of Justice of the European

---

[1]  Referred to hereinafter as "**the ICSID Convention**."  This established the International Centre for Settlement of Investment Disputes, hereinafter "**ICSID**" or "**the Centre**."

[2]  Petition to Enforce Arbitral Award in the United States District Court for the District of Columbia, ¶¶ 14-21 (hereinafter the "**Petition to Enforce**").

[3]  *Id.* ¶ 20.

[4]  *Id.* ¶ 7.

[5]  Memorandum of Points and Authorities in Support of Respondent's Motion for Lack of Jurisdiction under the FSIA, at 2 (hereinafter "**Spain's Memorandum**").

Union[6] in a case concerning an arbitral clause in a bilateral investment treaty ("**BIT**") between The Netherlands and Slovakia.[7]   The Court held that such a clause was "precluded by" (in other words, incompatible with) two provisions of the Treaty on the Functioning of the European Union ("**TFEU**"), Articles 267 and 344,[8] when contained in an international agreement between EU Member States.   Spain asserts:   "[T]he holding and reasoning in *Achmea* applies equally to the dispute resolution provisions in Article 26:"[9]   this, in spite of the fact that the ECT is not a BIT, but a multilateral Treaty, with the EU itself and a large number of third States as Parties, including 27 out of the present 28 EU Member States.[10]   The authority cited by Spain in support of its claim is a "Communication from the Commission to the European Parliament and the Council," dated 19 July, 2018, where it is stated:   "The *Achmea* judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations."[11]

5.      The questions which I am asked to address in this Declaration are the following:

(1)      Does Article 26 of the ECT provide for the arbitration of disputes between an EU member state and investors of another EU Member State (**intra-EU disputes**)?

---

[6]   Hereinafter, "the Court of Justice" or, where the context permits, "**the Court**."

[7]   Case C-284/16, *Slowakische Republik (Slovak Republic) v. Achmea BV*, ECLI:EU:C:2018:156 (hereinafter, "***Achmea***" or "**the *Achmea* judgment**") (Ex. 1 hereto).   The BIT was initially concluded between The Netherlands and Czechoslovakia.   On 1 January 1993 the Slovakia succeeded to the rights and obligations of Czechoslovakia under the BIT, which is referred to hereinafter as "**the Netherlands/Slovakia BIT**" or, where the context permits, "**the BIT**." Slovakia acceded to the European Union on 1 May 2004.

[8]   The significance of those provisions is explained *infra* ¶¶ 28-32, 47.

[9]   Spain's Memorandum, at 22-23.

[10]   At the time when the ECT was concluded, all the then Member States were Parties.   Italy withdrew from the Treaty as of 1 January 2016.

[11]   *Communication from the Commission to the European Parliament and the Council, Protection of intra-EU investment*, COM (2018) 547 final, p 3 *in fine* (Ex. 2 hereto).   The European Commission has no judicial authority.   *See also infra* ¶ 52.

(2)     Does the ruling by the CJEU in *Achmea* or the reasoning on which it is based establish that arbitration of intra-EU disputes under Article 26 ECT is incompatible with Articles 267 and 344 TFEU, as a matter of EU law?

(3)     Supposing the answer to Question (2) to be affirmative, does it follow from the *Achmea* decision that, as a matter of EU law, where an Award has been obtained by investors in proceedings brought under Article 26 ECT for the settlement of an intra-EU dispute, a valid arbitration agreement and an award made pursuant to that agreement do not exist.[12]

6.      In preparing this Declaration, I have reviewed the relevant parts of the documents listed below, including the Expert Declaration of Professor Steffen Hindelang dated 14 December 2018 (**the Hindelang Declaration**), which was submitted in support of Spain's motion to dismiss for lack of jurisdiction under the FSIA.  I have been asked to comment, where appropriate, on the Hindelang Declaration, when addressing the above Questions.

(1)     *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award (May 4, 2017).

(2)     The Petition to Enforce Arbitral Award, dated 19 July 2018, in No. 1:18-cv-01686-CKK (D.D.C.).

(3)     The Expert Declaration of Professor Steffen Hindelang, dated 14 December 2018, submitted in support of Spain's motion to dismiss.

(4)     The Declaration of Miriam K. Harwood, dated 14 December 2018, submitted in support of Spain's motion to dismiss.

(5)     The European Commission's *Amicus Curiae* Submission, dated 12 November 2018, submitted in the annulment proceedings in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36.

---

[12] *See supra* ¶ 4.

(6)     The following submissions by the parties in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36:  (a) Spain's Counter-Memorial on the Merits and Memorial on Jurisdiction, dated 13 April 2015; (b) Petitioners' Reply, dated 18 September 2015; (c) Spain's Rejoinder on the Merits and Reply on Jurisdiction, dated 27 November 2015; and (d) Petitioners' Rejoinder on Jurisdiction, dated 23 December 2015.

7.     My expertise is in the field of EU law, including at its interface with public international law, and I do not express a view on any other field of law in this Declaration.

## II.   EXECUTIVE SUMMARY

8.     I have answered the Questions as follows:

Question (1)

Article 26 ECT provides for arbitration of disputes between Investors of a Contracting Party to the ECT and another ECT Contracting Party, including disputes between an EU Member State and an investor of another EU Member State.  The finding of the Tribunal to that effect is confirmed by the external relations practice of the EU.  In particular, the EU employs a "disconnection clause" when it intends for international treaties not to apply in relations between EU Member States.  No such disconnection clause disapplying Article 26 or any of the ECT's other provisions in relations between EU Member States was included in the ECT and there is no plausible basis for reading such a clause into the Treaty by implication.

Question (2)

The only principle for which the *Achmea* judgment stands as legal authority is that Articles 267 and 344 TFEU, taken together, preclude an arbitral clause in an international agreement concluded between EU Member States, "such as" Article 8 of the Netherlands/Slovakia BIT.

No help can be obtained from the *Achmea* judgment towards establishing that intra-EU arbitration under Article 26 ECT is incompatible with EU law because:

(i)     The practice of the CJEU in developing its case law on novel issues militates against extensive interpretation.

(ii)    Besides their respective bilateral and multilateral characters, the Netherland/Slovakia BIT and the ECT are very different kinds of agreement in terms of their aims and significance.

5

(iii)    The CJEU's reasoning in *Achmea* is not applicable to the case of arbitration under Article 26 ECT in intra-EU disputes.  In particular:

    (a)    The better view appears to be that the meaning of the phrase "applicable rules and principles of international law" found in Article 26(6) ECT does not include EU law as part of the applicable law for the purposes of that Treaty.  On that view, arbitrations under Article 26 do not represent the risk to the uniform interpretation and effective application of EU law, and to the autonomy of the EU legal order, even in respect of intra-EU disputes, that those under Article 8 of the Netherlands/Slovakia BIT were found in *Achmea* to do.

    (b)    The CJEU's strictures against the Netherlands/Slovakia BIT, owing to its character as an international agreement between Member States, do not apply to the ECT.  The inclusion of Article 26 in a multilateral agreement, to which individual Member States are parties in their own right alongside the EU and many third countries, cannot plausibly be seen as a betrayal of the mutual trust Member States are required to display towards each other nor as a matter of Member States colluding in order to circumvent the EU judicial system.  Nor can the creation of the arbitration mechanism in Article 26 ECT by the collective will of all the parties to the ECT be regarded as an act of Member States contrary to Article 344 TFEU.

<u>Question (3)</u>

If the CJEU were to rule that Articles 267 and 344 TFEU preclude arbitration under Article 26 ECT in intra-EU disputes, it would not follow automatically that the offer to arbitrate in that Article (and hence any ensuing arbitration proceedings and an eventual award) would be invalid, because:

(i)    EU law does not have primacy over international law.

    Accordingly, in a proceeding to enforce an intra-EU arbitration award pursuant to the ECT in the court of an EU Member State, that court would face a conflict between the EU Member State's international obligations under the ECT (and perhaps also under the ICSID Convention) and its EU obligations, and would be called upon to decide in the light of its national constitutional requirements whether to treat the offer to arbitrate as valid.

    By contrast, in a proceeding to enforce such an award in the court of a third country, such as the District Court of the District of Columbia, a decision to respect international obligations would appear unimpeachable, as the primacy of EU law would not apply to it.

(ii)    The principle of legal certainty demands that any ruling on the invalidity of applying Article 26 ECT in intra-EU disputes should not be given retroactive (*ex*

*tunc*) effect from 1998, but should apply exclusively to future purported acceptances of the offer to arbitrate.  It is, moreover, very likely that the CJEU would give its ruling such effect.

## III.   ANALYSIS

9.      The questions that I am asked follow a logical progression.  Question (1) seeks confirmation that the arbitral mechanism provided for by Article 26 ECT must be understood to apply to disputes between an EU Member State and an investor of another EU Member State (**intra-EU disputes**), such as the dispute between the Petitioners and Spain that is the subject of the present enforcement proceedings.  If, as the Tribunal found, Article 26 ECT does provide for arbitration in such cases, Question (2) asks whether, in this respect, Article 26 ECT is incompatible with Articles 267 and 344 TFEU, following the judgment of the CJEU in the *Achmea* case.  Finally, Question (3) asks, assuming that it is incompatible, whether this would affect the validity of the arbitration agreement between the Petitioners and Spain and of any Award made pursuant to it.

Question (1)
***Does Article 26 of the ECT provide for the arbitration of disputes between an EU member state and investors of another EU Member State (intra-EU disputes)?***

10.      In Part V.A of the Award,[13] the Tribunal analyses Spain's contention that Article 26 ECT, governing the settlement of "[d]isputes between a Contracting Party and an Investor of another Contracting Party,"[14] does not apply to disputes between an investor of an EU Member State and another EU Member State, identified in the award as "the Intra-EU Objection."  The Tribunal's analysis is based on the General Rule of Interpretation set out in Article 31(1) of the Vienna Convention on the Law of Treaties (**VCLT**):  "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."  Applying that rule, the Tribunal reaches the conclusion that "the ordinary meaning of the relevant provisions of the ECT, construed in accordance with the

---

[13]  Award ¶¶ 160-207.

[14]  ECT, art. 26(1).

rules of the VCLT, is clear and supports Claimants' ability to assert their claims."[15]  It goes on to

cite a passage from the Award in *Charanne*,[16] which rejected an argument that the ECT contains

an implicit "disconnection clause" excluding intra-EU claims from the scope of Article 26 ECT.

In the quoted passage, the *Charanne* Tribunal stated that it "considers that the terms of the treaty

are clear and [they] do not [require] any additional interpretation that could lead to [adding] an

implicit disconnection clause for intra-EU disputes" to the ECT.[17]

11.    The Tribunal's unequivocal conclusion on this point is confirmed by the external

relations practice of the EU, more particularly with regard to "disconnection clauses" as explained

below.

12.    The International Law Commission has defined a disconnection clause contained

in a multilateral convention as a clause "according to which in their relations *inter se* certain of the

parties to the multilateral convention would not apply the rules of the convention but specific rules

agreed among themselves."[18]

13.    A feature of the EU's international practice is the inclusion of a disconnection

clause in multilateral treaties to which the Union and/or its Member States are parties.  Such

clauses are included where there is a possibility of an overlap with matters governed by EU law,

in order to ensure that it is EU law, and not the rules established by the treaty in question, that

apply between the Member States of the Union.[19] A variety of models of disconnection clauses

has been developed, which can be adapted to the requirements of different kinds of agreement.[20]

---

[15]  Award ¶ 207.

[16]  *Charanne B.V. and Constr. Invs. S.A.R.L. v. Kingdom of Spain*, SCC V 062/2012, Final Award (Jan. 21, 2016) (hereinafter "***Charanne* Award**") (Ex. 3 hereto).

[17]  *Id.* ¶ 437.

[18]  Report of the International Law Commission, 57th session (May 2-June 3, July 11-Aug. 5, 2005), ¶ 463 (Ex. 4 hereto)

[19]  *See* M. Cremona, *Disconnection Clauses in EU Law and Practice*, in MIXED AGREEMENTS REVISITED – THE EU AND ITS MEMBER STATES IN THE WORLD (C. Hillion and P. Koutrakos eds., 2010), p. 160 *et seq*. (Ex. 5 hereto).

[20]  *Id*. at 164-70.

14.     Given this consistent practice, if the EU had considered the application of Article 26 ECT to be problematic in the case of disputes between its Member States, it could and would have insisted on the inclusion in the Treaty of a clearly drafted disconnection clause designed to prevent such application.[21]

15.     However, it is evident on the face of the ECT that it contains no disconnection clause rendering the ECT, or any of its provisions, inapplicable to intra-EU claims.[22]

---

[21] One of the first disconnection clauses in an international treaty concluded by the (then) EC Member States was Article 27(2) of the 1988 Joint Council of Europe (CoE) / Organisation for Economic Cooperation and Development in Europe (OECD) Convention on Mutual Administrative Assistance in Tax Matters, Strasbourg, 25 January 1988, ETS. No. 127 (Ex. 6 hereto), which provided in its original version:  "*Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.*"  *See also* Article 16bis of the Convention on Insider Trading, Strasbourg, 20 April 1989, ETS. No. 130, as amended by Protocol CETS No. 133, 1991 ("*In their mutual relations, Parties which are members of the European Economic Community shall apply Community rules and shall therefore not apply the rules arising from this Convention except in so far as there is no Community rule governing the particular subject concerned*") (Exs. 7 and 8 hereto); Article 27(1) of the European Convention on Transfrontier Television, Strasbourg, 5 May 1989, ETS. No. 132, as amended by Protocol ETS No. 171 (to which, as with the ECT, the EU itself was a signatory) ("*In their mutual relations, Parties which are members of the European Community shall apply Community rules and shall not therefore apply the rules arising from this Convention except in so far as there is no Community rule governing the particular subject concerned*") (Exs. 9 and 10 hereto); Article 25(2) of the Convention on Civil Liability for Damage Resulting from Activities Dangerous to the Environment, Lugano, 21 June 1993, ETS. No. 150 ("*In their mutual relations, Parties which are members of the European Economic Community shall apply Community rules and shall therefore not apply the rules arising from this Convention except in so far as there is no Community rule governing the particular subject concerned*") (Ex. 11 hereto).

The EU and its Member states would therefore have had model disconnection clauses to include in the ECT had they so wished.  In fact, as noted in *Vattenfall AB v. Fed. Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue ¶ 205 (Aug. 31, 2018) (hereinafter "***Vattenfall***") (Ex. 12 hereto), the travaux préparatoires of the ECT show that during negotiation of the treaty the EU had proposed the insertion of a disconnection clause, but it was ultimately dropped from the draft treaty.  *See* Draft Treaty, Basic Agreement for the European Energy Charter, at 84 (Aug. 12, 1992) (Ex. 13 hereto).  The ECT does contain a limited disconnection clause in Article 25 concerning most favoured nation treatment, but the text makes clear that it does not cover the ECT dispute resolution system.

[22] This view is shared by leading academic writers.  *See* T. Roe & M. Happold, *Settlement of Investment Disputes under the Energy Charter Treaty* 91 (Cambridge 2011) (Ex. 14 hereto); C. Tietje "The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs

16.     There are, moreover, strong grounds that militate against reading such a clause into Article 26 ECT.

17.     Article 26(1) identifies the disputes to which it applies as those "between a Contracting Party and an Investor of another Contracting Party relating to an investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III."[23]  Investors like the Petitioners, which are organized in accordance with the laws of Contracting Parties, respectively the United Kingdom and Luxembourg, and have invested in the Area of another Contracting Party, Spain, are covered by the express terms of that provision.

18.     It is immaterial that the United Kingdom, Luxembourg and Spain are, at the same time, Member States of the EU.  As Advocate General Wathelet[24] observed in the *Achmea* case with respect to the ECT:

> *"That multilateral treaty on investment in the field of energy operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as **an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing**.  In that sense, the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States."*[25]

EU Member States," *Beiträge zum Transnationalen Wirtschaftsrecht*, September 1, 2008, p. 11 (Ex. 15 hereto).

[23]  Part III of the ECT is headed "Investment Promotion and Protection."  It contains Article 10, which lays down the obligations undertaken by investors of Contracting Parties towards Investors of other Contracting Parties in their respective Areas, including obligations of fair and equitable treatment and most favoured nation treatment.

[24]  The CJEU has two classes of Members, Judges and Advocates General.  In all important cases, the Judges are assisted by an Advocate General, whose task is to deliver an independent Opinion, analysing the relevant law and the arguments of the parties and recommending a decision.  The Opinion represents the starting point for the deliberations of the Judges.  Opinions of Advocates General are usually much more fully reasoned than the CJEU's judgments.  They have judicial authority and are regularly cited in subsequent cases.

[25]  Opinion of Advocate General Wathelet, Case C-284/16, EU:ECLI:C:2017:699, ¶ 43 (emphasis added) (Ex. 16 hereto) (hereinafter "**Opinion of Advocate General Wathelet**").

19.     The learned Advocate General was referring to the established practice of the EU that distinguishes cases where a Treaty is concluded with one or more third countries by the Member States of the EU acting collectively as such, together with the Union,[26] from the conclusion of "an ordinary multilateral treaty" where each of the Member States acts as an independent Party in its own right.  The ECT is of the latter kind, with all the Parties simply listed in alphabetical order.[27]  That formal choice made by the Parties to the ECT appears to me, as it did to Advocate General Wathelet, to provide confirmation that the arbitration mechanism in Article 26, as well as the material provisions on the protection of investments, must have been intended to apply in the same way between all the Parties, including in relations between Member States of the EU.

20.     The plain meaning of Article 26(1) is reinforced by that of the key provision on international arbitration, Article 26(3)(a), which is in these terms:

> "*Subject **only** to paragraphs (b) and (c), **each** contracting party hereby gives its **unconditional** consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*[28]

21.     The wording of paragraph (3)(a) amounts to an absolute commitment by every Contracting Party to allow the submission of disputes to international arbitration, with the exception of the two derogations provided for under paragraph (3)(b) and (c), neither of which is relevant to the present proceedings.

22.     These specific carve outs are indicative of the care that was taken by the authors of the ECT, with the EU's representatives in the forefront,[29] to make clear to Investors the scope of any derogations from the otherwise unqualified consent to international arbitration given by the

---

[26]  *See, e.g.*, Free Trade Agreement between the European Union and its Member States, of the one part, and the Republic of Korea, of the other part, O.J. 2011 L127/1 (Ex. 17 hereto).

[27]  *See* Concluding Document of the Hague Conference on the European Energy Charter, The International Energy Charter Consolidated Energy Charter Treaty (Ex. 18 hereto).

[28]  ECT, art. 26(3)(a) (emphasis added).

[29]  The ECT was conceived as a project of the then European Communities.  *See Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, ¶ 4.131 (Nov. 30, 2015), (Ex. 19 hereto).

Contracting Parties.  Had it been intended to include in the Treaty a disconnection clause relating to intra-EU disputes, this would surely have been stated explicitly in the text of the ECT.

23.     Moreover, the ECT has a general conflict clause in Article 16 on "Relation to Other Agreements," which applies "[w]here two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty," i.e. the provisions relating to the substantive obligations owed to Investors and to dispute settlement.  The conflict resolution principle established by this Article is that the provision more favourable to the Investor prevails. To the extent that the ECT and the EU Treaties cover the same subject matter (as Professor Hindelang suggests that they do[30]), this Article would determine priority between provisions of the ECT and EU Treaties.  If parties to the ECT had intended that this Article not apply to Article 26 in the case of intra-EU disputes, then again they surely would have made this explicit.

24.     Another factor that militates against the existence of an implied disconnection clause in the ECT is that, where the Contracting Parties wished another Treaty to prevail in case of a conflict, they duly made provision for this, as in the case of Decision No. 1 of the Energy Charter Conference regarding the Svalbard Treaty.[31]

25.     Finally, Article 46 ECT provides:  "No reservations may be made to this Treaty." The existence of an implied disconnection clause would not be compatible with a provision couched in such uncompromising terms.

---

[30]  Hindelang Declaration, ¶¶ 28-31.

[31]  As noted in *Vattenfall*, ¶ 204, the ECT includes provisions which limit its application in certain respects, such as the exclusion of the operation of Article 16 in the case of potential conflicts between the ECT and the Svalbard Treaty in the following terms:  "*In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty.  In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.*"  Decisions with respect to the Energy Charter Treaty, Annex 2 to the Final Act of the European Energy Charter Conference (Ex. 20 hereto).

26.     It is clear from the foregoing that the arbitration mechanism in Article 26 ECT is made available to the Investors of any of the Contracting Parties in disputes with any other Contracting Party hosting their investments, including disputes between an EU Member State and an investor of another EU Member State.  The finding of the Tribunal to that effect is confirmed by the external relations practice of the EU, in the light of the absence of any disconnection clause disapplying Article 26, or any of the ECT's other provisions, in relations between EU Member States, and of any remotely plausible basis for reading such a clause into the Treaty by implication.

Question (2)

***Does the ruling by the CJEU in Achmea or the reasoning on which it is based establish that arbitration of intra-EU disputes under Article 26 ECT is incompatible with Articles 267 and 344 TFEU, as a matter of EU law?***

27.     In addressing that Question, I begin by noting relevant aspects of the jurisdiction conferred on the CJEU by Article 267 TFEU to give preliminary rulings on questions referred to it by national courts (**the preliminary ruling** jurisdiction), which was the jurisdiction exercised by the CJEU in *Achmea*.  Next, I analyse the reasoning and scope of the CJEU's ruling in *Achmea* judgment.  Based on that analysis, I discuss why *Achmea* cannot be read as an authority on the compatibility with EU law of the arbitration mechanism found in Article 26 ECT.

### A.     The preliminary ruling jurisdiction of Article 267 TFEU

28.     The CJEU derives its jurisdiction to issue preliminary rulings from Article 267 TFEU which provides, in pertinent part:

> "*The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:*
>
> > *(a)     the interpretation of the Treaties;*
> >
> > *(b)     the validity and interpretation of acts of the institutions, bodies or*
> >
> > *agencies of the Union;*
>
> *Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.*

> *Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.*

....."

29.     The preliminary ruling jurisdiction conferred by Article 267 TFEU enables the CJEU to provide authoritative guidance to Member State courts that are called upon to apply rules of EU law when deciding cases.  The CJEU has repeatedly stressed that the jurisdiction is not a declaratory one and does not allow it to respond to hypothetical questions; a reference must be "necessary for the effective resolution of a dispute."[32]

30.     A reference for a preliminary ruling represents an interlocutory stage in the proceedings before the referring court.  A question referred to the CJEU for decision must present a pure question of EU law.  Once the CJEU issues its ruling, it is then for the referring court to apply the CJEU's ruling to the concrete circumstances of the dispute before it.  As the wording of Article 167 makes clear, questions may relate either to the interpretation of provisions of the EU Treaties or to the interpretation or validity of acts of the EU's institutions, bodies or agencies.  The CJEU has no jurisdiction to rule on the validity of Member State legislation or of treaties the Member States have entered into.

31.     It is settled law that the CJEU's interpretative rulings are not only binding on the national court that made the reference but also apply generally as binding legal precedents in all EU national courts ("*erga omnes*" or "towards everyone");[33] though it is always possible for a national court to send the CJEU a question inviting it to reconsider or clarify an earlier

---

[32]  The point was recently reiterated in Case C-621/18, *Wightman v. Sec'y of State for Exiting the European Union*, EU:C:2018:999, ¶ 28 (Ex. 21 hereto)

[33]  Joined Cases 28 to 30/62, *Da Costa en Schaake v. Nederlandse Belastingadministratie*, EU:C:1963:6, 38 (Ex. 22 hereto); Case 68/74, *Alaimo v. Préfet du Rhône*, EU:C:1975:11, Grounds of Judgment, ¶¶ 5-7 (Ex. 23 hereto); Case 283/81, *CILFIT v. Ministry of Health*, EU:C:1982:335, ¶¶ 13-14 (Ex. 24 hereto).  As explained in the *CILFIT* judgment, it is "the point of law" decided by the CJEU that becomes a precedent; the questions at issue in the subsequent proceedings need not be "strictly identical."  *Id.* ¶ 14.

interpretation.[34]  A ruling, moreover, will normally apply retroactively (or "*ex tunc*"), in the sense that it must be taken to express the correct meaning of the relevant legal provision, as it should have been understood from the date of its entry into force.[35]  I say "normally," because very exceptionally the Court may, on grounds of legal certainty, decide that a ruling should have purely prospective effect.[36]

32.     However, it is important to be clear that the binding effect of a preliminary ruling applies only to the answer given by the CJEU to the question(s) of interpretation submitted to it by the referring court.[37]  That is to be found in the operative part of the judgment incorporating the Court's conclusion (the "*dispositif*").  Legal scholars may debate the wider implications of the reasoning in the judgment leading to the *dispositif*; but this remains academic speculation unless and until any such implications become the subject of a future ruling by the Court.

### B.     The *Achmea* judgment

#### (a)     Background

33.     Following its accession to the EU, Slovakia liberalised its sickness insurance market in 2004, then partially reversed this legislative change in 2006.  Achmea, a Dutch insurance provider, had taken advantage of the opening of the market to establish a Slovakian subsidiary offering sickness insurance.  Considering that the 2006 legislation infringed provisions of the BIT, Achmea initiated proceedings against Slovakia in 2008 under the arbitral clause in Article 8 of the Netherlands/Slovakia BIT, and these culminated in a Final Award of damages in 2012.

34.     This was an arbitration seated in Germany and conducted pursuant to the United Nations Commission on International Trade Law (**UNCITRAL**) rules of arbitration.  Slovakia, therefore, brought an action in the German courts to have the Award set aside as contrary to public

---

[34]  *See Id.* ¶ 15.

[35]  Case 61/79, *Amministrazione delle Finanze dello Stato v. Denkavit Italiana*, EU:C:1980:100, n.16 (Ex. 25 hereto).

[36]  Case 43/75, *Defrenne v. SABENA*, EU:C:1976:56 (Ex. 26 hereto).

[37]  *See* Hindelang Declaration, ¶ 25 (citing Case C-689/13, *Puligenica Facility Esco Spa (PFE) v. Airgest Spa*, EU:C:2016:199, *dispositive* 3 (Ex. 27 hereto)).

policy, arguing that the arbitral clause in Article 8 of the BIT was incompatible with Articles 267 and 344 TFEU and the principle of non-discrimination in Article 18 TFEU.  Having failed at the German court of first instance, Slovakia appealed to the German Federal Court of Justice, which likewise did not agree with the alleged incompatibility but nevertheless thought it appropriate to refer three questions to the CJEU.

35.     The questions asked:  first, whether Article 344 TFEU[38] precluded the application of an arbitral clause in a BIT between EU Member States, where the BIT was concluded before one of them acceded to the Union, though arbitral proceedings were brought after that date; secondly, if the answer was negative, did Article 267 TFEU[39] preclude the application of such a provision; and, thirdly, if the answers to both questions were negative, did the first paragraph of Article 18 TFEU[40] preclude the application of such a provision under the circumstances as described?[41]

36.     The questions referred to the CJEU were, therefore, concerned exclusively with the compatibility of an arbitration mechanism in an intra-EU BIT with certain provisions of EU law. They did not ask whether any incompatibility that might be found would mean that there was no offer to arbitrate capable of being validly accepted by an investor, as Spain and Professor Hindelang appear to suggest.[42]  The possible impact on the legal situation of investors raises entirely different issues in EU law, on which the CJEU has not so far been given an opportunity to rule.  They are addressed in my answer to Question (3).

---

[38]  Article 344 provides:  "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*"

[39]  *See supra* ¶ 28.

[40]  Article 18 of the TFEU provides:  "*Within the scope of application of the Treaties, and without prejudice to any special provisions contained therein, any discrimination on grounds of nationality shall be prohibited.*"

[41]  *Achmea* judgment, ¶ 23.

[42]  Spain's Memorandum, at 14, *in fine*; Hindelang Declaration, ¶¶ 33-36.

37.     In his Opinion of 19 September 2017,[43] Advocate General Wathelet examined the three questions systematically, though in reverse order, and found no incompatibility between an intra-EU BIT and any of the EU Treaty provisions there referred to.

### (b)     The reasoning in the judgment of the CJEU

38.     Unlike Advocate General Wathelet, the CJEU did not deal individually with the questions put by the German Federal Court of Justice.  Taking the first two questions together, the incompatibility it found was not with each of Article 267 and Article 344 TFEU, but with their combined effect.  It held there was no need to answer the third question.[44]

39.     On a close analysis, two strands can be discerned in the CJEU's reasoning.

### (i)     First Strand – Disruption of the judicial dialogue

40.     The first strand, comprising paragraphs 39 to 53 of the judgment, concerns the characteristics of the jurisdiction conferred on an arbitral tribunal constituted under Article 8 of the Netherlands/Slovakia BIT.

41.     In assessing the compatibility of that jurisdiction with Article 267 TFEU, the CJEU made three findings:  (i) that, in exercising the jurisdiction conferred by Article 8, an arbitral tribunal may be called upon to interpret or apply EU law; (ii) that such a tribunal, not being part of the EU judicial system, does not qualify as a court or tribunal of a Member State within the meaning of Article 267, so there is no direct procedural link enabling the tribunal to make references to the CJEU for a preliminary ruling; and (iii) that there is no guarantee of an indirect link to the Court, by way of a review, by a national court with the ability to make a reference, of an eventual award by the tribunal.  Those three findings meant that there would be a disruption of the dialogue provided for by Article 267 TFEU between EU Member State courts and the CJEU in the interpretation or application of EU law.

42.     An essential step in the CJEU's reasoning is its understanding of the applicable law clause in Article 8(6) of the Netherlands/Slovakia BIT.  This loosely drafted provision requires the

---

[43]   Opinion of Advocate General Wathelet (Ex. 16 hereto).

[44]   *Achmea* judgment, ¶¶ 31, 61.

arbitral tribunal to take into account, in particular though not exclusively: (i) the law in force of the contracting party concerned (in the *Achmea* case, Slovakia); (ii) the provisions of the BIT and "other relevant agreements between the Contracting Parties;" (iii) the provisions of special agreements relating to the investment; (iv) and "the general principles of international law."[45] The Court points out that EU law qualifies "*both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States;*"[46] and goes on to find that, on that twofold basis, the arbitral tribunal referred to in Article 8 "may be called on to interpret or indeed to apply EU law."[47]

### (ii)    Second Strand – An international agreement between Member States

43.     The second strand in the reasoning of the CJEU, comprising paragraphs 54 to 59 of the judgment, concerns the fact that the BIT's arbitral mechanism, which would disrupt the dialogue between the CJEU and the national courts, was created by an international agreement between two Member States.

44.     It is emphasised in those paragraphs that the disruption of the judicial dialogue is the result of a decision deliberately taken by the Parties to the Netherlands/Slovakia BIT. They have chosen to remove certain disputes liable to give rise to issues of EU law from the jurisdiction of their own courts and handed them over for settlement under a mechanism operating outside the EU judicial system.[48] According to the CJEU, this could prevent such disputes from being resolved in a manner that ensures the full effectiveness of EU law.[49]

---

[45]  *See Achmea* judgment, ¶ 6 *in fine* (discussing Article 8(6) of the BIT).

[46]  *Id.* ¶ 41.

[47]  *Id.* ¶ 42.

[48]  *Id*. ¶ 55.

[49]  *Id*. ¶ 56.

45. The CJEU drew a contrast with the powers that it has found legitimate to confer on courts established under international agreements concluded by the EU itself, recalled in paragraph 57 of the judgment. As the Court says:

> "... *apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU **is provided for by an agreement which was concluded not by the EU but by Member States***."[50]

46. In the behaviour of the parties to the BIT, the CJEU discerns a breakdown in the mutual trust that ought to exist between Member States and a breach of the principle of sincere cooperation, having an adverse effect on the autonomy of EU law.[51]

47. This second strand in the Court's reasoning supplies the connection with Article 344 TFEU. It is clear from the express terms of that Article[52] that it imposes an obligation only on Member States and that, for the obligation to be infringed, the submission of the dispute in question to a method of settlement not provided for in the Treaties must be the act of a Member State. In *Achmea* the CJEU appears to have treated the creation of the arbitration mechanism in Article 8 of the Netherlands/Slovakia BIT by the Member States concerned as tantamount to the submission by those Member States of a dispute for resolution outside the Treaty framework.

### *(c)   What the CJEU decided*

48. The two strands in the reasoning of the CJEU are tied together in the *dispositif* of the judgment. This is where it is necessary to look for what the Court actually decided. The *dispositif* declares:

> "Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under

---

[50]  *Id.* ¶ 58 (emphasis added). The bold words are omitted by Professor Hindelang. *See* Hindelang Declaration, ¶ 36.

[51]  *Achmea* judgment, ¶¶ 58-59.

[52]  *See supra* at n.38.

which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."

49.     The phrase "a provision… such as Article 8 of the BIT" is ambiguous.  It might arguably be a reference to arbitral clauses having the specific characteristics of Article 8 of the Netherlands/Slovakia BIT; or it could refer to arbitral clauses found in intra-EU BITs in general. What is certain, however, is that the only principle for which the *Achmea* judgment stands as legal authority is that Articles 267 and 344 TFEU, taken together, preclude an arbitral clause in an international agreement concluded between EU Member States, "such as" Article 8 of the Netherlands/Slovakia BIT.  It is to that principle alone (in the language of the CJEU's *CILFIT* judgment, "the point of law in question")[53] that the *erga omnes* and *ex tunc* effects of the Court's ruling attach.

50.     The answer contained in the *dispositif* of the *Achmea* judgment is confined, consistent with the preliminary ruling jurisdiction provided by Article 267 TFEU, within the parameters set by the questions referred to the CJEU.  Both the questions and the Court's answer were about intra-EU BITs, not multilateral treaties or treaties to which the EU is party such as the ECT.  There is no sense in which the words of the dispositif, "a provision in an international agreement concluded between Member States, such as Article 8 of the [Netherlands/Slovakia BIT]…," can be read as applying to Article 26 ECT, which is contained in a multilateral agreement concluded not only by Member States but by a large number of third countries, as well as by the EU itself.  Article 26 ECT, including the availability of arbitration in intra-EU disputes, must accordingly be assumed to be compatible with EU law.[54]

---

[53]  *See supra* at n.33.

[54]  Professor Hindelang draws a false analogy between the ruling in *Achmea* and the CJEU's decision in Opinion 1/09, EU:C:2011:123 (Ex. 28 hereto).  *See* Hindelang Declaration ¶ 38.  That decision concerned the incompatibility with EU law of a draft international agreement for the creation of a European and Community Patent Court (hereinafter "**PC**"), with exclusive jurisdiction to determine a wide variety of patent disputes, including in relation to "Community patents," *i.e.*, patents enjoying protection throughout the then European Community, that it was

51.     The claim by Professor Hindelang, that "[t]he CJEU's reasoning in *Achmea* thus fully applies to the ECT and the situation in *Eiser*," which is echoed in Spain's Memorandum,[55] is unfounded.[56]

52.     The same must be said about the Commission's "Communication" of 19 July 2017 on "Protection of intra-EU investment," that both Spain and Professor Hindelang cite as if it were a legal authority.[57]  The Commission is not an authoritative interpreter of EU law.  It is the EU's main executive organ[58] and the Communication simply expounds its own views on the *Achmea* case for the information of two other political organs of the Union, the European Parliament and the Council.  In proceedings before the CJEU the Commission simply appears as a party, whose submissions may or may not be accepted by the Court as persuasive.

---

proposed should be granted pursuant to a future "Community Patent Regulation."  The CJEU noted that "*the draft agreement establishes, in essence, a new court structure.*"  Opinion 1/09 ¶ 64.  The PC would be "*outside the institutional and judicial framework of the European Union*", as "*an organisation with a distinct legal personality under international law.*"  *Id.* ¶ 71.  The exclusive jurisdiction to be conferred on the PC would entail the interpretation and application of the proposed Community Patent Regulation and of other EU measures with which that Regulation would fall to be read, as well as of "*the fundamental rights and general principles of European Union law, or even the right to examine the validity of an act of the European Union.*"  *Id*. ¶ 78.  The PC would take the place of Member State courts with respect to the matters covered by its jurisdiction, and become the sole court able to communicate with the CJEU by way of references for a preliminary ruling regarding those aspects of EU law.  *Id.* ¶ 79.  It is quite simply wrong to suggest, as Professor Hindelang does, that the dispute resolution procedures in issue in Opinion 1/09 and in *Achmea* "are comparable in a crucial respect:  neither permits access to the preliminary ruling procedure."  Hindelang Declaration ¶ 38.  In the first place, the draft agreement would have given the PC "access to the preliminary ruling procedure," since it would have been able to refer questions to the CJEU.  Secondly, the draft agreement would have amended the judicial system established under the Treaties, by removing jurisdiction in respect of a whole area of EU law from Member State courts and conferring it upon a newly created international court.  The disruption of the judicial dialogue between Member State courts and the CJEU envisaged in the EU Treaties would have been of an entirely different order, as compared with that liable to be caused by Article 8 of the Netherlands/Slovakia BIT.

[55]  Hindelang Declaration, ¶ 48; Spain's Memorandum at 23.

[56]  I express my disagreement with Professor Hindelang below.  *See infra* ¶ 61 *et seq*.

[57]  *See supra* n.11.

[58]  The Commission's powers are defined by the Treaty on European Union (hereinafter "**TEU**").  *See* TEU, art. 17 (Ex. 29 hereto).

53.     In the next section of this Declaration, I explain why Spain and Professor Hindelang are wrong to believe that help can be obtained from the *Achmea* judgment towards establishing that intra-EU arbitration under Article 26 ECT is incompatible with EU law.

**C.      Why it is misguided to seek help from the *Achmea* judgment towards establishing that intra-EU arbitration under Article 26 ECT is incompatible with EU law**

*(a)      The practice of the CJEU militates in favour of caution*

54.     The practice of the CJEU in developing its case law on novel issues militates in favour of a cautious approach to any interpretation of the *Achmea* judgment going beyond the facts of the case itself.   It is not uncommon for the Court to make pronouncements that tempt commentators to draw extravagant conclusions, when they are first enunciated, only to find the applicable principles significantly narrowed in subsequent cases.[59]

---

[59] *See, e.g.*, Case C-34/09, *Gerardo Ruiz Zambrano v. Office National de L'emploi*, ECLI:EU:C:2011:124 (Ex. 30 hereto).   The case concerned Belgian measures refusing a right of residence and a right to work for a Colombian national who was the father of dependent minor children with EU citizenship.   If their parents had been forced to leave Belgium and return to Colombia, the children would have had to go with them.   As grounds for the disapplication of the measures in question, the Court of Justice purported to apply the principle that "*Article 20 TFEU precludes national measures which have the effect of depriving citizens of the Union of the genuine enjoyment of the substance of the rights conferred by virtue of their status as citizens of the Union*." *See id.* ¶ 42.   The breadth of this formulation led to a large number of cases in which it was claimed that EU citizens would be deprived of the genuine enjoyment of their rights as such, unless certain third country nationals were accorded rights of residence within the EU.   In Case C-256/11, *Dereci and Others v. Bundesministerium fur Inneres,* ECLI:EU:C:2011:734 (Ex. 31 hereto), the Court took the opportunity of explaining that "*the criterion relating to the denial of the genuine enjoyment of the substance of the rights conferred by virtue of European Union citizen status refers to situations in which the Union citizen has, in fact, to leave, not only the territory of the Member State of which he is a national but also the territory of the Union as a whole*." *Id.* ¶ 66.   That is evidently a much narrower principle.   Another example is the doctrine of Member State liability for financial loss caused by breaches of EU law, as originally formulated in Joined Cases C-6/90 and C-9/90, *Francovich and Bonifaci v. Italy,* ECLI:EU:C:1991:428 (Ex. 32 hereto), and the later formulation in Joined Cases *C-46/93 and C-48/93, Brasserie du Pêcheur v. Germany and R v. Secretary of State for Transport, ex parte Factortame Ltd and Others,* ECLI:EU:C:1996:79 (Ex. 33 hereto).   It was made clear in *Brasserie du Pêcheur* that, in order to give rise to liability, a breach must be "sufficiently serious," a requirement not mentioned in *Francovich*.

(b)     *The Netherlands/Slovakia BIT and the ECT are very different instruments*

55.     Apart from their respective bilateral and multilateral characters, the Netherland/Slovakia BIT and the ECT are very different in terms of their aims and significance.

56.     BITs have the narrow objective of providing protection for the investors of the two States that are parties to them.  An individual BIT between two EU Member States only does nothing to further the interests of the EU as a whole.

57.     Moreover, as Advocate General Wathelet observed in his opinion in *Achmea*,[60] intra-EU BITs are an historical relic.  During the 1990s, the countries of Central and Eastern Europe that were candidates for membership of the EU were encouraged to enter into BITs with existing Member States; this, it was believed, would help stimulate their economic development. The termination of those BITs from the date of accession (while grandfathering existing investments) could, and probably should, have been included amongst the accession arrangements; but that was not done, and so they survived as "intra-EU BITs."  In a sense, therefore, this category of BITs can be seen as having served their purpose and as representing an anomaly that should have been cleared up long ago.

58.     The ECT is an entirely different legal instrument.  The participation of all three European Communities[61] as well as all of the then Member States is indicative of the high strategic significance they attached to the ECT.  This is reflected in the recitals in the preamble to the Decision of the Council and the Commission on the conclusion of the ECT.[62]  For instance, the second recital provides that the aim of the ECT is "*to provide a secure and binding international*

---

[60]  Opinion of Advocate General Wathelet, ¶¶ 40-41 (Ex. 16 hereto).

[61]  At the time when the ECT was concluded, there were three European Communities, the European Community (EC), the European Coal and Steel Community (ECSC) and the European Atomic Energy Community (Euratom).  The EU has succeeded to the powers of the EC and the ECSC Treaty has expired.  Currently, therefore, the "EU Parties" to the ECT consist of the EU itself and Euratom.

[62]  Council and Commission Decision 98/981/EC/ECSC/Euratom of 23 September 1997 on the conclusion by the European Communities of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects, O.J. 1998 L 69/1 (Ex. 34 hereto).

*legal framework for the principles and objectives set out in [the European Energy Charter];*" while the fourth recital describes those principles and objectives are "*of fundamental importance to Europe's future, allowing the members of the Commonwealth of Independent States and the Countries of Central and Eastern Europe to develop their energy potential, while helping to improve security of supply.*"

59.     The ECT was a major policy initiative in the sphere of the EU's external economic relations and its importance remains high.  The Treaty, including its Article 26, has a status no BIT could aspire to.

### (c)     The reasoning in the *Achmea* judgment is not applicable to the ECT

60.     Most importantly, neither of the strands of reasoning in the *Achmea* judgment is transposable from Article 8 of the Netherlands/Slovakia BIT to Article 26 ECT.

61.     I respectfully disagree with the assessment in paragraphs 40 to 48 of the Hindelang Declaration.  This appears to me to be deficient in two ways:  (i) regarding the first strand in the CJEU's reasoning, Professor Hindelang fails to give sufficient weight to the difference between the applicable law clause in Article 8(6) of the BIT and the equivalent clause in Article 26(6) ECT; and (ii) he ignores the second strand of the reasoning in the *Achmea* judgment altogether.

### (i)     Significance of the drafting of the applicable law clause for the judicial dialogue

62.     The arbitral mechanism provided for by Article 26 ECT is not liable to disrupt the dialogue between Member State courts and the CJEU (whether or not in intra-EU disputes) in the way that the mechanism provided for by Article 8 of the Netherlands/Slovakia BIT was found to do.  This is due to the difference between the drafting of Article 8(6) of the BIT and that of Article 26(6) ECT.

63.     As I have noted above,[63] Article 8(6) of the BIT identifies a number of elements of "the law" that the arbitral tribunal must take into account, including "the law in force of the Contracting Party concerned" and the provisions of "other relevant agreements between the

---

[63]  *See supra* ¶ 42.

Contracting Parties." In *Achmea*, the CJEU observed that EU law qualifies under both of those headings.[64] The terms of the clause would, therefore, allow rules of EU law to be invoked by the tribunal in arbitral proceedings under Article 8 on exactly the same footing as the provisions of the BIT itself – not just as part of the factual matrix of the dispute, but as directly governing its resolution.

64.     In clear contrast to Article 8(6) of the BIT, Article 26(6) ECT provides:

> "*A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*"

65.     Manifestly, Article 26(6) does not refer to "the law in force of the Contracting Party concerned," so EU law could not be let in on that basis. Nor (again, unlike Article 8(6) of the Netherlands/Slovakia BIT) does Article 26(6) include a reference to "the provisions of other relevant agreements between the Contracting Parties," which could be understood to cover the EU Treaties.

66.     Professor Hindelang claims that "EU law is public international law,"[65] and hence that the phrase "applicable rules and principles of international law" includes EU law. However, in my respectful opinion, whatever view EU lawyers may take of the "dual nature of the EU legal order,"[66] the interpretation of Article 26(6), a provision contained in an international agreement, is a matter for international law alone. I understand, moreover, that there is support among international lawyers for understanding the relevant phrase in Article 26(6) as a reference to general and customary principles of international law and not to international treaty law.

67.     From that interpretation, it follows that EU law does not constitute applicable law for the purposes of the ECT. This would mean that provisions of EU law will not fall to be interpreted and applied by a tribunal operating under Article 26, as the source of the legal rules determining the outcome of the dispute before it. At the most, they could only feature as part of

---

[64]  *Achmea* judgment, ¶ 41.

[65]  Hindelang Declaration, ¶ 41.

[66]  *Id.* ¶¶ 13-14.

the factual matrix of the dispute, to be established (where appropriate by expert evidence) as a preliminary step towards such determination.

68.     One of the unanswered questions in the *Achmea* judgment is how much the CJEU may have been influenced by the drafting of Article 8(6) of the BIT.  It certainly referred explicitly to the two criteria specified in that provision which identified EU law as potentially applicable law.  Professor Hindelang appears to assume that, even if this had not been so, and EU law could only be brought into play as a factual element in the decision-making process, the lack of any direct or indirect link to the CJEU would still have been seen by the Court as a disruption of the judicial dialogue designed to preserve the integrity of EU law.  There is no basis for this assumption, as the judgment simply fails to address the point.

69.     This is a different point from the one mentioned at paragraph 43 of the Hindelang Declaration.  As Professor Hindelang points out in that paragraph, the word "may" in the CJEU's statement that the arbitral tribunal referred to in Article 8 "may be called on to interpret or indeed to apply EU law"[67] shows that, for the jurisdiction conferred by the BIT to be considered problematic, it is not necessary for the tribunal to have decided that EU law is material to the resolution of the dispute before it; the simple fact that exercise of the jurisdiction might, in certain circumstances, entail the interpretation or application of EU law suffices.  The issue here is not whether EU law was actually relevant in the *Achmea* case but what it was about the arbitral jurisdiction that rendered it problematic in the eyes of the Court.  Was it because EU law was found to be part of the applicable law?  Or would the objection have been the same if it could only have been part of the factual matrix?

70.     The better view on this question is that EU law does not constitute applicable law for the purposes of that Treaty; and that, accordingly, arbitrations under Article 26 do not represent the risk to the uniform interpretation and effective application of EU law, and to the autonomy of

---

[67] *Achmea* judgment, ¶ 42.

the EU legal order, even in respect of intra-EU disputes, that those under Article 8 of the Netherlands/Slovakia BIT were found in *Achmea* to do.[68]

> ### (ii)   Significance of the need for reciprocity in the system of investor protection

71.   Professor Hindelang fails to appreciate the reasons why the CJEU's strictures against arbitration under the Netherlands/Slovakia BIT, which are based on its character as an international agreement between Member States alone, do not apply to arbitration under Article 26 the ECT, even in intra- EU disputes.

72.   The inclusion of Article 26 in a multilateral agreement, to which individual Member States are parties in their own right alongside the EU itself and many third countries, cannot plausibly be seen as a betrayal of the mutual trust Member States are required to display towards each other, nor as Member States colluding in order to circumvent the EU judicial system.

73.   There are very good reasons to provide for the settlement of disputes by an independent arbitral tribunal in an investment treaty that has States which are not members of the EU as parties.  With regard to non-member states, there is no need to maintain the presumption of common values, including due process, that underpin the mutual trust on which the CJEU insists between EU Member States.[69]  However, such investor protection must evidently be provided on a reciprocal basis, implying equality of respect between all the parties to the agreement.  In creating the kind of international partnership envisaged by the ECT,[70] it was appropriate that the same

---

[68]   Some further insight may be gained from a case currently pending before the CJEU, Request for Opinion 1/17 2017/C 369/02, Oct. 30, 2017, (Ex. 35 hereto), which concerns the compatibility with EU law of the arbitral mechanism for which provision is made under the Investment Chapter of the Comprehensive Economic and Trade Agreement between Canada and the EU (hereinafter "**CETA**").  However, the applicable law clause Article 8.31.2 of CETA is considerably more detailed than Article 26 ECT.  The Opinion of Advocate General Bot is expected to be rendered on 29 January 2019 and that of the CJEU will follow, probably some months later.

[69]   *Achmea* judgment, ¶ 34.

[70]   *See* European Energy Charter, recitals (Ex. 36 hereto) ("*Anxious to give formal expression to this new desire for a European-wide and global cooperation based on mutual respect and confidence; Resolved to promote a new model for energy cooperation in the long term in Europe*

dispute settlement mechanism be made available to investors from any one of the States Parties to the Treaty in the Area of any other State Party.  Excluding arbitration under Article 26 between EU Member States, as a bloc, could have been taken to imply that, while these states trusted each other's courts, they did not trust the courts of the third country Parties.  As noted above,[71] it was open to the EU Parties to the ECT to insist on the inclusion of a disconnection clause in the Treaty, and there were plenty of models they could have chosen from.  The need to preserve equality and trust between all signatories to the ECT, including non-EU members, explains the decision not to do so.

74.     Moreover, it does not appear possible for the availability of the arbitration mechanism of Article 26 ECT in intra-EU disputes to constitute an infringement of Article 344 TFEU.  As noted in paragraph 47, above, the only way in which the arbitral mechanism in Article 8 of the Netherlands/Slovakia BIT could have been found to infringe Article 344 must have been by treating the creation of such a mechanism under an agreement between two Member States as tantamount to the submission of a dispute by those Member States for resolution outside the framework of the EU Treaties.  That explanation cannot be extended to the arbitral mechanism in Article 26 ECT, because this was not the creation of EU Member States bound by Article 344.  It was created by the collective will of all the parties to the ECT, including the EU itself and non-EU member countries, in addition to EU Member States.  By no stretch of language or logic could this be regarded as an act of Member States contrary to Article 344.

75.     It follows that, regardless of any possible disruption of the judicial dialogue, arbitration of intra-EU disputes under Article 26 ECT cannot be brought within the scope of the ruling or the reasoning in the *Achmea* judgment, since that was based on the *combined effect* of Articles 344 and 267 TFEU.

---

*and globally within the framework of a market economy and based on mutual assistance and the principle of non-discrimination…*").

[71]   *See supra* ¶ 14.

### *(iii)* *Conclusion on the non-application of the reasoning in* **Achmea**

76.     Accordingly, it is clear that the CJEU's reasoning in *Achmea* does not apply to the arbitration of intra-EU disputes under Article 26 ECT.

77.     The position advocated by Professor Hindelang, in failing to grasp the significance of the matters considered under points (i) and (ii) above, would have the consequence of rendering incompatible with EU law investor protection by way of an arbitral mechanism, not only in intra-EU disputes under BITs or under the ECT, but also in disputes between EU Member States and third countries under that Treaty, or disputes under BITs between the EU and/or its Member States and a third country, or even disputes under a bilateral trade agreement like CETA,[72] since in any of these cases issues of EU law could arise in the course of arbitral proceedings, with no means of referral to the CJEU.  Such wholesale denial of the possibility of recourse to arbitration would represent an enormous handicap for the EU as an international economic actor.  It is inconceivable that the CJEU could contemplate its judgment in *Achmea* having such a damaging result.

### D.     Conclusion on Question (2)

78.     Neither the ruling nor the reasoning in the *Achmea* judgment support the contention that the arbitration of intra-EU disputes under Article 26 ECT is precluded by Article 267 and 344 TFEU.

### Question (3)

***Supposing the answer to Question (2) to be affirmative, does it follow from the Achmea decision that, as a matter of EU law, where an Award has been obtained by investors in proceedings brought under Article 26 ECT for the settlement of an intra-EU dispute, a valid arbitration agreement and an award made pursuant to that agreement do not exist?***

79.     This Question makes the assumption that the CJEU would conclude that arbitration under Article 26 in intra-EU disputes is precluded by Article 267 and 344 TFEU.

---

[72]  *See supra* n.68.

80.      In a decision of 31 October 2018, the German Federal Court of Justice set aside the Award which had been obtained by Achmea.[73]  Essentially, this was on the ground that, in the light of the CJEU's ruling on the incompatibility with Articles 267 and 344 TFEU of the arbitral clause in Article 8 of the Netherlands/Slovakia BIT, the agreement between Achmea and Slovakia to resolve the dispute between them by arbitration, which was based on that provision, and hence the Award, must be considered invalid.

81.      Question (3) asks whether, if the assumption it makes were realised, a similar outcome to the decision of the German Federal Court of Justice regarding the *Achmea* Award would follow.  There are two main reasons why that would not be so.  The first is because EU law cannot and therefore does not have primacy over international law.  The second is that any ruling by the CJEU that Articles 267 and 344 TFEU preclude arbitration under Article 26 ECT in intra-EU disputes would very likely be given purely prospective effect.

### A.      EU law does not have primacy over international law

82.      While EU law undeniably has primacy over the law of the Member States, it cannot and does not claim to prevail over international law.  Indeed, such a claim would conflict with express Treaty commitments requiring the EU to contribute to "*the development of international law,*"[74] to be guided by the principle of "*respect for... international law*"[75] and to "*consolidate and support...the principles of international law,*"[76] as well as to promote "*an international system based on stronger multilateral cooperation....*"[77]

83.      In reaching its decision of 31 October 2018, the German Federal Court of Justice was spared the necessity of resolving a conflict between obligations imposed respectively by

---

[73]  German Federal Court of Justice, Decision, Case I ZB 2/15 (31 October 2018) (Ex. 36 to the Hindelang Declaration).

[74]  TEU, art. 3(5) (Ex. 29 hereto).

[75]  *Id.*, art. 21(1).

[76]  *Id.*, art. 21(2)(b)

[77]  *Id.*, art. 21(2)(h).

international law and EU law.  This was due, first, to the character of the international agreement in question, as a BIT to which only Member States were parties; and, secondly, to the interaction between that BIT and the UNCITRAL arbitration rules pursuant to which the award in that case was issued.  Since Germany was chosen as the seat of the arbitration, the UNCITRAL rules permitted German courts to review the validity of the Award on the basis of German law, including EU law as interpreted by the CJEU.[78]

84.     The position would be different were the CJEU to decide that Articles 267 and 344 TFEU preclude recourse to the arbitral mechanism of Article 26 ECT in intra-EU disputes.  That mechanism provides a method of dispute settlement under a multilateral international agreement establishing a special kind of partnership between the EU, 27 Member States and many third countries, as described in paragraphs 58 and 59, above.  My answer to Question (1) has shown that arbitration under Article 26 was intended to be available to the investors of all the Contracting Parties for the protection of their investments in each of the other Contracting Parties.  If a Respondent State in the position of Spain were able to invoke, as grounds for challenging the validity of an Award, the incompatibility of intra-EU arbitration under Article 26 ECT with Articles 267 and 344 TFEU, that would infringe international obligations owed by the Member State Parties and the EU to the third country parties to the ECT.[79]  A Member State court in which such a challenge was mounted would be faced with an uncomfortable choice between either upholding the international law obligations of the Member State concerned or its conflicting EU obligations; discomfort that would be compounded in a case like the present one, where the Award

---

[78]  In *Achmea*, the CJEU found that pursuant to Article 8(5) of the Netherlands/Slovakia BIT "*the arbitral tribunal is … itself to choose its seat and consequently the law applicable to the procedure governing judicial review of the validity of the award.*"  *Achmea* judgment, ¶ 51.  The CJEU set out Article 8(5) which states:  "*The arbitration tribunal shall determine its own procedure applying the United Nations Commission on International Trade Law (UNCITRAL) arbitration rules.*"  *Achmea* judgment, ¶ 5.  Article 18 of the UNCITRAL rules provides:  "*1. If the parties have not previously agreed on the place of arbitration, the place of arbitration shall be determined by the arbitral tribunal having regard to the circumstances of the case.  The award shall be deemed to have been made at the place of arbitration.*"  UNCITRAL Rules, art. 18(1) (Ex. 37 hereto).

[79]  *See supra* ¶ 77.

was obtained in an ICSID arbitration, in view of the strict rules on compliance and enforcement that apply under Articles 53 and 54 of the ICSID Convention in respect of such Awards.[80]

85.    A conflict of that kind could not be resolved simply by playing the EU primacy card, as Professor Hindelang appears to believe.[81]  Professor Hindelang relies on his understanding of Article 26(6) to bring the primacy of EU law into play, so as to produce the effect of invalidating the offer of arbitration.  He says:

> "*A tribunal purportedly constituted under Article 26 of the ECT would therefore have to apply and duly observe the rules of EU law **that limit or conflict with its own jurisdiction**.  It would have to observe the principle of autonomy of EU law as well as the primacy of EU law over any conflicting rule created by the EU Member States*."[82]

86.    That claim is dependent on two assumptions, both of which are governed by international law, not EU law.  The first assumption is that EU law can be brought within the scope of the applicable law for the purposes of the ECT, by interpreting the phrase "applicable rules and principles of international law" in Article 26(6) as extending to Treaty law.  I have already indicated that, as a matter of international law, I understand that is likely to be incorrect.[83]  The second assumption is that the applicable law identified by Article 26(6) is relevant to the determination of the jurisdiction conferred on the tribunal.  Again, my understanding is that, as a matter of international law, the law referred to in Article 26(6) is likely intended to be applied

---

[80]  Article 53(1) of the ICSID Convention provides:  "*The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.  Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.*"  Article 54(1) provides:  "*Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.  A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.*"

[81]  Hindelang Declaration, ¶ 40.

[82]  Hindelang Declaration, ¶ 42 (emphasis added).

[83]  *See supra* ¶ 66.

solely in the determination of the substantive issues in dispute. However, these are matters to be settled by the expertise of others.

87.     In the result, if the assumption made in Question (3) were realised, a challenge to the validity of an Award rendered in an intra-EU arbitration under Article 26 ECT would be liable to result in a conflict between an EU Member State's international obligations under the ECT (and perhaps also under the ICSID Convention) and its EU obligations, which could not be resolved automatically in favour of the latter. It would be for the Member State court faced with such a conflict to reach a decision in the light of its national constitutional requirements; and this might well lean towards upholding the State's international rather than its EU obligations.

88.     If the court concerned were not that of a Member State but of a third country, such as the District Court of the District of Columbia, a decision to respect international obligation would appear unimpeachable, as the primacy of EU law would not apply to it.

**B.      A ruling by the CJEU that Articles 267 and 344 TFEU preclude arbitration under Article 26 ECT in intra-EU disputes would very likely be given purely prospective effect**

89.     I noted above that the CJEU may decide that its rulings under Article 267 TFEU should be given purely prospective effect, though this power is exercised very rarely.[84] It will only do so if asked, and no such request was made in the *Achmea* case. In the case of a ruling that Articles 267 and 344 TFEU preclude arbitration in intra-EU disputes, I consider it very likely that there would be a request for a temporal limitation and that it would be granted. The principle of legal certainty, which underpins this power of the CJEU, militates strongly in favour of such an outcome.

90.     The ECT, including Article 26 with no relevant disconnection clause, was concluded in 1998 by the three Communities that were the predecessors of the EU and by all of the then Member States. No direct legal challenge has ever been made to the compatibility of the Treaty with EU law – either before its conclusion, under the procedure now provided for by Article

---

[84]   *See supra* ¶ 31.

218(11) TFEU, which allows such compatibility to be tested where the Union is proposing to enter into an international agreement, or under Article 263 TFEU for the annulment of the Council and Commission Decision by which the Treaty was concluded – and it is now 20 years too late to mount such a challenge.[85]  In this connection, I note the observation by Advocate General Wathelet in his Opinion in *Achmea*, that "*if no EU institution and no Member State sought an opinion from the court on the compatibility of [the ECT] with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.*"[86]

91.     Numerous intra-EU investors have laid out very large sums of money over many years in the belief that they enjoyed the protection of the ECT – a belief in which they were encouraged by the lack of any challenge to the validity of the Treaty, in so far as it applied to them. In those circumstances, a ruling that had the usual retroactive effect, all the way back to 1998, would seriously impair legal certainty.

92.     It is important to be clear what the invalidation of the offer of arbitration in Article 26 ECT, and hence of the proceedings leading to an Award such as that obtained by the Petitioners, would entail, were the assumption in Question (3) to be realised, with no temporal limitation on the CJEU's ruling.

93.     Any infringement of Article 344 resulting from the availability of arbitration under Article 26 ECT in intra-EU disputes would be the consequence of actions by the Member States and the EU itself that concluded the ECT without subjecting Article 26 to a disconnection clause. Investors like the Petitioners, who accepted in good faith the offer of arbitration contained in Article 26, would be entirely blameless.

94.     The invalidation of that offer, for which Spain and Professor Hindelang contend, would thus have the extraordinary consequence of allowing a Member State to take advantage of its own wrongdoing with respect to Article 344, in order to disable private investors from accepting

---

[85]  TFEU, art. 263 ¶ 6 (Ex. 38 hereto).

[86]  Opinion of Advocate General Wathelet, ¶ 43 (Ex. 16 hereto).

its offer of dispute settlement by way of arbitration, thereby evading the financial consequences of wrongs it has been found by the tribunal to have committed against those investors.

95.    Against that background, the principle of legal certainty appears to me to demand that any ruling on the invalidity of applying Article 26 ECT in intra-EU disputes be not given *ex tunc* effect from 1998, but that it should apply exclusively to future purported acceptances of the offer to arbitrate.  It is, moreover, very likely that the CJEU would give its ruling such effect.

### C.    Conclusion on Question (3)

96.    If the CJEU were to rule that Articles 267 and 344 TFEU preclude arbitration under Article 26 ECT in intra-EU disputes, it would not follow automatically that the offer to arbitrate in that Article (and hence any ensuing arbitration proceedings and an eventual award) would be invalid, because:

(i)    EU law does not have primacy over international law.

Accordingly, in a proceeding to enforce an intra-EU arbitration award pursuant to the ECT in the court of an EU Member State, that court would face a conflict between the EU Member State's international obligations under the ECT (and perhaps also under the ICSID Convention) and its EU obligations, and would be called upon to decide in the light of its national constitutional requirements whether to treat the offer to arbitrate as valid.

By contrast, in a proceeding to enforce such an award in the court of a third country, such as the District Court of the District of Columbia, a decision to respect international obligations would appear unimpeachable, as the primacy of EU law would not apply to it.

(ii)    The principle of legal certainty demands that any ruling on the invalidity of applying Article 26 ECT in intra-EU disputes be not given retroactive (*ex tunc*) effect from 1998, but that it should apply exclusively to future purported acceptances of the offer to arbitrate.  It is, moreover, very likely that the CJEU would give its ruling such effect.

## IV.   OVERALL CONCLUSION

97.     To sum up on all three Questions:

- The arbitration mechanism in Article 26 ECT applies to disputes between an EU Member State and an investor of another EU Member State.

- Neither the ruling nor the reasoning of the *Achmea* judgment establishes that the arbitration of intra-EU disputes under Article 26 ECT is incompatible with Articles 267 and 344 TFEU.

- Even if arbitration under Article 26 ECT in intra-EU disputes were in conflict with Articles 267 and 344 TFEU, it would not necessarily follow that an agreement to arbitrate under Article 26 ECT is invalid.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 14, 2019
London, United Kingdom

Sir Alan Dashwood QC
Henderson Chambers

Annex 1

# PROFESSOR  SIR ALAN DASHWOOD KCMG CBE QC

## CURRICULUM VITAE

Born:              18 October 1941, Johannesburg, South Africa

Nationality:       British

BA Hons., Rhodes University, South Africa; MA Oxon / Cantab; Barrister

Languages:         English (native speaker), French, Italian.

Home address:      36 High Street, Girton, Cambridge CB3 0PU.
                   Telephone: 0044 1223 276590

Chambers:          Henderson Chambers, 2 Harcourt Buildings, Temple, London EC4Y
                   9DB, United Kingdom. Telephone: 0044 20 7583 9020.

**Career**

| | |
|---|---|
| 1966 – 1967 | Assistant Lecturer, Department of Civil Law, University of Glasgow. |
| 1967 – 1968 | Studying for Bar/VI Form Classics Master at Leeds Grammar School. |
| 1968 – 1973 | Lecturer, Department of Law, University College of Wales, Aberystwyth. |
| 1969 | Called to the Bar. |
| 1973 – 1975 | Lecturer, Centre of European Governmental Studies, University of Edinburgh. |
| 1975 – 1978 | Reader in Law, School of European Studies, University of Sussex. |
| 1978 – 1980 | Legal Secretary to Advocate General J-P Warner, Court of Justice of the European Communities, Luxembourg. |
| 1980 – 1987 | Professor of Law, University of Leicester. |
| 1984 – 1987 | Head of Department of Law, University of Leicester. |
| 1987 –1994 | Director, Legal Service, Council of the European Union. |
| 1995 –2009 | Professor of European Law, University of Cambridge and Fellow of Sidney Sussex College; since 2009, Emeritus Professor of Law and Emeritus Fellow of Sidney Sussex. |
| 1995 – 2000 | Director, Centre for European Legal Studies, Cambridge. |
| 1997 – 2000 | Vice-Master, Sidney Sussex College. |
| 1997 – | Tenant, 2 Harcourt Buildings (now Henderson Chambers). |
| 2002 – | Master of the Bench of the Inner Temple. |
| 2004 | Appointed CBE. |
| 2010 | Appointed Queen's Counsel. |
| 2011 | Visiting Foreign Chair, Law Faculty, University of Ghent |
| 2012 – 2017 | Professor of Law (part-time), City University, London. |
| 2013 | Appointed KCMG for services to the development of EU law. |

**Teaching and research**

I began teaching European Community Law, as it then was, in 1970, and have been specialised in it since the period I spent at the European Court of Justice as Advocate General Warner's Legal Secretary (1978-1980). At Cambridge, until my retirement, I lectured on the Part IB/Part II EU Law paper of the Law Tripos (undergraduate degree) and I established or helped to establish new LLM courses on External Relations Law of the EU, Contemporary Issues in the Law of European Integration and EU Trade Law. I also supervised a large number of PhD students. At City University, I lectured on EU Law to undergraduate students and lectured to and tutor students who were candidates for the Graduate Diploma in Law (the former "Conversion Course").

My earliest publications were on Criminal Law; since 1980, however, all my published work has been on aspects of EU Law. I am a co-author of a leading textbook, *Wyatt and Dashwood's European Union Law*, the sixth edition of which appeared in the summer of 2011. Other publications include: *The General Law of EU External Relations* (2000), a collection of essays I edited with Christophe Hillion, and to which I contributed three chapters; *The Future of the Judicial System of the European Union* (2001), edited with Angus Johnston, to which I was the principal contributor; and *The Law and Practice of EU External Relations – Salient Features of a Changing Landscape* (2008), edited with Marc Maresceau, to which I contributed a substantial chapter on the interface between EC (as it then was) external relations competences and the common foreign and security policy. I have been, and remain, a frequent contributor to legal periodicals and collections of essays. A list of my more important publications from 1995 is included below.

**Editorships**

I was invited by Sweet & Maxwell in 1975 to be the founding Editor of *European Law Review* (ELRev) and continued in the post until 1990. From 1995 to 2009 I was one of the Joint Editors of *Common Market Law Review* (CMLRev.). I was also the founder of the *Cambridge Yearbook of European Legal Studies* (CYELS) in 1998 and continued as a Joint Editor until 2003. I am presently a member of the Advisory Boards of those three journals.

**Academic responsibilities**

I was Head of the Law Department at the University of Leicester from 1984 to 1987 and had been invited to continue for a further 3 years when I was appointed to the Council's Legal Service. During my tenure of the Headship, I was a member of the University's Senate and Council and of its main Committees. I was also Public Orator at Leicester for three years.

In Sidney Sussex, I was a member of the College Council, which is the main body responsible for the governance of the College, continuously from 1996 to my retirement in 2009, except when I had sabbatical leave. I was Vice-Master of the College from 1997 to 2000.

Within the Cambridge Law Faculty, I was Director of the Centre for European Legal Studies (CELS) from 1995 to 2000. I was a member of the Faculty Board of Law from 1995 to 2000, and again from 2006 to 2009. I was Chair of Examiners for Law Tripos

2

Part II from 2002 to 2005 and Chair of the Degree Committee from 2006 to 2009. I served on the Faculty's Senior Academic Appointments Committee and on its Special Appointments Committee. Outside the Law Faculty, I served on the Senior Academic Appointments Committee of the International Relations Department; and in 2007 I was a member of the Teaching and Learning Review Panel for the Faculty of Social and Political Studies (as it then was).

## Responsibilities in the Legal Service of the Council of the EU

I was one of four Directors, under the authority of the Director-General, leading an international team of lawyers in the General Secretariat of the Council. Our job was to give oral and written advice to Ministers, COREPER and Council Working Groups, and to represent the Council in proceedings before the European Courts. My first Legal Service portfolio comprised: institutional questions; the Community budget and financial resources; social policy; cooperation with the African, Caribbean and Pacific countries; and staff matters. I advised the Presidency in the annual budget negotiations with the European Parliament and helped to devise and implement the new system of septenniel financing, which was initiated by the so-called "Delors package" in 1988. In the negotiations on "Political Union", which culminated in the Maastricht Treaty, I advised on institutional matters. I had nearly three years in charge of the legal aspect of agriculture and fisheries, and then moved on to external relations, where my job included advising during the final stage of the Uruguay Round of multilateral trade negotiations and preparing the implementation of the WTO Agreement. I was responsible for the legal aspect of the common foreign and security policy, when it was established post-Maastricht, and was the first legal advisor to the Political Committee (now the Political and Security Committee). I also oversaw, from the Council side, the drafting of the 1994 Treaty of Accession of Austria, Finland and Sweden to the EU.

## More recent legal practice

I have advised Government Departments, Regional and Local Authorities and diverse private clients on the following matters, among others: Brexit; the Eurozone crisis; the interface between intellectual property rights and the EU rules on the free movement of goods; EU competition law; public procurement, including in the specialised field of defence procurement; State aid; European aspects of telecoms law; the interaction between EU law and bilateral investment treaties; Directive 2006/114 on misleading advertising; the freezing of the assets of persons suspected of involvement in international terrorism; the international arms trade; the interpretation of the Treaty of Lisbon.

Examples of the cases  in which I have acted for the UK before the European Court of Justice are: Joined Cases C-397 to C-403/01, *Pfeiffer*, on the possibility of reliance on Article 6 of the Working Time Directive to challenge the validity of German legislation allowing on-call workers to be employed in excess of the 48-hour weekly limit; Opinion 1/03, on competence to conclude the New Lugano Agreement; Case C-91/05, *ECOWAS*, where the issue was the relationship between Community competence in the field of development cooperation policy and the common foreign and security policy; Joined Cases C- 402 and 415/05P, *Kadi and Yusuf*, which raised the issue whether the ECJ has jurisdiction to review the legality, on fundamental rights grounds, of Community measures implementing UN Security Council Resolutions that require the freezing of the assets of individuals suspected of being associated with terrorism; Case C-303/05, *Advocaten voor de Wereld*, on the validity of the Framework Decision on the European

3

Arrest Warrant; Case C-411/06, *Commission v. Parliament and Council*, on EU legislation governing shipments of waste; Opinion 1/08, on competence to conclude an agreement amending the EU's schedule of commitments under the General Agreement on Trade in Services; Opinion 1/09, on the draft agreement for the creation of a unified patent litigation system; and Case C-370/12, *Pringle*, on the validity of the ESM Treaty. I am currently acting for the UK in Cases C-656/11 and 81/13, which relate to the UK's "opt-in" right in the area of freedom, security and justice, as it applies in respect of certain international agreements.

I am currently acting in the *Micula* litigation before the GCEU and in the Court of Appeal. I am also acting for the Food Safety Agency in a case relating to the EU rules on the role of the official veterinarian in a slaughterhouse, which is currently on appeal to the Supreme Court. I am also part of the team representing the Group Litigants in their action against Volkswagen.

**Evidence, consultation etc.**
I am frequently invited to give oral or written evidence to Parliamentary Committees on issues of EU law and policy.

In 2002, at the invitation and with the support of the Foreign and Commonwealth Office, I produced, with the help of a group of colleagues at Cambridge, a Draft Constitutional Treaty of the European Union, as a contribution to the work of the Convention on the Future of Europe. The Draft was submitted to the Convention by Peter Hain MP, then the Minister for Europe. It has been published in (2003) 28 *European Law Review*, pp.3 to 38.

I am regularly consulted by Government Departments on EU law matters, both formally under instructions as a barrister and on an informal basis, giving advice *pro bono publico*. When not conflicted, I also advise Governments and Parliaments of other Member States, as well as EU Institutions.

**More important publications since 1995**

**Books:**

- *Wyatt & Dashwood's European Union Law* (with co-authors) (6th ed, Hart Publishing, 2011).

- *Reviewing Maastricht: Issues for the 1996 IGC* (ed. and main contributor) (Sweet & Maxwell, 1996).

- The General Law of EC External Relations (ed. with C. Hillion, and three chapters) (Sweet & Maxwell, 2000).

- The Future of the Judicial System of the European Union (ed. with A. Johnston and main contributor) (Hart, 2001).

- *The Law and Practice of EU External Relations – Salient Features of a Changing Landscape* (ed. with M. Maresceau and contributor ) (CUP, 2008).

**Contributions to books**:

- "Implied external competence of the EC" in Koskenniemi (ed), *International Law Aspects of the European Union* (Kluwer, 1998), pp 113-123.

- "Issues of Decision-Making in the European Union after Nice" in Arnull and Wincott (eds), *Accountability and Legitimacy in the European Union* (OUP 2003), pp. 13-40.

- "The Impact of Enlargement on the Union's Institutions" in Hillion (ed.), *EU Enlargement – A Legal Approach*, (Hart, 2004), pp.45-56.

- "The Law and Practice of CFSP Joint Actions", in Cremona and De Witte (eds), *EU Foreign Relations Law: Constitutional Fundamentals*, (Hart, 2009), pp. 53-77).

- "Article 47 and the Relationship between First and Second Pillar Competences" in Dashwood and Maresceau, (eds.), *Law and Practice of EU External Relations* (CUP 2008), pp. 70-103.

- "The Institutional Framework and the Institutional Balance", in Dougan (ed), *50 Years of the European Treaties: Looking Back and Thinking Forward* (Hart, 2009), pp. 1-17.

- "Mixed Agreements in the Era of the Lisbon Treaty" in Hillion and Koutrakos (eds.). *Mixed Agreements Re-visited: the EU and its Member States in the World.* (Hart, 2010), pp. 351-366.

- "The Continuing Bi-polarity of EU External Action", in Inge Govaere and Others (eds), *The European Union in the World*, Studies in honour of Marc Maresceau ( Martinus Nijhof, 2014), pp 3-16.

- ""EU Acts and Member State Acts in the Negotiation, Conclusion and Imolemention of International Agreements" in Marise Cremona and Claire Kilpatrick (eds), *EU Legal Acts: Challenges and Transformations* (OUP, 2018), pp189 to 249.

**Articles:**

- "The limits of European Community Powers", (1996) 21 ELRev, pp. 113-128.

- "States in the European Union", (1998) 23 ELRev, pp. 201-216.

- "External Relations Provisions of the Amsterdam Treaty", 35 CML Rev (1998), pp. 1019-1045.

- "European Community Legislative Procedures after Amsterdam", 1 CYELS, (1998), pp. 25-38.

- "Decision-making at the Summit", 3 CYELS (2000), pp. 79-105.

- "The Constitution of the European Union after Nice: Law-making Procedures", (2001) 26 ELRev, pp.215-238.

- "The Elements of a Constitutional Settlement for the European Union", 4 CYELS (2001), pp.1-13.

- "The draft EU Constitution – First Impressions", 5 CYELS (2002), pp.395-419

- "The relationship between the Member States and the EU/EC", 41 CMLRev. (2004), pp. 355-381.

- "The Institutions of the Enlarged EU under the Regime of the Constitutional Treaty" (with Angus Johnston), 41 CMLRev. (2004),pp. 1481-1518.

- "The EU Constitution – What Will Really Change?" 7 CYELS  (2204/2005), pp. 33-56.

- "From *Van Duyn* to *Mangold* via *Marshall*: Reducing Direct Effect to Absurdity?" 9 CYELS (2006-2007), pp. 81-109.

- "40 years an EU Lawyer – Apologia pro Vita Sua" 13 CYELS (2010/2011).

- "The United Kingdom in a Re-Formed European Union" (2013) 338 ELRev, pp 737 to 756.

## CERTIFICATE OF SERVICE

I hereby certify that, on January 14, 2019, I caused the foregoing Expert Declaration of Sir Alan Dashwood, and exhibits thereto, to be filed with the Clerk for the U.S. District Court for the District of Columbia through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

 /s/ Stuart F. Delery
Stuart F. Delery
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
sdelery@gibsondunn.com
